UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                    )
SHEILA MAE TRAVERS-SHEIK,           )
                                    )
            Plaintiff,              )
                                    )   C.A. No. 05-11631 GAO
v.                                  )
                                    )
HABIT MANAGEMENT INSTITUTE (sic),   )
                                    )
            Defendant               )
_____ )

**DEFENDANT HABIT MANAGEMENT, INC'S MEMORANDUM
OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Habit Management, Inc. ("Defendant" or "HMI")[1] hereby moves this Honorable Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to dismiss with prejudice Plaintiff Sheila Travers-Sheik's ("Plaintiff" or "Travers-Sheik") claims of discrimination and retaliation against HMI.

**I.   INTRODUCTION**

Travers-Sheik worked at HMI for approximately two years from January 2001 until she voluntarily resigned in December 2002. HMI initially hired Travers-Sheik as a part-time Urine Monitor/Health Aide at its Yarmouth, Massachusetts outpatient clinic for recovering drug users. Travers-Sheik is Black and was born in the United States. She has held herself out, however, for purposes of this lawsuit, to be Cape Verdian and/or Arab.[2]

Travers-Sheik alleges that HMI discriminated against her on the basis of race/color ("Race/Color" Claim) and national origin ("National Origin" Claim) when it changed her job

---

[1] Plaintiff has misidentified HMI in the caption of this matter as "Habit Management Institute." Also, on or about October 27, 2006, Habit OPCO, Inc. acquired all of HMI's assets and since that time, all clinics have been owned and operated by Habit OPCO, Inc.

[2] Travers-Sheik has, at times, identified herself as Arab since 2001 when she changed her name to incorporate her (now former) husband's last name of "Sheik."

title from Urine Monitor to Office Assistant,[3] and retaliated against her when it reduced her hours after she filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") ("Retaliation" Claim).  Plaintiff also makes allegations implying that she was, at times, subjected to a hostile work environment based on her race and national origin.

Plaintiff's discrimination claims fail as a matter of law because she cannot demonstrate that her title change constituted an adverse action and, even if she could, she has offered no evidence to show that HMI's legitimate business reason was pretextual and that the real reason for changing her title stemmed from discriminatory animus.  Plaintiff's Retaliation Claim also fails because HMI decided to reduce her hours as a result of company-wide changes made before Travers-Sheik filed her MCAD Charge, rendering it literally impossible to assign retaliatory motive to HMI's actions.  Finally, to the extent that Travers-Sheik alleges a hostile work environment claim based on either race/color or national origin, those claims fail because the comments she attributes to her coworkers were neither severe nor pervasive, and, even if they were, no reasonable jury could conclude that HMI knew or should have known of the alleged comments, much less that it failed to take appropriate responsive action.  Moreover, undisputed facts reflect that Travers-Sheik failed to reasonably avail herself of HMI's complaint procedures with respect to three comments allegedly made by her supervisors.  Accordingly, the Court should dismiss all of Travers-Sheik's claims against HMI as a matter of law.

---

[3] In its Order on HMI's Motion to Dismiss, the Court characterized the discrimination claims as being premised on HMI's not "select[ing] [the plaintiff] to fill open positions for which she had applied and for which she alleges she had a college education." Order on Motion to Dismiss, at 4; Amended Complaint, at 4.  While Plaintiff has made some conclusory allegations to this effect, the record reflects that the gravamen of her complaint has, since the beginning, been that HMI discriminated against her on the basis of race/color and national origin when it changed her title to "Office Assistant" as opposed to "Office Associate." See MCAD Charge; MCAD LOPC Determination (annexed to HMI's Statement of Facts). Although Travers-Sheik alleges that she applied for other positions within HMI, she admits that she never filled out a written application. (SOF ¶ 15). It is therefore undisputed that Plaintiff never actually applied for a position at HMI for which she was rejected.  For the record, HMI notes that according to her own testimony, Travers-Sheik did not have a college degree in 2002. (SOF ¶ 5).

## II.     BACKGROUND

**HMI Is An Outpatient Clinic For Recovering Drug Users.**  HMI is an accredited Substance Abuse Treatment organization offering multi-disciplinary treatment services to individuals addicted to drugs. (Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("SOF"), ¶ 1).  HMI has been in operation since 1986, and provides treatment services at 15 different sites in New England.  (SOF ¶ 2).

**HMI hires Plaintiff as Urine Monitor/Health Aide**.  HMI hired Travers-Sheik on January 3, 2001 as a part-time Urine Monitor/Health Aide to work 12 hours per week at its Yarmouth, Massachusetts facility.  (SOF ¶ 3).  Plaintiff was born in New Bedford, Massachusetts (SOF ¶ 7).  Her parents were also born in Massachusetts.  (SOF ¶ 8).  Travers-Sheik's paternal ancestors originate from Cape Verde.  (SOF ¶ 9).  Travers-Sheik took her husband's name of "Sheik" when she married him in or around 2001.  (SOF ¶ 10).  Travers-Sheik is not, herself, of Arabian heritage.  (SOF ¶ 11).[4]

When she was hired, HMI provided a copy of its Employee Handbook to Travers-Sheik, which she acknowledged receiving.  (SOF ¶ 4).  The Employee Handbook contained, among other things, a comprehensive Anti-Harassment Policy and a Problem Resolution Procedure for employees who believe they have been mistreated.  (SOF ¶ 6).

On April 30, 2001, HMI increased Travers-Sheik's hours from 12 to 28 hours per week when she transferred to another Urine Monitor/Health Aide position to replace a terminated employee.  (SOF ¶ 14).  She performed essentially the same functions as in the prior position, but also became exclusively responsible for scheduling all random drug tests for patients.  (SOF ¶ 16).  On January 3, 2002, Plaintiff received a three percent raise in pay.  (SOF ¶ 17).  On February 25, 2002, HMI increased Travers-Sheik's hours from 30 to 33 per week.  (SOF ¶ 18).

---

[4] Travers-Sheik's husband, with whom she has been separated since around 2002, is German, Irish and part Arab, but her husband's family doesn't "have great feelings about that nationality."  (SOF ¶ 12).

**HMI Implements Company-Wide Change In Support Staff Titles.** In November 2002, HMI changed many of its employee titles as part of a company-wide initiative to standardize and improve support position titles and update support position descriptions. (SOF ¶ 19). HMI had experienced rapid corporate growth in the preceding five years, and the Company's management decided that it needed to ensure that all its human resources systems, policies and procedures, including job descriptions and hiring standards, were uniform for all program sites. (SOF ¶ 20). With respect to its staff positions, for example, HMI determined that there were too many position titles throughout its organization and decided to consolidate them. (SOF ¶ 21). HMI also believed that the position titles should be changed to make them more attractive to prospective candidates. (SOF ¶ 22). For example, HMI believed that it could more easily recruit prospective employees if it advertised Travers-Sheik's position as an "Office Assistant" rather than a "Urine Monitor." (SOF ¶ 23).

In October 2002, HMI completed its review and reduced the number of titles from approximately twenty to seven, updated its position descriptions and published a skills matrix depicting the skills, education and credentials required for administrative and support positions, including Travers-Sheik's position. (SOF ¶ 24). Company-wide, approximately 50 support employees received new titles, but not a single support employee's grade or pay level changed as a result of the position restructuring. (SOF ¶ 25). Seven employees were affected in Yarmouth, including Travers-Sheik, who automatically became reclassified as "Office Assistant." (SOF ¶ 26). In November 2002, Nick Mazzoni, Yarmouth's Program Director, met with Travers-Sheik to inform her of the title change, provided her with a copy of her new position description, reviewed it with her and asked her if she had any questions. (SOF ¶ 29). She did not. (SOF ¶ 30).

**Travers-Sheik Alleges Offensive Comments.** HMI retained Cape Way Patrol ("CWP") to provide security services during HMI's hours of operation. (SOF ¶ 31). In 2001-2002, CWP

sent a security guard, Warren Nickerson, to patrol HMI. (SOF ¶ 32).[5] Travers-Sheik alleges that Nickerson and Art Eisner, an HMI co-worker, made certain offensive remarks regarding her race and national origin. (SOF ¶ 34). Travers-Sheik alleges that both Eisner and Nickerson talked about how they would love to drop a bomb on the Iraqis and the Arabs and that "they should wipe away Indians and Blacks." (SOF ¶ 36). She further alleges that Nickerson said, three or four times, that "Indians don't belong here […] [and] Indians think this is their land. This is not their land, this is our land; it belongs to the white Americans." (SOF ¶¶ 37-38).[6] Travers-Sheik alleges that Eisner called her a "black bitch" on three occasions and overheard him say "Yeah, all these dark-skinned people who think maybe they are lighter and they go for a different shade, that they are much better, whoever is lighter skin." (SOF ¶ 40).

Travers-Sheik also alleges that her then-supervisor Courtney Garove told her that as a result of September 11, 2001, "they should gather all the Arabians, and the Sheiks, together and put them in a concentration camp so America could be safe." (SOF ¶ 41).

Travers-Sheik also alleges that Linda Fraunfelter, who succeeded Garove, made two racial comments to her. (SOF ¶ 42). Once, Fraunfelter allegedly told Travers-Sheik that "Black people don't get good grades." (SOF ¶ 43). On another occasion, after Travers-Sheik had complimented Fraunfelter on the green color of her dress and said it reminded her of a "thin mint," Fraunfelter allegedly took co-worker Andrea Fernandes's (who is Black) hands and put them together and said, "now it's a thin mint." (SOF ¶ 44).

**HMI Promptly Investigates Two Unrelated Discriminatory Comments Made to Travers-Sheik.** On December 13, 2001, Travers-Sheik went to Mazzoni's office and told him that she was feeling uncomfortable about comments that Eisner had made to her. (SOF ¶ 46). Travers-Sheik would not repeat the actual comments, but said they were "demeaning and

---

[5] Nickerson was not an HMI employee. (SOF ¶ 33).

[6] Travers-Sheik also claimed that she learned that someone had called her a "nigger," although she had not heard the comment. (SOF ¶ 39). The Court should disregard this comment in its analysis because derogatory remarks of which the plaintiff was unaware cannot support a claim for harassment. E.g., Mason v. Southern Ill. Univ. at Carbondale, 233 F.3d 1036, 1041 (7th Cir. 2000).

somewhat sexual in nature." (SOF ¶ 47). She made no allegation that the comments pertained to either her race or national origin. (SOF ¶ 48). She also made no complaint about Nickerson, Fraunfelter or Garove. (SOF ¶ 45). Immediately, Mazzoni called Eisner into his office to speak with him about the sexual comments that he had allegedly made to Travers-Sheik. (SOF ¶ 50). Eisner denied making any inappropriate comments, but nevertheless, Mazzoni informed Eisner of the type of behavior that was expected of him at HMI and told him that he needed to conform his behavior accordingly. (SOF ¶ 51). After his meeting with Eisner, Mazzoni informed Travers-Sheik that he had talked with Eisner. (SOF ¶ 52). Travers-Sheik never complained about Eisner again. (SOF ¶ 53).

On November 7, 2002, Travers-Sheik talked to Fraunfelter and appeared to be visibly upset, but refused to explain why. (SOF ¶ 55). Fraunfelter then asked Travers-Sheik's co-worker, Dan O'Leary, about what was bothering her, and he said that she didn't like being called a "black bitch." (SOF ¶ 56). Fraunfelter immediately informed Mazzoni, who promptly invited Travers-Sheik to speak with him about the incident. (SOF ¶ 57). Mazzoni told Travers-Sheik that if someone was calling her a "black bitch," she should identify the person so that Mazzoni could address the situation. (SOF ¶ 58). Travers-Sheik said she preferred not to disclose the person's identity. (SOF ¶ 60). Mazzoni tried to convince her to reveal the person's identity by reminding her that such statements violate HMI's policies. (SOF ¶ 61). Travers-Sheik still refused, saying that she understood that "people are on medication." (SOF ¶ 62). Based on Travers-Sheik's statement, Mazzoni believed that the person who had made the statement was a patient, and not a staff member. (SOF ¶ 63). Travers-Sheik persisted in her refusal to identify the person who had made the statement, rendering it impossible for Mazzoni to pursue the matter. (SOF ¶ 64). Aside from this one incident, there is no record that Travers-Sheik <u>ever</u> complained to Mazzoni, or anyone else, that any coworker ever made offensive comments to her regarding her race, color or national origin. (SOF ¶ 65).[7]

---

[7] In November 2002, Travers-Sheik alleges that she complained to Mazzoni that Eisner had called her a black bitch, but there is no record that Travers-Sheik ever made any such complaint. (SOF ¶ 66). The

**HMI Reduces Plaintiff's Hours From 33 To 30 Due To Changes In Drug Program.**

In January 2002, HMI modified its drug testing policies and procedures. (SOF ¶ 69). HMI began using oral swabs, instead of urine tests, to test patients. (SOF ¶ 70). Oral swabs are much more efficient and less time consuming than urine tests. (SOF ¶ 71). HMI also started randomly drug testing patients once per month instead of twice per month (except for new patients). (SOF ¶ 72). As a result of these changes, the time required to schedule patients for drug testing was significantly reduced. (SOF ¶ 73).[8] Since Travers-Sheik was the only employee responsible for scheduling drug tests, her responsibilities diminished dramatically. (SOF ¶ 76). After several months, it became clear that HMI did not need Travers-Sheik to work as many hours. On November 15, 2002, Mazzoni and Fraunfelter met with Travers-Sheik to inform her that starting on December 2, 2002, her hours would be reduced from 33 to 30. (SOF ¶ 77).[9] During the meeting with Mazzoni and Fraunfelter, Travers-Sheik stated that she did not object to the change so long as she was able to retain her benefits, which she was. (SOF ¶ 79).[10]

---

absence of such documentation is significant because all such complaints are documented. (SOF ¶ 67).

[8] HMI's drug testing volume was greatly reduced due to state budget cuts. (SOF ¶ 74). As a result, the Yarmouth program anticipated losing at least 40 to 50 patients (11-14 percent of its total patient population). (SOF ¶ 75).

[9] Mazzoni had considered reducing her hours to 28 per week, but ultimately decided to reduce her hours only to 30 per week because he knew that reducing it below 30 would disqualify Travers-Sheik from participating in many of HMI's benefits plans. (SOF ¶ 78).

[10] HMI made no subsequent reduction in Plaintiff's hours after the reduction from 33 to 30. (SOF ¶ 81). In its Order on HMI's Motion to Dismiss, the Court noted that without discovery it would not know whether there had been a further reduction in hours that might sustain a claim of retaliation. At her subsequent deposition, Travers-Sheik testified, for the first time, that in December 2002, Fraunfelter informed her that her hours were to be reduced from 30 to 27. (SOF ¶¶ 84-85). It is indisputable that, in fact, no such reduction occurred. Mazzoni would have had to authorize such a reduction and he never did so. (SOF ¶ 86). Finally, there is no documentation of any proposal or decision by anyone at HMI to reduce Plaintiff's hours, and there would have been such documentation. (SOF ¶ 87).

**Travers-Sheik Files MCAD Charge and Resigns.** On November 18, 2002, Travers-Sheik filed a charge with the MCAD. (SOF ¶ 85). On December 19, 2002, Travers-Sheik abruptly resigned without providing advance notice. (SOF ¶ 87).

## III. ARGUMENT

### A. Plaintiff Fails To State A Claim Of Discrimination Under Title VII.

When there is no direct evidence of discriminatory intent, and there is none here, a plaintiff must resort to the burden-shifting framework first created by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), and establish a *prima facie* case of discrimination by demonstrating that (1) she is a member of a protected class; (2) her employer took an adverse employment action against her; (3) she was qualified for the employment she held or sought; and (4) the position she held or sought remained open or was filled by a person whose qualifications were similar to hers. Douglas v. J.C. Penney Co., 474 F.3d 10, 14 (1st Cir. 2007). If the plaintiff can establish a *prima facie* case, the burden shifts to the employer to establish a legitimate, non-discriminatory reason for its adverse employment action. Id. Once the employer meets its burden, the plaintiff must prove that the employer's articulated reason(s) were actually pretext, and that the true reason was prohibited discrimination. Id.

#### 1. Plaintiff's Race/Color Claim Fails.

##### a. Plaintiff Cannot Establish Adverse Action.

Plaintiff's Race/Color Claim fails because she cannot establish that her title change from Urine Monitor/Health Aide to Office Assistant constituted an adverse action.[11] To constitute an adverse action, conduct "must be more disruptive than a 'mere inconvenience or an alteration of job responsibilities.'" Badgaiyan v. Principi, 2007 U.S. Dist. LEXIS 37008, *2 (D. Mass., May 21, 2007) (quoting De Jesus v. Potter, 211 Fed. Appx. 5, 9 (1st Cir. 2006)). An adverse employment action generally involves a discrete change in the terms and conditions of

---

[11] HMI assumes, for purposes of this Motion only, that Travers-Sheik can establish elements of her *prima facie* case that have not been specifically disputed here. HMI reserves the right to challenge each element during the pendency of this litigation.

employment, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

Here, Travers-Sheik fails to demonstrate that her title change constitutes an adverse employment action. See Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993) (title change, without more not "materially adverse" enough to constitute adverse employment action); Kocsis v. Multi-Care Mgmt, 97 F.3d 876, 886 (6th Cir. 1996) (semantic change in title and a "bruised ego" not enough where pay and benefits remained the same). Plaintiff admitted at deposition that she suffered no reduction in pay or other material disadvantage with respect to her working conditions as a result of the title change. (SOF ¶ 25). Rather, her claim is premised upon her own subjective feelings of disappointment, and these are insufficient to establish an adverse employment action. MacCormack v. Boston Edison Co., 672 N.E.2d 1, 22 (Mass. 1996). Without any evidence that the title change was accompanied by a change in responsibilities, pay or benefits, Travers-Sheik cannot establish, as a matter of law, that she suffered an adverse employment action.

     **b. No Evidence Of Pretext To Hide Race Discrimination.**

Even if Travers-Sheik could establish a *prima facie* case of race/color discrimination with respect to her title change, she cannot prove that HMI's legitimate business explanation was pretextual to hide race discrimination. See Zapata-Matos v. Reckitt Colman, Inc., 277 F.3d 40, 45 (1st Cir. 2002) ("the ultimate burden is on [plaintiff] to persuade the trier of fact that he was treated differently because of" his race). A plaintiff may demonstrate pretext either by indirectly showing that the employer's stated reasons for its adverse actions were not credible, or by directly showing that the action was more likely motivated by a discriminatory reason. Ianetta v. Putnam Invs., Inc., 183 F.Supp.2d 415, 425 (D. Mass. 2002). Travers-Sheik's claim fails because she has provided no evidence that HMI's explanation is false or that HMI changed her title because she is Black.

HMI changed Travers-Sheik's title as part of a company-wide program to reduce the number of job titles and to make those job titles appear more professional and attractive to prospective employees. (SOF ¶¶ 19, 22). Not only does Travers-Sheik fail to provide any evidence that HMI's explanation is false, but she also fails to demonstrate that she was treated differently than similarly situated White co-workers because she is Black.[12] Because the change was part of a <u>company-wide</u> initiative to standardize and improve support position titles and update support position descriptions due to HMI's rapid growth over the prior five years, Travers-Sheik <u>cannot</u> demonstrate that HMI treated her differently than other similarly situated employees.

### 2. Plaintiff's National Origin Claim Fails.

#### a. Plaintiff Cannot Establish Adverse Action.

Travers-Sheik's National Origin Claim fails for the same reason that her Race/Color Claim fails – she cannot establish that her title change constitutes an adverse action. <u>See</u> § III(A)(1)(a), <u>supra</u>. Accordingly, the Court should dismiss her National Origin Claim.

#### b. No Evidence Of Pretext To Hide National Origin Discrimination.

A plaintiff who claims national origin discrimination must set forth her national origin and then allege discrimination <u>based on</u> that national origin. <u>See</u>, <u>e.g.</u>, <u>Shah v. Wilco Sys.</u>, 76 Fed. Appx. 383, 385 (2d Cir. 2003) (where plaintiff claims national origin as Indian, even though she is a naturalized American citizen, she can claim only national origin discrimination as an Indian, and not as an American). The Supreme Court has defined "national origin" to mean "the country where a person was born, or, more broadly, the country from which his or her ancestors came." <u>Espinoza v. Farah Mfg. Co.</u>, 414 U.S. 86, 88 (1973).

At various times, Travers-Sheik has identified herself as Cape Verdian (SOF ¶ 9) or Arabian (SOF ¶ 11). But, Travers-Sheik has failed to provide any evidence that HMI

---

[12] In addition to Travers-Sheik, a white co-worker and another black co-worker in Yarmouth also became Office Assistants. (SOF ¶ 27).

discriminated against her because her family is Cape Verdian, or that anyone at HMI believed her to be, or associated her with, being an Iraqi or an Arab. Without such evidence, she cannot establish that she was discriminated against based on her national origin.[13] See Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 45 (1st Cir. 2002) ("An employer would be entitled to judgment as a matter of law if the record conclusively revealed [that] [...] plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

### B. Plaintiff's Retaliation Claim Fails.

Without direct evidence, retaliation claims are analyzed under the McDonnell-Douglas burden-shifting approach. Bell v. Potter, 234 F. Supp. 2d 91, 94 (D. Mass. 2002). To establish a *prima facie* case of retaliation, a plaintiff must show that (1) she undertook protected conduct; (2) she suffered an adverse employment action; and (3) the two were causally linked.[14] Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 19 (1st Cir. 2006). Travers-Sheik alleges that HMI unlawfully retaliated against her for filing a charge with the MCAD when it reduced her hours. But, she cannot establish a *prima facie* case, and even if she could, she has produced no evidence that HMI's reason is pretextual to hide retaliation.

#### 1. Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation.

Travers-Sheik cannot show a causal link between the reduction in her hours and her filing of the MCAD charge because HMI's decision to reduce her hours predated her MCAD filing. Mazzoni met with Travers-Sheik on November 15, 2002 to inform her that HMI intended to

---

[13] At most, Travers-Sheik has alleged that some of her co-workers made statements about "blacks," "Arabs" or "Iraqis." But, she does not attribute any of these statements to Mazzoni or any other decision-maker who had either influence or the authority to change her job title. See Azimi v. Jordan's Meats, Inc., 2004 U.S. Dist. LEXIS 20137, *30 (D. Me., Oct. 7, 2004) (discriminatory discharge claim dismissed because "no cognizable evidence from which one could reasonably infer that those involved in the prior harassment either made or influenced the decision to terminate his employment or that decision makers otherwise shared the harassers' biases.").

[14] If a plaintiff can establish a *prima facie* case, the same burden-shifting analysis applies to the defendant's obligation to articulate a legitimate non-discriminatory reason, and Plaintiff's burden to prove that the reason is pretextual to hide discrimination. Bell, 234 F. Supp. 2d at 94.

reduce her hours from 33 to 30 as a result of a diminution of her job responsibilities. Plaintiff filed her MCAD charge three days later on November 18, 2002, and Mazzoni did not receive notice of the charge until November 27 or 28, 2002. Because the allegedly adverse action preceded her filing of an MCAD charge, Travers-Sheik's retaliation claim fails as a matter of law. See, generally, Bourbeau v. City of Chicopee, 445 F.Supp. 2d 106, 123 (D. Mass. 2006) (adverse employment action must occur after plaintiff engaged in protected activity).

Travers-Sheik also appears to allege that on December 19, 2002, she learned that her hours were going to be further reduced from 30 to 27. (SOF ¶ 82). But, there is absolutely no record evidence, other than Plaintiff's own unsupported assertions that her hours were cut again on December 19 (the day that she voluntarily resigned) from 30 to 27. Without any other objective evidence, Plaintiff's unsupported assertions are insufficient to create a genuine dispute of material fact. See Rogan v. City of Boston, et. al., 267 F.3d 24, 27 (1st Cir. 2001) (plaintiff's obligation to produce evidence of discrimination cannot be satisfied by conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative); DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (if plaintiff produces little evidence, summary judgment may be appropriate even where intent is an issue).[15]

### 2. Plaintiff Has Produced No Evidence of Pretext.

Travers-Sheik has failed to produce any evidence that HMI's reason for her hours reduction was pretextual to hide retaliation. See Sher v. United States VA, 2007 U.S. App. LEXIS 12365, *44 (1st Cir., May 29, 2007) (when an employer offers multiple legitimate nondiscriminatory reasons for an adverse employment action, a plaintiff must generally offer evidence to counter each reason). In fact, the chronology of events actually disproves Travers-Sheik's theory that HMI reduced her hours because she filed an MCAD charge. As a result, HMI is entitled to summary judgment on her Retaliation Claim.

---

[15] Further undermining Plaintiff's version is the fact that she alleges that Fraunfelter was the one who threatened to cut her hours to 27. Fraunfelter was not empowered to reduce an employee's hours – only Mazzoni had that power at the Yarmouth facility and, in any case, HMI never actually reduced her hours to 27. (SOF ¶¶ 86-87).

### C. Plaintiff Cannot Establish She Was Subject To A Hostile Work Environment.

To establish a *prima facie* case of workplace harassment based on race or national origin, a plaintiff must prove that she was subjected to unwelcome harassment regarding, and based upon, her race or national origin, and that the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment. Douglas, 474 F.3d at 15. The conduct must be both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive, and the plaintiff must show that she did in fact did perceive it to be so. Id. The employer is only liable for such conduct by Plaintiff's co-workers if it knew or should have known about the conduct and failed to take appropriate remedial action. Noviello v. City of Boston, 398 F.3d 76, 95 (1st Cir. 2005).

"Isolated incidents," "simple teasing" or "mere offensive" behavior are insufficiently severe or pervasive so as to constitute actionable harassment, and trial judges must use "common sense, and an appropriate sensitivity to social context" to distinguish types of conduct. Kosereis v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003); Walton v. Johnson & Johnson Servs., Inc., 347 F.3d 1272, 1285 n.12 (11th Cir. 2003) ("isolated incidents" do not amount to discriminatory changes in the terms and conditions of employment). The Court should consider all of the circumstances, including the frequency of the alleged conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Pastula v. Lane Constr. Corp., 2006 U.S. Dist. LEXIS 74199, *26-28 (D. Me., Oct. 11, 2006) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-788 (1998)).

### 1. Race-Based Hostile Work Environment Claim Fails.

#### a. Co-Workers' Comments Were Not Severe Or Pervasive.

Travers-Sheik claims that over a two-year period, co-worker Eisner referred to her as a "black bitch" three times and also stated that light-skinned blacks are better than dark-skinned blacks. (SOF ¶ 40). She further alleges that Nickerson said, on one occasion, that "they should

wipe away [...] blacks."[16] (SOF ¶ 36). Plaintiff also alleges that Fraunfelter once said "Blacks tend not to do well in school" and/or that "Black people don't get good grades;" and that she told a Black co-worker to put her hands together and described the image as a "thin mint."[17] Even if the Court found Travers-Sheik's account credible, approximately six comments over a two-year period are too isolated and infrequent to create a hostile work environment. E.g., See Long v. Ford Motor Co., 193 Fed. Appx. 497, 499, 502 (6th Cir. 2006) (where co-worker called plaintiff "wetback" and "Puerto Rican spic" on several occasions not pervasive enough to constitute a hostile or abusive working environment because episodes involved only two individuals in discrete circumstances in the absence of other, ongoing misconduct about which the employer failed to act); Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1051 (8th Cir. 2002) (one-time use of term "black bitch" is an isolated comment that is insufficient to constitute pervasive hostile work environment); Gordon v. Shafer Contr. Co., 469 F.3d 1191, 1195 (8th Cir. 2006) (three to four racially offensive comments and additional sexually offensive comments are insufficient); Kosereis, 331 F.3d at 216 (name calling and teasing are insufficient); Sprague v. Thorn Ams., 129 F.3d 1355, 1366 (10th Cir. 1997) (five incidents of "unpleasant and boorish" conduct over 16-month period insufficient).

### b. HMI Not Liable For Co-Workers' Comments.

Even if the Court believes that the comments allegedly made by her co-workers were sufficiently severe or pervasive to establish that element of her *prima facie* case, Travers-Sheik is still required to draw some causal link between her co-workers' comments and negligence on the employer's part. Noviello, 398 F.3d at 95. She must show that HMI knew or should have known about the harassment and failed to take prompt action to stop it. Id. She cannot do this.

---

[16] HMI is not liable for Nickerson's conduct because Travers-Sheik has failed to prove that HMI knew or should of known of his harassing conduct, or that HMI had any right to exert control over his behavior. See, generally, 29 C.F.R. § 1604.11(e).

[17] Courts have held that the harassment must be objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Noviello, 398 F.3d at 92. Here, it is unlikely that a reasonable person would interpret Fraunfelter's characterization of the scene as one resembling a "thin mint" as being objectively offensive.

Travers-Sheik never complained to Mazzoni about her co-workers making discriminatory comments based on race. (SOF ¶ 45). The first time Travers-Sheik complained about any comments was on December 13, 2001 when she complained to Mazzoni that she felt "uncomfortable with comments made by" Eisner. Travers-Sheik would not identify the nature of the comments, but said they were demeaning and "somewhat sexual in nature." (SOF ¶ 47). Travers-Sheik asked that Mazzoni speak with Eisner about the incident. Minutes later, Mazzoni confronted Eisner, but Eisner denied making any inappropriate comments. Nevertheless, Mazzoni informed Eisner of the type of behavior that was expected of him at HMI and that he needed to conform his behavior accordingly. After his meeting with Eisner, Mazzoni informed Travers-Sheik that he had talked with Eisner, and Travers-Sheik never discussed the matter again.[18]

Almost one year later, on November 7, 2002, Travers-Sheik complained again about what she perceived to be offensive behavior. Travers-Sheik talked to Fraunfelter and appeared to be visibly upset, but would not reveal the source of her consternation. Fraunfelter then asked Travers-Sheik's co-worker, Dan O'Leary, and he said that Travers-Sheik didn't like being called a "black bitch." (SOF ¶ 56). Fraunfelter immediately reported the epithet to Mazzoni, who subsequently invited Travers-Sheik to speak with him about the incident. Mazzoni asked Travers-Sheik to identify the person so he could address it with the individual and reminded Travers-Sheik that "we do not support that kind of treatment of our staff." Travers-Sheik refused and stated that "she understood that people are on medication, etc., but did not like being called that." (SOF ¶ 62). Mazzoni concluded that the person who uttered the epithet was a patient and without further cooperation from Travers-Sheik, never discovered the identity of the person who uttered the statement. (SOF ¶ 63-64).

Mazzoni's conduct regarding the two prior instances clearly demonstrates that had he known about the allegations she now makes here for the first time, he would have taken her

---

[18] It is worth noting that two months after Travers-Sheik complained to Mazzoni about Eisner's sexual comments, on February 25, 2002, HMI *increased* her hours from 30 to 33. (SOF ¶ 18).

accusations seriously and immediately initiated an investigation. Travers-Sheik has failed to prove that HMI had any knowledge about the conduct she <u>now</u> alleges against Eisner or Nickerson, and the Court should dismiss her race-based hostile work environment claim.

### c. HMI Not Liable For Supervisor Fraunfelter's Comments.

Travers-Sheik's allegations that HMI should be held liable for supervisor Fraunfelter's comments regarding her race also fails because there is no genuine dispute of material fact that HMI had a complaint mechanism for its employees and Travers-Sheik failed to avail herself of it, even though she had done so on prior occasions. An employer is vicariously liable for comments made by supervisors unless the employer can establish an affirmative defense. <u>Noviello</u>, 398 F.3d at 94. An employer can avoid liability if it can show that (1) it exercised reasonable care to prevent and correct promptly the harassment; (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." <u>Id.</u> at 94-95. Here, it is undisputed that HMI maintained an anti-harassment policy that provided a mechanism for employees to make complaints and that Travers-Sheik acknowledged receiving a copy of it. (SOF ¶¶ 4, 6). Travers-Sheik's failure to avail herself of this mechanism, in light of the fact that she had previously complained to Mazzoni about offensive comments, compels dismissal of her hostile work environment claim with respect to Fraunfelter's comments. "If the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so." <u>Farragher</u>, 524 U.S. at 806-807.

### 2. National Origin-Based Hostile Work Environment Claim Fails.

### a. Co-Workers' Comments Are Not Severe or Pervasive.

Travers-Sheik's national origin hostile work environment claim fails for the same reason her race-based hostile work environment claim fails – the two or three comments about Iraqis/Arabs she attributes to her co-workers are simply too few to rise to the level of severe or pervasive. <u>See</u> § III(C)(l)(a), <u>supra</u>. Accordingly, she fails to establish a *prima facie* case. Moreover, comments about "dropping bombs on the Iraqis" or "killing all the Arabs" is

insufficient to constitute severe or pervasive harassment because these are uncognizable political statements.[19]  See Ashjari v. NYNEX Corp., 1998 U.S. Dist. LEXIS 397, *11 (S.D.N.Y., Jan. 20, 1998) (no reasonable jury would find that argumentative positions on matters of common interest such as someone's belief that the United States "should invade Iran and kill a lot of people" in retaliation for Iran's threat on author Salmon Rushdie's life could rise to the level of actionable workplace harassment); El-Zabet v. Nissan North America, Inc., 2005 U.S. Dist. LEXIS 33023, *20 (E.D. Tenn., Sep. 12, 2005) (five comments, including his belief that "we need to nuke all those people in the Middle East" not enough); Hammad v. Bombardier Learjet, Inc., 192 F. Supp.2d 1222, 1237-38 (D. Kan. 2002) (same).  Without more, she cannot prevail.

### b.     "Harassment" Not Based On Her National Origin.

Travers-Sheik's national origin hostile work environment claim also fails because she cannot produce any evidence that her co-workers' actions were motivated by discriminatory animus based on her national origin.  See El-Zabet v. Nissan North America, Inc., 2005 U.S. Dist. LEXIS 33023, *20 (E.D. Tenn., Sep. 12, 2005) (plaintiff's national origin hostile work environment claim failed because, among other things, plaintiff failed to demonstrate that his supervisor's "'harassment' was because of plaintiff's Jordanian national origin"); Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002); Higgins v. New Balance Ath. Shoe, Inc., 194 F.3d 252, 258 (1st Cir. 1999).

Travers-Sheik asserts that, although she was born in the United States (SOF ¶ 7), her family originates from Cape Verde.[20]  (SOF ¶ 9).  But, in this lawsuit, Travers-Sheik does not allege that she suffered a hostile work environment based on this national origin.  Rather, she seems to argue that her co-workers created a hostile work environment based on her association with Iraqis or Arabs because she adopted her husband's last name of "Sheik."  She alleges that both Eisner and Nickerson talked about dropping a bomb on Iraqis and the Arabs, and that

---

[19] It should not escape the Court's attention that in March 2003, the United States invaded Iraq.

[20] Because Travers-Sheik does not claim to be Native American or Mexican, comments about these groups are irrelevant to the Court's analysis.

-17-

Garove told her that as a result of September 11, 2001, the US should gather all the "Arabians and Sheiks" and put them in a concentration camp.[21] (SOF ¶ 41).

A plaintiff does not state a cognizable claim of national origin discrimination by <u>assuming</u> that people around her <u>assumed</u> she was of Iraqi or Arabian descent, when in fact, she is not of Iraqi or Arabian descent. <u>See</u> <u>EEOC v. Trans States Airlines, Inc.</u>, 462 F.3d 987, 992 (8th Cir. 2006) ("the contention that a jury necessarily would infer that [defendant's employee] engaged in inaccurate stereotyping is not attractive"). Furthermore, she has failed to adduce any evidence that any of her co-workers associated her with being Iraqi or Arab.[22] Accordingly, she has failed to prove her claim.

### c. HMI Not Liable For Co-Workers' Comments.

Travers-Sheik also fails to demonstrate that HMI knew or should have known about Plaintiff's co-workers' alleged comments regarding her national origin and then failed to take appropriate action to stop them. <u>See</u> § III(C)(l)(b), <u>supra</u>. In the complete absence of any such evidence, there can be no basis for imposing liability for the alleged harassment upon HMI.

## IV. CONCLUSION

For the foregoing reasons, Defendant HMI respectfully requests that the Court enter summary judgment for HMI, and dismiss each of Plaintiff's claims with prejudice.

---

[21] To the extent that Travers-Sheik may argue that HMI is vicariously liable for Supervisor Garove's comment, her claim fails because she failed to avail herself of HMI's internal complaint mechanism. <u>See</u> § III(C)(l)(c), <u>supra.</u>

[22] The Court should further note that on several employment documents, Plaintiff has spelled her name "Shiek" and not "Sheik." (SOF ¶ 92). This is significant because the word "Sheik" is defined as "the leader of an Arab or Muslim tribe, village or family." <u>American Heritage Dictionary</u>, 753 (3rd ed. 1994). But, there is no definition for the word, "Shiek." If Plaintiff seeks to escape summary judgment by virtue of the simple fact that people associated her name with Arabs or Iraqis, she should be required to, at the very least, identify the proper name.

Respectfully submitted,

HABIT MANAGEMENT, INC.

By its attorneys,

/s/ David M. Jaffe
Jennifer C. Tucker (BBO #547944)
Anita M. Polli (BBO #552567)
David M. Jaffe (BBO #641610)
Littler Mendelson, PC
One International Place
Suite 2700
Boston, MA  02110
(617) 378-6000

Dated:  July 13, 2007

## Certificate of Service

I, David M. Jaffe, hereby certify that I delivered a copy of this electronically filed Memorandum of Law in Support of Its Summary Judgment Motion by certified mail on July 13, 2007, postage pre-paid, to Sheila Mae Travers-Sheik, 7 Jonathan Lane, P.O. Box 743, East Falmouth, MA 02536.

/s/ David M. Jaffe
David M. Jaffe

Firmwide:82727169.4 050742.1002