UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHEILA MAE TRAVERS-SHEIK,     ) | |
|     ) | |
|     Plaintiff,     ) | |
|     ) | C.A. No. 05-11631 GAO |
| v.     ) | |
|     ) | |
| HABIT MANAGEMENT INSTITUTE (sic),     ) | |
|     ) | |
|     Defendant.     ) | |

**DEFENDANT HABIT MANAGEMENT, INC.'S RULE 56.1**
**STATEMENT OF UNDISPUTED MATERIAL FACTS OF RECORD**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendant Habit Management, Inc. ("Defendant" or

"HMI")[1] submits this Statement of Undisputed Material Facts Of Record in support of its Motion

for Summary Judgment on Plaintiff Sheila Travers-Sheik's ("Plaintiff" or "Travers-Sheik")

claims of discrimination and retaliation against HMI.

**A.**     **HMI Is An Outpatient Clinic For Recovering Drug Users.**

1.     HMI is an accredited Substance Abuse Treatment organization offering multi-

disciplinary treatment services to individuals addicted to drugs. (Affidavit of Nick Mazzoni

("Mazzoni Aff."), attached hereto as Ex. A, ¶ 3).

2.     HMI has been in operation since 1986, and provides treatment services at 15

different sites in Massachusetts, New Hampshire and Vermont, including a clinic in Yarmouth,

Massachusetts, where Plaintiff worked. (Mazzoni Aff. ¶ 3).

---

[1] Plaintiff has misidentified HMI in the caption of this matter as "Habit Management Institute."

**B.**   <u>**HMI Hires Plaintiff as Urine Monitor/Health Aide**</u>.

3.    HMI hired Travers-Sheik on January 3, 2001 as a part-time Urine Monitor/Health Aide to work 12 hours per week at its Yarmouth facility. (Mazzoni Aff. ¶ 6, Ex. 1)[2].

4.    When she was hired, HMI provided a copy of its Employee Handbook to Travers-Sheik, which she acknowledged receiving. (Mazzoni Aff. ¶ 6, Ex. 2).

5.    In 2001-2002, Travers-Sheik did not have a college degree.  (Deposition of Sheila Mae Travers-Sheik ("Travers-Sheik Dep."), attached as Ex. 3 to the Affidavit of David M. Jaffe ("Jaffe Aff.") attached hereto as Ex. B, page 20, lines 7-14 (hereinafter, "20:7-14")).

6.    The Employee Handbook contained, among other things, a comprehensive Anti-Harassment Policy and a Problem Resolution Procedure for employees who believe they have been mistreated.  (Mazzoni Aff. ¶ 6, Ex. 3).

7.    Travers-Sheik was born in New Bedford, Massachusetts.  (Travers-Sheik Dep. 12:5-6).

8.    Her parents were also born in Massachusetts.  (Travers-Sheik Dep. 12:16-19).

9.    Travers-Sheik's paternal ancestors originate from the Cape Verde islands. (Travers-Sheik Dep. 12:23-13:6, 103:4).

10.    Travers-Sheik took her husband's name of "Sheik" when she married him in or around 2001.  (Travers-Sheik Dep. 13:24-14:12).

11.    Travers-Sheik is not, herself, of Arabian heritage, but her husband is.  (Travers-Sheik Dep., 122:2-6).

12.    Travers-Sheik's husband, with whom she has been separated since around 2002, is German, Irish and part Arab, but her husband's family doesn't "have great feelings about that nationality."  (Travers-Sheik Dep. 14:2-3, 122:6-18).

13.    At the time she was hired, Travers-Sheik's responsibilities included (1) providing supervision and collecting urine specimens from patients for drug screen testing; (2)

---

[2] All documents attached as Exhibits to the Affidavit of Nicholas Mazzoni have been properly authenticated as business records kept in the ordinary course of business.  Fed R. Evid 803(b) (Mazzoni Aff. ¶¶ 30 – 33).

documenting patient names/dates; (3) enforcing HMI policies and procedures with respect to patients; (4) maintaining the physical environment free of safety hazards (i.e., mopping wet floors, ensuring hallways were clear, etc.); and (5) serving in a backup role as a receptionist, when needed.  (Mazzoni Aff. ¶ 8, Ex. 4).

14.    On April 30, 2001, HMI increased Travers-Sheik's hours from 12 to 28 hours per week and she transferred to another Urine Monitor/Health Aide position to replace a terminated employee.  (Mazzoni Aff. ¶ 9, Ex. 5).

15.    Travers-Sheik never filled out a written application seeking an internal transfer or other position at HMI for which she was denied.  (Travers-Sheik Dep. 156:6-14; Mazzoni Aff. ¶ 21; (Affidavit of Malcolm J. Gormley ("Gormley Aff."), attached hereto as Ex. C, ¶ 6).

16.    She performed essentially the same functions as in the prior position, but also became exclusively responsible for scheduling all random drug tests for patients.  (Mazzoni Aff. ¶ 9, Ex. 6).

17.    On January 3, 2002, Plaintiff received a three percent raise in pay.  (Mazzoni Aff. ¶ 10, Ex. 7).

18.    On February 25, 2002, HMI increased Travers-Sheik's hours from 30 to 33 per month.  (Mazzoni Aff. ¶ 17).

**C.    HMI Implements Company-wide Change In Support Staff Titles.**

19.    In November 2002, HMI changed many of its employee titles as part of a company-wide initiative to standardize and improve support position titles and update support position descriptions.  (Mazzoni Aff. ¶ 11, Exs. 8 – 12).

20.    HMI had experienced rapid corporate growth in the preceding five years and the Company's management decided that it needed to ensure that all its human resources systems, policies and procedures, including job descriptions and hiring standards, were uniform for all program sites.  (Mazzoni Aff. ¶ 11).

21.    With respect to its staff positions, for example, HMI determined that there were too many position titles throughout its organization and decided to consolidate them.  (Mazzoni Aff.

¶ 11).

22.   HMI also believed that the position titles should be changed to make them more attractive to prospective candidates.  (Mazzoni Aff. ¶ 11).

23.   For example, HMI believed that it could more easily recruit prospective employees if it advertised Travers-Sheik's position as an "Office Assistant" rather than a "Urine Monitor." (Mazzoni Aff. ¶ 11).

24.   In October 2002, HMI completed its review and reduced the number of titles from approximately 20 to seven, updated its position descriptions and published a skills matrix depicting the skills, education and credentials required for administrative and support positions, including Travers-Sheik's position.  (Mazzoni Aff. ¶ 12, Exs. 8 and 9).

25.   Company-wide, approximately 50 support employees received new titles, but not a single support employee's, including Travers-Sheik, grade or pay level changed as a result of the position restructuring.  (Mazzoni Aff. ¶ 12; Travers-Sheik Dep. 168:22-169:1).

26.   Seven employees were affected in Yarmouth, including Travers-Sheik.  (Mazzoni Aff. ¶ 12, Ex. 10).

27.   Of the seven, three employees became "Office Assistants," Art Eisner, (White male), Andrea Fernandes, (Black female) and Travers-Sheik.  (Mazzoni Aff. ¶ 12, Ex. 10).

28.   Because of Plaintiff's former title, she automatically became reclassified as an "Office Assistant."  (Mazzoni Aff. ¶ 12).

29.   In November 2002, Mazzoni met with Travers-Sheik to inform her of the title change, provided her with a copy of her new position description, reviewed it with her and asked her if she had any questions.  (Mazzoni Aff. ¶ 13).

30.   She asked no questions at that meeting or at any subsequent point during her employment about the title change.  (Mazzoni Aff. ¶ 13).

**D.**   **Travers-Sheik Alleges Offensive Comments.**

31.   HMI retained the services of Cape Way Patrol ("CWP") to provide security services during HMI's hours of operation.  (Mazzoni Aff. ¶ 14).

32.   In 2001-2002, CWP sent a security guard, Warren Nickerson, to patrol HMI. (Mazzoni Aff. ¶ 14).

33.   Nickerson was not an HMI employee. (Mazzoni Aff. ¶ 14).

34.   Nickerson and Eisner made several offensive remarks regarding her race and national origin. (Travers-Sheik Dep. 83:16-22, 84:5-11, 88:12-16, 90:14-91:2, 90:18-19, 98:24-99:5, 105:12-106:11, 189:23-190:2)

35.   On "four or five" occasions, Nickerson told her that "he would shoot Mexicans [...] and how he didn't mind shooting Mexicans [...] [and] he just talked about Indians." (Travers-Sheik Dep. 83:16-22, 84:5-11).

36.   Both Eisner and Nickerson talked about how they would love to drop a bomb on the Iraqis and the Arabs and that "they should wipe away Indians and blacks." (Travers-Sheik Dep. 88:12-16).

37.   Nickerson said, three or four times, that "Indians don't belong here […] [and] Indians think this is their land". (Travers-Sheik Dep. 90:14-91:2).

38.   Nickerson also said, "This is not their land, this is our land; it belongs to the white Americans." (Travers-Sheik Dep. 90:18-19).

39.   An unidentified person called Travers-Sheik a "nigger," but she did not hear the comment. (Travers-Sheik Dep. 286:2-24).

40.   Eisner called her a "black bitch" on three occasions (Travers-Sheik Dep. 98:24-99:5, 105:12-106:11), and overheard him say "Yeah, all these dark-skinned people who think maybe they are lighter and they go for a different shade, that they are much better, whoever is lighter skin." (Travers-Sheik Dep. 189:23-190:2).

41.   Travers-Sheik's then-supervisor, Courtney Garove, told her that as a result of September 11, 2001, "they should gather all the Arabians, and the Sheiks, together and put them in a concentration camp so America could be safe." (Travers-Sheik Dep. 121:9-16).

42.   Linda Fraunfelter, who succeeded Garove, made two racial comments to Travers-Sheik. (Travers-Sheik Dep. 101:5-8).

43.   Once, Fraunfelter told Travers-Sheik that "Black people don't get good grades." (Travers-Sheik Dep. 101:9-22, 204:18-24).

44.   On another occasion, after Travers-Sheik had complimented Fraunfelter on the green color of her dress and said it reminded her of a "thin mint," Fraunfelter took co-worker Andrea Fernandes's (who is Black) hands and put them together and said, "now it's a thin mint." (Travers-Sheik Dep. 102:23-103:13).

45.   Travers-Sheik never complained to Mazzoni, or anyone else, that Nickerson, Eisner, Fraunfelter or Garove ever made discriminatory comments to her on the basis of race or national origin.  (Mazzoni Aff. ¶¶ 14, 19; Gormley Aff. ¶ 5) .

**E.   HMI Promptly Investigates Two Unrelated Discriminatory Comments Made to Travers-Sheik.**

46.   On December 13, 2001, Travers-Sheik went to Mazzoni's office and told him that she was feeling uncomfortable about comments that Eisner had made to her.  (Mazzoni Aff. ¶ 16, Ex. 13).

47.   Travers-Sheik would not repeat the actual comments, but said they were "demeaning and somewhat sexual in nature."  (Mazzoni Aff. ¶ 16, Ex. 13).

48.   She made no allegation that the comments pertained to either her race or national origin.  (Mazzoni Aff. ¶ 16, Ex. 13).

49.   Travers-Sheik asked Mazzoni to speak with Eisner about his comments.  (Mazzoni Aff. ¶ 16).

50.   Immediately, Mazzoni called Eisner into his office to speak with him about sexual comments that he had allegedly made to Travers-Sheik. (Mazzoni Aff. ¶ 16, Ex. 14).

51.   Eisner denied making any inappropriate comments, but nevertheless, Mazzoni informed Eisner of the type of behavior that was expected of him at HMI and that he needed to conform his behavior accordingly.  (Mazzoni Aff. ¶ 16, Ex. 14).

52.   After his meeting with Eisner, Mazzoni informed Travers-Sheik that he had talked with Eisner.  (Mazzoni Aff. ¶ 16, Ex. 13).

53.   Travers-Sheik never complained about Eisner or discussed the matter with Mazzoni again.  (Mazzoni Aff. ¶ 16, Ex. 13).

54.   On February 25, 2002, two months after Travers-Sheik complained to Mazzoni about Eisner's sexual comments, HMI increased her hours from 30 to 33.  (Mazzoni Aff. ¶ 17).

55.   On November 7, 2002, Travers-Sheik talked to Fraunfelter and appeared to be visibly upset, but refused to explain why.  (Mazzoni Aff. ¶ 18, Ex. 15).

56.   Fraunfelter then asked Travers-Sheik's co-worker, Dan O'Leary, about what was bothering her, and he said that she didn't like being called a "black bitch."  (Mazzoni Aff. ¶ 18, Ex. 15).

57.   Fraunfelter immediately informed Mazzoni, who subsequently invited Travers-Sheik to speak with him about the incident. (Mazzoni Aff. ¶ 18, Ex. 15).

58.   Mazzoni told Travers-Sheik that if someone was calling her a "black bitch," she should identify the person so that Mazzoni could address the situation with that person. (Mazzoni Aff., 18, Ex. 15).

59.   Travers-Sheik responded by saying that she "didn't mind being called black and she didn't mind being called a bitch, but she didn't like the two together."  (Mazzoni Aff. ¶ 18, Ex. 15).

60.   Travers-Sheik then said she preferred not to disclose the person's identity. (Mazzoni Aff. ¶ 18, Ex. 15).

61.   Mazzoni tried again to convince her to reveal the person's identity by reminding her that such statements violated HMI's policies.  (Mazzoni Aff. ¶ 18, Ex. 15).

62.   Travers-Sheik still refused and stated that she would still rather not identify the person because she understood that people are on medication.  (Mazzoni Aff. ¶ 18, Ex. 15).

63.   Based on Travers-Sheik's statement, Mazzoni believed that the person who had made the statement was a patient and not a staff member.  (Mazzoni Aff. ¶ 18).

64.   Since Travers-Sheik refused to identify the person who made the statement, Mazzoni pursued the matter no further.  (Mazzoni Aff. ¶ 18).

65.   Aside from this one incident, there is no record that Travers-Sheik <u>ever</u> complained to Mazzoni, or anyone else, that any coworker ever made offensive comments to Travers-Sheik regarding her race, color or national origin.  (Mazzoni Aff. ¶ 19; Gormley Aff. ¶ 5).

66.   In November 2002, Travers-Sheik alleges that she complained to Mazzoni that Eisner had called her a black bitch, but there is no record that Travers-Sheik ever made any such complaint.  (Travers-Sheik Dep. 154:8-13; Mazzoni Aff. ¶ 20).

67.   The absence of such documentation is significant because all such complaints are documented.  (Gormley Aff. ¶5).

**F.   HMI Reduces Plaintiff's Hours From 33 To 30 Due To Changes In Drug Program.**

68.   In November 2002, HMI decided to reduce Travers-Sheik's hours because one of her major responsibilities, scheduling drug testing, had been significantly reduced due to HMI's decision to change its drug testing procedures.   (Mazzoni Aff. ¶ 22, Ex. 16).

69.   In January 2002, HMI had modified its drug testing policies and procedures throughout the company.  (Mazzoni Aff. ¶ 22).

70.   HMI began using oral swabs, instead of urine tests, to test patients.  (Mazzoni Aff. ¶ 22).

71.   Oral swabs are much more efficient and less time consuming than urine tests. (Mazzoni Aff. ¶ 22).

72.   HMI started randomly drug testing patients once per month instead of twice per month (except for new patients).  (Mazzoni Aff. ¶ 22).

73.   As a result of these changes, the time required to schedule patients for drug testing was significantly reduced.  (Mazzoni Aff. ¶ 22).

74.   HMI's drug testing volume was also drastically reduced due to state budget cuts. (Mazzoni Aff. ¶ 22).

75.   As a result of the budget cuts, the Yarmouth program anticipated losing at least 40 to 50 patients (11-14 percent of its total patient population).  (Mazzoni Aff. ¶ 22).

76.   Since Travers-Sheik was the only employee responsible for scheduling drug tests,

her responsibilities diminished dramatically.  (Mazzoni Aff. ¶ 22).

77.    On Friday, November 15, 2002, Mazzoni and Fraunfelter met with Travers-Sheik to inform her that starting on December 2, 2002, her hours would be reduced from 33 to 30. (Mazzoni Aff. ¶ 23; Ex. 16).

78.    Mazzoni had considered reducing her hours to 28 per month, but ultimately decided to reduce her hours only to 30 per month because he knew that reducing it below 30 would disqualify Travers-Sheik from participating in many of HMI's benefits plans. (Mazzoni Aff. ¶ 23).

79.    During the meeting with Mazzoni and Fraunfelter, Travers-Sheik stated that she did not object to the change so long as she was able to retain her benefits, which she was.  (Mazzoni Aff. ¶ 23).

80.    Mazzoni did not fill out the payroll status change form until November 18, 2002, which is why that date, and not November 15, appears below his signature on the form. (Mazzoni Aff. ¶ 23, Ex. 16).

81.    HMI made no subsequent reduction in Plaintiff's hours after the reduction from 33 to 30.  (Mazzoni Aff. ¶ 24).

82.    Travers-Sheik testified that there had been such a subsequent reduction of her hours in December 2002 from 30 to 27 hours per week.  (Travers-Sheik Dep. 133:10-21).

83.    Mazzoni would have had to authorize such a reduction and he never did so. (Mazzoni Aff. ¶ 24).

84.    There is no documentation of any proposal or decision by anyone at HMI to reduce Plaintiff's hours, and there would have been such documentation.  (Mazzoni Aff. ¶ 24).

**G.    Travers-Sheik Files MCAD Charge.**

85.    On November 18, 2002, Travers-Sheik filed a charge with the MCAD.  (MCAD Charge, attached at Ex. 1 to Jaffe Aff.).

86.    Mazzoni did not find out that Travers-Sheik had filed a charge with the MCAD until November 27 or 28, 2002.  (Mazzoni Aff. ¶ 25).

**G.    Travers-Sheik Resigns.**

87.    On December 19, 2002, Travers-Sheik abruptly resigned without providing advance notice. (Mazzoni Aff. ¶ 26, Ex. 18).

88.    On several employment documents, and her resignation letter, Travers-Sheik spelled her name "Shiek" and not "Sheik." (Mazzoni Aff. ¶¶ 6-7, 26- 29, Exs. 1-2, 18-21).

Respectfully submitted,

**HABIT MANAGEMENT, INC.,**

By its attorneys,

/s/ David M. Jaffe
Jennifer C. Tucker (BBO #547944)
Anita M. Polli (BBO #552567)
David M. Jaffe (BBO #641610)
Littler Mendelson PC
One International Place, Suite 2700
Boston, MA  02110
(617) 378-6000 (t)
(617) 737-0052 (f)

Dated:  July 13, 2007

## CERTIFICATE OF SERVICE

I, David M. Jaffe, hereby certify that on this 13th day of July, 2007, the foregoing Statement of Undisputed Material Facts was filed electronically through the ECF system, is available for viewing and downloading from the ECF system, and will be sent electronically to parties as registered participants identified on the Notice of Electronic Filing and via first class mail to all non-registered participants identified on the Notice of Electronic Filing.

/s/ David M. Jaffe
David M. Jaffe

Firmwide:82724384.1 050742.1002

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SHEILA MAE TRAVERS-SHEIK,<br><br>    Plaintiff,<br><br>v.<br><br>HABIT MANAGEMENT INSTITUTE (sic),<br><br>    Defendant. | C.A. No. 05-11631 GAO |

## AFFIDAVIT OF NICHOLAS MAZZONI

I, Nicholas Mazzoni, provide this affidavit based on personal information and knowledge and hereby depose and state:

1.    I am over the age of twenty-one (21) and give this affidavit of my own free will.

2.    I have personal knowledge of all facts stated herein and am competent to testify as to all facts stated herein.

3.    HMI is an accredited Substance Abuse Treatment organization offering multi-disciplinary treatment services to individuals addicted to drugs.  HMI has been in operation since 1986, and provides treatment services at 15 different sites in Massachusetts, New Hampshire and Vermont, including a clinic in Yarmouth, Massachusetts, where Travers-Sheik worked.

4.    On or about October 27, 2006, Habit OPCO, Inc. acquired all of HMI's assets and since that time, all clinics have been owned and operated by Habit OPCO, Inc.

5.    I am currently the Program Director at the Yarmouth, Massachusetts HMI facility and have held this position since April 2001.  In April 2001, I was appointed as the interim Program Director, and became permanent Program Director in December 2001.

6.    HMI hired Travers-Sheik on January 3, 2001 as a part-time Urine Monitor/Health Aide to work 12 hours per week at its Yarmouth facility.  (Attached hereto as Exhibit 1 is a true and accurate copy of Travers-Sheik's Habit Management, Inc. Personnel Data Sheet (HMI 039)).

Management's Criteria-Based Job Description and Performance Evaluation from 1/3/01 to

1/2/02 ((HMI 024-28)).

10.    On January 3, 2002, Travers-Sheik received a three percent raise in pay.

(Attached hereto as Exhibit 7 is a true and accurate copy of Travers-Sheik's Payroll Status

Change dated 1/3/02 (HMI 029)).

11.    In November 2002, HMI changed many of its employee titles as part of a

company-wide initiative to standardize and improve support position titles and update support

position descriptions.  (Attached hereto as Exhibit 8 is a true and accurate copy of HMI's

Support Positions Qualifications Summary (HMI 078-079); Exhibit 9 is a true and accurate copy

of HMI's Support Positions Skills Matrix (HMI 080); Exhibit 10 is a true and accurate copy of

HMI's "Support Positions – Yarmouth" (HMI 081); Exhibit 11 is a true and accurate copy of

Grade and Salary Ranges dated 1/2002 (HMI 082); and Exhibit 12 is a true and accurate copy of

Grade and Salary Ranges dated 11/ 2002 (HMI 083)).  HMI had experienced rapid corporate

growth in the preceding five years and the Company's management decided that it needed to

ensure that all its human resources systems, policies and procedures, including job descriptions

and hiring standards, were uniform for all program sites.  With respect to its staff positions, for

example, HMI determined that there were too many position titles throughout its organization

and decided to consolidate them.  HMI also believed that the position titles should be changed to

make them more attractive to prospective candidates.  For example, HMI believed that it could

more easily recruit prospective employees if it advertised Travers-Sheik's position as an "Office

Assistant" rather than a "Urine Monitor."

12.    In October 2002, HMI completed its review and reduced the number of titles from

approximately twenty to seven, updated its position descriptions and published a skills matrix

depicting the skills, education and credentials required for administrative and support positions,

including Travers-Sheik's position.  (Exhibits 8 and 9).  Company-wide, approximately fifty

support employees received new titles and in Yarmouth but, not a single support employee's

grade or pay level changed as a result of the position restructuring.  Seven employees were

affected in Yarmouth, including Travers-Sheik. Of the seven, three employees became "Office Assistants": Art Eisner (white male), Andrea Fernandes (African American female) and Travers-Sheik. (Exhibit 10). Because of Travers-Sheik's former title, she automatically became reclassified as an "Office Assistant."

13.    In November 2002, I met with Travers-Sheik to inform her of the title change, provided her with a copy of her new position description, reviewed it with her and asked her if she had any questions. She asked no questions at that meeting or at any subsequent point during her employment about the title change.

14.    HMI retained Cape Way Patrol ("CWP") to provide security services during HMI's hours of operation. In 2001-2002, CWP sent a security guard, Warren Nickerson, to patrol HMI. Nickerson was not an HMI employee. Travers-Sheik never complained to me about Nickerson making any discriminatory remarks to her based on race, national origin or any other protected category.

15.    Courtney Garove was Travers-Sheik's supervisor in 2001, before Linda Fraunfelter took that job. Travers-Sheik never complained to me about Garove making any discriminatory remarks to her based on race, national origin or any other protected category.

16.    On December 13, 2001, Travers-Sheik came to my office and told me that she was feeling uncomfortable about comments that Eisner had made to her. (Attached hereto as Exhibit 13, is a true and accurate copy of an Individual Supervision Worksheet dated December 13, 2001 (HMI 010)). Travers-Sheik would not repeat the actual comments, but said they were "demeaning and somewhat sexual in nature." She made no allegation that the comments pertained to either her race or national origin. Travers-Sheik asked me to speak with Eisner about his comments. I immediately called Eisner into my office to speak with him about sexual comments that he had allegedly made. Eisner denied making any inappropriate comments, but nevertheless, I informed Eisner of the type of behavior that was expected of him at HMI and that he needed to conform his behavior accordingly. (Attached hereto as Exhibit 14 is a true and accurate copy of an Individual Supervision Worksheet regarding Arthur Eisner dated December

-4-

13, 2001 (HMI 011)). After my meeting with Eisner, I informed Travers-Sheik that I had talked with Eisner. Travers-Sheik never discussed the matter or complained to me about Eisner's behavior again. (Exhibit 13).

17.     On February 25, 2002, two months after Travers-Sheik complained to me about Eisner's sexual comments, HMI increased Travers-Sheik's hours from 30 to 33.

18.     On November 7, 2002, Travers-Sheik talked to then-supervisor Fraunfelter and appeared to be visibly upset, but refused to explain why. (Attached hereto as Exhibit 15, is a true and accurate copy of a Supervision sheet dated 11/7/02 (HMI 008)). After Travers-Sheik refused to explain why she was upset, Fraunfelter asked Travers-Sheik's co-worker, Dan O'Leary, about what was bothering her. O'Leary told Fraunfelter that Travers-Sheik had told him that she didn't like being called a "black bitch." Fraunfelter immediately informed me, and I invited Travers-Sheik to speak with me about the incident. I told Travers-Sheik that if someone was calling her a "black bitch," she should identify the person so that I could address the situation with that person. Travers-Sheik responded by saying that she "didn't mind being called black and she didn't mind being called a bitch, but she didn't like the two together." Travers-Sheik then said she preferred not to disclose the person's identity. I tried again to convince her to reveal the person's identity by reminding her that such statements violated HMI's policies. Travers-Sheik refused and stated that she would still rather not identify the person because she understood that people are on medication. Based on Travers-Sheik's statement, I believed that the person who had made the statement was a patient and not a staff member. Since Travers-Sheik refused to identify the person who made the statement, it was impossible to pursue the matter further.

19.     Aside from this one incident, Travers-Sheik never complained to me, or anyone else to my knowledge, that any coworker including but not limited to, Eisner, Fraunfelter, or Garove, ever made offensive comments to her regarding her race, color or national origin.

20.     In November 2002, Travers-Sheik alleges that she complained to me that Eisner had called her a black bitch. If she had, I would have written the incident down in my records and certainly remembered such an epithet. But, Travers-Sheik never made any such complaint to me.

21.     Travers-Sheik never formally applied for a transfer or promotion during her employment for which she was denied.

22.     In November 2002, HMI decided to reduce Travers-Sheik's hours because one of her major responsibilities, scheduling drug tests, had been significantly reduced due to HMI's decision to change its drug testing procedures. (Attached hereto as Exhibit 16 is a true and accurate copy of a Payroll Status Change dated 12/2/02 (HMI 018)). In January 2002, HMI had modified its drug testing policies and procedures throughout the company. First, HMI began using oral swabs, instead of urine tests, to test patients and using oral swabs was much more efficient and less time consuming. Second, HMI started randomly drug testing patients once per month instead of twice per month (except for new patients). As a result of these changes, the time required to schedule patients for drug testing was significantly reduced. HMI's drug testing volume was also drastically reduced due to state budget cuts. As a result of these budget cuts, the Yarmouth program anticipated losing at least 40 to 50 patients (11-14 percent of its total patient population). Since Travers-Sheik was the only employee responsible for scheduling drug tests, her responsibilities diminished dramatically.

23.     On Friday, November 15, 2002, I met with Fraunfelter and Travers-Sheik to inform Travers-Sheik that starting on December 2, 2002, her hours would be reduced from 33 to 30. I had considered reducing her hours to 28 per month, but ultimately decided to reduce her hours only to 30 per month because I knew that reducing it below 30 would disqualify her from participating in many of HMI's benefits plans. During the meeting, Travers-Sheik stated that she did not object to the change so long as she was able to retain her benefits. I did not fill out the payroll status change form until November 18, 2002, which is why that date appears below my signature. (Exhibit 16).

-6-

24.    HMI made no subsequent reduction in Plaintiff's hours after the reduction from 33 to 30. I would have had to authorize such a reduction and I never did so. There is no documentation of any proposal or decision by anyone at HMI to reduce Plaintiff's hours, and there would have been such documentation.

25.    I did not find out about Travers-Sheik's MCAD charge until November 27 or 28, 2002. I have attached the November 25, 2002 post-marked envelope from the MCAD addressed to Art Eisner. (Attached hereto as Exhibit 17 is a true and accurate copy of the postmarked envelope from the MCAD (HMI 193)). Since the MCAD sent this letter out by U.S. Mail, HMI would have received this letter some time on or about November 27 or 28.

26.    On December 19, 2002, Travers-Sheik resigned without providing advance notice. (Attached hereto as Exhibit 18 is a true and accurate copy of Travers-Sheik's resignation letter (HMI 001)).

27.    Attached hereto as Exhibit 19 is a true and accurate copy of Travers-Sheik's Application for Employment (HMI 049 – 052), wherein she spelled her name "Shiek."

28.    Attached hereto as Exhibit 20 is a true and accurate copy of the Form W-4 completed by Travers-Sheik dated 1/3/01 (HMI 040), wherein she spelled her name "Shiek."

29.    Attached hereto as Exhibit 21 is a true and accurate copy of the Form I-9 completed by Travers-Sheik dated 1/3/01 (HMI 041), wherein she spelled her name "Shiek."

30.    HMI maintains all personnel records for its Yarmouth facility in my office.

31.    I have personal knowledge of the business records and personnel records filing system at HMI.

32.    During the course of this litigation, my office has produced several documents from those files.

33.    I recognize the list of exhibits below as true and accurate copies of records maintained in HMI's business and personnel records files and kept in the ordinary course of business.

| Ex. No. | Description (Bates No.) |
|---------|------------------------|
| 1 | Habit Management, Inc. Personnel Data Sheet for Travers-Sheik (HMI 039) |
| 2 | Employee Acknowledgement Form by Travers-Sheik dated 1/3/01 (HMI 048) |
| 3 | Habit OPCO Employee Handbook dated 10/27/06, Sections 703 and 718 (HMI 085 –088, 165, 174 – 175) |
| 4 | Habit Management's Criteria-Based Job Description and Performance Evaluation for Travers-Sheik from 1/3/01 to 3/3/01 (HMI 030-031) |
| 5 | Travers-Sheik Payroll Status Change dated 4/30/01 (HMI 035) |
| 6 | Habit Management's Criteria-Based Job Description and Performance Evaluation for Travers-Sheik from 1/3/01 to 1/2/02 (HMI 024-28) |
| 7 | Travers-Sheik's Payroll Status Change dated 1/3/02 (HMI 029) |
| 8 | HMI's Support Positions Qualifications Summary dated 11/2002 (HMI 078-079) |
| 9 | HMI's Support Positions Skills Matrix dated 10/23/02 (HMI 080) |
| 10 | HMI's "Support Positions – Yarmouth" (HMI 081) |
| 11 | Grade and Salary Ranges dated 1/2002 (HMI 082) |
| 12 | Grade and Salary Ranges dated 11/2002 (HMI 083) |
| 13 | Individual Supervision Worksheet dated 12/13/01 (HMI 010) |
| 14 | Individual Supervision Worksheet dated 12/13/01 (HMI 011) |
| 15 | Supervision worksheet dated 11/7/02 (HMI 008) |
| 16 | Payroll Status Change dated 12/2/02 (HMI 018) |
| 17 | Copy of postmarked envelope from the MCAD (HMI 193) |
| 18 | Travers-Sheik Resignation letter dated 12/19/02 (HMI 001) |
| 19 | Application for Employment completed by Travers-Sheik (HMI 049 – 052) |
| 20 | Form W-4 completed by Travers-Sheik dated 1/3/01 (HMI 040) |
| 21 | Form I-9 completed by Travers-Sheik dated 1/3/01 (HMI 041) |

Signed under the pains and penalties of perjury this _13_ day of July, 2007.

Nicholas Mazzoni

Firmwide:82724225.3 050742.1002

**Habit Management, Inc.**
**Personnel Data Sheet**

Please Check Appropriate Work Location:

_____ Boston        _____ Fitchburg      _____ Lawrence      ✓ Yarmouth

_____ Brockton      _____ Mobile 1       _____ Lowell        _____ Other

_____ Corporate     _____ Mobile 2       _____ Springfield

---

Personal Data : (please print or type)

Name : Sheila M Travers - Shrek     Social Security #: _____ REDACTED _____

Address : 285   7 Jonathan Ln P.O. Box 957     Date of Birth : _____ REDACTED
                        (Street)

E. Falmouth        MA        02536       Home Phone: ( )  394 - 0247
(City/Town)        (State)    (Zip Code)

In the event of an emergency : Shrek    1 508 - 292 - 1010
Name : Winifred Travers    1 508 540 - 2893
             David M Shrek

Phone : 1 508 - 292 - 1010 David
        1 508 540 - 2893 Winifred

Relationship : Husband
               Mother

---

Position Data : ( To be completed by supervisor)

Title : Unit manager           Start Date : 1-3-00

Salary : $9.50

Hours : _____ 12°       Supervisor: Courtney Cavuse

HMI 039

## EMPLOYEE ACKNOWLEDGEMENT FORM

The employee handbook describes important information about Habit Management, and I understand that I should consult the Human Resources Department regarding any questions not answered in the handbook. I have entered into my employment relationship with Habit Management voluntarily and acknowledge that there is no specified length of employment. Accordingly, either I or Habit Management can terminate the relationship at will, with or without cause, at any time, so long as there is no violation of applicable federal or state law.

Since the information, policies, and benefits described here are necessarily subject to change, I acknowledge that revisions to the handbook may occur, except to Habit Management's policy of employment-at-will. All such changes will be communicated through official notices, and I understand that revised information may supersede, modify, or eliminate existing policies. Only the chief executive officer of Habit Management has the ability to adopt any revisions to the policies in this handbook.

Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document. I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it.

EMPLOYEE'S NAME (printed): _Sheila TRAvees - Shick_

EMPLOYEE'S SIGNATURE: _Sheila Jeanne - Shick_

DATE: _Jan 3 2001_

HMI 048

# Habit OPCO

# Employee Handbook

10/27/2006

HMI 085

# Habit OPCO
# Employee Handbook

## Table of Contents

**No. Policy**          **Page**

INTRODUCTION
020  Employee Welcome Message
040  Introductory Statement
051  Employee Acknowledgement Form

EMPLOYMENT
101  Nature of Employment ........... 1
102  Employee Relations ........... 2
103  Equal Employment Opportunity ........... 3
104  Business Ethics and Conduct ........... 4
105  Hiring of Relatives ........... 5
107  Immigration Law Compliance ........... 6
108  Conflicts of Interest ........... 7
110  Outside Employment ........... 8
114  Disability Accommodation ........... 9
116  Job Posting and Employee Referrals ........... 10

EMPLOYMENT STATUS & RECORDS
201  Employment Categories ........... 13
202  Access to Personnel Files ........... 15
203  Employment Reference Checks ........... 16
204  Personnel Data Changes ........... 17
205  Introductory Period ........... 18
208  Employment Applications ........... 19
209  Performance Evaluation ........... 20

EMPLOYEE BENEFIT PROGRAMS
301  Employee Benefits ........... 21
305  Holidays ........... 22
306  Workers' Compensation Insurance ........... 23
308  Time Off to Vote ........... 24
309  Bereavement Leave ........... 25
311  Jury Duty ........... 26
312  Witness Duty ........... 27
313  Benefits Continuation (COBRA) ........... 28
314  Educational Assistance ........... 29
315  Paid Time Off (PTO) ........... 32
316  Health Insurance ........... 34

HMI 086

# Habit OPCO
# Employee Handbook

317  Life Insurance                                      35
318  Short-Term Disability                               36
320  401(k) Savings Plan                                 37
324  Employee Assistance Program                         38
326  Flexible Spending Account (FSA)                     39
380  Liability Insurance Coverage                        40

TIMEKEEPING/PAYROLL
401  Timekeeping                                         41
403  Paydays                                             42
405  Employment Termination                              43
408  Pay Advances                                        44
409  Administrative Pay Corrections                      45
410  Pay Deductions and Setoffs                          46

WORK CONDITIONS & HOURS
501  Safety                                              47
502  Work Schedules                                      48
504  Use of Phone and Mail Systems                       49
505  Smoking                                             50
506  Meal Periods                                        51
507  Overtime                                            52
508  Use of Equipment and Vehicles                       53
510  Emergency Closings                                  54
512  Business Travel Expenses                            55
514  Visitors in the Workplace                           57
516  Computer and E-mail Usage                           58
517  Internet Usage                                      59
518  Workplace Monitoring                                61
522  Workplace Violence Prevention                       62
526  Cell Phone Usage                                    64

LEAVES OF ABSENCE
601  Medical Leave                                       65
602  Family Leave                                        67
603  Personal Leave                                      69
604  Educational Leave                                   71
605  Military Leave                                      72
607  Pregnancy-Related Absences                          73

EMPLOYEE CONDUCT & DISCIPLINARY ACTION
701  Employee Conduct and Work Rules                     74

HMI 087

# Habit OPCO
# Employee Handbook

| | | |
|---|---|---|
| 702 | Drug and Alcohol Use | 75 |
| 703 | Sexual and Other Unlawful Harassment | 76 |
| 704 | Attendance and Punctuality | 77 |
| 705 | Personal Appearance | 78 |
| 706 | Return of Property | 79 |
| 708 | Resignation | 80 |
| 710 | Security Inspections | 81 |
| 712 | Solicitation | 82 |
| 714 | Drug Testing | 83 |
| 716 | Progressive Discipline | 84 |
| 718 | Problem Resolution | 85 |

MISCELLANEOUS
| | | |
|---|---|---|
| 800 | Life-Threatening Illnesses in the Workplace | 87 |
| 806 | Suggestion Program | 88 |
| 890 | False Claim Act and Healthcare Fraud and Abus | 89 |

# Habit OPCO
# Employee Handbook

## 703 Sexual and Other Unlawful Harassment

Habit OPCO is committed to providing a work environment that is free of discrimination and unlawful harassment. Actions, words, jokes, or comments based on an individual's sex, race, ethnicity, age, religion, or any other legally protected characteristic will not be tolerated. As an example, sexual harassment (both overt and subtle) is a form of employee misconduct that is demeaning to another person, undermines the integrity of the employment relationship, and is strictly prohibited.

Any employee who wants to report an incident of sexual or other unlawful harassment should promptly report the matter to his or her supervisor. If the supervisor is unavailable or the employee believes it would be inappropriate to contact that person, the employee should immediately contact the Human Resources Director or any other member of management. Employees can raise concerns and make reports without fear of reprisal.

Any supervisor or manager who becomes aware of possible sexual or other unlawful harassment should promptly advise the Human Resources Director or any member of management who will handle the matter in a timely and confidential manner.

Anyone engaging in sexual or other unlawful harassment will be subject to disciplinary action, up to and including termination of employment.

**HMI 165**

Across Handbook

# Habit OPCO
# Employee Handbook

## 718 Problem Resolution

Habit OPCO is committed to providing the best possible working conditions for its employees. Part of this commitment is encouraging an open and frank atmosphere in which any problem, complaint, suggestion, or question receives a timely response from Habit OPCO supervisors and management.

Habit OPCO strives to ensure fair and honest treatment of all employees. Supervisors, managers, and employees are expected to treat each other with mutual respect. Employees are encouraged to offer positive and constructive criticism.

If employees disagree with established rules of conduct, policies, or practices, they can express their concern through the problem resolution procedure. No employee will be penalized, formally or informally, for voicing a complaint with Habit OPCO in a reasonable, business-like manner, or for using the problem resolution procedure.

If a situation occurs when employees believe that a condition of employment or a decision affecting them is unjust or inequitable, they are encouraged to make use of the following steps. The employee may discontinue the procedure at any step.

1. Employee presents problem to immediate supervisor after incident occurs. If supervisor is unavailable or employee believes it would be inappropriate to contact that person, employee may present problem to Human Resources Director or any other member of management.

2. Supervisor responds to problem during discussion or after consulting with appropriate management, when necessary. Supervisor documents discussion.

3. Employee presents problem to Human Resources Department if problem is unresolved.

4. Human Resources Department counsels and advises employee, assists in putting problem in writing, visits with employee's manager(s), if necessary, and directs employee to Appeals Committee for review of problem.

5. Employee presents problem to Appeals Committee in writing.

6. Appeals Committee reviews and considers problem. Appeals Committee informs employee of decision and forwards copy of written response to Human Resources Department for employee's file. The Appeals Committee has full authority to make any adjustment deemed appropriate to resolve the problem.

**HMI 174**

# Habit OPCO
# Employee Handbook

Not every problem can be resolved to everyone's total satisfaction, but only through understanding and discussion of mutual problems can employees and management develop confidence in each other. This confidence is important to the operation of an efficient and harmonious work environment, and helps to ensure everyone's job security.

**HMI 175**

1-Failed To Meet Expectations
2-Partially Meets Expectations
3-Meets Expectations In Most Respects
4-Meets Expectations In All Respects
5- Exceeds Expectations
N/A- Not Applicable

## HABIT MANAGEMENT
### Criteria-Based Job Description
### and Performance Evaluation

NAME: Sheila Travers

DEPARTMENT/UNIT: _____

PERIOD OF APPRAISAL from  1 / 3 / 01   to  3 / 3 / 0

TITLE:        Urine Monitor/Health Aide          DEPARTMENT:

REPORTS TO:                                      GROUP:

JOB CODE:                                        GRADE:

POSITION SUMMARY:

KEY RESPONSIBILITIES/ACHIEVEMENT PATHS

A.    KEY RESPONSIBILITY: Provides supervision and collection of urinalysis samples for drug screen analysis.

ACHIEVEMENT PATHS:

| | | | | | |
|---|---|---|---|---|---|
| 1) Observes clients as they provide sample | 1 | 2 | 3 | (4) | 5 | N/A |
| 2) Accurately and legibly documents client name/dates, etc. | 1 | 2 | (3) | 4 | 5 | N/A |
| 3) Documents infractions of HMI policy/ procedures accurately | 1 | (2) | 3 | 4 | 5 | N/A |
| 4) Interacts with clients in a respectful manner and in accordance with HMI staff Code of Ethics | 1 | 2 | 3 | (4) | 5 | N/A |
| 5) Observes universal precautions | 1 | 2 | 3 | (4) | 5 | N/A |
| 6) Provides receptionist coverage as assigned | 1 | 2 | (3) | 4 | 5 | N/A |

Examples Which Support Ratings:

Sheila handles her job as Health Aide /reception
in a professional manner. She is able to
answer questions & direct patients to the
appropriate department.

B.    KEY RESPONSIBILITY: Provides back up for Unit Manager

ACHIEVEMENT PATHS:

| | | | | | |
|---|---|---|---|---|---|
| 1) Enforces HMI policies and procedures | 1 | 2 | (3) | 4 | 5 | N/A |

HMI 030

TITLE: Urine Monitor/Health Aide, Page 2

2) Documents incidents consistent with HMI policies    1    (2)    3    4    5    N/A

3) Keeps physical environment clear of safety hazards    1    2    3    (4)    5    N/A
   i.e., mops wet floors and ensures that hallways are
   clear, etc.

**Examples Which Support Ratings:**

Sheila enforces all policies + procedures, but does not follow through with writing incident reports.

C.    **KEY RESPONSIBILITY:** Performs other duties as assigned.

**ACHEIVEMENT PATHS:**

1) Urine scheduling    1    2    (3)    4    5    N/A

2)    1    2    3    4    5    N/A

3)    1    2    3    4    5    N/A


**NECESSARY QUALIFICATIONS (Education and Experience):**

1.    Ability to read, write, speak and understand English.

2.    Ability to understand and follow directions.

3.    Completion of High School preferred.

**TITLE:** Urine Monitor/ Health Aide, Page 3

## PERFORMANCE APPRAISAL SUMMARY

I.  **SUMMARY OF ACHIVEMENTS**

Sheila is well liked by both staff & Patients. She is willing to cover any and all shifts if possible

II. **MODE EVALUATION** (i.e., the manner in which key responsibilities and special projects are achieved and to what extent the manner enhanced or detracted from actual results):

Sheila is able to schedule all Patients for two veins monthly. needs to work on scheduling more consistant numbers on a daily basis.

III. **GENERAL ACCOUNTABILITIES** (Comment on the following: attendance and punctuality, adherence to standards of dress and appearance, neatness of work area, guest relations, etc.):

Sheila is pleasure to work with. Sheila arrives early to work to ensure that all cards are in the appropriate order.
Dresses in a neat and professional manner

IV. **AREAS TARGETED FOR DEVELOPMENT/IMPROVEMENT** (i.e., to facilitate continued professional growth and/or to restore performance to minimum requirements where improvement is required):

- reduce noise level in dosing waiting room.

**HMI 032**

- document all incident reports in writing

- improve number of veines scheduled

TITLE: Urine Monitor/Health Aide, Page 4

V.    **ACTIONS TO BE TAKEN** (i.e., by the employee and the supervisor related to the recommendation and/or requirements in #IV above):

- run daily or report weekly to ensure number of urines scheduled.
- let supervisor on duty know of any incidents and follow-up in writing

VI.    **DEVELOPMENTAL APPRAISAL**

| | AREAS SET FOR IMPROVEMENT AT LAST APPRAISAL (list in order of importance most important first) | RESULTS ACHIEVED (use the rating continuum as in the performance appraisal) | RATIONALE (comment as in the performance appraisal) |
|---|---|---|---|
| | Specifics | | |
| | | Low — High | |
| | | Low — High | |
| | | Low — High | |
| | | Low — High | |
| | | Low — High | |

**HMI 033**

TITLE: Urine Monitor/Health Aide, Page 5

VII.    **OVERALL PERFORMANCE APPRAISAL** (Check One):

　　　_____ Exceeds Expectations                    (5)

　　　_____ Meets Expectations In All Respects       (4)

　　　__X__ Meets Expectations In Most Respects      (3)

　　　_____ Partially Meets Expectations             (2)

　　　_____ Fails To Meet Expectations               (1)

| | | |
|---|---|---|
| _(signature)_ | Admin. Asst | 8-23-01 |
| Appraiser's Signature | Title | Date |
| _(signature)_ LMHC | Clinical Supervisor | 8.28.01 |
| Reviewed by | Title | Date |
| _(signature)_ - Shiek | Female Aide | 8-28-01 |
| Approved by | Title | Date |

**EMPLOYEE COMMENTS** (Optional):

_____          _____
*Employee's Signature                                  Date

*Employee signature implies neither agreement nor disagreement with this appraisal.  The signature indicates only that the employee has read this appraisal and discussed it with the supervisor.

HMI 034

# PAYROLL STATUS CHANGE

**EFFECTIVE DATE** 4, 30, 01

NAME: Sheila Travers          PAYROLL #: Sheila

| NEW ADDRESS | STREET | FOR NEW EMPLOYEE ONLY | SOCIAL SECURITY NO. |
|---|---|---|---|
| | CITY, STATE, ZIP | | DATE OF BIRTH |
| | TELEPHONE | | |

| CHANGE | FROM (DOES NOT APPLY TO NEW EMPLOYEE) | TO |
|---|---|---|
| JOB | | |
| DEPARTMENT | | |
| SHIFT | 12° | 28T |
| PAY | | |

## REASON FOR CHANGE

☐ HIRED        ☐ MERIT INCREASE      ☐ LENGTH OF SERVICE INCREASE
☐ REHIRED      ☐ RESIGNATION        ☐ REEVALUATION OF CURRENT JOB
☐ PROMOTION    ☐ RETIREMENT         ☐ PROBATION PERIOD COMPLETED
☐ DEMOTION     ☐ LAYOFF             ☐ UNION CONTRACT
☐ TRANSFER     ☐ DISCHARGE          ☐

COMMENTS, IF NECESSARY _Take over Jessica Clarks position_

| LEAVE OF ABSENCE | CHARGED TO VACATION | ☐ YES ☐ NO | ADVANCE PAY AUTHORIZED | ☐ YES ☐ NO |
|---|---|---|---|---|
| FROM  /  / | OTHER, EXPLAIN | | | |
| TO  /  / | | | | |

AUTHORIZED BY _____        APPROVED BY _____

COPIES TO: 1. PAYROLL
2. PERSONNEL
3. DEPARTMENT HEAD

© Copyright 1980 — SELECTFORM, INC.
Box 3045, Freeport, NY 11520
Form 25—Printed in U.S.A.

HMI-035

1-Failed To Meet Expectations
2-Partially Meets Expectations
3-Meets Expectations In Most Respects
4-Meets Expectations In All Respects
5- Exceeds Expectations
N/A- Not Applicable

**HABIT MANAGEMENT**
**Criteria-Based Job Description**
**and Performance Evaluation**

NAME: _____ Sheila Travers _____

DEPARTMENT/UNIT: _____ HMI - Yarmouth _____

PERIOD OF APPRAISAL from _ 1 - 3 - 01 _ to _____ 1 - 2 - 02 _____

TITLE:          Urine Monitor/Health Aide          DEPARTMENT:

REPORTS TO:                                          GROUP:

JOB CODE:                                            GRADE:

POSITION SUMMARY:

KEY RESPONSIBILITIES/ACHIEVEMENT PATHS

A.    KEY RESPONSIBILITY: Provides supervision and collection of urinalysis samples for drug screen analysis.

    ACHIEVEMENT PATHS:

    1)  Observes clients as they provide sample          1    2    3    ④    5    N/A

    2)  Accurately and legibly documents client name/dates, etc.          1    2    ③    4    5    N/A

    3)  Documents infractions of HMI policy/ procedures accurately          1    2    ③    4    5    N/A

    4)  Interacts with clients in a respectful manner and in accordance with HMI staff Code of Ethics          1    2    3    ④    5    N/A

    5)  Observes universal precautions          1    2    3    ④    5    N/A

    6)  Provides receptionist coverage as assigned          1    2    ③    4    5    N/A

    Examples Which Support Ratings:
    Sheila handles her role as health aide in a professional manner. She has adjusted well to new responsibilities around oral testing. Sheila also handles some reception duties and does so accurately and appropriately.

B.    KEY RESPONSIBILITY: Provides back up for Unit Manager

    ACHIEVEMENT PATHS:

    1)  Enforces HMI policies and procedures          1    2    ③    4    5    N/A

HMI 024

TITLE: Urine Monitor/Health Aide, Page 2

| | | | | | |
|---|---|---|---|---|---|
| 2) Documents incidents consistent with HMI policies | 1 | 2 | ③ | 4 | 5 | N/A |
| 3) Keeps physical environment clear of safety hazards i.e., mops wet floors and ensures that hallways are clear, etc. | 1 | 2 | ③ | 4 | 5 | N/A |

**Examples Which Support Ratings:**

Sheila is able to meet expectations in this area. Needs to ensure all policies and procedures are being followed and incident reports are written when needed.

**C.     KEY RESPONSIBILITY:** Performs other duties as assigned.

**ACHEIVEMENT PATHS:**

| | | | | | |
|---|---|---|---|---|---|
| 1) Drug Testing Scheduling | 1 | 2 | ③ | 4 | 5 | N/A |
| 2) | 1 | 2 | 3 | 4 | 5 | N/A |
| 3) | 1 | 2 | 3 | 4 | 5 | N/A |

## NECESSARY QUALIFICATIONS (Education and Experience):

1.     Ability to read, write, speak and understand English.

2.     Ability to understand and follow directions.

3.     Completion of High School preferred.

**HMI 025**

## PERFORMANCE APPRAISAL SUMMARY

I.    **SUMMARY OF ACHIVEMENTS**

Sheila is a valuble member of the clinic staff. She is respected and liked by both patients and staff. Sheila has taken on responsibility of scheduling drug tests and has a willingness to take on additional duties.

II.   **MODE EVALUATION** (i.e., the manner in which key responsibilities and special projects are achieved and to what extent the manner enhanced or detracted from actual results):

- Schedules monthly drug tests. Needs to ensure that test are random and scheduled on non-take home days.

- Able to come to supervisor w/ concerns.

III.  **GENERAL ACCOUNTABILITIES** (Comment on the following: attendance and punctuality, adherence to standards of dress and appearance, neatness of work area, guest relations, etc.):

Sheila is very professional in all areas of her employment. She arrives to work on-time and is willing to work additional hours to meet the programs needs. Sheila dresses appropriately for work. She is very friendly in her interactions w/ all patients.

IV.   **AREAS TARGETED FOR DEVELOPMENT/IMPROVEMENT** (i.e., to facilitate continued professional growth and/or to restore performance to minimum requirements where improvement is required):

- Improve on scheduling # of drug tests each day throughout the month.

- Improve customer service skills. Gain knowledge/experience around professional boundries w/ pts.

HMI 026

- Document all policy and procedure infractions appropriately i.e. incident reports.

TITLE: Urine Monitor/Health Aide, Page 4

V.    **ACTIONS TO BE TAKEN** (i.e., by the employee and the supervisor related to the recommendation and/or requirements in #IV above):

- attend in-service training on boundries / confidentiality
- Bi-monthly unit manager / health aide meetings to be scheduled to review responsibilities, policies, etc.

VI.    **DEVELOPMENTAL APPRAISAL**

| AREAS SET FOR IMPROVEMENT AT LAST APPRAISAL (list in order of importance most important first) | | RESULTS ACHIEVED (use the rating continuum as in the performance appraisal) | RATIONALE (comment as in the performance appraisal) |
|---|---|---|---|
| | Specifics | | |
| | | Low        High | |
| | | Low        High | |
| | | Low        High | |
| | | Low        High | |
| | | Low        High | |

**HMI 027**

TITLE: Urine Monitor/Health Aide, Page 5

VII.     OVERALL PERFORMANCE APPRAISAL (Check One):

      _____ Exceeds Expectations            (5)

      _____ Meets Expectations In All Respects    (4)

      __X__ Meets Expectations In Most Respects   (3)

      _____ Partially Meets Expectations        (2)

      _____ Fails To Meet Expectations         (1)


_____     Program Director     1-3-02
Appraiser's Signature            Title                    Date

_____     _____     _____
Reviewed by                 Title                    Date

_____     _____     _____
Approved by                 Title                    Date


EMPLOYEE COMMENTS (Optional):


_____     1-8-02
*Employee's Signature                            Date


*Employee signature implies neither agreement nor disagreement with this appraisal. The signature indicates only that the employee has read this appraisal and discussed it with the supervisor.

# PAYROLL STATUS CHANGE

EFFECTIVE DATE
1 , 3 , 02

NAME: Sheila Travers                    PAYROLL #:

| NEW ADDRESS | STREET | | FOR NEW EMPLOYEE ONLY | SOCIAL SECURITY NO. |
|---|---|---|---|---|
| | CITY, STATE, ZIP | | | DATE OF BIRTH |
| | TELEPHONE | | | |

| CHANGE | FROM (DOES NOT APPLY TO NEW EMPLOYEE) | TO |
|---|---|---|
| JOB | | |
| DEPARTMENT | | |
| SHIFT | | |
| PAY | | ↑ 3% |

## REASON FOR CHANGE

☐ HIRED        ☐ MERIT INCREASE        ☐ LENGTH OF SERVICE INCREASE
☐ REHIRED      ☐ RESIGNATION          ☐ REEVALUATION OF CURRENT JOB
☐ PROMOTION    ☐ RETIREMENT           ☐ PROBATION PERIOD COMPLETED
☐ DEMOTION     ☐ LAYOFF               ☐ UNION CONTRACT
☐ TRANSFER     ☐ DISCHARGE            ☐ _____

COMMENTS, IF NECESSARY _____

_____

_____

_____

| LEAVE OF ABSENCE | CHARGED TO VACATION  ☐ YES  ☐ NO | ADVANCE PAY AUTHORIZED  ☐ YES  ☐ NO |
|---|---|---|
| FROM  /  / | OTHER, EXPLAIN | |
| TO  /  / | | |

AUTHORIZED BY _Nicholas Murphy_ APPROVED BY _____

COPIES TO:  1. PAYROLL          1-8-02
            2. PERSONNEL
            3. DEPARTMENT HEAD

© Copyright 1980—SELECTFORM, INC.
Box 3045, Freeport, NY 11520
Form 29—Printed in U.S.A.

HMI 029

**Exhibit 2**

## HABIT MANAGEMENT, INC.

**Support Positions**
**Qualifications Summary**

<u>Position</u>                              <u>Qualifications</u>

***Office Assistant***
(formerly, Clerk I,
Unit Manager, Health
Aide, Clerical Ass't.,
Dosing Clerical)

- Ability to read, write, and speak English effectively
- Ability to follow directions
- Ability to file or sort via alphabetical / numerical criteria **(Test)**
- Ability to operate standard office equipment (fax, computers, etc.)
- High school diploma or equivalent required

***Office Associate***
(formerly, Clerk II,
Health Aide Supv.,
Unit Mgr. Supv.,
Sec'y/ Rec.,
Weekend Dosing Adm.)

- Ability to read, write, and speak English effectively
- Ability to follow directions
- 2 years of related experience
- Demonstrated ability to type a minimum of 45 wpm **(Test)** and to operate standard office equipment including fax, computers, etc.
- Ability to file or sort via alphabetical / numerical criteria **(Test)**
- Knowledge of, and proficiency in, Microsoft Word **(Test)** required
- Good interpersonal skills
- High school diploma or equivalent required

***Medical Assistant /***

***Clinical Assistant***

- Current Medical Assistant Certificate (or studies in progress required and ability to recognize and understand basic medical terminology **(test)** (M.A. only)
- Basic computer skills (both)
- Ability to read, write, and speak English effectively **(both)**
- Ability to understand and follow directions (both)
- 2 to 5 years of related experience required (Clinical Assistant)
- Demonstrated ability to keyboard a minimum of 45 wpm **(test)** and to operate standard office equipment including fax, calculator, computer, etc. (Clinical Assistant)
- Knowledge of, and proficiency in, Microsoft Word **(test)** required; working knowledge of Microsoft Excel **(Opt Test)** strongly preferred (Clinical Assistant)
- Good proofreading skills (both) **(test)**
- Strong interpersonal skills (both)
- High school diploma or equivalent required; post-secondary training preferred (post-secondary required for M.A.)

HMI 078

Support Position Reconfiguration
November, 2002

2

**Senior Office Associate**
(formerly, Clerk III,
Med'l. Records Coord.,
Support Staff Supv.)

Ability to read, write, and speak English effectively
Minimum of 5 years of related experience
Demonstrated ability to type a minimum of 50 wpm **(test)** and to
    operate standard office equipment including fax, computers, etc.
Knowledge of, and proficiency in, Microsoft Word **(test)** required;
    working knowledge of Microsoft Excel **(test)** strongly preferred
Good proofreading skills **(test)**
Strong interpersonal skills
High school diploma or equivalent required; post-secondary
    training preferred

**Medical Records
Associate**

Alternative title for Level III position when incumbent is
completely devoted to medical records function.

**Administrative**

**Assistant**

Minimum of high school diploma or equivalent required; post-secondary
    coursework related to business and office operations preferred
Minimum of 5 years of related office experience
Ability to organize and prioritize own work and that of others to meet
    deadlines
Strong writing, analytical and interpersonal skills, working
    knowledge of Microsoft Word and ability to operate
    various types of office equipment required
Demonstrated ability to type a minimum of 55 wpm **(test)**
Good proofreading skills **(test)**
Working knowledge of Microsoft Excel strongly preferred
**(test)**

**Office Manager**
(Applies only to
selected offices based
on size, need, etc.)

Minimum of high school diploma or equivalent required; post-secondary
    coursework related to business and office operations
    preferred
5 to 7 years experience required; previous office management
    experience, including supervision of others, strongly preferred
Ability to organize and prioritize own work and that of others to
    meet deadlines
Strong writing, analytical **[any tests?]** and interpersonal skills
Strong office skills including demonstrated ability to keyboard 55 wpm,
    **(test)** working knowledge of Microsoft Word and Excel, ability to
    operate various types of office equipment required
Good proofreading skills **(test)**

HMI 079

**Support Positions**
**Skills Matrix**
**As of: 10.23.02**

Exhibit 3

| Required Skills | Office Assistant | Office Associate | Medical Assistant | Clinical Assistant | Sr. Office Associate | Admin Assistant | Office Manager |
|---|---|---|---|---|---|---|---|
| English communications | X | X | X | X | X | X | X |
| Alpha/Numeric filing or sorting | X | X | X | X | X | X | X |
| Operating standard ofc equip | X | X | X | X | X | X | X |
| Following directions | X | X | X | X | X | X | X |
| Keyboarding/typing | | 45 wpm | 45 wpm | 45 wpm | 50 wpm | 55 wpm | 55 wpm |
| Proficiency in MS Word | X | X | X | X | X | X | X |
| Interpersonal skills | | X | X | X | X | X | X |
| Organizing/prioritizing | | | X | X | X | X | X |
| Proofreading | | | X | X | X | X | X |
| Analytical skills | | | X | X | X | X | X |
| MS Excel knowledge preferred | | | | X | X | X | X |
| MS Excel proficiency | | | | | | X | X |
| Supervising others | | | | | | X | X |
| Basic math skills | | | | | | X | X |
| Cash management skills | | | | | | X | X |
| Database knowledge prefd. | | | | | | X | X |
| *Experience required:* | | | | | | | |
| No experience required | X | X | X | | | | |
| 2 years | | | | X | | | |
| 5 years | | | | | X | X | |
| 7 years | | | | | | | X |
| *Credentials:* | | | | | | | |
| High school diploma or equiv. | | X | X | X | X | X | X |
| Post-secondary educ. prefd. | | | | X | X | X | X |
| Medical Assistant certificate (or studies in progress) | | | X | | | | |
| Basic medical terminology | | | X | | | | |

Exhibit 4

# HABIT MANAGEMENT

## Support Positions—Yarmouth

| Incumbent | Current Title | New Title | Grade Level |
|---|---|---|---|
| Eisner, Arthur | Health Aide | Office Assistant | 101 |
| Fernandes, Andrea D. | Health Aide | Office Assistant | 101 |
| Travers-Shiek, Shiela M. | Clerk I | Office Assistant | 101 |
| Eldridge, Alice L. | Clerk II/Secretary | Office Associate | 102 |
| Gallagher, Barbara | Clerk II | Office Associate | 102 |
| O'Leary, Daniel J. | Clerical/UM Supervisor | Office Associate | 102 |
| Sheehan, Penny S. | Clerk II | Office Associate | 102 |

Exhibit 5

| Grade | Salary Ranges | | |
|---|---|---|---|
| | Beginning | Midpoint | Top |
| 101 | $9.25 | $11.25 | $13.00 |
| 102 | $10.00 | $12.75 | $15.00 |
| 103 | $10.75 | $13.25 | $15.50 |
| 104 | $11.00 | $13.50 | $16.25 |
| 105 | $16.75 | $19.00 | $22.25 |
| 106 | $20.50 | $23.25 | $26.50 |
| 107 | $21.25 | $24.50 | $27.50 |

NONEXEMPT POSITIONS

| Current Job Titles | Grade |
|---|---|
| Unit Manager /Clerk I | 101 |
| Urine Monitor/Health Aide/Clerk I | 101 |
| Dosing Clerical/Clerk I | 101 |
| Clerical Assistant/Clerk I | 101 |
| Urine Supervisor/Clerk II | 102 |
| Unit Manager Supervisor/Clerk II | 102 |
| Secretary/Receptionist/Clerk II | 102 |
| Weekend Dosing Administrator/Clerk II | 102 |
| Medical Records Coordinator/Clerk III | 103 |
| Support Staff Supervisor Clerk III | 103 |
| Driver (Mobile) | 104 |
| Dosing Nurse LPN | 105 |
| Dosing Nurse RN | 106 |
| Assessment Nurse RN | 106 |
| Charge Nurse RN | 107 |

Rev 01/2002

HMI 082

Exhibit 6

| Grade | Salary Ranges | | |
|---|---|---|---|
| | Beginning | Midpoint | Top |
| 101 | $9.25 | $11.25 | $13.00 |
| 102 | $10.00 | $12.75 | $15.00 |
| 103 | $10.75 | $13.25 | $15.50 |
| 104 | $11.00 | $13.50 | $16.25 |
| 105 | $16.75 | $19.00 | $22.25 |
| 106 | $20.50 | $23.25 | $26.50 |
| 107 | $21.25 | $24.50 | $27.50 |

**NONEXEMPT POSITIONS**

| Current Job Titles | Grade |
|---|---|
| Office Assistant | 101 |
| Office Associate | 102 |
| Senior Office Associate | 103 |
| Driver (Mobile) | 104 |
| Staff Nurse LPN | 105 |
| Staff Nurse RN | 106 |
| Charge Nurse RN | 107 |

Rev 11/2002

HMI 083

Clinic: __Yarmouth__

## INDIVIDUAL SUPERVISION

Staff Name: __Sheila Travers__    Position: __Health Aide__

Date: __12-13-01__

Time: _____

Issues Discussed:

Sheila approached this writer at 9:30 to say that she was feeling "uncomfortable with comments made by a co-worker, Art E." Sheila would not be specific about the comments but stated that they were "demeaning and somewhat sexual in nature". Sheila stated that she wanted me to speak with Art. I asked her if she was okay for today and she said she was fine and if I could speak with him that would be great. This was the 1st time Sheila had brought these concerns to my attention. At 10⁰⁵ I informed Sheila that I had spoken to Art and she said thanks. At 10:30 am I was informed that Sheila left for the day, 2 hours early, without notifying her direct supervisor or the program director

Signature _Nicholas Manzey_    Date __12-13-01__

HMI 010

Clinic: __Yarmouth__

# INDIVIDUAL SUPERVISION

Staff Name: __Art Eisner__        Position: __Health Aide__

Date: __12 · 13 · 01__        Time: _____

**Issues Discussed:**

Spoke with Art regarding complaints from a colleague regarding verbal comments that were making people "uncomfortable and being perceived in a sexual, demeaning way"

Art was unclear as to specific comments made but was understanding of what was expected of him regarding language and appropriate comments.

Signature _~Julie Magny~_        Date __12 · 13 · 01__

HMI 011

# SUPERVISION

**Staff Name:  Sheila Travers-Shiek**         **Position: Unit Manager**

**Date:  11-7-02**                                          **Time: 7:30 a.m.**

## Individual Departmental Supervision

**Issues Discussed:**

Sheila came into the chart room visibly upset.  She spoke with Dan O'Leary.  I observed that she appeared angry.  I questioned her as to the cause.  She preferred to not answer my question.  I mentioned that as her supervisor she could come to me with a problem and that it was better to do that than go to other employees.  She still refused to discuss it.  After she left the chart room, I asked Dan what she had said.  He said all he knew was that she said she didn't like being called "the black bitch".

I went to Nick Mazzoni and informed him of the situation.  Nick asked Sheila to step in his office so he and I could address the situation.  Nick told Sheila that if someone was calling her that, that we should know who it is and we would address the situation.  Sheila said she "didn't mind being called black and she didn't mind being called a bitch, but she didn't like the two together".  Sheila said she would rather not disclose the name of the person that made the remark.  Nick reinforced HMI policy that we do not support that kind of treatment of our staff.  Sheila said she still would rather not give us a name and that she understood that people are on medication, etc. but did not like being called that.

HMI 008

## PAYROLL STATUS CHANGE

| EFFECTIVE DATE |
| --- |
| 12 / 2 / 02 |

NAME: Sheila Travers Sheik     PAYROLL #

| NEW ADDRESS | STREET | | FOR NEW EMPLOYEE ONLY | SOCIAL SECURITY NO. |
| --- | --- | --- | --- | --- |
| | CITY, STATE, ZIP | | | DATE OF BIRTH |
| | TELEPHONE | | | |

| CHANGE | FROM (DOES NOT APPLY TO NEW EMPLOYEE) | TO |
| --- | --- | --- |
| JOB | | |
| DEPARTMENT | | |
| SHIFT | 33 hours | 30 hours |
| PAY | | |

### REASON FOR CHANGE

| | | |
| --- | --- | --- |
| ☐ HIRED | ☐ MERIT INCREASE | ☐ LENGTH OF SERVICE INCREASE |
| ☐ REHIRED | ☐ RESIGNATION | ☐ REEVALUATION OF CURRENT JOB |
| ☐ PROMOTION | ☐ RETIREMENT | ☐ PROBATION PERIOD COMPLETED |
| ☐ DEMOTION | ☐ LAYOFF | ☐ UNION CONTRACT |
| ☐ TRANSFER | ☐ DISCHARGE | ☐_____ |

COMMENTS, IF NECESSARY _____

_____

_____

| LEAVE OF ABSENCE | | CHARGED TO VACATION | ☐ YES  ☐ NO | ADVANCE PAY AUTHORIZED | ☐ YES  ☐ NO |
| --- | --- | --- | --- | --- | --- |
| FROM | / / | OTHER, EXPLAIN | | | |
| TO | / / | | | | |

AUTHORIZED BY _Pamela Manzoni_     APPROVED BY _____

COPIES TO:  1. PAYROLL
2. PERSONNEL
3. DEPARTMENT HEAD

11-18-02

© Copyright 1960 - SELECTFORM, INC.
Box 3045, Freeport, NY 11520
Form 26-Printed in U.S.A.

HMI 018

NWEALTH OF MASSACHUSETTS
SION AGAINST DISCRIMINATION
HBURTON PLACE - ROOM 601
BOSTON, MA 02108

BOSTON
NOV 25 '02
MA

PB METER
7842121

≡ 0.83 ≡
U.S. POSTAGE

Art Eisner
Habit Management Institute
20 Forsyth Ave.
South Yarmouth, MA 02664

HMI 193

December 19 2002

The Purpose of this Letter is to give my Notice of Resignation from my Position of Female Aid, Here at HMI. Due to the Menner in Which I was approached by linda Fraunfelt. I felt threatened and do not wish to work in such an enviroment. I feel the situation should have been handled in a more appropriate menner and, I do not wish to work in this current

Condition.

Sheila M Travers – Shiek

This effected to day December 19 2002

Thank you

Rec'd 12/19/02 @ 4:10 pm

**HMI 001**

    

# APPLICATION FOR EMPLOYMENT
# HABIT MANAGEMENT, INC.

Please answer all question in full. Habit Management, Inc. is an equal opportunity employer and does not discriminate on the basis of age, color, national origin, race, religion or sex. PLEASE PRINT NEATLY.

Name _TRAVERS - Shiek_____ _(Sheila_____ _TMAE____
　　　　**Last**　　　　　　　　**First**　　　　　　　　**Middle**

Other Names Used_____

Address _25 Parkwood  South Yarmouth  mA_____
　　　　　**Street**　　　　**City**　　　**State**　　**Zip**

Telephone ( )_540-2893  394-0247__ Soc. Sec. # **REDACTED**

Last Former Address _7 Jonathan Ln   E. Falmouth mA 02536__

Are you a U.S. citizen?___✓___ If no, do you possess a valid work permit?_____
(Proof of citizenship or immigration status will be required upon employment.)

U.S. military service?_____ If Yes, dates of service and branch_____
(A copy of your DD form 214 is required upon employment.)

## POSITION DESIRED

Position: _Aid_____ Date Available: _December 06 2000_

Have you ever applied to this company before? _no_____

When?/Where?_____

Can you work weekends whenever scheduled or requested?　　YES _✓_ NO_____
Would you accept part-time work?　　　　　　　　　　　　YES _✓_ NO_____
Would you accept temporary work?　　　　　　　　　　　YES _✓_ NO_____

Summarize special skills and qualifications acquired from employment or other experience
_____
_____

If applying for an office position:
Typing:　　　Approximate WPM_____　　Shorthand:　　Approximate WPM_____

## AN EQUAL OPPORTUNITY EMPLOYER

HMI 049

# EMPLOYMENT EXPERIENCE

Start with your present or last job. Include military service assignments and any verifiable work performed on a volunteer basis. You may exclude organization names which indicate race, color, religion, gender, national origin, handicap, or other protected status. Any history of self-employment, provide firm name and business references.

PRESENT EMPLOYER _Cape Heritage_ Telephone _888-8222_
Address _8 Sandwich_
Salary _11.00_ Position _CNA_ Supervisor _Cheryle Fritze_
Dates of Employment _Sept 1 99_
Reason for Leaving _____

## FORMER EMPLOYERS

**1.**
Employer _JML Falmouth_ Telephone _457-4621_
Address _Falmouth_ Supervisor _____
Salary _11.00_ Position _CNA_
Dates of Employment _January 27 1997_
Reason for Leaving _____

**2.**
Employer _Stop and Shop_ Telephone _540-7481_
Address _Falmouth_ Supervisor _____
Salary _6.00_ Position _Cashier_
Dates of Employment _____
Reason for Leaving _Went to work at JML_

**3.**
Employer _____ Telephone _____
Address _____ Supervisor _____
Salary _____ Position _____
Dates of Employment _____
Reason for Leaving _____

**4.**
Employer _____ Telephone _____
Address _____ Supervisor _____
Salary _____ Position _____
Dates of Employment _____
Reason for Leaving _____

May we contact your present employer? _YES_ If no, state reason _____

HMI 050

## EDUCATION

List all diplomas, degrees, or certifications you have obtained from high school, college, university, trade, or occupational schools.  Dates of attendance for verification use only.

| Name and Address of School | Type of Degree or Diploma | # Years Completed | Major | Dates of Attendance |
|---|---|---|---|---|
| 1. JTEC | CNA Certificate | | | 8 1994 |
| 2. Falmouth High | | 4 | General | 1983 |
| 3. | | | | |

### References

Give name, address and telephone number of three references other than relatives and employers.

1. Meagan Jones  84 Cider Pond Rd  Falmouth, MA 02540  548-2778
2. Barbara Jones  38 Locust Rd.  Falmouth, MA 02540  548-5397
3. Mary Wright  Gray Rd.  Woods Hole, MA  540-5736

### SEALED RECORD NOTICE

Applicants having sealed conviction records on file with the commission of Probation may answer "no record" to the following questions:

Have you been convicted of a misdemeanor?
(Applicants may answer "no" with respect to a first conviction for drunkenness, simple assault, speeding, minor traffic violations, affray or disturbance of the peace.)
_____ YES _____✓____ NO
If yes, please explain_____
_____
_____

Have you ever been convicted of a felony?
_____ YES _____ NO
If yes, please explain_____
_____
_____
_____

Do you have an active driver's license?___YES_____

License #_____    State_____

HMI 051

I understand that any false information, omissions or misinterpretations of facts called for in this application may result in rejection of my application or discharge at any time during my employment. I also understand that under the Fair Credit Union Act, this investigation may include an Investigation Consumer Report, including information regarding my character, general reputation, personal characteristics, and mode of living. I authorize Habit Management, Inc. and/or its agents, including consumer reporting bureaus, to verify any of this information including, but not limited to, criminal history and motor vehicle driving records. I authorize all persons, schools, companies and law enforcement authorities to release any information concerning my background and hereby release any said persons, schools, companies, and law enforcement authorities from any liability for any damage whatsoever for issuing this information. I also understand that the use of illegal drugs is prohibited during employment.

I understand that the Company will require applicants for employment to take a urinalysis or blood test for drug and alcohol screening as part of a pre-employment physical examination, and that any offer of employment with Habit Management, Inc. is conditioned upon the results of my physical examination (including urinalysis or blood tests for drug and alcohol screens) being satisfactory. I understand that if I am employed with Habit Management, Inc., the Company will require that I submit to a drug or alcohol screen if I apply for a promotion, if I am involved in an on-the-job accident, or of the Company has a reasonable suspicion that I am under the influence of drugs or alcohol, and I hereby authorize the release of the results of any physical examinations or drug tests required herein to Habit Management, Inc. I further understand that the Company may inspect all lockers and any other bags (including purses or briefcases) or parcels brought into or taken out of Habit Management, Inc. and that my refusal to submit to a urinalysis, blood test, or search, when requested to do so, may result in the termination of my employment.

I UNDERSTAND AND AGREE THAT IF I AM OFFERED EMPLOYMENT BY HABIT MANAGEMENT, INC., MY EMPLOYMENT WILL BE FOR NO DEFINITE TERM AND THAT EITHER I, OR HABIT MANAGEMENT, INC., WILL HAVE THE RIGHT TO TERMINATE THE EMPLOYMENT RELATIONSHIP AT ANY TIME, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE. I ALSO UNDERSTAND THAT THIS STATUS CAN ONLY BE ALTERED BY A WRITTEN CONTRACT OF EMPLOYMENT WHICH IS SPECIFIC AS TO ALL MATERIAL TERMS AND IS SIGNED BY ME AND THE PRESIDENT OF THE COMPANY.

"It is unlawful to require or administer a lie detector test as a condition of employment or continued employment. An employer who violates this law shall be subject to criminal penalties and civil liability."

<u>Sheik m Traias</u>                    <u>December 20 2000</u>
Signature of Applicant                              Date

HMI 052

# Form W-4 (1999)

**Purpose.** Complete Form W-4 so your employer can withhold the correct Federal income tax from your pay. Because your tax situation may change, you may want to refigure your withholding each year.

**Exemption from withholding.** If you are exempt, complete only lines 1, 2, 3, 4, and 7, and sign the form to validate it. Your exemption for 1999 expires February 16, 2000.

**Note:** You cannot claim exemption from withholding if (1) your income exceeds $700 and includes more than $250 of unearned income (e.g., interest and dividends) and (2) another person can claim you as a dependent on their tax return.

**Basic instructions.** If you are not exempt, complete the Personal Allowances Worksheet. The worksheets on page 2 adjust your withholding allowances based on itemized

deductions, adjustments to income, or two-earner/two-job situations. Complete all worksheets that apply. They will help you figure the number of withholding allowances you are entitled to claim. However, you may claim fewer allowances.

**Child tax and higher education credits.** For details on adjusting withholding for these and other credits, see Pub. 919, Is My Withholding Correct for 1999?

**Head of household.** Generally, you may claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals. See line E below.

**Nonwage income.** If you have a large amount of nonwage income, such as interest or dividends, you should consider making estimated tax payments using Form 1040-ES. Otherwise, you may owe additional tax.

**Two earners/two jobs.** If you have a working spouse or more than one job, figure the total number of allowances you are entitled to claim on all jobs using worksheets from only one Form W-4. Your withholding will usually be most accurate when all allowances are claimed on the Form W-4 prepared for the highest paying job and zero allowances are claimed on the others.

**Check your withholding.** After your Form W-4 takes effect, use Pub. 919 to see how the dollar amount you are having withheld compares to your estimated total annual tax. Get Pub. 919 especially if you used the Two-Earner/Two-Job Worksheet and your earnings exceed $150,000 (Single) or $200,000 (Married).

**Recent name change?** If your name on line 1 differs from that shown on your social security card, call 1-800-772-1213 for a new social security card.

---

## Personal Allowances Worksheet

**A** Enter "1" for yourself if no one else can claim you as a dependent . . . . . . . . . . . . . . **A** _____

**B** Enter "1" if:
- You are single and have only one job; or
- You are married, have only one job, and your spouse does not work; or
- Your wages from a second job or your spouse's wages (or the total of both) are $1,000 or less.

**B** _____

**C** Enter "1" for your spouse. But, you may choose to enter -0- if you are married and have either a working spouse or more than one job. (This may help you avoid having too little tax withheld.) . . . . . . . . . **C** _____

**D** Enter number of dependents (other than your spouse or yourself) you will claim on your tax return . . . . . **D** _____

**E** Enter "1" if you will file as head of household on your tax return (see conditions under Head of household above) . **E** _____

**F** Enter "1" if you have at least $1,500 of child or dependent care expenses for which you plan to claim a credit . **F** _____

**G** Child Tax Credit:
- If your total income will be between $20,000 and $50,000 ($23,000 and $63,000 if married), enter "1" for each eligible child.
- If your total income will be between $50,000 and $80,000 ($63,000 and $115,000 if married), enter "1" if you have two eligible children, enter "2" if you have three or four eligible children, or enter "3" if you have five or more eligible children . . **G** _____

**H** Add lines A through G and enter total here. Note: This amount may be different from the number of exemptions you claim on your return. ► **H** _____

| For accuracy, complete all worksheets that apply. | • If you plan to itemize or claim adjustments to income and want to reduce your withholding, see the Deductions and Adjustments Worksheet on page 2.<br>• If you are single, have more than one job and your combined earnings from all jobs exceed $32,000, OR if you are married and have a working spouse or more than one job and the combined earnings from all jobs exceed $55,000, see the Two-Earner/Two-Job Worksheet on page 2 to avoid having too little tax withheld.<br>• If neither of the above situations applies, stop here and enter the number from line H on line 5 of Form W-4 below. |

---

Cut here and give the certificate to your employer. Keep the top part for your records.

---

| Form **W-4**<br>Department of the Treasury<br>Internal Revenue Service | **Employee's Withholding Allowance Certificate**<br>► For Privacy Act and Paperwork Reduction Act Notice, see page 2. | OMB No. 1545-0010<br>**1999** |

| **1** Type or print your first name and middle initial: Sheila m | Last name: TRAVERS-Shiek | **2** Your social security number: REDACTED |

Home address (number and street or rural route): 7 Jonathon Ln P.O. Box 957

**3** ☐ Single ☒ Married ☐ Married, but withhold at higher Single rate.
Note: If married, but legally separated, or spouse is a nonresident alien, check the Single box.

City or town, state, and ZIP code: E. Falmouth ma 02536

**4** If your last name differs from that on your social security card, check here. You must call 1-800-772-1213 for a new card ► ☒

**5** Total number of allowances you are claiming (from line H above or from the worksheets on page 2 if they apply) . **5** _____

**6** Additional amount, if any, you want withheld from each paycheck . . . . . . . . . . . . **6** $ _____

**7** I claim exemption from withholding for 1999, and I certify that I meet BOTH of the following conditions for exemption:
- Last year I had a right to a refund of ALL Federal income tax withheld because I had NO tax liability AND
- This year I expect a refund of ALL Federal income tax withheld because I expect to have NO tax liability.

If you meet both conditions, write "EXEMPT" here . . . . . . . . . . ► **7** EXEMPT

Under penalties of perjury, I certify that I am entitled to the number of withholding allowances claimed on this certificate, or I am entitled to claim exempt status.

Employee's signature
(Form is not valid unless you sign it) ► Sheila m TRAVERS-Shiek     Date ► Jan 3 200?

| **8** Employer's name and address (Employer: Complete 8 and 10 only if sending to the IRS) | **9** Office code (optional) | **10** Employer identification number |

Cat. No. 10220Q

HMI 040

U.S. Department of Justice
Immigration and Naturalization Service

OMB No. 1115-0136
**Employment Eligibility Verification**

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. **ANTI-DISCRIMINATION NOTICE.** It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins

| Print Name: Last TRAVERS-Shiek | First Sheila | Middle Initial M | Maiden Name |
|---|---|---|---|
| Address (Street Name and Number) 7 Jonathan Ln | | Apt. # | Date of Birth (month/day/year) |
| City MA | State | Zip Code 02536 | Social Security # REDACTED |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
- ☒ A citizen or national of the United States
- ☐ A Lawful Permanent Resident (Alien # A
- ☐ An alien authorized to work until ___/___/___
  (Alien # or Admission #

Employee's Signature | Date (month/day/year)

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

Preparer's/Translator's Signature | Print Name

Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year)

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C as listed on the reverse of this form and record the title, number and expiration date, if any, of the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: | | MASSACHUSETTS Drivers Lic | | SS Card |
| Issuing authority: | | Department of Mass Vechides | | Mass. |
| Document #: | | REDACTED | | REDACTED |
| Expiration Date (if any): ___/___/___ | | 1 27 04 | | ___/___/___ |
| Document #: | | | | |
| Expiration Date (if any): ___/___/___ | | | | |

**CERTIFICATION** - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) ___/___/___ and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment).

| Signature of Employer or Authorized Representative | Print Name Courtney Baird | Title Admin Asst. |
|---|---|---|
| Business or Organization Name Habit Management Inc | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) Jan 3 2001 |

**Section 3. Updating and Reverification.** To be completed and signed by employer

| A. New Name (if applicable) Sheila M Travers-Shiek | B. Date of rehire (month/day/year) (if applicable) |
|---|---|

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

Document Title: | Document #: | Expiration Date (if any): ___/___/___

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative Sheila M Travers-Shiek | Date (month/day/year) Jan 3 2001 |
|---|---|

Form I-9 (Rev. 11-21-91) N

HMI 041

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SHEILA MAE TRAVERS-SHEIK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 05-11631 GAO |
| v. | ) | |
| | ) | |
| HABIT MANAGEMENT INSTITUTE (sic), | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF DAVID M. JAFFE AND RULE 7.1 CERTIFICATION

I, David M. Jaffe, provide this affidavit based on personal information and knowledge and hereby depose and state:

1.      I am over the age of twenty-one (21) and give this affidavit of my own free will.

2.      I have personal knowledge of all facts stated herein and am competent to testify as to all facts stated herein.

3.      I am an attorney at Littler Mendelson, P.C. and represent Defendant Habit Management, Inc. in this matter.

4.      I have attached as Exhibit 1, a true and accurate copy of the Charge of Discrimination Filed by Travers-Sheik with the Massachusetts Commission Against Discrimination ("MCAD") dated November 18, 2002.

5.      I have attached as Exhibit 2, a true and accurate copy of the Lack of Probable Cause Finding issued by the MCAD regarding Travers-Sheik's Charge of discrimination dated September 1, 2004.

6.      I have attached as Exhibit 3, a true and accurate copy of the complete Transcript of the Deposition of Plaintiff Sheila Mae Travers-Sheik taken on January 17, 2007.

7.     On July 12, 2007, I attempted to contact Travers-Sheik to confer and, in good faith, resolve or narrow the issues presented in HMI's Rule 56 Motion.  Local Rule 7.1.  I left a voice-mail at her telephone number, which she has not returned at the time of this filing.

Signed under the pains and penalties of perjury this 13th day of July, 2007.

/s/ David M. Jaffe
David M. Jaffe

Firmwide:82771554.1 050742.1002

## CERTIFICATE OF SERVICE

I, David M. Jaffe, hereby certify that on this 13th day of July, 2007, the foregoing Affidavit of David M. Jaffe and Rule 7.1 Certification was filed electronically through the ECF system, is available for viewing and downloading from the ECF system, and will be sent electronically to parties as registered participants identified on the Notice of Electronic Filing and via first class mail to all non-registered participants identified on the Notice of Electronic Filing.

/s/ David M. Jaffe
David M. Jaffe

### The Commonwealth of Massachusetts
### Commission Against Discrimination
### One Ashburton Place , Boston, MA 02108
### Phone:  (617) 994-6000 Fax:  (617) 994-6024

| MCAD DOCKET NUMBER:  02BEM03858 | EEOC/HUD CHARGE NUMBER:  16CA300392 |
|---|---|
| FILING DATE:  11/18/02 | VIOLATION DATE:  11/18/02 |

Name of Aggrieved Person or Organization:
Sheila M. Travers-Shiek
7 Jonathan Lane
East Falmouth, MA 02536
Primary Phone: (508)540-2893 ext. ____

Named is the employer, labor organization, employment agency, or state/local government agency who discriminated against me:
Habit Management Institute
Human Resources - Legal Department
20 Forsyth Avenue
South Yarmouth, MA 02664
Primary Phone: (508)398-5155 ext. ____

Linda  Fraundfelt, Mgmt Assistant
Habit Management Institute
20 Forsyth Avenue
South Yarmouth, MA 02664

Art  Eisner
Habit Management Institute
20 Forsyth Avenue
South Yarmouth, MA 02664

No. of Employees:       25+
Work Location: S. Yarmouth

Cause of Discrimination based on:
Race, Color, Black (Non-Hispanic).

The particulars are:
I, Sheila M. Travers-Shiek, the Complainant believe that I was discriminated against by Habit Management Institute, Linda  Fraundfelt, Mgmt Assistant, Art  Eisner, on the basis of Race, Color, Race, Color. This is in violation of M.G.L. 151B Section 4 Paragraph 1 and Title VII.

I have been employed by the Respondent Habit Management for approximately two (2) years in "unit management". Recently or on or about November 15, 2002, the Respondent reclassified my position for other employees in the Respondent's workplace. However, I  was classified as "office assistant"  where others not in my protected class were reclassified "office associate". I believe that my educational and work experience warranted this reclassfication.  Simultaneously, Respondent  Linda Fraundfelt who is my immediate supervisor has decreased my work hours.  I have knowledge  that others who received the recent reclassification  were not subjected to a cut in hours, but they were given more  hours. Additionally, Respondent Art Eisner, who is a co-worker has subjected me to discriminatory remarks on more than one occasion and more recently, his discriminatory actions have escalated.  Recently I have been harassed on

MCAD Docket Number 02BEM03858, Complaint

02BEM03858
11/18/2002

my personal medical history. As a result of the differing terms and conditions and harassment that I have been subjected to, I have suffered continuous emotional distress. I believe these actions against me at my workplace are discriminatorily motivated due to my race and color, Black.

-----

I swear or affirm that I have read this complaint and that it is true to the best of my knowledge, information and belief.

_Keih m Travers - Shiek_
(Signature of Complainant)

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS DAY of 11/18/2002.

NOTARY PUBLIC: _Diane Chang_

SIGNATURE NOTARY PUBLIC: _____
MY COMMISSION EXPIRES: _3/27/09_

MCAD Docket Number 02BEM03858, Complaint

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

| | |
|---|---|
| Habit Management Institute<br>Human Resources - Legal Department<br>20 Forsyth Avenue<br>South Yarmouth, MA 02664 | Person Filing Charge:<br>This Person (Check One):<br><br>Date of Alleged Violation:<br>Place of Alleged Violation:<br>EEOC Charge Number:<br>MCAD Docket Number: |

Person Filing Charge: Sheila M. Travers-Shiek
This Person (Check One): ( ) Claims to be aggrieved
( ) Is filing on behalf of
Date of Alleged Violation: 11/18/02
Place of Alleged Violation: South Yarmouth, S. Yarmouth
EEOC Charge Number: 16CA300392
MCAD Docket Number: 02BEM03858

Habit Management Institute
Human Resources - Legal Department
20 Forsyth Avenue
South Yarmouth, MA 02664

Linda Fraundfelt, Mgmt Assistant
Habit Management Institute

20 Forsyth Avenue
South Yarmouth, MA 02664

Art Eisner
Habit Management Institute

20 Forsyth Avenue
South Yarmouth, MA 02664

---

NOTICE OF CHARGE OF DISCRIMINATION WHERE AN FEP AGENCY WILL INITIALLY PROCESS (See Attached Information Sheet For Additional Information)

You are hereby notified that a charge of employment discrimination under
    [ ] Title VII of the Civil Rights Act of 1964
    [ ] The Age Discrimination in Employment Act of 1967 (ADEA)
    [ ] The Americans Disabilities Act (ADA)
Has been received by
[ ]    The EEOC and sent for initial processing to    <u>MCAD</u>
                                    (FEP Agency)

[ ]    <u>The Mass. Commission Against Discrimination</u>
    (FEP) Agency and sent to the EEOC for dual filing purposes.

While the EEOC has jurisdiction (upon the expiration of any deferral requirements if this is a Title VII or ADA Charge) to investigate this charge, EEOC may refrain from beginning an investigation and await the issuance of the Agency's final findings and orders. These final findings and orders will be given weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe that the allegations made in the charge are true.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency in the course of its proceedings will be considered by the Commission when it reviews the Agency's final findings and orders. In many instances the Commission will take no further action, thereby avoiding the necessity of an investigation by both the Agency and the Commission. This likelihood is increased by your active cooperation with the Agency.

[X]    As a party to the charge, you may request that EEOC review the final decision and order of the above named Agency. For such a request to be honored, you must notify the Commission in writing within 15 days of your receipt of the Agency's issuing a final finding and order. If the agency terminates its proceedings without issuing a final finding and order, you will be contacted further by the Commission. Regardless of whether the Agency or the Commission processes the charge, the Recordkeeping and Non-Retaliation provisions of Title VII and the ADEA as explained on the second page of this form apply.

<u>For further correspondence on this matter, please use the charge number(s) shown.</u>

EEOC Charge Number 16CA300392, EEOC Transmittal Letter to Respondent

[ ]   An Equal Pay Act Investigation (29 U.S.C 206(d) will be conducted by the Commission concurrently
      with the Agency's investigation of the charge.
[X]   Enclosure: Copy of the Charge

Basis of Discrimination
( ) Race          ( ) Color          ( ) Sex          ( ) Religion          ( ) National Origin
( ) Age           ( ) Disability      ( ) Retaliation  ( ) Other

Circumstances of alleged violation:
    SEE ENCLOSED COPY OF THE CHARGE OF DISCRIMINATION (or EEOC FORM 5)

| Date | Type Name/Title of Authorized EEOC Official | Signature |
|------|---------------------------------------------|-----------|
| 11/18/2002 | Robert L. Sanders, Director | |

EEOC Charge Number 16CA300392, EEOC Transmittal Letter to Respondent

**MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION**
**ONE ASHBURTON PLACE, ROOM 601, BOSTON, MA 02108**
**(617) 727-3990**

### -DISMISSAL and NOTIFICATION of RIGHTS-

| | |
|---|---|
| TO: Sheila M. Travers-Shiek<br>7 Jonathan Lane<br>East Falmouth, MA 02536 | CASE: Sheila M. Travers-Shiek v. Habit Management Institute, et al.<br>MCAD NO: 02BEM03858<br>EEOC NO: 16CA300392     SEP 0 1 2004<br>INVESTIGATOR: Nickolas M. Connery |

**Your complaint has been dismissed for the following reasons:**

[  ]   The facts you allege fail to state a claim under any of the statutes the Commission enforces.

[  ]   Respondent employs less than the required number of employees

[  ]   Your complaint was not timely filed with the Commission, i.e. you waited too long after the date(s) of the alleged discrimination to file. Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[  ]   You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conference, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your complaint. You have had more than 30 days in which to respond to our written request.

[  ]   The Commission's efforts to locate you have been unsuccessful. You have had at least 30 days in which to respond to a notice sent to your last known address.

[  ]   The Respondent has made a reasonable settlement, offering full relief for the harm you alleged. 30 days have expired since you received actual notice of this settlement offer.

[ X ]   The Commission issues the following determination. Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes a violation of the statutes. This does not certify that the Respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this complaint.

### -NOTICE of APPEAL-

If you wish to appeal the dismissal of your complaint and believe that the above stated reason for dismissal is incorrect, you may appeal to this Commission within 10 days after receipt of this notice. You or your attorney must make your appeal of the dismissal in writing to the appeals clerk of this Commission. Attention: Ms. Nancy To.

All employment complaints, where applicable, were filed by the MCAD with the Equal Employment Opportunity Commission. Our finding, which will be forwarded to its area office, JFK Federal Building, Boston, MA will be given substantial weight provided that such findings are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the ADEA, and/or the ADA, as amended.

_Dorca I. Gomez_
Dorca I. Gomez
Investigating Commissioner

_9-1-2004_
DATE

CC: Richard J. Keefe, Esq.
VP of Human Resources & General Counsel
Habit Management Institute Corporate Offices
205 Portland Street
Boston, MA 02114

**MEMORANDUM**

**TO:** File.
**FR:** Nickolas M. Connery, Field Representative
**CASE:** Sheila M. Travers-Shiek v. Habit Management Institute, Inc. et al.
**MCAD NO:** 02BEM03858
**EEOC NO:** 16CA300392
**EMPLOYEES:** 25+

## RECOMMENDATION FOR DISMISSAL OF THE COMPLAINT

**ISSUES INVESTIGATED:** On November 18, 2002, the Complainant, Ms. Sheila M. Travers-Shiek, filed a claim with this Commission alleging that she had been discriminated against on the basis of Sex (female) and Race/color (black), in that she was subjected to unequal terms and conditions of employment, sexual harassment by a co-worker, Mr. Art Eisner, and Constructive Discharge, in violation of MGL 151B, Section 4, Paragraphs 1 and 16a, and of Title VII of the 1964 Civil Rights Act (as amended).

**SUMMARY OF FINDINGS:** Complainant has failed to establish a prima face case for disparate treatment. The Complainant is a member of the protected classes for Race and Sex. However, Respondent has articulated and substantiated a legitimate non-discriminatory reason for its actions. Complainant's title was reclassified and her responsibilities modified in Spring 2002, as a result of a company-wide restructuring instituted by Respondent. Complainant's hours were reduced because new technology made one of her primary responsibilities, client drug testing, much less time consuming. Complainant has failed to prove that, but for her Race or Sex, she would have been reclassified differently. Therefore, this charge must be dismissed.

Complainant has established a prima facie case for harassment. Complainant alleges that her co-worker, Art Eisner, subjected her to unwanted comments related to her Sex and Race. However, the Complainant specifically articulates only one incident of such conduct, contrary to her assertion of "ongoing harassment." Moreover, Complainant was uncooperative with Respondent's investigation into the incident, and no more such incidents were reported to Respondent's management. Complainant's other claims of harassment are vague and unsubstantiated. An isolated incident of inappropriate conduct by a co-worker does not rise to the level of harassment. Therefore, this charge must be dismissed.

Complainant has not established a prima face case for Constructive Discharge. Complainant was not meeting the reasonable expectations of her employer. The Complainant was not adequately performing assigned job duties and was unwilling or unable to accept constructive criticism from superiors. The Complainant's difficulties with taking directions culminated in an argument with one of her supervisors, Linda Fraundfelter on or about December 19, 2002. Complainant misinterpreted her supervisor's criticism as harassment. Complainant left her shift early, and sent notice of her voluntary resignation the following day. Complainant has not demonstrated a substantive connection between her Race or Sex and her problems with Respondent's management.

Complainant has not offered sufficient information to show that either of the individually named Respondents, Linda Fraundfelter or Art Eisner, engaged in willful conduct designed to purposefully violate her civil rights. Therefore, all claims against these Respondents must be dismissed.

**CONCLUSION:**

For the foregoing reasons, a lack of probable cause finding is recommended.

Nickolas M. Connery
Investigator

Katherine M. Martin, Esq.
Supervisor

# ORIGINAL

Volume 1, Pages 1-298

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SHEILA MAE TRAVERS-SHEIK,

                Plaintiff,

vs.             Civil Action No.

              05-11631 GAO

HABIT MANAGEMENT INSTITUTE (sic),

                Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF SHEILA MAE TRAVERS-SHEIK

Wednesday, January 17, 2007, 10:05 a.m.

Littler Mendelson, PC

One International Place, Suite 2700

Boston, Massachusetts

- - - - - - - Reporter:  Patricia A. Bucko, RMR - - - - - - -

www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404  fax 617.728.4403

3

1                    I N D E X

2   Testimony of:

3   Sheila Mae Travers-Sheik

4        By Ms. Tucker        5

5

6                    EXHIBITS

7   NUMBER              DESCRIPTION         PAGE

8    1      Application for Employment.      37

9    2      Habit Management New Employee

10          Orientation Plan.               47

11   3      Employee Acknowledgment Form.    50

12   4      Policies from Handbook.          53

13   5      Habit Management Criteria-Based

14          Job Description and Performance

15          Evaluation for the period

16          1/31/01-3/3/01.                  63

17   6      Payroll Status Change.           69

18   7      Habit Management Criteria-Based

19          Job Description and Performance

20          Evaluation for the period

21          1/3/01-1/2/02.                   78

22   8      Payroll Status Change.          122

23   9      Payroll Status Change.          125

24  10      Payroll Status Change.          128

4

| | | | |
|---|---|---|---|
| 1 | 11 | Payroll Status Change. | 134 |
| 2 | 12 | Copy of Identification | |
| 3 | | Badge. | 171 |
| 4 | 13 | Charge filed at the MCAD. | 175 |
| 5 | 14 | Dismissal and Notification | |
| 6 | | of Rights at the MCAD. | 196 |
| 7 | 15 | Dismissal and Notification | |
| 8 | | of Rights at the EEOC. | 196 |
| 9 | 16 | Complaint. | 209 |
| 10 | 17 | Handwritten complaint. | 222 |
| 11 | 18 | Handwritten letter dated | |
| 12 | | 12/19/02. | 235 |
| 13 | 19 | Mid Cape Medical Center | |
| 14 | | record. | 256 |
| 15 | 20 | Mid Cape Emergency Center | |
| 16 | | report. | 259 |
| 17 | 21 | Letter dated 1/11/07. | 261 |
| 18 | 22 | Document from Social Security. | 275 |
| 19 | 23 | Defendant's First Set of | |
| 20 | | Interrogatories to Plaintiff. | 278 |
| 21 | 24 | Defendant's First Request to | |
| 22 | | Produce Documents. | 278 |
| 23 | 25 | Handwritten requests. | 279 |
| 24 | 26 | Answers to Interrogatories. | 283 |

5

1          SHEILA MAE TRAVERS-SHEIK, first being

2    duly sworn, deposes and states as follows:

3              EXAMINATION

4    BY MS. TUCKER:

5      Q.   Good morning.  I am going to start by

6    asking you, do you go by Travers or Travers-Sheik;

7    how should I refer to you during the deposition

8    today?

9      A.   I go by Travers, but I also go by Sheik, so

10   Travers-Sheik seems to blend in, but Sheik.

11     Q.   As I'm asking you questions, I'll use --

12     A.   Sheik.

13     Q.   -- Miss Sheik?

14     A.   Yes.

15     Q.   All right.  Miss Sheik, I would like to

16   starting by addressing a couple of matters we

17   addressed off the record, briefly.  The first is

18   that you have brought with you the temporary

19   identification that you currently have in your

20   possession.  And would you explain for the record

21   why it is you only have a temporary form of

22   identification?

23     A.   Unfortunately, my pocketbook was stolen

24   from my car, and I left it in the car for, within

6

1   the last, in a minute, because I went to see the

2   doctor, and somebody took it from me and I thought

3   it blended in with my car seat because it is black.

4       Q.   And was your permanent driver's license --

5       A.   Inside.  ID's, every card that you can

6   imagine is gone.

7       Q.   Okay.  So your permanent driver's license

8   was stolen and you reported it stolen; is that

9   correct?

10      A.   No, I didn't, because I felt stupid,

11  unfortunately.

12      Q.   But you did apply for another driver's

13  license?

14      A.   Another driver's license, every card to

15  replace, yes.

16      Q.   And as you are waiting to receive your

17  regular driver's license, you were given a temporary

18  driver's license?

19      A.   A temporary driver's license.

20      Q.   And that is the form of identification that

21  you brought with you today?

22      A.   Yes.

23           MS. TUCKER:  So I will stipulate on the

24  record that for purposes of deposition, that for

FARMER ARSENAULT BROCK LLC

7

1   identifying the witness, that this temporary form of

2   identification is satisfactory.

3           Miss Sheik, I represent the defendant in

4   this action, Habit Management, Inc., as you know.

5       A.   Yes.

6       Q.   And I am going to be asking you a series of

7   questions to which you will be answering under oath

8   today.

9       A.   Yes.

10      Q.   I want to ask you about another preliminary

11  matter, which is the other matter that I raised off

12  the record, which is the issue of whether you want

13  to object to any questions that might be

14  objectionable, as we proceed through the deposition.

15  And as I told you, typically, counsel to the parties

16  agree to reserve all objections, except those as to

17  form, and to reserve all motions to strike until the

18  time of trial.

19          It actually facilitates our discussion

20  today.  And I understand -- well, let me ask you for

21  the record, you are, as I understand it,

22  representing yourself today at the deposition?

23      A.   Yes.

24      Q.   You are appearing pro se?

8

1    A.    Pro se.

2    Q.    And you are doing so voluntarily?

3    A.    Voluntarily.

4    Q.    And because of that, I took a few moments

5    to explain to you this procedure that we typically

6    follow with respect to objections.

7           As I understand it, it was agreeable to

8    you to reserve these objections as I described until

9    time of trial; is that true?

10   A.    That's true.

11   Q.    Thank you.

12          Now, let me ask you, I may have just

13   asked you this, I apologize, have you ever been

14   deposed in any situation before?

15   A.    Deposed in --

16   Q.    Had your deposition taken as we are doing

17   today?

18   A.    Just today.

19   Q.    Just today, okay.

20          Because of that, I think I'll just go

21   through a couple of procedural things about how a

22   deposition proceeds.  And I also want you to

23   understand, as we go through the day today, that if

24   you have any question at any point, I'd like you to

9

1   ask me so we can make sure that you are not confused

2   about the procedure or what's going to happen next.

3           Briefly, as I said, I'll be asking you a

4   series of questions, and I represent the defendant

5   in the action, Habit Management, Inc., so I will be

6   asking you questions, and you have an obligation to

7   answer as truthfully and fully as you can, because

8   you are under oath.

9           When you answer, you need to actually

10  give a verbal response, because the court reporter

11  really can't take down nods of the head; do you

12  understand?

13      A.   Definitely.

14      Q.   Okay, thank you.

15           And I would also ask you to try to keep

16  your voice up for her sake, and --

17      A.   Okay.

18      Q.   And the other thing is, if you need to take

19  a break at any point, you should feel free to tell

20  me, just state, "I would like to take a break," and

21  we will do that and then we will resume.

22           That having been said, if I just asked

23  you a question, I would ask you that you not take a

24  break then, that you give your answer and then take

10

1    a break.

2         A.   Definitely.

3         Q.   Maybe one final thing before we begin.

4              If I ask you a question and you don't

5    remember --

6         A.   Yes.

7         Q.   -- feel free to say, for the record, simply

8    that you don't remember.

9         A.   Okay.

10        Q.   One of the things that is important during

11   a deposition is that you not guess at an answer.

12        A.   Yes.

13        Q.   Because it really doesn't help either one

14   of us later if you have just been guessing and you

15   are not sure what the answer was, okay?

16        A.   Yes.

17        Q.   Do you have any questions before we start?

18        A.   No, just take one moment at a time.

19        Q.   Okay.

20             If you want water, or anything to drink,

21   there are drinks behind you.  Would you like

22   something before we start?

23        A.   Just water.

24        Q.   And actually, the water is the one thing

11

1   that doesn't appear to be there.

2       A.   I'll take Diet Coke.

3       Q.   Okay.  You will have an opportunity to read

4   the transcript of your testimony today.

5       A.   Okay.

6       Q.   And if you see anything that appears to

7   have been transcribed inaccurately --

8       A.   Yes.

9       Q.   -- you'll have the opportunity to say that

10  it was transcribed inaccurately.

11           That will not be an opportunity to

12  change your testimony, it will simply be that if you

13  see that something was spelled wrong, or a word was

14  missing, something like that, okay?

15      A.   Yes.

16      Q.   And you will have 30 days in which to

17  review the transcript, and then you will return it

18  to me with your signature and any noted changes.

19           Would you please state your full name

20  and your residential address, Miss Sheik.

21      A.   My full name is Sheila Mae Travers-Sheik.

22      Q.   And your residential address, please?

23      A.   My permanent address is 7 Jonathan Lane,

24  East Falmouth, Mass. 02536, PO Box 743.

12

1        Q.    And what is your birth date?

2        A.    1/27/65.

3        Q.    Your birthday's coming up?

4        A.    Uh-huh.

5        Q.    And where were you born?

6        A.    In New Bedford, Massachusetts.

7        Q.    And did you grow up there in New Bedford?

8        A.    No, I grew up on Cape Cod, Falmouth.

9        Q.    And what are your parents' names?

10       A.    Winifred M. Travers, and Richard Frank

11  Travers.

12       Q.    And your mother is with us today.

13              Is your father still alive?

14       A.    No, he is deceased; active duty in Vietnam.

15       Q.    I'm sorry for that loss.

16              Where were your parents born, Miss

17  Sheik?

18       A.    New Bedford, Massachusetts, my father, and

19  Winifred Travers, Cotuit, Massachusetts.    Cotuit.

20              Was it Cotuit?

21       Q.    What race do you consider yourself to be?

22       A.    Black.    Cape Verdean that has to be.

23       Q.    And do you have ancestors that came from

24  Cape Verde?

FARMER ARSENAULT BROCK LLC

13

1      A.    My grandfather, Antonio Andrade, Cape

2   Verde.

3      Q.    Antonio, what was the last name?

4      A.    Andrade, A-n-d-r-a-d-e

5      Q.    Is that your paternal grandfather?

6      A.    Uh-huh, yes.

7      Q.    Any other ancestors from Cape Verde?

8      A.    No.

9      Q.    Have you ever been to Cape Verde?

10     A.    No.

11     Q.    Do you own or rent the property at 7

12   Jonathan Lane?

13     A.    My mother does.

14     Q.    And does she own the property there or

15   rents it?

16     A.    She owns.

17     Q.    And who else lives there besides the two of

18   you?

19     A.    Dina Travers.

20     Q.    And who is Dina Travers?

21     A.    She is my sister.

22     Q.    And how old is she?

23     A.    38.

24     Q.    And you are not currently married?

FARMER ARSENAULT BROCK LLC

14

```
 1      A.   I am separated.

 2      Q.   And how long have you been separated?

 3      A.   About four years.

 4      Q.   About four years?

 5      A.   Uh-huh.

 6      Q.   You were married prior to that?

 7      A.   Well, yes.

 8      Q.   And what was your husband's name?

 9      A.   David Michael Sheik.

10      Q.   So you still use his name as part of your

11  last name?

12      A.   Yes.

13      Q.   Do you have any children?

14      A.   No.

15      Q.   Any other marriages besides the marriage to

16  Mr. Sheik?

17      A.   No.

18      Q.   Does your former spouse provide you with

19  any financial support?

20      A.   No.

21      Q.   And where is he?

22      A.   He lives in Yarmouth.  Address I don't

23  know.

24      Q.   Do you still have any contact with him?
```

FARMER ARSENAULT BROCK LLC

15

1    A.    Every great while when needed.

2    Q.    But he does not provide you with any

3  financial support?

4    A.    Nothing.

5    Q.    Did you have any children with him?

6    A.    No.

7    Q.    And you said there are no other marriages?

8    A.    No.

9    Q.    Miss Sheik, could you tell me what

10  education you received?  And why don't you start

11  with high school.

12    A.    Falmouth High, general diploma.

13    Q.    And what year, what year did you get that

14  diploma?

15    A.    1983.

16    Q.    Now, after that, do you --

17    A.    I went on to Fisher College.

18    Q.    Fisher College.  For how many years, or

19  parts of years?

20    A.    I graduated in 2004 as a medical assistant.

21    Q.    And when did you start Fisher College?

22    A.    1995.

23    Q.    Okay.  Between 1983 and 1995 --

24    A.    I stopped.

FARMER ARSENAULT BROCK LLC

16

1    Q.    Let me -- I'm sorry, I have to finish the

2  question first, just for the court reporter's sake.

3    A.    Oh, sorry.

4    Q.    Between 1983 and 1995, were you attending

5  any form of school or getting any classes?

6    A.    I was taking a CLEP exam and I was, from

7  1995 to 1998, or 1999, I stopped attending Fisher

8  College.

9    Q.    You stopped attending?

10   A.    Yes.  And I can't remember, but I went

11  back.

12   Q.    Okay.

13          So going again, just so we have the

14  record straight.

15   A.    Yes.

16   Q.    Between 1983, when you graduated from high

17  school --

18   A.    Uh-huh.

19   Q.    -- and 1995 --

20   A.    Yes.

21   Q.    -- did you attend any educational

22  institutions in that period of time?

23   A.    Yes, I did, went to UMass Amherst.

24   Q.    And did you attend college there?

17

1     A.   College there.

2     Q.   For what period of time?

3     A.   1984 through 1986.

4     Q.   Now, did you receive any sort of --

5     A.   No.

6     Q.   -- degree?

7         Why did you stop attending college in

8 '86?

9     A.   Financial.  Big time financial reasons.

10    Q.   You couldn't afford the tuition?

11    A.   Yes.

12    Q.   All right.

13        After you left UMass Amherst in 1986,

14 between that point and the point at which you

15 started attending Fisher College, was there any

16 other college you attended?

17    A.   I also tried, I went to Harvard Extension.

18    Q.   And what classes did you take at Harvard

19 Extension?

20    A.   Psychology and English.  I don't remember

21 all of it.

22    Q.   You took certain courses there?

23    A.   Uh-huh.

24    Q.   Did you do that in the evenings?

18

1    A.   Yes, I did.

2    Q.   Did you receive any sort of degrees or

3    diploma from the extension school?

4    A.   No, no, I didn't.

5    Q.   Did you complete the courses you started

6    there?

7    A.   Yes.  From what I can remember.  It has

8    been a while.  It was only a couple of subjects.

9    Q.   Okay.  Right, and I understand it was only

10   a couple of subjects.  I guess my question is, were

11   you able to complete them from beginning to end?  In

12   other words, if I went back to the extension school

13   and asked for a record of your attendance there.

14   A.   No, they won't show, maybe one or two

15   classes that I completed, and that was it.

16   Q.   And after you took a couple of classes at

17   Harvard Extension School, did you obtain any form of

18   education before you started at Fisher College?

19   A.   I took CLEP.

20   Q.   You have to state for the record what

21   CLEP's are.

22   A.   CLEP's are generally subjects which you

23   could take, one class you could receive a credit.

24   It's home study, and you get a credit if you pass

19

1   the exam, which is, costs about, at that time, maybe

2   65 or $55.

3        Q.   And what were the classes you took in that

4   way?

5        A.   Human resource and psychology.

6        Q.   And you did this at home --

7        A.   And biology, yes.

8        Q.   And did you obtain diplomas or certificates

9   saying that you had taken these?

10       A.   Oh, I received little papers saying, that

11  said, "Congratulations.  You passed the exam."

12       Q.   And do you know what level exams these

13  were?

14       A.   Undergrad.

15       Q.   So do you have the pieces of paper that say

16  you completed those courses?

17       A.   I would have to call the CLEP company for

18  them to bring it up.

19       Q.   But you could do that?

20       A.   I could do that; that's no problem.

21       Q.   Okay.  Other than the CLEP courses, any

22  other education, again, before Fisher --

23       A.   Just Fisher College.

24       Q.   Okay.  Fisher College, you started, you

20

1   think, 1995?

2        A.   1995, 1996.

3        Q.   And then you stopped for a while; is that

4   correct?

5        A.   Yes.

6        Q.   And why did you stop?

7        A.   Financial.

8        Q.   You couldn't afford the tuition?

9        A.   I couldn't afford the car to travel.

10       Q.   And where is Fisher College, remind me?

11       A.   It was in Hyannis, and there was some type

12  of, I don't know, I can't say if it was bankruptcy,

13  and then they stopped, and then they started up.

14  They always had it in New Bedford or Attleboro, and

15  on-line was starting in 2000, and they have it at

16  Beacon Hill in Boston.

17       Q.   So when you attended in 1995 and 1996,

18  which location were you going to?

19       A.   Hyannis.

20       Q.   And where were you living at the time?

21       A.   7 Jonathan Lane, East Falmouth, Mass.

22       Q.   Were you paying any rent to your mother for

23  staying there?

24       A.   Yes.

21

1    Q.   And you got to a point where you had no

2  money to spend on the car, I believe you said, in

3  order to get to school?

4    A.   Yes.

5    Q.   So you stopped attending college?

6    A.   Yes.

7    Q.   Now, at that point in 1996, when you

8  stopped, did you have any sort of degree or

9  certificate from Fisher?

10    A.   No, no.

11    Q.   You said you went back?

12    A.   Yes.

13    Q.   And that was in 1998 or 1999?

14    A.   I went back 2003.

15    Q.   Okay, so not 1998 or 1999, 2003?

16    A.   2003.

17    Q.   And did you enroll at the New Bedford

18  location?

19    A.   Yes.

20    Q.   Now, are you still attending college?

21    A.   Yes.

22    Q.   And what is the program you're attending at

23  Fisher College?

24    A.   Human resource.

22

1      Q.    How long of a program is that?

2      A.    A four-year program.

3      Q.    Are you scheduled to complete that program

4  this year, then?

5      A.    This year, the 2007.

6      Q.    And in what month do you expect to

7  graduate?

8      A.    June 3rd or June 2nd, one of those two

9  dates.

10     Q.    Do you anticipate that you will be able to

11  complete the --

12     A.    Yes.

13     Q.    -- schedule there?

14     A.    Yes.

15     Q.    So when you receive a degree in June, what

16  will that be in?

17     A.    Human resource management, yes, yes.

18     Q.    Okay.

19           Any other education that you --

20     A.    My medical assistant's.

21     Q.    Okay.  Explain what the medical assistant

22  education was?

23     A.    Medical assistant is generally a form of a

24  business administration assistant.  It's just an

FARMER ARSENAULT BROCK LLC

23

 1    associate.  You do hands-on helping the doctors for

 2    logging in patients and escorting them into the

 3    rooms, situating themselves in the facility.

 4        Q.   And when did you obtain the education to be

 5    a medical assistant?

 6        A.   When did I finish, or when did I --

 7        Q.   When did you start it and when did you

 8    finish?

 9        A.   I started in 1995; I finished in 2004.

10        Q.   And where did you obtain that education?

11        A.   At New Bedford, Massachusetts, to finish.

12        Q.   What's the name of the institution?

13        A.   Fisher College.

14        Q.   So at Fisher, you obtained education from

15    1995 to 2004.  That's over a nine-year period.

16        A.   Yes.

17        Q.   Is that in one program?

18        A.   The same field that I started in, yes.

19        Q.   And is that a nine-year program, or did you

20    stop and start?

21        A.   Stop and start, stop, start.

22        Q.   So in 1995, you started out intending to

23    pursue a medical assistant education?

24        A.   Yes.

24

1     Q.   When you stopped in 1996, did you stop all

2   education at that point?

3     A.   Everything.

4     Q.   And when did you go back to resume your

5   medical assistant education?

6     A.   2003.

7     Q.   And now when did you start pursuing the

8   human resource management?

9     A.   2006.

10     Q.   I see.  And how long a program is that?

11     A.   It's a four-year program, because it

12   connects with the -- whatever associate degree that

13   I received can connect with the human resource.

14     Q.   Well, have you received any sort of degree

15   or certificate --

16     A.   Associate --

17     Q.   Hold on a second.

18         -- as a medical assistant?

19     A.   Yes.

20     Q.   When did you receive that?

21     A.   2004.

22     Q.   Now, tell me, now, what is that called?

23     A.   Medical assistant and associate degree.

24     Q.   And associate degree?

25

1      A.   Yes.

2      Q.   And then in June of this year you expect to

3   receive your bachelor of science in human resource

4   management?

5      A.   Yes.

6      Q.   Does that constitute all the educational

7   experience you have had?

8      A.   So far.

9      Q.   What I'm now going to ask you to do is go

10  back and tell me about your employment history in a

11  similar manner, if you would.

12          So let's start with 1983, when you

13  graduated from high school, and move forward.

14          Can you tell me what employment you have

15  held and where?  I think it's easier for you to go

16  in this fashion than for me to interrupt you at each

17  point and say when did you start and stop each job.

18  So if you could, just start, and I'll ask you

19  questions as we go along.

20     A.   Okay.

21     Q.   Can you start, what's the first job you had

22  after high school, 1983?

23     A.   Stop & Shop.

24     Q.   What did you do there?

26

1      A.   Cashier.

2      Q.   Was that a full-time job?

3      A.   Part-time job.

4      Q.   Did you have any other job at the same

5   time?

6      A.   No.

7      Q.   And how long did you work at Stop & Shop?

8      A.   Off and on for a couple of years.

9      Q.   Okay.  That brings us to about 1985 or so.

10   Do you remember what your next job was?

11      A.   Nothing.  Not -- it must have been another

12   form of a Stop & Shop.

13      Q.   Another form of job?

14      A.   Yes.  It was like in Amherst.

15      Q.   In Amherst, Mass.?

16      A.   Yes.

17      Q.   And were you a cashier there?

18      A.   Cashier.

19      Q.   Where was the first Stop & Shop in which

20   you worked?

21      A.   Falmouth, Massachusetts.

22      Q.   Okay.  What's the next job that you had

23   after working at Stop & Shop?

24      A.   Then I went to become a waitress.

27

1    Q.    Do you remember when that was?

2    A.    1988, I believe.

3    Q.    Where were you a waitress?

4    A.    I know the name.  I'm so sorry, I'm trying.

5    Q.    No, that's okay.

6          Do you remember where it was located?

7    A.    It is in Hyannis.  It was the Wurst Haus.

8    Q.    I want to ask you one question before I go

9    further.  Your birth date is 1965?

10   A.    Yes.

11   Q.    So when you graduated, I just want to make

12   sure these dates make sense.  So you were 18 when

13   you graduated from high school?

14   A.    18, yes.

15   Q.    How long were you a waitress at the Wurst

16   House?

17   A.    A year.

18   Q.    And did you have employment after that?

19   A.    Unemployment; they closed down.

20   Q.    So you collected unemployment benefits?

21   A.    Yes.

22   Q.    For how long, approximately?

23   A.    A year.

24   Q.    And then after that did you obtain

28

1   employment elsewhere?

2       A.   Over the summertime I went to the Flying

3   Bridge.

4       Q.   And what is the Flying Bridge?

5       A.   It's a restaurant.

6       Q.   Where?

7       A.   Falmouth.

8       Q.   Were you a waitress there?

9       A.   Yes.

10      Q.   For how long?

11      A.   For at least five, six months, and then

12  they had to close down.

13      Q.   Were they open during the summer?

14      A.   Yes.

15      Q.   And -- okay.  And then after they closed,

16  did you obtain unemployment again?

17      A.   Unemployment again.

18      Q.   When were you married?  When did you get

19  married?

20      A.   Late.  I got married 2000.

21      Q.   In 2000?

22      A.   Yes, November 12th.

23      Q.   And you said you have been separated for

24  four years?

29

1    A.   Uh-huh, yes.

2    Q.   So you were married until 2002?

3    A.   2002.

4    Q.   Going back to your employment, after

5    collecting unemployment, after having worked at the

6    Flying Bridge, what was your next job; do you

7    remember?

8    A.   It must have been another waitress, Hearth

9    and Kettle.

10   Q.   Was that a summer position again?

11   A.   That's considered year round, but they seem

12   to lay off people, too, and I wasn't laid off, I was

13   dismissed because I kept calling in.

14   Q.   You were dismissed because you kept

15   calling?

16   A.   In sick.  Unfortunately, I have scoliosis.

17   Q.   When were you working there?  Do you

18   remember approximately what year this was?  We had

19   you --

20   A.   19, 1989 to 1990; something like that,

21   or -- it's in between that time.

22   Q.   Maybe around 1990?

23   A.   '90.

24   Q.   Okay.

FARMER ARSENAULT BROCK LLC

30

1          And you were calling in sick because of

2  your scoliosis?

3     A.   Yes.

4     Q.   And you were dismissed because you called

5  in sick too many times?

6     A.   Too many times there.

7     Q.   Is your scoliosis something, I assume, that

8  you have had all your life?

9     A.   It, for some odd reason, the doctor

10 acknowledged it when I was 12, but when I turned 24

11 something reacted in my body.  My body tends to

12 react on pain.

13    Q.   So you started having more difficulty with

14 it when you were 24?

15    A.   24.

16    Q.   And that's why you had to call in sick

17 several times?

18    A.   I called in sick quite a bit at the jobs.

19    Q.   Because of that?

20    A.   Uh-huh.

21    Q.   Okay.

22          Well, and I'll probably ask you more

23 questions about that later, but I wanted to see if

24 we could just get through your employment history

31

1    first.

2        A.    Definitely.

3        Q.    After the Hearth and Kettle, do you

4    remember what your next employment was?

5        A.    I know I became a CNA and it must have been

6    in the 1990s.

7        Q.    So you took the exam to become a certified

8    nursing assistant?

9        A.    Yes.  Wrong thing to do, especially because

10   of the scoliosis.

11       Q.    Well, do you remember, where did you obtain

12   the education to take this CNA exam, licensing exam?

13       A.    J-Tech gave it to me, which is dealing with

14   unemployment.

15       Q.    How do you spell J-Tech?  What is J-Tech?

16       A.    Just J, T-e-c-h.  J-Tech is an education

17   place for helping people who don't have any form of

18   education, and they put me into this area to become

19   a CNA.

20       Q.    And that was at some point in the 1990s?

21       A.    Yes.

22       Q.    Did you obtain your license to be a CNA?

23       A.    Oh, God, yes.

24       Q.    For what period of time were you a licensed

32

1 CNA?

2     A.   To my best knowledge, I don't remember.  It

3 seems like for quite a few years I have been a CNA,

4 but I have always had problems with my back with

5 CNA.

6     Q.   But do you have any piece of paper that

7 says you are licensed as a nursing assistant?

8     A.   I did; not anymore.  It expired 19 -- no,

9 excuse me, it expired, because the last time I

10 worked was 2001.

11     Q.   Did you ever work as a CNA?

12     A.   Yes.

13     Q.   Where?

14     A.   At JML.

15     Q.   JML?

16     A.   Yes, it's a nursing home.  At Optimum Care.

17     Q.   Now, when did you work at JML?

18     A.   What year?  1997, 1998.  I worked two jobs

19 at the same time.

20     Q.   Okay.

21     A.   In Optimum Care, at the same time.

22     Q.   So you worked at JML and Optimum Care?

23     A.   Yes.

24     Q.   Both nursing homes?

33

1     A.   Both nursing homes.

2     Q.   And you think that was in the 1997 to 1998

3 period?

4     A.   Yes.

5         And then I decided to go to Cape

6 Heritage.  I know there is some span, and I can't

7 remember certain --

8     Q.   What is Cape Heritage?

9     A.   Cape Heritage was a nursing home.

10    Q.   Were you working for a temp agency that

11 would place you at these different homes?

12    A.   No, I went directly to these places.

13    Q.   Okay.  So did you go from working for the

14 two homes at once, to working just at Cape Heritage?

15    A.   Yes, because they would give me about

16 80 hours a week.

17    Q.   Okay.  For what period of time did you work

18 at Cape Heritage?

19    A.   To my best of knowledge it was 1999 to

20 2001.  And plus, I was working at J -- Habit

21 Management.

22    Q.   Okay, let's leave Habit Management to the

23 side for one moment.  I am trying to get your

24 history before you came to Habit Management.

34

1      A.    Uh-huh.

2      Q.    So immediately before you started working

3 there, you were working at Cape Heritage?

4      A.    Yes.

5      Q.    As a CNA?

6      A.    Yes.

7      Q.    For about 80 hours a week, you said?

8      A.    Uh-huh, yes.

9      Q.    And for what period of time, about, did you

10 work at Cape Heritage; do you think it was about one

11 to two years?

12     A.    About two years.

13     Q.    About two years?

14     A.    Two, two and a half, two years.

15     Q.    And where is Cape Heritage?

16     A.    Sandwich.

17     Q.    Did you report to somebody there; do you

18 remember the name of your supervisor?

19     A.    No, and she was a great lady, I just don't

20 know her name.

21     Q.    Now, why did you leave Cape Heritage?

22     A.    Because I attempted suicide.  That was

23 affecting my liver, and lifting people was too much

24 of a strain; I couldn't handle it.

35

1    Q.   When did you attempt suicide?

2    A.   2001, February 2nd.

3    Q.   And I don't mean to probe unnecessarily.

4    A.   That's fine.

5    Q.   But if you could tell me, briefly, the

6    circumstances that led up to that.

7    A.   I found out my husband was cheating on me,

8    and he wanted to leave the relationship.

9    Q.   And when did you learn that he was cheating

10   on you?

11   A.   That day.

12   Q.   On February 2nd, 2001?

13   A.   That day, yes.  I just got married.  I was

14   only married for two months.

15   Q.   You said you were married in November of

16   2000?

17   A.   Yes.

18   Q.   I see.

19        So you found out he was cheating on you,

20   and on the same day you attempted to take your life?

21   A.   Yes, uh-huh.

22   Q.   Again, I apologize for the slight invasive

23   nature of the question.

24   A.   That's fine.

36

1    Q.   But can you tell me what you did in an

2    attempt to take your life?

3    A.   I took a lot of pills, and there is a

4    blank.   There is a blank.

5    Q.   Okay, and I apologize if this causes you to

6    feel upset.

7    A.   That's okay.

8    Q.   I won't ask any more questions than I think

9    is necessary about that.

10   A.   I'm sorry.

11   Q.   No, take a moment.

12        MS. TUCKER:  Off the record.

13        (Off the record.)

14   Q.   One question, Miss Sheik, I neglected to

15   ask you at the start of this, and I should confirm

16   with you, are you currently taking any medication?

17   A.   Yes, I am.

18   Q.   Can you tell me what that medication is?

19   A.   Honestly, I don't know the names, because I

20   try to ignore the names.  I'm so sorry, I just take

21   it when I don't want to read the pills.

22   Q.   What is the medication for?

23   A.   It is for depression.

24   Q.   For depression?

FARMER ARSENAULT BROCK LLC

37

1     A.   Yes.

2     Q.   To your knowledge, would it affect your

3  ability to testify here today, to recollect relevant

4  events?

5     A.   No, no.  I'm clear-minded with it.

6     Q.   Okay, thank you.

7         And you show no signs of being under the

8  influence of alcohol or any other controlled

9  substance, are you?

10    A.   No, I can't, because my liver burns.

11    Q.   And can you tell me what you mean by that?

12    A.   When I get nervous and when I drink, if I

13  drink, my liver tends to burn, because I burned it

14  with the pills so badly that affects my liver.

15    Q.   The pills that you took in February of

16  2001?

17    A.   Uh-huh.  Uh-huh.

18         I do apologize.  I didn't mean to cry.

19    Q.   No, no apology necessary.

20         Let's go back to your employment at

21  Habit Management.

22    A.   Yes.

23    Q.   Did you apply for employment there?

24    A.   Yes.

FARMER ARSENAULT BROCK LLC

38

1      Q.   Do you recall being interviewed by anyone

2  in connection with your application?

3      A.   Courtney, and I don't know her name.  She

4  was the business administrative assistant.

5      Q.   Did anyone else interview you?

6      A.   Janet Police did interview me.

7      Q.   Janet Police?

8      A.   Yes.  She was the programmer.

9      Q.   And for what job did you apply?

10     A.   It's, I call it UA.  It's a unit manager

11 position.

12          MS. TUCKER:  I'm going to mark as an

13 exhibit a document entitled "Application for

14 Employment of Habit Management, Inc.," as Exhibit

15 Number 1.

16          (Marked, Exhibit 1, Application for

17 Employment.)

18     Q.   Okay.  Please take a look at what I have

19 had marked as Exhibit Number 1, Miss Sheik.

20          Take a moment to look through that, and

21 tell me if you recognize that document.

22     A.   Yes, I do.

23     Q.   And could you tell me what it is?

24     A.   It's an employment application from -- what

39

1    year was this?  I applied earlier.  It was December

2    3rd, and they gave me, they interviewed many other

3    people, and they granted it to me, and

4    I -- yes.

5        Q.   Okay.  The date on the front, under the

6    title "Position desired," shows that you were

7    available as of December 26th, 2000, correct?

8        A.   Yes, yes.

9        Q.   And your testimony is that you actually

10   started work later when they offered you the

11   position?

12       A.   They offered me the position then, but I

13   started December, on January 3rd, 2001.

14       Q.   Looking through this application, if you

15   would, for a moment, could you tell me if you see

16   anything inaccurate on the application?

17       A.   That Stop & Shop was later, but I don't

18   know which year.  It doesn't even say the year for

19   me.

20           My education I didn't put down.

21       Q.   Well, I note under "education," you put the

22   J-Tech CNA certificate, which --

23       A.   That's right, because that is what I

24   completed.

40

1    Q.   Okay.  And I'm just going to ask you to let

2    me finish, for the court reporter's sake, let me

3    make sure I finish the question before you answer.

4         And then you attended Falmouth High, and

5    that you graduated in 1983.  I don't see any mention

6    of any of the UMass or Fisher College education that

7    you told me about.  Why did you not put that on this

8    application?

9    A.   Because I never completed.

10   Q.   Looking at the employment history here, I

11   note you did put Cape Heritage, and you did put JML.

12        Is there a reason why you didn't put the

13   other nursing home at which you worked?

14   A.   No.  It should have been placed on there.

15   I don't know why.

16        I think I'm, I am always in a hurry for

17   applications, and I like doing things as fast as

18   possible, and I should have thought it out, but

19   I'm.....

20   Q.   Well, let me ask you, for Cape Heritage, it

21   indicates --

22   A.   Oh, Cheryl.

23   Q.   Excuse me?

24   A.   That was my boss.

FARMER ARSENAULT BROCK LLC

41

1      Q.   Cheryl?

2      A.   Cheryl Fritz.

3      Q.   Cheryl Fritz was your supervisor at Cape

4  Heritage?

5      A.   Yes.  Great lady.

6      Q.   So my question of you is this:  For dates

7  of employment at Cape Heritage, you have stated

8  "September 1st, 1999."  Is that when you started

9  there?

10     A.   More accurate, yes.

11     Q.   All right.

12          And when you filled out this

13  application, were you employed at Cape Heritage?

14     A.   Yes.

15     Q.   And tell me, again, why you were thinking

16  of leaving in December of 2000?

17     A.   December of 2000?  I left in September of

18  2001.

19     Q.   Well, you filled the application for Habit

20  Management out in December of 2000.  And at that

21  point you said --

22     A.   I --

23     Q.   Let me finish.  Hold on, let me finish.

24          At that point you said that your present

42

1    employer was Cape Heritage?

2        A.    Yes.

3        Q.    And my question is, while you were working

4    at Cape Heritage and you came to fill out this

5    application, why were you planning to leave Cape

6    Heritage?

7        A.    I had no intentions of leaving, I just

8    needed more hours.

9        Q.    I see.  So you were planning to work at

10   both places?

11       A.    Yes.

12       Q.    Okay.

13              Is there anything else about this

14   application, when you look at it, that you believe

15   is incorrect or incomplete, that you want to tell me

16   about?

17       A.    That's me.  That's me.  That is, whatever I

18   put down is accurate.

19       Q.    It is accurate?

20       A.    Uh-huh.

21       Q.    Now, at this point, how many hours were you

22   working at Cape Heritage?

23       A.    It varied, I worked about 60 to 80 hours.

24       Q.    60 to 80 hours at Cape Heritage?

FARMER ARSENAULT BROCK LLC

43

1      A.   Yes.

2      Q.   As a CNA?

3      A.   Yes.

4      Q.   And you wanted additional hours?

5      A.   At that time, when it came in December, the

6  hours were breaking down, and it went down to

7  40 hours, and I needed more money.

8      Q.   Because I note, if you look at the first

9  page of the application, you checked off "yes" to

10 these three questions about your availability.  One

11 question is whether you could work on weekends.

12     A.   Yes.

13     Q.   And one was whether you could accept

14 part-time work, and one was whether you would accept

15 temporary work.

16     A.   Yes, yes.

17     Q.   And you felt you would be able to do any of

18 those things and still keep your employment at Cape

19 Heritage?

20     A.   Yes.  Cape Heritage was a place where I

21 could decide if I wanted to work at night, which was

22 11 to 7, or 7 to 3, or 3 to 11, or I could schedule

23 it in part-time.

24          It was convenient, flexible.

FARMER ARSENAULT BROCK LLC

44

1    Q.   And at this point, were you living on
2  Jonathan Lane?
3    A.   No, I was living in Yarmouth with my
4  husband.
5    Q.   And is that the 25 Parkwood address?
6    A.   Yes.
7    Q.   At what point did you leave 25 Parkwood?
8    A.   Must have been in May or June.
9    Q.   Of 2001?
10    A.   2001.
11    Q.   Okay, that's probably all I'm going to ask
12  you about the application.
13         You received an offer of employment from
14  Habit Management, right?
15    A.   Yes.
16    Q.   And do you remember who made the offer to
17  you?
18    A.   Courtney.  I do not know her last name.
19    Q.   Was it a verbal offer?
20    A.   She called me up on the telephone;
21  announced, "Congratulations, you have a job at Habit
22  Management."
23    Q.   And I notice on the application, you
24  describe the position desired as simply aide.  Is

1   that when she called you and told you what the job

2   would be?  Do you remember what she called the job?

3       A.   Because I mentioned I was a CNA and it said

4   aide.  I just reflected on -- I said an aide,

5   assistant.

6       Q.   And do you remember what she called it?

7       A.   No.

8       Q.   Now, what was the Habit Management work

9   address where you reported to work; do you remember?

10      A.   Yarmouth.  I'm so sorry, I don't know the

11  address right now.

12      Q.   That's okay, but it was the location in

13  Yarmouth?

14      A.   Yes.

15      Q.   Do you recall how many hours a week you

16  were working when you first started at Habit

17  Management, and I mean hours at Habit Management?

18      A.   At that time?

19      Q.   Yes.

20      A.   From January 3rd to, I believe, the

21  beginning of April, I was working at least 12 hours

22  or less.

23      Q.   12 hours or less?

24      A.   Yes.

46

1       Q.    Were you paid on an hourly basis?

2       A.    Yes.

3       Q.    Do you recall what you were paid per hour?

4       A.    No.

5       Q.    Does 9.50 sound about right?

6       A.    9.10 sounds more accurate.

7       Q.    9.10.

8             Do you remember how many days a week you

9   were working there?

10      A.    Two days a week.

11      Q.    Two days.

12            Was it the same two days or did it

13  alternate?

14      A.    Always the -- I believe it was always the

15  same two days.  It was Monday -- Sunday and Monday.

16      Q.    Two consecutive days?

17      A.    Yes.

18      Q.    And which shift did you work?

19      A.    It was morning, which started at 5:45.  I

20  would get there 5:45 and leave, probably around 10.

21      Q.    So it was about a four-hour shift?

22      A.    Four-hour shift.  Maybe it was on a

23  Thursday, but I thought it was two days a week.

24      Q.    And you recall the date on which you

FARMER ARSENAULT BROCK LLC

47

1    started work at Habit Management as being --

2        A.    January 3rd.

3        Q.    January 3rd, 2001.

4            Do you recall going through an

5    orientation process?

6            MS. TUCKER:  Mark that, please.

7        A.    I know we did have an orientation, but I

8    don't know, I don't remember the whole procedure.

9            I remember watching a film.  I don't

10   remember exactly every little image of the film.

11       Q.    That's okay.  Let's take a break for a

12   moment.  I'm going to mark something as Exhibit

13   Number 2.

14           (Marked, Exhibit 2, Habit Management New

15   Employee Orientation Plan.)

16           MS. TUCKER:  Back on the record.

17       Q.    If you would look at Exhibit Number 2, Miss

18   Sheik, and tell me if you recognize that document.

19   I actually do not know if you have seen that

20   document before.

21       A.    I don't remember it, but I must have,

22   because that's my writing.

23       Q.    And when you refer to your writing, are you

24   referring to the blanks for employee's signature by

FARMER ARSENAULT BROCK LLC

48

1    this list of items?

2        A.   My -- oh, goodness.

3             When it says "January" on it, that's my

4    writing.  And the "ST," one "ST" is not mine.

5        Q.   Okay.

6             MS. TUCKER:  Well, let's go back for a

7    minute and let me state for the record that this is

8    a two-page -- excuse me.

9        A.   Three page.

10            MS. TUCKER:  Oh excuse me, three-page

11   document entitled "Habit Management New Employee

12   Orientation Plan," and in the space for "Employee

13   name" it says, "Sheila Travers" and the job title is

14   female aide.

15            The start date is January 3rd, 2001.

16   And your supervisor is identified as Courtney.  And

17   the document consists of a list of items, primarily

18   trainings and tapes and handbook items.  And by each

19   item there is a place for an employee's signature,

20   and a place for the supervisor to sign, and a date.

21            Is that an accurate description of the

22   document?

23       A.   Yes.

24       Q.   I note the first item on the list is,

49

 1   quote, "Meet with designated human resources liaison

 2   to complete personnel paperwork and insurance forms.

 3   Orient to personnel procedures and review employee

 4   handbook."

 5           Do you recall that part of the process?

 6       A.   Honestly, I don't remember this too well,

 7   but I do know that is my name and that I wrote it.

 8       Q.   Do you remember receiving a copy of the

 9   employee handbook when you started work at Habit

10   Management?

11       A.   They never gave us an employee to-take-home

12   handbook.  It was always in the cabinet and she told

13   us where to see the handbook, but when the

14   opportunity came, it wasn't always there.

15       Q.   Okay.  And just to make sure I understand

16   what you just said, the employee handbook was in a

17   specific location at work; is that correct?

18       A.   At times.  And then it always seemed to

19   disappear whenever it was needed.

20           I don't know -- at that moment, I didn't

21   even acknowledge the employee handbook because it

22   wasn't even necessary.

23       Q.   When you say you didn't acknowledge the

24   employee handbook, I'm not sure what you mean.

50

1      A.   No, no, no.  I mean -- it wasn't there.  I

2  recall seeing it like a quick second.

3      Q.   Well, let me mark this as Exhibit 3.

4           (Marked, Exhibit 3, Employee

5  Acknowledgment Form.)

6      Q.   Take a look at Exhibit 3, Miss Sheik, and

7  take a moment to read that.  It's a one-page

8  document, entitled, "Employee acknowledgment form."

9      A.   (Witness complies.)

10     Q.   Take a moment to read it, and then I'm

11 going to ask you if that is your signature on the

12 bottom of the form.

13     A.   Yes, it is.

14     Q.   And what is the date on the form, please?

15     A.   January 3rd, 2001.

16     Q.   So again, going back to your recollection,

17 that is the first date of your employment?

18     A.   Yes.

19     Q.   And if you'll look at the third paragraph

20 of typewritten material, on Exhibit Number 3 it

21 says, "Furthermore, I acknowledge that this handbook

22 is neither a contract of employment nor a legal

23 document.  I have received the handbook, and I

24 understand that it's my responsibility to read and

51

1  comply with the policies contained in this handbook,

2  and any revisions made to it."

3      A.   I received it probably by hand, but I never

4  had a handbook.

5      Q.   So your testimony is that you have no

6  recollection of having your own copy of the employee

7  handbook?

8      A.   Not my own copy, no.

9      Q.   Is it possible that you were given one that

10  day, and then you put it somewhere and don't

11  remember that you had your own copy of it?  Because

12  you are stating here that you received a copy, which

13  is why I'm just trying to understand what your best

14  recollection is.

15      A.   Honestly, there is no recollection to it.

16  I really don't, I can't answer something that I

17  can't remember.

18      Q.   Okay.  So you don't remember receiving a

19  copy?

20      A.   No, and I don't even -- I, in my best of

21  mind, I don't even think I received a copy, because

22  I always, I never received -- I can't say I received

23  a copy.

24      Q.   How is it, then, that you had signed

52

1   something saying that you had?

2       A.  I can't say.  I honestly can't say.  I

3   don't recall having the book at hand.  I don't see

4   it in my thoughts, can't see it.

5       Q.  Do you recall signing this form?

6       A.  I must have, because that's my name.

7       Q.  Now, and I know as you look at it today,

8   you don't doubt that you did.  All I'm asking is, do

9   you actually recall signing this?

10      A.  No, I don't recall that today.

11          I do recall being extremely happy to be

12  employed, but I don't recall.

13      Q.  And you were excited about your job at

14  Habit Management?

15      A.  Yes.

16      Q.  Why were you excited at the time?  Tell me

17  a little bit about that.

18      A.  It's a new job and it seemed very nice.

19      Q.  What did you like about it?

20      A.  The flexibility.

21      Q.  Had you met any people, other than

22  Courtney, before you started work there?

23      A.  No, not that I know of, no.  Everybody was

24  brand-new, in my mind.

FARMER ARSENAULT BROCK LLC

53

1    Q.    Do you remember anything about whom you

2    might have met on that first date of employment at

3    Habit Management?

4    A.    Just Courtney.

5    Q.    Okay.

6    A.    And probably she introduced me to people,

7    but I don't know; I don't think so.

8    Q.    Okay.

9         MS. TUCKER:  Let me mark something else

10   as Exhibit 4.

11        (Marked, Exhibit 4, Policies from

12   handbook.)

13   Q.    Miss Sheik, I have marked, collectively, as

14   Exhibit 4, a handful of policies from the Habit

15   Management, Inc. employee handbook, and I would like

16   you to take a look through them, and after you have

17   looked at them, tell me if maybe that jogs your

18   memory a bit, if you remember seeing any of these

19   policies which were, in fact, contained in the

20   handbook.

21   A.    Not at the time when I first started.

22   Q.    Do you remember a time when you did have

23   the opportunity to see these policies?

24   A.    Not all of it.  I was grateful to get the

54

1    book whenever I could get it, but I didn't have

2    ample time to really absorb, which I like looking at

3    things, and no.  I did have it in my hand; I did

4    open it; I did review, but my clients were

5    interrupting me, so having clients and opening the

6    book, just wasn't absorbing the material.

7        Q.    Okay.  But you do have a recollection of

8    there being times during your employment when you

9    did take a look at the employee handbook?

10       A.    Yes.

11       Q.    Now, you've mentioned "she" when you were

12   talking about somebody telling you where the

13   handbook was.  Who is the individual you were

14   talking about?

15       A.    Miss Fraunfelter.

16       Q.    Fraunfelter?

17       A.    F-r-a-u-n-f-e-l-t-e-r.

18       Q.    Could you spell that for the record, and do

19   you know Miss Fraunfelter's first name?

20       A.    Linda.

21       Q.    And please tell us what her position was at

22   Habit Management.

23       A.    This business administrative assistant.

24       Q.    Business administrative assistant.

55

1           Was this someone to whom you reported?

2      A.   Yes.

3      Q.   Okay, but let's step back for a minute, and

4 finish what you were saying about the handbook.

5           What is your recollection about Miss

6 Fraunfelter and you and the employee handbook?

7      A.   She kept it in her room.

8      Q.   She kept it in her office?

9      A.   Office.

10     Q.   Do you remember asking her if you could see

11 the handbook?

12     A.   I recall, I recall seeing it other than

13 asking about it, and I recall taking the handbook

14 into the dosing room.

15     Q.   Oh, okay.  Do you have a recollection of

16 why you were looking at the handbook, which policies

17 you wanted to read?

18     A.   Timing, timing, timing.  There was

19 something that dealt with timing, because I knew

20 there was something dealing with timing.

21     Q.   Timing of what?

22     A.   Sick days.  If I needed, if I had sick

23 days.  But there was also dealing with education,

24 and I know that, too.

56

1     Q.  Do you remember reviewing, at any point,

2  the policy entitled, "Problem resolution"?  It's

3  within Exhibit 4 in front of you.

4     A.  Not the problem resolution, but it was

5  dealing definitely with timing, and everything dealt

6  with time.  Where is the timing?

7     Q.  Well this, and I will represent to you,

8  this is not a full copy of the employee handbook.  I

9  collected a few policies and put them together as

10  Exhibit 4, because I wanted to know if you had a

11  recollection of seeing these policies.

12     A.  Most likely I might have glanced over it,

13  but my main focus was timing.

14     Q.  And by "timing," you mean time off?

15     A.  Time off, time rolled, time something.

16  It's dealing with timing.

17     Q.  Okay.

18     A.  And college education, which I had to talk

19  to another, he was an attorney, and I don't know his

20  name.

21     Q.  Do you remember -- okay, well, I'm not

22  going to ask you about conversations with a lawyer,

23  because those are privileged.

24     A.  He worked for Habit Management.

FARMER ARSENAULT BROCK LLC

57

1    Q.    Okay.

2    A.    But I don't --

3    Q.    Are you remembering a particular

4    conversation about a policy?

5    A.    Yes, a policy dealing with schooling, and

6    could I get some help for college.

7    Q.    Okay.  So I'm not going to ask you about

8    any questions about that right now.

9            I want to have you take a look again at

10   the policy I just mentioned called "Problem

11   Resolution."

12   A.    Yes.

13   Q.    I want you to take a look at that policy,

14   and tell me as you look at it now, whether you

15   remember ever seeing it before.

16   A.    I never read it.  I don't know if I read it

17   or if I glanced over it.

18   Q.    Okay.  Do you remember when you were

19   employed at Habit Management, understanding that

20   there was a procedure for raising a problem,

21   bringing it to the attention of management?

22   A.    I would always go to the management.

23   Q.    And who, to whom did you report when you

24   first started working at Habit Management; who was

FARMER ARSENAULT BROCK LLC

58

1    your direct supervisor?

2        A.    My best, the person that I would always

3    need to inform was always Courtney or Janet Police.

4        Q.    And you do not recall Courtney's last name,

5    correct?

6        A.    Never knew Courtney's last name.

7        Q.    Did you consider her your immediate

8    supervisor?

9        A.    Yes.

10       Q.    And then Janet Police, when you started

11   working there, was the program director?

12       A.    Program -- she was the head boss.

13       Q.    And where did Linda Fraunfelter come in

14   that chain?

15       A.    When Miss Courtney decided to leave.

16       Q.    Did Miss Fraunfelter take her position?

17       A.    Yes.

18       Q.    So I'm going to ask you one last question

19   about this problem resolution policy.  It sounds to

20   me from what you just said, that you would come

21   forward to management if you had a problem, but that

22   you weren't specifically following this policy.

23       A.    No, because the management aren't the

24   bosses.

59

1           That's my boss.  I would go directly to

2  Courtney, and if it doesn't seem to -- and Courtney

3  would go to Janet Police, but I sometimes would talk

4  to Janet Police.  They're my bosses.

5      Q.  Directly?

6      A.  Directly.

7      Q.  Okay, all right.  Now, you resigned from

8  Habit Management on December 19th, 2001, correct?

9      A.  Yes.

10     Q.  So you worked there for a total of a little

11 less than two years?

12     A.  Yes.  About a year and 45 days.

13     Q.  Well, if you --

14     A.  I'm so, so sorry.  A year -- less than two

15 years, I meant.

16     Q.  That's okay.  You started on January 3rd,

17 2001?

18     A.  Yes.

19     Q.  And you left December 19th, 2002?

20     A.  Yes.

21     Q.  I might have misstated that.

22     A.  Yes.  That's less than two years.

23     Q.  And when you first started in this

24 position, which was what was identified as "aide" on

60

1    the application, could you tell me what your

2    responsibilities were?  What did you do at work?

3        A.   I would pass out cards.

4        Q.   What cards?

5        A.   Cards, clients' cards that identify them,

6    who they are.

7        Q.   Could you actually state for the record

8    your understanding of what Habit Management did;

9    what was Habit Management, or what is it?

10       A.   Habit Management was a methadone clinic

11   that gave dosing to clients who, unfortunately, was

12   in a predicament of addiction of some form.

13       Q.   Okay.

14            So now talking about what your

15   responsibilities were at the clinic.  Go ahead and

16   tell me; I didn't mean to interrupt you.

17       A.   That's fine.

18            I would pass out cards, observe clients

19   do UA's.

20       Q.   And what is a UA?

21       A.   A UA, I would go to the bathroom with them,

22   and they would have to pee in a cup.

23       Q.   Does UA stand for urinalysis?

24       A.   Yes, urine.

61

1     Q.   Okay, go ahead.

2     A.   And then I would submit it to the side with

3  the label on it.

4     Q.   Okay.  And when you first started work at

5  Habit Management, was that pretty much what you

6  spent most of the time doing?

7     A.   Most of the time, yes.

8     Q.   And you reported to Courtney directly?

9     A.   For anything that was of need, yes.

10    Q.   Did you report to anybody other than --

11  you've already talked about Janet Police, who was

12  the program director at the time.  Was there anybody

13  else to whom you reported for any reason?

14    A.   No, just those two, because they are my

15  bosses.

16    Q.   Okay.

17         Now, was there a time at which Janet

18  Police stopped being the program director?

19    A.   Yes.

20    Q.   And who took her place?

21    A.   Nick Mazzone.

22    Q.   Nick Mazzone?

23    A.   Nick Mazzone.

24    Q.   Do you remember when that was?

62

1      A.    That was -- to tell you the honest truth,

2    it must have been in April, but I don't know exactly

3    when he -- it was dealing with John Vininski and Mr.

4    Mazzoni.  Those two collaborated together at that

5    time.

6      Q.    Okay.  And when you refer to April, you're

7    referring to April 2001?

8      A.    2001.

9      Q.    So, essentially, shortly, a few months

10   after you became employed at Habit Management, there

11   was a change in who was program director, correct?

12     A.    Yes.

13     Q.    All right.  Now you, how did things go for

14   you at Habit Management, during the first three

15   months?

16     A.    It was different.

17     Q.    Different how?

18     A.    Different in the degree that it was -- it

19   was different.  All I can say is that when I

20   attempted suicide things were different.

21     Q.    Okay.  Now, let's talk about that for a

22   minute, because you did start work on January 3rd,

23   2001.

24             And as you told me, you attempted

63

1    suicide essentially about a month later, on February

2    2nd --

3        A.   Yes.

4        Q.   -- 2001.

5            Now, you did, you did continue working

6    at Habit Management after that suicide attempt,

7    correct?

8        A.   Yes.

9            MS. TUCKER:  Let me mark something as an

10   exhibit.

11           (Marked, Exhibit 5, Habit Management

12   Criteria-Based Job Description and Performance

13   Evaluation for the period 1/3/01-3/3/01.)

14       Q.   Miss Sheik, take a look at Exhibit 5, which

15   appears to be a performance evaluation.  And it

16   states on the first page that the period of

17   appraisal to which this evaluation pertains is

18   January 3rd, 2001 to March 3rd, 2001.  In other

19   words, the first two months of your employment.  I'd

20   like you to take a look at it and tell me whether

21   you recall seeing this before, and then tell me

22   whether that is in fact your signature on the last

23   page.

24       A.   (Witness complies.)

64

1              Yes.

2        Q.    It is your signature there?

3        A.    Yes.

4        Q.    Okay.  And do you remember receiving this,

5    perhaps, evaluation, for the first two months of

6    your employment?

7        A.    I believe so.  I don't remember too well

8    about this one.

9              I know I did, I just, I can't see it too

10   well.  I know I did, I did, I just -- what date?

11              8/28/01.

12       Q.    The signatures on the last page are dated

13   August 23rd and then August 28th, 2001.

14       A.    Okay.

15       Q.    Let me ask you about a couple of things on

16   the evaluation.

17              If you look at the first page, under the

18   first section there it states, "Sheila handles her

19   role as health aide," slash "reception, in a

20   professional manner.  She is able to answer

21   questions and direct patients to the appropriate

22   department."

23              And my question is, were you also, did

24   you also, did you have receptionist

65

1    responsibilities, then, as well as aide

2    responsibilities?

3        A.    Mainly aide.

4        Q.    But did you sometimes function as a

5    receptionist as well?

6        A.    Yes, I did.

7        Q.    Okay.

8              If you would look at Roman numeral IV,

9    it's on the third page, there is a second entitled

10   "Areas targeted for development and improvement."

11       A.    Yes.

12       Q.    And it says -- there are three items there

13   that are targeted for development and improvement.

14   One is reducing noise level in the dosing waiting

15   room; the second is documenting any and all incident

16   reports in writing, and the third is improving the

17   number of urines scheduled daily.

18             Do you remember having some discussion

19   with somebody about need for improvement in these

20   three areas?

21       A.    Most likely, yes.  There must have been,

22   yes.

23       Q.    And who would you have talked to about

24   those areas?

66

1      A.    It would have been Courtney.

2      Q.    Okay.

3            If you look at the last page, the page

4   with the signatures.

5      A.    (Witness complies.)

6      Q.    Do you recognize the signature on the blank

7   entitled "Appraiser's signature"?

8      A.    Yes, Courtney.

9      Q.    That is Courtney's signature?

10     A.    Yes.

11     Q.    And, unfortunately, I can't read the last

12  name, because her writing is so messy.

13     A.    Would it be "neck"?

14     Q.    Then there is a line for "reviewer."  I'm

15  not sure --

16     A.    Clinical supervisor.

17     Q.    I'm not sure who that is.  Do you recognize

18  that name?

19     A.    It's Nick Mazzoni.

20     Q.    That is Nick Mazzoni's signature?

21     A.    Yes, I would think so, yes.

22     Q.    Now, I note on that last page, the overall

23  performance appraisals, that you met performance

24  expectations; is that correct?

FARMER ARSENAULT BROCK LLC

67

1    A.   Yes.

2    Q.   And was that your understanding at the

3  time, that you were meeting performance

4  expectations?

5    A.   Yes.

6    Q.   And at the time that you received this

7  performance evaluation, did you feel that you were

8  being given an opportunity for being successful at

9  Habit Management?

10    A.   Yes.

11    Q.   How was your relationship with Courtney?

12    A.   Interesting.

13    Q.   In what way?

14    A.   I could go and talk to her, but it felt

15  strained at that moment in time.

16    Q.   It felt strained?

17    A.   Not with me and her, with her.  So it

18  seemed very tense.

19    Q.   So she seemed tense?

20    A.   Yes.

21    Q.   Did you ever ask her why she was tense?

22    A.   I had a feeling because what happened with

23  Janet Police, things.  And she would say things and

24  you could tell she was upset.

FARMER ARSENAULT BROCK LLC

68

1    Q.    Okay.  Did she ever tell you why she was

2    upset?

3        A.    Oh, she was completely, at that moment in

4    time, saying she's leaving, she is leaving, she is

5    giving this place up.

6        Q.    And what moment in time are you referring

7    to?

8        A.    This is dealing in, I would say, June

9    and -- no, July and August.

10            There was a point there I didn't

11   understand what was going on and there was like this

12   unbelievable change.

13       Q.    In what?

14       A.    Personalities, positions.  Everything just

15   was not -- it was just, things were going on and she

16   was just, she kept saying, "I'm leaving.  I'm

17   leaving this place; I'm done.  I'm going to move to

18   Boston or something for clinical."

19       Q.    Okay.

20       A.    It was a consistent thing and it just,

21   there was just lots of tension.

22       Q.    Well, let me ask you before we get a little

23   bit more into that, in April of 2001, was there any

24   change in your position?

69

1       A.   Yes, I had an increase in hours.

2       Q.   Okay.

3            MS. TUCKER:   Let me mark this as the

4   next exhibit, Number 6.

5            (Marked, Exhibit 6, Payroll Status

6   Change.)

7            MS. TUCKER:   Off the record.

8            (Off the record.)

9            MS. TUCKER:   Back on the record.

10      Q.   Take a look at Exhibit 6, please.

11      A.   (Witness complies.)

12      Q.   That is a one-page document.  It is

13  entitled, "Payroll Status Change."

14           It has a date of April 30th, 2000 --

15      A.   Clark something.

16      Q.   Hold on one minute, please.

17      A.   Sorry.

18      Q.   It has a date of April 30th, 2001 on it.

19  And it indicates, I believe, that you are, quote,

20  "Taking over Jessica Clark's position and that your

21  hours are increasing from 12 to 28."

22           Is that a correct interpretation of this

23  document?

24      A.   Yes.

FARMER ARSENAULT BROCK LLC

70

1    Q.    And did your hours, in fact, increase from

2    12 to 28?

3    A.    Yes.

4    Q.    On or around April 30, 2001?

5    A.    Yes.

6    Q.    All right.  Who was Jessica Clark?

7    A.    Jessica Clark was a woman who worked as an

8    aide, also, at Habit Management.

9    Q.    And do you know why she left?

10   A.    The reason why, the reason she left?

11   Q.    Yes.  Can you --

12   A.    She wanted to seek out more, better pay.

13   She wanted to work at a diner.  And supposedly they

14   were going to give her about $14 an hour.  And

15   Courtney and Miss Janet Police was trying to keep

16   her on as long as possible and give her more money

17   up to 14, $15, something.  They were just trying

18   very hard to keep her.

19   Q.    But she decided to leave?

20   A.    Yes.

21   Q.    And were you glad to have the opportunity

22   to increase your hours at the time?

23   A.    Definitely, yes.

24   Q.    Do you remember who offered the increase to

71

1    you?

2        A.    It wasn't offered to me; I asked for it.

3        Q.    Well, who, then, told you that you were

4    going to be able to have an increase in hours?

5        A.    Oh, who -- that was Courtney and Janet

6    Police was still working then.

7        Q.    Okay.

8              Did both of them speak to you about the

9    fact that you would be able to work more hours?

10       A.    Yes.

11       Q.    And what do you remember them saying about

12   that?  Were they happy to be able to offer the hours

13   to you to the extent that you knew?

14       A.    Yes.

15       Q.    Did your responsibilities change or just

16   your hours; did you take on any additional schedule

17   responsibilities at that time?

18       A.    Yes, swabbing, a CPA, which is scheduling

19   for swabs.

20       Q.    Now, can you explain that to me a little?

21   There have been a couple of references to CPA.  I

22   want to be sure I understand what this is.

23       A.    CPA is dealing for patients, for them to be

24   scheduled on certain times of the month, so they can

FARMER ARSENAULT BROCK LLC

72

1    be swabbed in the mouth for any unknown objects,

2    such as marijuana, cocaine, barbiturates, anything

3    foreign.  And it has to be in the mouth for three

4    minutes.  But I think at that time we were doing

5    UA's before we did the swabbing.  So it was UA's at

6    that time, and, yes, it was UA's, and that was to

7    identify any foreign objects, and I have to schedule

8    each one of them.

9        Q.   Okay, so let me make sure I understand

10   this.

11            So the idea was there was a switch in

12   the method of testing.  Instead of doing urinalysis,

13   you were doing oral swabs?

14       A.   Not at that time.  I think it was the UA's

15   that we were still stuck with.

16       Q.   In April of 2001?

17       A.   Yes.

18       Q.   But at some point later there was a switch

19   to swabbing?

20       A.   Yes.  Now, okay.

21       Q.   Going back to this time when your hours

22   increased in April of 2001.

23       A.   Yes.

24       Q.   I believe you testified that you did take

73

1    on some additional scheduling responsibility?

2        A.   Yes.

3        Q.   And what was that; what did you have to

4    schedule?

5        A.   That was like scheduling each client.

6             I would place it in the computer and

7    schedule their dates on swabbing.  And whenever the,

8    whatever, whoever was the program manager,

9    suggesting this individual might have to have it

10   once a week or three times a week, or once a month,

11   to identify if they were using anything, or twice a

12   month.

13       Q.   Did you also do random drug testing of

14   clients?

15       A.   Yes.

16       Q.   And how many random drug tests had to be

17   scheduled for each patient per month, at that time;

18   do you remember?

19       A.   Well, we had maybe, at that time, maybe 300

20   and something patients.

21       Q.   Uh-huh.

22       A.   And per day maybe about ten, 20.  15, 20;

23   it varied.

24       Q.   Do you remember whether there was any sort

74

1    of policy about how many times a patient would have

2    to be subjected to a random test per month?

3        A.    About twice a month.

4        Q.    Twice a month?

5        A.    But if a patient was really good, it would

6    be once a month.  I think twice a month.  It must be

7    twice.

8        Q.    After the increase in hours, and to some

9    extent responsibility for you, were you still

10   reporting to Courtney, or were you reporting to

11   somebody else?

12       A.    I was still reporting to Courtney.

13       Q.    Okay.

14       A.    And if Janet Police was there, I don't

15   know.

16       Q.    Well, as of January 2002, were you still in

17   the same position that you were in in April of 2001?

18       A.    My hours increased, and I think it was in

19   March or -- 2000 something.

20       Q.    2002?

21       A.    Yes.

22       Q.    So going back to just the rest, let's stick

23   to just the rest of 2001.

24       A.    Yes.

75

1     Q.   Your hours are increased and you take on

2   some more scheduling responsibilities, April of

3   2001.

4     A.   Yes.

5     Q.   Does that stay the same, in other words,

6   your hours and responsibilities, for the rest of

7   2001?

8     A.   Yes.

9     Q.   At some point during that period, Janet

10  Police left, I gather?

11     A.   Yes.

12         And Mr. Mazzoni took her place as

13  program director.  There was something dealing with

14  John Vininski and Mr. Mazzoni at that time, and

15  other people trying to find if they could have that

16  position.

17         I don't know when Mr. Mazzoni really,

18  really took full force of it, but it was dealing

19  with John Vininski and him, and it was like, it

20  seemed like months that the decision didn't come

21  about.

22     Q.   Was it your memory that there was no

23  program director for several months?

24     A.   Yes.

FARMER ARSENAULT BROCK LLC

76

1    Q.    And that was an open position?

2    A.    Yes.

3    Q.    Now, did you have any conversation with

4    Miss Police about why she was leaving?

5    A.    Oh, no, no, no.  I had no clue about that,

6    because she seemed to just disappear.

7    Q.    You had not known that she was leaving

8    before she did, really?

9    A.    It just happened, and then she was gone.

10    Q.    Did you have any conversation with Miss

11    Police about how she felt about her work, or about

12    Habit Management?

13    A.    Of how she loved Habit Management.

14          It seemed, I don't recall ever really,

15    truly having a conversation in-depth of her

16    enjoying, but it seemed like she loved that job.

17    Q.    About how much did you interact with her,

18    anyway, as the program director?

19    A.    A few times when -- there was a point there

20    where I was upset about something, and I told her,

21    "If you don't want me here, I can leave."  And she

22    goes, "No, no, no, we want you here."  And I don't

23    -- there was something that took place, and it made

24    me very uncomfortable.

77

1      Q.   Do you remember what it was that you spoke

2  to Miss Police about?

3      A.   I'm trying to jog my memory.

4           There was --

5           No, I can't say right at this moment.  I

6  will remember it, I know I will.

7      Q.   Okay, okay.  Just tell me if you remember

8  it.  Like I told you before, if you can't remember

9  certain things, it is better to say you don't

10  remember them than to guess.

11      A.   I don't remember, but to the best of my

12  knowledge, she seemed like she loved that job; that

13  job was everything.  Because her and Courtney used

14  to always say, "Money and power.  Money and power."

15  They used to say it up and down the hallway.

16      Q.   What did that mean to you; how did you

17  interpret that?

18      A.   Money and power.  It was just, I thought,

19  that was their little saying that they seemed to get

20  along with.  And I don't know.  I was new, okay, I'm

21  new, and people maybe made jokes about something

22  that I have no clue about.

23      Q.   Right, right.

24           MS. TUCKER:  Okay, let me mark the next

78

1    exhibit.  I believe this is 7.

2              (Marked, Exhibit 7, Habit Management

3    Criteria-Based Job Description and Performance

4    Evaluation for the period 1/3/01-1/2/02.)

5        Q.   Miss Sheik, take a look at what has been

6    marked as Exhibit Number 7.  It's another

7    performance evaluation for you.

8        A.   Yes, I recall this one.

9        Q.   And the date of appraisal is from

10   January 3, '01 to January 2, '02.  So it looks like

11   your first annual performance appraisal.

12             Do you recognize it?

13       A.   Yes.

14       Q.   Is that your signature on the last page?

15       A.   Yes.

16       Q.   So you signed this on or about January 8th,

17   2002; is that correct?

18       A.   Yes.

19       Q.   Okay.  Taking a moment to look at it, I

20   note on the first page it says, quote, "Sheila

21   handles her role as health aide in a professional

22   manner.  She has adjusted well to new

23   responsibilities around oral testing."  Is that the

24   swabbing to which you referred earlier?

79

1    A.   Yes, yes.

2    Q.   "Sheila also handles some reception duties

3  and does so accurately and appropriately."

4         Does that sound like a fair evaluation

5  there of your performance?

6    A.   Yes, yes.

7    Q.   And then on the next page there is a

8  sentence that says, "Sheila is able to meet

9  expectations in this area," and the area to which we

10  are referring?

11    A.   Drug testing schedule.

12    Q.   Is the -- excuse me, what?

13    A.   Drug testing schedule.

14    Q.   And then it says, "You need to insure all

15  policies and procedures have been followed and

16  incident reports are written when needed."

17         Was that something that you understood

18  you could improve some in that area?

19    A.   Definitely.

20    Q.   Okay.

21         But then on the next page under "Summary

22  of achievements," it says, "Sheila is a valuable

23  member of the clinic staff.  She is respected and

24  liked by both patients and staff.  Sheila has taken

80

1   responsibility of scheduling drug tests and has a

2   willingness of taking on additional duties."

3           Was that a fair evaluation of you?

4   A.   Yes.

5   Q.   And it sounds like you were well respected

6   as of this point, January 2, 2002.  Did you feel

7   well-respected at that point?

8   A.   There was things that took place that I

9   didn't feel comfortable with.

10  Q.   As of this point, as of January, 2002?

11  A.   There was, there were events with the

12  security guard and with an individual; just could

13  not seem to jibe well.

14  Q.   Okay.  And I am just trying to make sure I

15  understand what periods of time are relevant to you

16  for what points.  And as we said, this document

17  stated January 2nd, 2002, so I'm trying to stick now

18  to the period coming before this evaluation, 2001.

19          Was there anything that occurred in 2001

20  that was a disturbing event to you, that is coming

21  to your mind right now?

22  A.   A security guard, his name was Warren.

23  Q.   Okay, now.  Warren, is that a first name or

24  a last name?

81

1    A.   Warren is his first name.  I don't have his

2  last name; I don't know him.

3    Q.   Okay, Warren, though?

4    A.   Yes.

5    Q.   A security guard.

6          Now, was he an employee of Habit

7  Management?

8    A.   I called him like a third party, because he

9  was -- Habit Management hired a company which is

10  Cape Way Patrol, and I didn't know --

11    Q.   To provide security?

12    A.   Security.  He was the security gentleman.

13  Not a gentleman, but security man.

14    Q.   Now, where -- well, tell me a little bit

15  about what he did.  Where was he located in Habit

16  Management?

17    A.   He was in the middle of -- okay, when you

18  enter the door, he would stand there and guard.

19    Q.   He was standing or sitting?

20    A.   Standing.  He never sat.

21    Q.   Okay.  So he was standing right inside the

22  main entrance?

23    A.   Yes.

24    Q.   Did he stay there; was that his job, to

82

1    stay by the main entrance?

2        A.    Yes, yes.

3        Q.    And do you understand why Habit Management

4    had a security guard?

5        A.    Oh, there was a need, because of events

6    that could take place.

7        Q.    Because of the clients in the clinic?

8        A.    Yes, because of the clients of the clinic.

9        Q.    Were they sometimes violent?

10       A.    I've never seen it.  They might have been a

11   little vocal.

12       Q.    Okay.

13       A.    But violence itself, I have never, truly, I

14   just had one, would be the time one client might

15   have pushed me aside, but it wasn't like to me an

16   issue.

17       Q.    Okay.

18             Going back to your recollection.  How

19   often would you interact with him when he was there?

20       A.    I tried not to.

21       Q.    Did you have to go by him at certain

22   points?

23       A.    I did.

24       Q.    And first of all, for how long a period was

83

1    he assigned there as a security guard; do you

2    remember?

3        A.   There was points that he never was there,

4    except in the summertime, I didn't see him.  He

5    always reappeared like in the winter and the fall.

6        Q.   Okay.

7             Well, when you started there, it was

8    January?

9        A.   Yes.

10       Q.   Do you recall when you first met him?

11       A.   I know it was in February that I recall

12   seeing him, and....

13       Q.   Well, tell me what you remember about him;

14   what was your interaction with him that was

15   troubling to you?

16       A.   What shocked me is that he had the side of

17   him -- he would tell me how he would shoot Mexicans,

18   and he supposedly got wounded from Mexico.  He was a

19   policeman.  And how he didn't mind shooting

20   Mexicans, which I just can't fathom somebody saying

21   that.  And he was very, very racial.  Because it all

22   dealt with he just talked about Indians.  And I --

23   it just floored me, because I couldn't understand

24   having a security guard who is supposed to be

FARMER ARSENAULT BROCK LLC

84

1    protecting, but I didn't feel safe.

2        Q.    Okay.  Let me ask you, because I really

3    want to understand the details of this.

4        A.    Okay, sorry.

5        Q.    Well, let's take it step by step.

6              How many conversations, let's call them

7    conversations, how many conversations do you

8    remember having with him where he would make a

9    comment like this, about shooting Mexicans, or some

10   comment that you found offensive?

11       A.    Maybe about four or five times.

12       Q.    Okay.

13       A.    He would, he would be that type of person

14   who would actually come up to you and say things.  I

15   don't know what his thinking was.  I don't know

16   about his past.  I don't know.  All I can say, he

17   disturbed me, and I had to go and talk to Janet

18   Police about it.

19       Q.    Okay, stop you there for a minute.

20             How many times do you remember him

21   saying something disturbing?  Do you think about

22   four or five total?

23       A.    I remember telling him to get lost one,

24   two, three, I remember.  I'm shaking so much.  I

FARMER ARSENAULT BROCK LLC

85

1    remember a client named Cora Johnson coming up to me

2    and telling me that he wanted to do harm to me, and

3    she got him out.  But before time, yes, there was

4    the time when Janet Police was there, one time, that

5    was really offensive, and I went to her.

6        Q.    Okay, all right, let's start with that,

7    then, because she left in April of 2001.  So we're

8    talking about the first four months of your

9    employment there?

10       A.    One time.

11       Q.    What do you remember him doing or saying?

12       A.    Telling me that he doesn't mind shooting

13   Mexicans and that he got wounded with a Mexican.

14   And what did I feel?  Because people don't know what

15   I am, and so am I the Mexican that he is going to

16   hurt and harm?  So I quickly went to Janet Police

17   and informed her about it.

18       Q.    Now, when he said what he said about

19   shooting Mexicans, where was he?

20       A.    Right in the, right in the building.  Right

21   in the building.

22       Q.    Right inside the main entrance?

23       A.    Yes.

24       Q.    And where were you; were you --

FARMER ARSENAULT BROCK LLC

86

1      A.   I was just coming in.

2      Q.   Okay.

3      A.   And it floored me to hear something like

4  that.

5           That time I just attempted suicide, and

6  hearing something like that, I could not even

7  acknowledge, wanted to acknowledge, but I had to.

8  And until this day, it floors me.

9      Q.   Now, when he said this, was he saying it

10  just to you?  Was he saying it to a bunch of people?

11      A.   No, just to me.  But it didn't seem like he

12  was talking to me, that is what I can't understand.

13  It's like, was he going through Alzheimer's and he

14  was talking to me?  Because that scared me and what

15  if something came about that he wanted to do harm,

16  and I don't know how to....

17      Q.   Was he an older man?

18      A.   He was not an older man, maybe like 68, 67

19  at the time, but that is not old enough to be that

20  way.

21      Q.   Did he, as a security guard, did he have,

22  actually have a weapon; do you know?

23      A.   He had a flashlight.  Did he carry a

24  weapon, I can't recall.  But he always had something

87

1    with him.

2        Q.    Okay.

3        A.    Okay.  And the flashlight can be a weapon

4    and is especially, have you ever seen the policemen

5    with their -- yes, I would say he did.

6        Q.    All right.  So going back to this time when

7    he made this comment about shooting Mexicans.  You

8    said that you came in; he was there; he says this.

9        A.    He says that.

10       Q.    Do you say anything back to him?  What

11   happens?

12       A.    I think I was so floored and I was so sick,

13   that I wasn't, I was in between phases right now,

14   and I could not grasp everything, but I did talk to

15   Janet Police.

16       Q.    Did you talk to her later that day?

17       A.    Oh, no, no, no, I had to wait, because she

18   doesn't work on those days that I worked, on

19   Sundays.  She didn't work on Sunday when I worked.

20   And I think I told her on Monday.  Yeah, I did tell

21   her on Monday.

22       Q.    Okay.  What did you remember about that

23   conversation with Miss Police?

24       A.    I informed her what took place, and she

88

1  said she would take care of it.  I don't know what

2  she did.

3      Q.   Did you have another experience where this

4  same security guard said something offensive to you?

5      A.   Yes.  He and Art Eisner was always

6  together; always together.  Always ranting and

7  raving about, okay, now, if we put it in 2001 and

8  11th.

9      Q.   I'm sorry, what do you mean, "11th"?

10     A.   Oh, because that was the time, 2011 (sic),

11 September 11, we had that big event.  And they

12 would, Art Eisner and Warren would talk about how

13 they would love to drop a bomb on the Iraqis, and

14 they should be -- and the Arabs, and they should

15 wipe away Indians and blacks because, just wipe

16 those people away; there is no need to have them.

17          And I went into the room and I heard

18 this and I looked at both of them.  I go, "What are

19 you talking -- what are you saying?"  And I said,

20 "Get out of here.  Just get out of here."

21     Q.   Now where were you?

22     A.   I was in the dosing room.  And also Warren

23 was in the dosing room talking to Art Eisner.  Art

24 Eisner and him were just two peas in a pod; so great

89

1    together.

2         Q.    Okay, let's stop for a minute.  Art Eisner

3    was an employee of Habit Management at the time?

4         A.    Yes.

5         Q.    And what was his position there?

6         A.    Just like mine.

7         Q.    He was an aide?

8         A.    Yes, a male aide.

9         Q.    And about how old was he; do you know?

10        A.    At that time maybe 68, 69.

11        Q.    So he and Warren were approximately the

12   same age?

13        A.    Oh, God, yes.

14        Q.    Now, you're remembering a time when you

15   walked in and they were having this conversation in

16   the dosing room, you said?

17        A.    Yes.  They were together and they were

18   talking about dropping a bomb on the Iraqis, and

19   Sheiks and Arabs should be just totally wiped out.

20   And they were, they just were in cahoots in that

21   conversation, and they looked at me and I said,

22   "What are you doing?  What are" -- you know, "Get

23   out of here, just get out of here."

24        Q.    Now, this was after September 11th, 2001?

FARMER ARSENAULT BROCK LLC

90

1      A.    Yes, this was sometime in March.

2      Q.    Of 2002, 2002.  So let me ask you this.

3            You had your conversation with Miss

4   Police at some point, obviously, before she left in

5   April, 2001?

6      A.    Uh-huh.

7      Q.    Do you remember any specific comments that

8   Warren made, this security guard, between the one

9   that you brought to Miss Police's attention and this

10  conversation in the dosing room; anything in between

11  those two?

12     A.    He would -- in between that time?

13     Q.    Yes.

14     A.    He would always bring up about "Indians

15  don't belong here."  And he would actually go into

16  the section where Barbara was, and he would always

17  say, "Oh, get rid of" -- "Indians think this is

18  their land.  This is not their land, this is our

19  land; it belongs to the white Americans."

20     Q.    Okay.  About how many times did you hear

21  him say that?

22     A.    Off and on.

23     Q.    Well, about how many times?

24     A.    Maybe --

91

1    Q.    Are we talking about two or --

2    A.    Maybe about three or four times.

3    Q.    All right.  And when he made these

4  comments, and only if you could remember, but where

5  was he when he made them?

6    A.    Okay.  One time was in the dosing room.

7    Q.    Was that the time you are referring to with

8  Art Eisner?

9    A.    Yes.

10    Q.    Okay, go ahead.

11    A.    Another time was at the, where Barbara was

12  at.

13    Q.    Now, who is Barbara?

14    A.    Barbara was the secretary.

15    Q.    So he made this comment in front of her?

16    A.    Out loud, out loud, ranting and raving.

17    Q.    Do you remember her last name?

18    A.    No, I never knew Barbara's last name.

19    Q.    And that is when he was making comments

20  about Native Americans --

21    A.    Indians, Native Americans, Indian.  Not

22  Indians from India, but, you know.

23    Q.    Any other comments that you specifically

24  recall?

92

1    A.   I just remember dropping the bomb, get rid

2    of the Arabs.  And then he would talk about on -- I

3    just remember Cora Johnson, and how he wanted to do

4    harm to me.  And this was on November 27th.  This

5    was like between 6:15 to 6:45 because she just came

6    in and she said, "What is he doing here?  What is he

7    doing here?"  I said, and I go, "Excuse me, what is

8    wrong?"  And she looked at me and turned around and

9    said, "What is he doing here?"

10   Q.   Excuse me, this is a client in the clinic?

11   A.   Yes, Cora Johnson.  I said, "He is a

12   security guard.  And she turned and started shaking

13   and I said, "Cora, what is wrong?"  She said,

14   "Nothing."  And Dan O'Leary was right over here.

15   Q.   Who is Dan O'Leary?

16   A.   Dan O'Leary is another male aide.  He and I

17   worked together.  And she goes, she started pointing

18   to me.  And I go, "What's wrong, Cora?"  And she

19   goes, "He wanted to do harm to you.  He was talking

20   about you."  And she said, had to call -- this was

21   the day before.  She had to go see, talk to her

22   husband and tell him, and her husband called up Nick

23   Mazzoni the next -- that must have been, the 27th

24   was the day I worked; the 28th was Thanksgiving, it

93

1    must have been the 26th that she, her husband called

2    up.

3        Q.   Okay.  And are we talking about 2001?

4        A.   2002.

5        Q.   Shortly before you left?

6        A.   Yes.

7        Q.   Okay.

8             Well, why don't we finish.  Why don't

9    you finish telling me what you remember about that

10   incident.

11            So her husband called Mr. Mazzoni?

12       A.   Yes.

13       Q.   And?

14       A.   And told her about whatever she said about

15   he wanted to do harm, she felt scared, she didn't

16   want him to be there, and he was going -- and that

17   he wanted physically to do harm to me.

18            And I'm just like, "This is crazy."

19       Q.   Okay.

20            Now, so you've told me about a few

21   incidents.  Are there any others that you remember

22   involving Warren?

23       A.   Oh, yeah.  He made a remark to Linda

24   Fraunfelter, and Linda Fraunfelter felt very unease

94

1    (sic).  Something about sex.  And Miss Fraunfelter

2    was so insulted, so insulted, that she called John

3    Vininski to talk to him.  And John Vininski did talk

4    to him.

5        Q.    Now, do you know how to spell John

6    Vininski?  I'm not sure who that is.

7        A.    V-i-n-i-s-k -- V-i-n-i-s-k-y, s-k-i.  I'm

8    so sorry.

9        Q.    What was his position at Habit Management?

10       A.    He was the head nurse.

11       Q.    Okay.  So Miss Fraunfelter spoke to him?

12       A.    Yes.

13       Q.    About Warren's comments?

14       A.    Yes.  And Warren, Warren was being very

15   verbal, and everything dealt with sex for some odd

16   reason.

17            And then he went and said something in a

18   sexual manner that she felt very offensive and she

19   didn't know --

20       Q.    Now, did you hear what he said to her?

21       A.    No.  She came up to me and Dan O'Leary and

22   said, "He started something very sexual," and --

23   she couldn't, she didn't like it.  She had to go

24   back to John Vininski.  John Vininski took control

FARMER ARSENAULT BROCK LLC

95

1   over the matter and then he, Warren said, "Oh, well,

2   I said something wrong, I guess.  I said something

3   wrong."  So....

4       Q.   And do you know what Mr. Vininski did about

5   the situation?

6       A.   He talked to him.

7       Q.   He did?

8       A.   He got him in the room, and they had this

9   conversation, but I had no clue what was said in

10  that room.

11      Q.   Do you know when this event occurred, the

12  one involving Miss Fraunfelter?

13      A.   This must have been, I believe, September,

14  October.

15      Q.   Of 2002?

16      A.   2, yes.

17      Q.   All right.  Anything else involving Warren?

18      A.   I know there is more.

19           Oh, oh, God, yes.  It was -- okay, this

20  was the 27th, it was on a Thursday, again, and it

21  was weeks -- 27th, I don't remember the date.  And,

22  please, just give me a second.  It was the week

23  after, and there was Warren and Art Eisner and I

24  walked in and they were dead silent.  You could see

FARMER ARSENAULT BROCK LLC

1    them talking, right?  And when I walked in it was
2    like nothing.  And I walked right around them.
3              And -- oh, yeah, that was on a Thursday
4    because Dan O'Leary was there, and Dan O'Leary was
5    sitting in the chair.  And Dan O'Leary looked at me
6    and said, "Sheila, did you hear what they said?"
7    And I said, "No, I didn't hear nothing."  He said,
8    "He called you an anus."  I said, "What's an anus?
9    What's an anus?  Oh, God."  And he said, "Yeah, he
10   called you an anus."
11       Q.   And who was he referring to when he said he
12   called you that?
13       A.   Art Eisner and Warren.
14       Q.   Both of them?
15       A.   Both of them.
16       Q.   Let me ask you, what race was Warren, or is
17   Warren?
18            I can't say.  I know he is Caucasian.
19       Q.   Okay.  What about Art Eisner?
20       A.   Caucasian.
21       Q.   And Dan O'Leary?
22       A.   He told me he is Irish Caucasian.
23       Q.   And what about Janet Police?
24       A.   Caucasian.  That's her married name.  I

97

1    don't know what is her maiden name, so I can't say.

2        Q.   Okay.  So Dan said that Warren and Art had

3    called you an anus, but not to your face,

4    apparently, behind your back?

5        A.   When I was walking -- Oh, yeah, before I

6    had entered the door.

7        Q.   Okay.

8        A.   They were screaming it out loud.

9        Q.   Did you hear it yourself?

10       A.   No, no.

11       Q.   Now, when you came in, did they say

12   anything, either one of them?

13       A.   No, not directly to me.  And I was, I went

14   in my own direction.

15            One thing about Warren and Art, I always

16   have to stay away when those two -- because they

17   make it so unbearable to walk into the door and so

18   unbearable to be together, because they would start

19   talking about the Iraqis, the Sheiks, the Arabs, the

20   blacks, and --

21       Q.   Okay, let me just ask you, though.  Do you

22   remember if -- you told me about a number of

23   specific memories you have about comments and

24   conversations.

1          How many times do you remember hearing

2   Warren make an offensive comment about the Arabs or

3   the Indians or the blacks; how many times would you

4   say?

5       A.   About five.

6       Q.   Okay.  And what about Mr. Eisner?

7       A.   What about him besides --

8       Q.   About how many times do you remember him

9   saying something that offended you, that you heard,

10  yourself?

11      A.   Directly to my face being called a black

12  bitch or being called a nigger, right -- not

13  directly to my face, that was when Andrea and --

14  Andrea and Jeff, Jeff, the nurse, what is his name?

15  He said, "Get away from me.  Get away from me, Art,"

16  Eisner.  And Andrea heard it and she told Nick right

17  away about it.  Again, --

18      Q.   Okay, but this is what I need to

19  understand, and I don't mean to interrupt you.

20      A.   Okay, that's fine.

21      Q.   What I first need to understand is what

22  happened to you directly, not what happened to other

23  people.  Hold on one second.

24          So did Art Eisner call you a black bitch

99

1    to your face?

2        A.    Oh, directly to my face.

3        Q.    How many times?

4        A.    About three times, because I took myself, I

5    begged Nick to take me out, out of working with him.

6        Q.    Okay.

7              When he called you that, was there

8    anybody else there who overheard it?

9        A.    There was a client who was in the room, and

10    she's like, "Did I hear that?"  I'm like,

11    "Leave it alone.  Leave it alone."

12              And I ran quickly to -- oh, I ran

13    directly to Dan O'Leary.

14        Q.    And you told him that Mr. Eisner had called

15    you a black bitch?

16        A.    A black bitch.  And I said, "Leave it

17    alone, just let it go because he is going to say it

18    again, and it is going to slip out and it is going

19    to happen to, right in front of the boss.  I know

20    it's going to happen."

21        Q.    Now, why didn't you want to report it to

22    the boss?

23        A.    Because every time I had complained about

24    Linda Fraunfelter or I complained about

1   Art Eisner, nobody, nobody listened.  It was like

2   Nick did not listen to me, whatever I told him about

3   Linda Fraunfelter, because Linda Fraunfelter, on the

4   other hand, told me so many things that was

5   derogatory.  Not so many things, it was quite a few

6   times derogatory.  Like calling me a slut in front

7   of Dan O'Leary.  Saying that she saw me --

8           This was September 4th; this was right

9   after I ran a road race.  I'm a chubby girl, okay?

10  Yes, I ran Falmouth road race; it's 7.1.  It was

11  running and walking, and this was September 4th.

12  And she comes up and saying, "Oh, I saw Sheila

13  walking and a whole bunch of men offered her a lot

14  of money."  And I looked at her and I'm like "What?"

15  She's like "I don't know what that is about."  And

16  she couldn't make jokes.  Dan O'Leary could make

17  jokes, but she herself was -- her jokes -- she tried

18  to make jokes that it was, it was so rude it hit to

19  the core.

20          And Dan O'Leary said, "What are you

21  going to do about it?  She is your boss; she walked

22  out."

23  Q.   Again, I want to understand.  So Linda

24  Fraunfelter made jokes that you thought were rude.

FARMER ARSENAULT BROCK LLC

101

1    Did they have anything to do with your race?

2        A.   Oh, God, let's go back.

3        Q.   Just --

4        A.   Yes, yes, yes.

5        Q.   About how many times did Miss Fraunfelter

6    say something that you felt was offensive because it

7    had to do with your race?

8        A.   Twice.

9        Q.   Okay.  What were those comments?

10       A.   One, it was in front of Miss Champ.  Miss

11   Champ is -- what was her title?  I don't know what

12   is her title; I'm so sorry.

13       Q.   Is she a client or an employee?

14       A.   Patty Champ.  She is a client.

15       Q.   Okay.  In front of this client, what did

16   Miss Fraunfelter say that offended you?

17       A.   Oh, she is an employee, I'm sorry.

18       Q.   In front of this employee, what did Miss

19   Fraunfelter say to you that you felt was offensive

20   because it was based on your race?

21       A.   Oh, it was dealing with the way I talked;

22   oh, it was dealing with education, because I told

23   her I was, I said a cheerleader, which I meant to

24   say a color guard.  And I knew she was going to take

FARMER ARSENAULT BROCK LLC

102

1    that into, into a joking manner and a rude joking

2    manner, but I didn't say it.  It was thought in my

3    mind.  I said I was a cheerleader and she said, "Oh,

4    it's obvious we know that somebody didn't do very

5    well in school."

6              And she says, "I guess blacks tends to

7    do that."  I said, looked at her and said, "I did

8    very well in school and blacks tends to do very well

9    in school."  And this was right in front of Miss

10   Champ.  And I'm surprised she didn't take her aside.

11        Q.   Do you remember when this was?  When did

12   this happen with Linda Fraunfelter?

13        A.   We had a meeting.  It was at the time of

14   the meeting that I don't -- it was in October,

15   October 16th, October 17th.  October 16th and 17th.

16   October 16th, it was a Boss's Nation, Nation --

17   National Boss.  And the day after there was an event

18   that she said that.

19        Q.   And was this 2001 or 2002?

20        A.   Two.

21        Q.   Okay.  So this was in 2002?

22        A.   Yes.

23        Q.   Okay.  Before October 16th or 17th, I guess

24   it was the September of 2002, did Miss Fraunfelter

FARMER ARSENAULT BROCK LLC

103

1    say anything that was racially offensive to you?

2         A.    Yes.    It was, it was in June.    It was when

3    Dan O'Leary took a vacation, and it was with Andrea.

4    Andrea is black, just like me.    We are Cape Verdean;

5    we are black.    That is what I am.    And I saw her

6    coming in and I said, "You look so pretty," you

7    know.    She wore this green dress which was like a

8    mint green.    And I said, "Oh, that is such a pretty

9    color on you."    And she goes -- and I said, ."It

10   reminds me of Thin Mints."    And she goes, "It's not

11   Thin Mints now."    And then she grabbed Andrea's

12   hands and put them together and said, "Now it's Thin

13   Mints."

14        Q.    Okay.

15        A.    And I'm looking at my shirt and I'm like

16   I'm wearing blue and Andrea is wearing, I guess, I

17   forget the color, beige or something like that, and

18   I was wearing blue and Andrea just shook her head

19   (indication).

20        Q.    Let me ask you.    When you looked at the

21   dress and said it reminded you of Thin Mints, in

22   what way did it remind you of Thin Mints; what were

23   you commenting on?

24        A.    Green, the color of green.    Because I

1    always think of Girl Scout cookies, and the color of

2    it was green, and it's a pretty color, and she had

3    that color; that's the Thin Mints.  It was not

4    dealing with brown, it dealt with the color green

5    that she had on.  It was very, very pretty on her.

6        Q.    All right.  Now, you said -- we are going

7    to break in about five minutes, so I just want to

8    finish with this line of thinking, all right?

9              You said that Miss Fraunfelter had made

10   a couple of comments.  You complained to Mr. Mazzoni

11   and he hadn't done anything; is that correct?

12       A.    He might have talked to her, but every

13   single time he talked to her, it turned rebellious.

14   It was a different -- she was going to do harm to

15   me.  Like -- there are so many days, how many --

16       Q.    No, we are going to stop in about five

17   minutes, but it is important I understand what the

18   basis, you know, for your complaint is in a case.

19       A.    Okay.

20       Q.    So let me just finish what I am saying,

21   okay?

22             You had said to me originally that you

23   didn't complain about Art Eisner's comments, I

24   believe, because you felt that when you complained

FARMER ARSENAULT BROCK LLC

105

1    about Miss Fraunfelter --

2        A.   No, no.

3        Q.   -- Mr. Mazzoni didn't respond?

4        A.   No, I complained about Art Eisner, and --

5    quite a few times.  Because there was one time when

6    he made me cry and I had to leave.  And he mentioned

7    how much I should be working in Zachary's, and he

8    could see me with my breasts exposed swinging around

9    the pole.  And that was too much for me.  And my

10   husband called, told -- called up and told Mr.

11   Mazzoni to stop this.

12       Q.   Okay.  Now, going back to Mr. Eisner for a

13   minute.  Where we had started on this was I had

14   asked you what he said to you directly that had to

15   do with your race, and you said he called you a

16   black --

17       A.   Black bitch.

18       Q.   Black bitch at least three times?

19       A.   Yes.

20       Q.   What I need to know is your best memory.

21   Why don't we do this and then we will stop for

22   lunch.  You remember him, apparently, calling you

23   that?

24       A.   Black bitch.

FARMER ARSENAULT BROCK LLC

106

1    Q.    To your face?

2    A.    To my face.

3    Q.    On three occasions?

4    A.    November 27th.

5    Q.    Of 2002?

6    A.    Oh, no, no, no, I'm sorry, wait.  I'm

7    sorry, no, no, no.

8          It was November, it was on a Thursday,

9    and I believe it was November 8, on a Thursday.

10   Q.    Of what year?

11   A.    Of 2002.

12   Q.    What do you remember?

13   A.    Well, that day we were doing swabbing, and

14   I saw him not swabbing the person long enough.  He

15   did it maybe about a minute and a half.  You are

16   supposed to have the swab in three minutes for the

17   person to detect if there is a foreign object.  And

18   I told him, "That person can't go.  It has to be

19   reswabbed.  You have to swab it."  And he goes,

20   "No, you don't, you don't have to swab it."  And I

21   said, "Yes, you do," and -- what happened?

22          Oh.  And so I ran to Dan O'Leary, and

23   then I came back.  And then he said, he went to talk

24   to Dan O'Leary.  And he goes, "You don't have to

FARMER ARSENAULT BROCK LLC

1  swab it that long." And then I said, "Yes, you do,

2  you have to swab it." And he said, "You're nothing

3  but a black bitch."

4      Q.   So Mr. Eisner said this to you November of

5  2002?

6      A.   November 8th of 2002.

7      Q.   Okay. Now, when he did that, did you

8  report that comment?

9      A.   I ran quickly to Dan O'Leary and said, "Art

10  Eisner just called me a black bitch."

11      Q.   Okay. Now, do you recall Mr. Mazzoni

12  asking you to come into a meeting with him and Ms.

13  Fraunfelter, in which he asked you to tell him who

14  had made the black bitch comment to you?

15      A.   Yes.

16      Q.   Okay. What do you recall about that

17  meeting? Do you remember whether you agreed to say

18  who it was that called you that?

19      A.   I said it was, I said, "I didn't go up to

20  you to tell you. I did not want to tell you."

21          The reason for that, because what took

22  place with Linda Fraunfelter just a week ago, I

23  mentioned how she told -- she encouraged this whole

24  matter. She was the one who encouraged it. Because

1    the week before that, which was on, on a Thursday,

2    it was October 31st, she comes in yelling at me and

3    telling me to shut down the computer because,

4    something dealing with the interaction of the

5    computer was affecting her computer.  And I had to

6    swab somebody.

7        Q.    Yes?

8        A.    And she's like, "You make sure you shut

9    down this computer."

10            And then a client was overhearing, was

11   sitting over here and said, "Oh, poor Sheila."  And

12   she goes, "Poor Sheila.  I make sure I give her a

13   lot of problems and she knows it."  And then Art

14   Eisner goes, "Give her hell.  Give her a lot of

15   hell."  And then I mentioned that to Nick, Mr.

16   Mazzoni and I said, "Well, she's the one who

17   encouraged him, and that's why this took place."

18       Q.    Okay.

19       A.    And then I said -- well, he goes, I said,

20   "Forget it.  I didn't even want to mention it to

21   you.  You were not supposed to know this.  I knew he

22   was going to say it some day out loud."  And I got

23   up.  I said -- he said, "You make sure you don't

24   talk about any more racial events ever in this place

109

1  again."

2      Q.  Let me ask you and then we'll stop right

3  after this.  I want to make sure I got this right.

4      A.  Yes.

5      Q.  Okay.  What you remember about that meeting

6  is -- well, let me ask you, do you remember him, Mr.

7  Mazzoni, saying, "Who called you a black bitch?"

8      A.  And I said it was Art.  First I said, I did

9  not want this to be said, I did not want this,

10 because eventually this will come out again.

11     Q.  But is it your testimony you actually told

12 him it was Art Eisner, at this meeting?

13     A.  It was Art Eisner.

14     Q.  And then what, how did he respond when you

15 told him it was Art?

16     A.  Oh, it -- "We are going to take care of

17 it."  And then he, something about -- and I kept

18 saying, "I do not want you -- I don't know why Dan

19 O'Leary told you," because I did not want him to

20 know this.

21     Q.  Was it your understanding that Mr. Mazzoni

22 had not known about this from anyone else, until

23 this time when Dan O'Leary told him?

24     A.  What do you mean, being called the black

110

1   bitch before?

2       Q.   You are saying that you told Mr. Mazzoni

3   that you didn't want him to know, because you wanted

4   Mr. Eisner to say it in front of him at some point,

5   right?

6       A.   Anybody, instead of just me myself.  And

7   that is it, because I even mentioned, because she

8   (indication), Mrs. Fraunfelter, was the one who

9   caused this.  She encouraged this individual to

10  behave that way.

11      Q.   "This individual" being Mr. Eisner?

12      A.   Mr. Eisner.

13      Q.   My question just is this.  To your

14  knowledge, at the time you had this meeting in

15  November of 2002 where Mr. Mazzoni was asking you

16  who called you a black bitch --

17      A.   Yes.

18      Q.   -- at that time, had you ever told him that

19  you had been called a black bitch before?

20      A.   Yes.

21      Q.   Well, when had you told him that you had

22  been called a black bitch?

23      A.   When -- oh, my God.  When I wanted to leave

24  that day, there was a -- when I did not want to work

1  with Mr. Art Eisner.

2      Q.    Which was when?

3      A.    This was, I don't even know, because it was

4  so many times he said this.  I believe it was in

5  March, March, February.

6      Q.    So you're saying that you told Mr. Mazzoni

7  in February, March of 2002, that Art Eisner called

8  you a black bitch?

9      A.    Yes.

10     Q.    And how did Mr. Mazzoni respond when you

11  told him that then?

12     A.    He was going to take it upon himself to

13  talk to Art Eisner.

14             Nothing seemed to resolve.  No matter --

15  and if I did complain about, let's say, Miss

16  Fraunfelter, my hours were cut.

17             If I complained about Art Eisner, at

18  that time my hours were cut the following week.

19     Q.    When were your hours cut?

20     A.    It was -- the first time it was in June,

21  July.  It was the week after the 4th of July, my

22  hours were cut.  That was only half an hour.  I had

23  33 and a half hours when, from April, May, June, 33

24  and a half hours, and Miss Fraunfelter cut my hours

1    because we had a disagreement, and the second time

2    was November.

3        Q.    2002?

4        A.    2002.

5        Q.    Okay, let's hold that, because that is a

6    whole subject I know we are going to talk about.  I

7    know we said we are going to break at noon, but

8    there is this one point I want to be sure I

9    understand from you accurately, okay?

10       A.    Oh, yes.

11       Q.    And it is important, because as we said,

12   you are under oath.

13       A.    Certainly.

14       Q.    And you don't want to be guessing if you

15   don't remember something accurately, so I want to

16   get this straight.

17             How many times did Art Eisner call you a

18   black bitch, to the best of your memory?

19       A.    Three times.  One time when it dealt

20   with -- not directly.  Oh, wait a minute, directly,

21   directly.

22       Q.    Yes, just directly.

23       A.    Two times.

24       Q.    Two times to your face he called you a

113

1  black bitch?

2      A.   Yes.

3      Q.   Leaving the dates aside for a minute, you

4  told me that you told Mr. Mazzoni one of those

5  times?

6      A.   Yes.

7      Q.   The other was the other time, the time that

8  you told Dan O'Leary?

9      A.   Yes.

10     Q.   So other than those two times, there were

11 no other times he called you that directly?

12     A.   No.

13     Q.   Okay.  It's just so I understand what we

14 are talking about.

15     A.   Yes.

16     Q.   Okay.  Did anybody else call you a black

17 bitch, other than Mr. Eisner, directly to your face?

18     A.   I was called a douche bag.

19     Q.   No, black bitch.  Sorry, but I need to know

20 exactly.

21     A.   No.  Sorry, no, black bitch.

22     Q.   Okay.  Did anybody else make any direct

23 racial comment like black bitch to you, to your

24 face, other than Art Eisner and what you told me

114

1    about Warren?

2        A.   Oh, no, no, no.

3        Q.   Right.  You told me, you told me a lot

4    about Warren.  If you think about additional things,

5    tell me, but I think we have gone through what

6    Warren said pretty fully, but tell me if you think

7    of something else.

8              Other than Warren and Mr. Eisner, did

9    anyone else make racial comments?

10       A.   Well, if you call frigid bitch a racial

11   comment, but that is not black bitch, no.

12             MS. TUCKER:  All right, this is probably

13   a good point to stop, because it's ten past 12:00.

14   Would you like to start at 1, because I would rather

15   not have you here longer in the day then we need to?

16             When we come back, I would like to go

17   back and finish with this performance evaluation

18   which we were talking about.

19       A.   Yes.

20       Q.   And so I am going to go back in time from

21   that and move forward through some of these

22   documents.

23       A.   That's okay.

24             MS. TUCKER:  Off the record.

FARMER ARSENAULT BROCK LLC

1          (Lunch break.)

2      MS. TUCKER:  Back on the record.

3      Q.  Miss Sheik, I'd like to go back to Exhibit

4  Number 7, which is the second performance evaluation

5  that we were looking at.

6      A.  Yes.

7      Q.  And I just want to ask you about on the

8  final page of the evaluation, there is this section

9  for "Employee comments."  I notice you didn't mark

10  anything there, and my question to you is, at this

11  point did you disagree with anything in this

12  evaluation?  Did you take issue with anything on

13  this evaluation, or did you think it was a pretty

14  fair and accurate evaluation of your performance?

15      A.  Let me tell you I didn't really read it.  I

16  was just so excited about having 33 percent for a

17  raise, and that was my main issue, that's it.  And

18  when I got a raise, that is all I cared about.

19          I should have more acknowledged the

20  whole thing, that is why you don't see nothing, or

21  any answers, because I was just like, "Hurrah, I got

22  a raise."

23      Q.  At that time, in January of 2002, were you

24  feeling generally positive about working at Habit

116

1    Management?

2         A.   Okay.

3              Working with the clients was wonderful.

4    It's just certain people who had a little hard time

5    because of me, of my, because of my attempted

6    suicide, because of my color, and supposedly

7    whatever race they thought I was.  And I never

8    mentioned my race, really, other than I was

9    considered black.

10        Q.   Okay.

11             Again, let's stick in time to January

12   2002.  Okay.  So at that point in time, you get this

13   performance evaluation; you get the raise that you

14   referred to; you testified earlier that there were

15   at least a couple of things that happened in 2001,

16   and so that happened before the time of this

17   evaluation, this situation after September 11th

18   where you walked in on the conversation between Mr.

19   Eisner and Warren, and you also said that earlier in

20   the year, I believe, you'd spoken to Mr. Mazzoni

21   about Mr. Eisner; that is correct?

22        A.   Yes.

23        Q.   So that was a long question, right?

24             So here you are in January of 2002.  A

117

1    couple of things had happened that had bothered you,

2    but were you generally feeling good about the work

3    environment in January of 2002?

4        A.   Let's just put in the record that I was

5    happy with what was -- dealing with the work itself,

6    not with my co-worker or like Art Eisner, or Warren,

7    especially Warren, and those were really -- 2002, 1,

8    2, those were really the issues.

9        Q.   Okay.

10            And I know we talked a lot about this

11   just before lunch, and I don't want to keep going

12   over this same material; I don't want to get too

13   repetitive.

14       A.   No, that's fine.

15            The evaluation itself, it was nice, but

16   I was more into I got a raise.

17       Q.   At this point, in January of 2002, had you

18   said anything at this point to Mr. Mazzoni about

19   feeling that you hadn't been treated appropriately

20   by Warren and by Mr. Eisner?

21       A.   Janet Police was the only one who I really

22   talked to about Warren, not Mr. Eisner, and Art

23   Eisner.  Art Eisner was, that was with -- oh, God,

24   Art Eisner.  Art Eisner was incredible.  Art Eisner

118

1  was definitely a problem with the idea of dealing

2  with race, or encountering with Warren.  Those were

3  the really upsetness (sic).

4     Q.  Okay.  So in 2001, you had spoken to Miss

5  Police about Warren, you said, correct?

6     A.  Yes.

7     Q.  Okay.

8     A.  Yes.

9     Q.  And did you also speak to Miss Police about

10  Art Eisner before she left, do you think?

11     A.  No.  She disappeared.

12     Q.  Now, in 2001, after she left, at some point

13  Mr. Mazzoni became the program director?

14     A.  He was.

15     Q.  Do you remember whether, and if you don't

16  remember, you could tell me that, too, but do you

17  remember whether, at the time of this evaluation,

18  the very beginning of 2002, had you had any

19  conversation with Mr. Mazzoni yet about being

20  treated in a way which you thought was a racist?

21     A.  Not me, but Andrea did, and because Andrea

22  overheard, and the time is a little, it's dealing in

23  February and March, came up more, and then with Dan

24  O'Leary.

119

1      Q.   Okay, okay, all right.

2           The conversation with Dan O'Leary, do

3   you remember that as being in 2002?

4      A.   2002, and that was in May, the 31st.  That

5   was when Frank Barry, the policeman, came to visit

6   HMI, because Frank Barry was, his wife called up the

7   cops and told Frank Barry that -- told the cops, the

8   wife called the cops and told, they came to Habit

9   Management, and they told us that Frank Barry was

10  attempting to commit suicide.  Something happened in

11  his household.

12     Q.   Who is Frank Barry?

13     A.   He's a client, and maybe I shouldn't

14  mention that, sorry.

15     Q.   That's okay.

16     A.   Something happened in his household that

17  his wife felt that he was going to do harm for

18  himself, and two cops came rushing in.

19           When I -- this day is when, really, I

20  knew that everybody else knew that I attempted

21  suicide.  And I looked at, I turned to Dan and I go,

22  "It's too bad, you know, he has everything.  He has

23  a child.  He has his work, and his family."  And Dan

24  O'Leary did this (indication), and he said,  "Well,

1    you did it."  And I said, "What?"  And he goes,

2    "Everybody knows you did it."

3        Q.    I don't want to interrupt you, but we have

4    a lot to cover, and I want to be sure that we finish

5    with the thought we started, which was the incident

6    you just described involving Mr. Barry, and Mr.

7    O'Leary making a comment to you.

8                    Was that in 2002?

9        A.    Yes, 2002.

10       Q.    Okay.  Let's stick in time, again, I want

11    to just get us to look at this in sections.

12       A.    Okay.

13       Q.    Here you are.  You are getting a good, or

14    meets expectation performance evaluation in January

15    2002.

16       A.    Yes.

17       Q.    At this point, is it correct to say that at

18    this point you do not raise with management concerns

19    about the comments that have been made to you by

20    people, at this point, when you get the performance

21    evaluation?  You did not have a conversation, at

22    that point?

23       A.    No.

24       Q.    Do you, about there being problems with

121

1    people calling you things, names?

2        A.    Just Janet Police.

3        Q.    You had had a conversation with her about

4    comments made by Warren, correct?

5        A.    Warren, yes.

6        Q.    Okay.

7        A.    And I forgot about Courtney.

8        Q.    What about Courtney?

9        A.    Courtney made a -- it's a derogatory, other

10    than being truly racist, it could be taken as being

11    racist.  She mentioned that how, because of this

12    event, which was 2011, '01, I mean, September 11th,

13    '01, and she mentioned about how they should gather

14    all the Arabians, and the Sheiks, together, and put

15    them in a concentration camp and so America could be

16    safe.

17                    And I, it was right in front of the

18    nurse.  Oh, Lord, please remember.  She was the

19    oldest.  She was the older woman there.  And she

20    goes, "Courtney, do you know what you just said?"

21                    And she goes, "What?"

22                    "Courtney, don't you get it?"

23                    I said, "You're kidding.  Do you want me

24    to be placed in jail?"  And she said, "Well, you've

122

1    got the last name."

2        Q.   Well, you are not yourself of Arab

3    heritage, are you?

4        A.   No.

5        Q.   And was your husband?

6        A.   Yes.  He's German and Irish, but he looks

7    German, other than his Arab section.  His father is

8    a very dark complexioned, but he does not, for some

9    odd reason they don't want to acknowledge they are a

10   Arab section.

11       Q.   Who doesn't want to acknowledge?

12       A.   My husband.  My ex -- well, my husband, at

13   this moment.  For some reason they don't want to

14   have, they don't have great feelings about that

15   nationality.

16       Q.   He himself doesn't have good feelings about

17   his own nationality?

18       A.   Uh-huh.  Uh-huh.

19       Q.   Okay, all right, let's just move ahead to a

20   couple of other documents I want to ask you about.

21            MS. TUCKER:  Let's mark this as Exhibit

22   8, please.

23            (Marked, Exhibit 8, Payroll Status

24   Change, dated 1/3/02.)

123

1    Q.   Miss Sheik, look at Exhibit Number -- well,

2    8, and tell me -- well, first let me state for the

3    record it's a one page entitled "Payroll Status

4    Change," dated January 3rd, 2002.  I read this to

5    show that you received a three percent increase at

6    that point in your pay.

7              And my question to you is, does that

8    document reflect the pay increase to which you just

9    referred?

10   A.   Yes.

11   Q.   And you did receive an increase in your

12   pay, effective January 3rd, 2002?

13   A.   Yes.

14   Q.   And as you said, you were happy about that?

15   A.   Yes.

16   Q.   Now, so around January 2002, at that point

17   in time, do you remember whether that might have

18   been the time at which there was a change in the

19   method of testing from primarily urinalysis, to the

20   oral swabs; could that have been in January of 2002?

21   A.   Yes, that could have been.  There was a big

22   change, yes.

23   Q.   And do you remember whether it was in 2002

24   or do you just not remember exactly when that was?

124

1    A.   Not exactly, but I know there was like a

2    change.  They were talking about in 2001, about a

3    big change coming about in 2002.  Yes, definitely,

4    we were at full force of it, and I remember one of

5    the advisors put it in their mouth and they said it

6    was disgusting, and so....

7    Q.   Okay.  And do you also recall whether there

8    was a change around this point in time from patients

9    being subjected to random drug tests, instead of

10   being subjected to them twice a month, they were

11   being subjected to them once a month; do you

12   remember that change?

13   A.   Yes, but to tell you the honest truth,

14   they, a lot of them, it doesn't matter if they were

15   subjected once a month.  It was, it's whenever,

16   because it turned out to be twice a month that I had

17   to schedule, because they told me to.  "They,"

18   meaning if it was Verlina (phonetics) or Cheryl.

19   These are psychologists who requested certain people

20   to be swabbed maybe twice a month, or once a month

21   or three times, whatever.

22        So, yeah, yes.

23   Q.   But do you remember, there was, at some

24   point in time, and I'm asking you, because I don't

125

1    know the exact month, but at some point in time in

2    early 2002, do you remember there was a change

3    between many patients being, instead of them being

4    subjected to random tests twice a month, they were

5    only going to be subjected to once a month; do you

6    remember a change like that?

7        A.   Yes, yes.

8        Q.   Now, was there any other time -- we talked

9    about an increase in your hours from 12 to 28 hours

10   in 2001.  Was there any other time that you recall

11   your hours being increased?

12       A.   Yes.  It was like in 2002, this was when

13   they were having the night sessions, which was,

14   which was from, I would get there 4:00, 4:45, to

15   maybe 5:00, 6 o'clock, 6 o'clock.  And they had

16   counseling upstairs, and for three nights I would do

17   this, come in like, I believe it was every Monday,

18   Wednesday and Friday, and I would make appointments

19   for them.  And these were the night people to do.

20            MS. TUCKER:  Okay.  Let me mark that

21   Exhibit 9.

22       A.   Because it went up to 33 and a half hours.

23            (Marked, Exhibit 9, Payroll Status

24   Change dated 2/25/02.)

126

1     Q.   Okay, this may be what you were just

2  referring to, Miss Sheik.  This is a document which

3  we have marked as Exhibit Number 9.  It is a payroll

4  status change document.  This one is dated February

5  25, 2002.  It shows a change from -- actually it

6  says 27 hours to 33 hours.  And then it says further

7  down on the page, "Increased to cover unit manager

8  hours for evening program."  Is that what you were

9  just describing?

10     A.   Yes.

11     Q.   And the fact that it says the change is

12  from 27 to 33, your hours had been reduced from 28

13  to 27 at some point, because we talked about your

14  hours going up from 12 to 28?

15     A.   Well, I did have 33 and a half hours, and

16  it was reduced.  And half an hour was reduced in

17  July, after July 24th of 2002.

18     Q.   Right.  So let's not go that far forward

19  yet.  This is February of 2002?

20     A.   Okay.

21     Q.   And I am going to give you a chance to

22  explain the later change in hours.  But prior to

23  February of 2002, as I understand it, your hours had

24  only gone up first from 12 to I thought 28, and then

127

1    this says from 27 to 33.  And I guess I'm asking

2    you, do you remember a time when your hours went

3    down from 28 to 27?

4        A.   It never went down from 27; somebody may

5    have made a mistake.

6        Q.   That is what I was wondering.

7             So at this point in February of 2002,

8    your hours were increased to 33 hours, and that was

9    a change that you welcomed, right?

10       A.   Yes, yes.

11       Q.   And because you wanted to make the

12   additional money that went along with that?

13       A.   Yes.

14       Q.   Did your duties or responsibilities change

15   in connection with your covering the evening

16   program?

17       A.   It, the duties actually just increased a

18   little bit, just because I had to be there for one,

19   and for another I had -- make sure I observed the

20   patients, which was the same thing.  It's --

21       Q.   Just more hours?

22       A.   Just more hours.

23       Q.   Okay.

24       A.   And make sure that they have been swabbed

128

1    and everything.

2        Q.    Now, between February and November of 2002,

3    did you stay in the same position performing

4    essentially the same responsibilities?

5        A.    From February to what?

6        Q.    November of 2002.

7        A.    Same position, same everything, but the

8    hours were cut down from July, after July 4th, and

9    then November the hours were cut down again, and

10   then in December.  And then I left.

11       Q.    Okay.

12             Well, let me ask you --

13             MS. TUCKER:  Why don't I mark this.

14             Can we mark that Exhibit 10.  Good.

15             (Marked, Exhibit 10, Payroll Status

16   Change dated 12/2/02.)

17       Q.    I am going to ask you to take a look at

18   Exhibit 10.  That is another Payroll Status Change

19   document.  This one is dated December 2nd, 2002.

20   Although I note at the bottom it says, "Copies to

21   payroll" and there is a date of November 18, 2002.

22   This reflects, I believe, a change in hours from 33

23   to 30, and so this is one of the reductions you are

24   referring to?

FARMER ARSENAULT BROCK LLC

129

1    A.    Yeah, but it actually --

2    Q.    Well, hold on, let me ask the question.

3          First of all, do you remember there

4    being a reduction specifically from 33 hours to

5    30 hours, either in November or December?

6    A.    Yes.

7    Q.    And do you remember any other reduction of

8    your hours between February and November?  Because

9    here it says, your hours as of the date of this

10   document, at least, certainly, were 33 hours.  I

11   just talked about a reduction earlier in 2002 from

12   33.

13   A.    In November, yes.

14   Q.    But not before November, right?  Isn't the

15   November the first time your hours were reduced from

16   33?

17   A.    It was in November that it was reduced.

18   Q.    From 33 to 30 hours?

19   A.    Yes.  And I don't understand why it says

20   "12/2/02"; it should have been November.

21   Q.    Okay, I don't either, to tell you the

22   truth.

23   A.    People can overlook.

24   Q.    Do you remember who told you that your

FARMER ARSENAULT BROCK LLC

130

1    hours were going to be reduced from 33 to 30 in

2    November of 2002?

3        A.   Mr. Mazzoni.

4        Q.   Mr. Mazzoni?

5        A.   Yes.

6        Q.   Do you remember a meeting with him?

7        A.   Miss Fraunfelter.

8        Q.   And Miss Fraunfelter?

9        A.   Yes.

10       Q.   Do you remember what they told you about

11   why your hours were being reduced?

12       A.   That she was going to take over, and that

13   Miss Fraunfelter was going to take over those hours,

14   and for me to keep my insurance.  He made sure that

15   I had the 30 hours.

16       Q.   As opposed to 28 hours or less than that?

17       A.   Yes.

18       Q.   Well, let me just ask you a question about

19   this.

20            Prior to this reduction in hours, were

21   you receiving benefits from Habit Management?

22       A.   No, it wasn't time.  I was -- the time

23   frame was going to come about in January for me to

24   apply for the health insurance.

131

1    Q.    January 2003?

2    A.    2003.

3    Q.    Okay.  And you would only be eligible for

4    the health insurance benefits if you were working a

5    certain number of hours; is that correct?

6    A.    Yes, but if it was, if I went to, it's

7    dealing with time frame.  Everything dealt with

8    time, and I --

9    Q.    Well, you just said that the hours were

10   reduced to 30, in order to allow you to be eligible,

11   I believe, for benefits; is that correct?

12   A.    For benefits, yes, there is something with

13   time.

14   Q.    Now, did either Mr. Mazzoni or Miss

15   Fraunfelter tell you that the time that you would

16   need to perform, administer and schedule the drug

17   tests, had changed because of the switch from the

18   urinalysis to the swabs; did they tell you it would

19   take less time?

20   A.    No, it was always the swabs.  And if they

21   were dealing any urine, it was only when somebody

22   was coming in new.  And that part of my workload I

23   would take and partial she would take.  All of a

24   sudden my work was terrible, so....

FARMER ARSENAULT BROCK LLC

132

1      Q.   Did they say anything to you at the time

2  about your work being terrible?

3      A.   It came across as my work was lousy.

4      Q.   And in what way, what do you remember

5  somebody saying that made that come across?

6      A.   It's the snickering.  It's like, you, your

7  -- she's -- I shouldn't say.  It was the way they

8  presented, like, "She is going to take over and that

9  is it, and your hours are down to 30."

10     Q.   Did you say anything to Mr. Mazzoni or Miss

11 Fraunfelter in that meeting?  Did you register any

12 complaint about the decrease in your hours from 33

13 to 30, in that meeting?

14     A.   Did I feel or did --

15     Q.   Did you say anything to them?

16     A.   No, I don't recall saying anything.

17          One thing I -- I'm one of those people

18 who just listens, and I have a hard time saying.

19     Q.   So in the meeting, did you -- well, do you

20 recall what else was said at the meeting?  Was it a

21 short meeting or --

22     A.   It was very short.

23     Q.   So she told you your hours were going to be

24 reduced to 30.  Now, did that have any impact on

FARMER ARSENAULT BROCK LLC

133

1    your eligibility for benefits?

2         A.   Not yet.

3         Q.   Well, did you think that it would at some

4    point?

5         A.   When it did happen, and that's when --

6    December 19th, when I had to resign.

7         Q.   Okay.  What's the connection between -- Oh,

8    are you saying you had to resign?  Then obviously

9    you wouldn't get benefits after you resigned.

10        A.   No, no, no.  They cut my hours again on

11   December 19th, and they informed me my hours was

12   reduced.

13        Q.   I'm sorry?

14        A.   To 27 hours.

15        Q.   On December 19th you were informed that

16   your hours were being reduced to 27 hours?

17        A.   28, 28, 27.

18        Q.   And who told you that?

19        A.   Miss Fraunfelter.

20        Q.   And that was on December 19th?

21        A.   December 19th, 2002.

22        Q.   Okay.

23        A.   And she mentioned, "We don't need somebody

24   who attempted suicide."

134

1      Q.   Now, let me ask you this.

2           MS. TUCKER:  Why don't we mark this

3  document Exhibit 11.

4           (Marked, Exhibit 11, Payroll Status

5  Change dated 12/18/02.)

6      Q.   I'm going to ask you about one more payroll

7  status change document I have.  It's the only other

8  one I have, I believe.  It is marked as Exhibit 11.

9  It's dated December 18, 2002.  And actually, all it

10 says here, I believe, is that it's an address

11 change; is that correct?  When you look at this

12 document, do you see anything on this other than --

13     A.   An address change, yes.

14     Q.   An address change, okay.

15          At that point, were you changing where

16 you lived?

17     A.   Because --

18     Q.   No.  Were you changing where you lived; did

19 you move?

20     A.   No, not yet.  We were still -- I was living

21 in a hotel.

22     Q.   Okay.  Starting when?

23     A.   For about a year, year and a half.  It was

24 like one of those hotels that people can live in.

FARMER ARSENAULT BROCK LLC

135

1    Q.    And when did you start living in the hotel?

2    A.    2001, June.

3    Q.    June 2001 you were living in a hotel?

4    A.    Yes.

5    Q.    What hotel?

6    A.    I see it.  I don't remember the name of it.

7    Q.    Where was it?

8    A.    It was in Yarmouth.

9    Q.    In Yarmouth.  Is it a chain hotel?

10   A.    Yes.

11   Q.    Okay, think for a minute.  How long did you

12   live there, a year?

13   A.    Over a year.  From then to 2002.

14   Q.    To when in 2002?

15   A.    2000 -- I believe in February of 2003.

16   Q.    Do you remember where it was in Yarmouth?

17   A.    It's right, it's right near Stop & Shop.

18   It's right -- why don't I want to remember that

19   stupid place?  It's not a stupid place, it was a

20   decent place.  I don't know, I can't tell you.  I

21   have blanked out on that place.

22   Q.    Okay.  Now, why were you filling out an

23   address change in December of 2002, if you had been

24   living there since June of 2001?

136

1      A.   Because I wanted all my mail to go to my

2  mother's house, and just in case we decided to move,

3  it wouldn't have to be completely different areas,

4  another location.   Because we were talking about

5  moving to another place, and I'm like, okay, fine,

6  we are going to move to another place.   And then all

7  of a sudden I noticed, where is my mail going to go

8  to.

9      Q.   So the address that you had given Habit

10 Management, the Jonathan Lane address, that was your

11 mother's address, right?

12     A.   Yes.

13     Q.   And that was the address they had.   And

14 then you told them, no, stop sending mail to

15 Jonathan Lane, send it to this post office box?

16     A.   Yes.

17     Q.   And why was that?

18     A.   Because mama already had that P.O. Box.

19     Q.   Which one?

20     A.   743.   We had 7 Jonathan Lane and P.O. Box

21 743.

22     Q.   Were you living in the hotel by yourself?

23     A.   No, with my husband.

24     Q.   With your husband, okay.   Until --

FARMER ARSENAULT BROCK LLC

137

1       A.   Until, I think, July.  No, no, not July, it

2   was March.  March, April, March, April, something

3   like that.

4       Q.   March and April of --

5       A.   2003.

6       Q.   What was his full name, again?

7       A.   Who?

8       Q.   Your husband.

9       A.   David Michael Sheik.

10      Q.   All right.  Well, we have talked about this

11  address change.  Now you're telling me that, that

12  there was another time in December when you, as you

13  remember it, your hours were reduced below 30; is

14  that right?

15      A.   In December?

16      Q.   Of 2002.

17      A.   December 19th, yes.  Mrs. Fraunfelter

18  informed me that my workload is over with; that I --

19  how she came up to me and said, "Well, I told you

20  ahead of time.  Didn't you hear?  Your workload is

21  over with.  You don't have that anymore.  I'm the

22  one who is taking over."

23      Q.   Did she tell you anything more when she

24  said that?

FARMER ARSENAULT BROCK LLC

138

1    And then I said, "Well," and she turned

2   to me and I said, "What am I supposed to do?"  And

3   she said, "We don't want someone who attempted

4   suicide to be working."

5    (Fire alarm test.)

6   Q.   Sorry for that interruption.

7   A.   I ran as quickly as possible and I said,

8   "What?  What?"  And I wanted to see Mr. Mazzoni.

9   And I said, "I have nothing to do.  I have nothing

10  to do."  And I went up to him and he was standing up

11  from his desk and he said, "Well, you look angry.

12  Well, you are angry with the wrong person."

13  Q.   This is on December 18th, 2002?

14  A.   2002.  And then my throat, my throat was

15  parched.  You know, you feel like there is a lump

16  there.  And I said, "Well, I have nothing."  The

17  only thing that came out of my voice, I said, "I

18  have nothing to do.  Can I go?"  He sat down.  He

19  waved (indication) and he said, "You can go."  And

20  so I left.

21  Q.   Why did he think you had nothing to do at

22  that point?

23  A.   I asked him --  I was waiting.  There was

24  like this big pause and I was waiting for him to say

139

1  come in.  I was waiting, and it -- it still feels

2  like some emotion.  And he didn't say, "Come in.

3  Let's talk about this.  Let's bring Mrs. Fraunfelter

4  over here.  You still have your hours.  You still

5  have your workload."

6         Nothing came out of him.  The only thing

7  that came out of him, the only thing that came out

8  of me, it wasn't him, "If I have nothing to do," I

9  said it directly, "can I leave?"  And he just

10 dismissed me.

11    Q.   What I need to understand a little better

12 is this.  You said that she was reducing your hours.

13    A.   Yes.

14    Q.   And then she made a comment about the fact

15 that you had attempted to commit suicide?

16    A.   Yes.

17    Q.   Why did you think you had nothing to do at

18 that point, as opposed to fewer hours?

19    A.   Okay.  At that time that -- that was on a

20 Thursday.  That Thursday is the one that I put in my

21 CPA's.  That is where I log in people to be swabbed,

22 and those -- that was my workload.  And so I would

23 have, I believe, maybe about -- I would work from,

24 starting at 5:10 to 10, and then from 10 until 2 or

FARMER ARSENAULT BROCK LLC

140

1    3.  That was my extra hours, and I would put

2    people's swab in to make sure that they have the

3    right time.  But what took place that day, she,

4    because I ran, I was going to backload to make sure

5    who am I missing; what am I supposed to do to set it

6    up.  It was done; the work was done.  But there were

7    a few things that was missing.  And she came up and

8    she goes, "I don't think you heard what I said, I

9    don't think you heard what I said."  And I'm holding

10   the paper and I'm like, "What do you mean?"  And she

11   grabbed it out of my hand which was Dan O'Leary and

12   not Art Eisner.  Art, he is another, he is a

13   counsellor.

14       Q.   Do you know his last name?

15       A.   Sorry no, not at the moment in time.

16       Q.   Art?

17       A.   Counselor.

18       Q.   Not Art Eisner.  Art the counselor and Dan

19   O'Leary saw Miss Fraunfelter grab the paper out of

20   your hand?

21       A.   The paper out of hand, and I was sitting

22   down and then all of a sudden, I don't know how I

23   got up, she took it out of my hands and then sat in

24   my seat.  I left as fast as possible to get out of

141

1   that place.

2       Q.    What did she say, again, about the fact

3   that you attempted to commit suicide; what did she

4   say?

5       A.    She said, "Well, we don't want anybody who

6   attempted suicide to work on this."

7       Q.    Work on what?

8       A.    On the CPA.

9       Q.    And I still don't quite understand what the

10  CPA is.  Is that a computer thing; what is the CPA?

11      A.    The CPA, I am not really saying it

12  properly.  For the patient to be swabbed, the CPA is

13  for me to schedule the swab.  For that swab that you

14  place in the mouth, I have to schedule each

15  individual for a certain day, a certain month.  I

16  make sure they all have their swabs, and if a

17  counselor comes in and asks me to place an extra day

18  on, I have to put that extra day, because who knows

19  what.

20      Q.    So it's sort of a calendaring mechanism?

21      A.    A calendaring, that is it, that's it.

22      Q.    And she said because you --

23      A.    Attempted suicide and then she just threw

24  the paper on the table.  And I said, "What?"  And I

142

1    ran to Mr. Mazzoni and I said, "I have nothing to

2    do.  I have nothing to do."

3            I don't know why that is the only thing

4    that came out of my stupid mouth.  And he said,

5    "Well, you do look angry."  He could hear everything

6    because it's not like -- it is close to each other.

7    He could hear everything.  And he goes, "Well,

8    you're angry with the wrong person."

9            And that's where a pause --

10   Q.    Then tell me, what happened after that?

11   A.    And then I waited.  I just gave that, it's

12   like I couldn't -- and my throat tightened up, and I

13   said, "If I have nothing else to do, can I go?"

14           He sat down.  He looked at his computer

15   and then he looked at me and said, "Go."  And then I

16   took off.

17           All I wanted him to say at that moment,

18   "Yes, you have your work.  Yes, you are not losing

19   any more hours."

20           Nothing, nothing was there.  I walked

21   out, walked out of there, and I came back for my

22   last schedule.  And I couldn't, it was too much.  It

23   was why bring up something that is personal, which

24   is committing suicide.  How many times did I have --

143

1    I did not go for counselling for this, all right?  I

2    didn't go.

3            I don't need to have somebody make jokes

4    out of it.  It was inappropriate.  This is not the

5    first time with the joke.  The first time was with

6    Dan O'Leary, and Dan O'Leary and Miss Fraunfelter

7    made another joke.  Those two -- this was in

8    September, made a joke out of my suicide attempt.

9    "Oh, yes, I heard about it.  That is too bad."

10           It was like -- and then again, oh, the

11   day before that, this was on December 18th, Dan

12   O'Leary started bringing up about my suicide attempt

13   in front of a client.  It was like, "Do you know

14   about Sheila?  On February the 2nd Sheila was out

15   for about a week or so.  Do you know about her, what

16   happened to her?"  And this, one of the clients

17   said, "That's none of my business.  That's none of

18   my business.  You keep that to yourself.  That's,

19   that's none of my business."  And it was just too

20   much.

21   Q.    Okay, and I don't mean to interrupt, but

22   let me ask one question about that.

23           When Miss Fraunfelter made that comment

24   to you on December 19th, 2002, and after which when

144

1    you went, you know, into Mr. Mazzoni, what is your

2    best memory, going back to just the hours issue for

3    a minute, of what she said about what was going to

4    happen to your hours?  Because I don't have another

5    piece of paper showing a reduction of hours, so what

6    I am trying to understand is what was your

7    understanding that day.

8        A.   Because I left that day, because I left

9    that day.

10       Q.   What was she saying to you?  That your

11   hours were going to go down further from 30 to what?

12       A.   27.

13       Q.   Okay, let me ask you this.

14       A.   Oh, no, no, let me just say one more thing.

15       Q.   Okay.

16       A.   On December the 5th there was an event took

17   place.  This was about 10:00 in the morning, 10,

18   10:15, but it was at that moment.  There was a new

19   client that came in, I don't know his name.  He was

20   a young gentleman, and I thought I was supposed to

21   give him a UA because he's a new client.  Because

22   he's a new client, you give new clients no matter

23   what.

24              Miss Fraunfelter comes and approaches

145

1    me.  She has a problem about keeping certain things

2    quiet and not mentioning it.  She, she goes, "You

3    are not supposed to give a male a UA.  It's only

4    supposed to be a female."  And I go, "We give it to

5    males and females, because that is how we detect if

6    there is a foreign object."

7              And she goes, then she goes, "What are

8    you going to do, why don't you take it to the

9    Commission Against Discrimination?"  And all of a

10   sudden I just backed down.  She said, "Let me tell

11   you something.  I'm no racist.  Who the hell do you

12   think you are?  I'm not racist."

13       Q.   And did you say anything to her when she

14   said that?

15       A.   Couldn't.  Too scared.

16       Q.   Did she say anything else?

17              Tell me everything she said that you

18   remember.

19       A.   I just remember, just "You're staying right

20   there.  You are not supposed to leave."  It's like

21   all of a sudden I was supposed to be placed in one

22   spot.  I was not allowed to do the secretary

23   anymore, which I, you know, interact with the

24   secretaries and then I come back and do my work.

146

1        And she said, "I don't give a damn.  You

2   just stay here.  Who the hell do you think you are?

3   I'm no racist, do you hear me?  Who the hell do you

4   think you are?"

5        I don't, I don't know why I can't come

6   out with it.  I got scared, and I knew right then

7   and there, well, what took place with Warren, the

8   security guard, that was only a week ago; what took

9   place with Art Eisner, which was a couple of weeks

10  ago, which I went to the Commission Against

11  Discrimination on the 18th of November, and then all

12  these things were coming about I went into a deep

13  depression.  It wasn't happening; it wasn't

14  happening, but it was coming about.

15      Q.   Well, well, let's walk through it slowly.

16  We are going to talk about it and you will have a

17  chance to fill in all the details.

18      A.   Yes, that's fine.

19      Q.   But going back for a moment to this

20  conversation with her where you learned on

21  December 19th your hours are going to be reduced.

22      A.   I learned earlier.

23      Q.   When did you learn?

24      A.   Earlier that she knew about the

147

1    Commission --

2        Q.   Okay, but that's not what I'm asking yet.

3    When did you first learn that your hours were going

4    to be reduced further from 30 hours to 27; was that

5    December 19th?

6        A.   December 19th.

7        Q.   And at that point?

8        A.   This was about 10:15 in the morning.

9        Q.   But not on that date?

10       A.   On that date.

11       Q.   On December 19th?

12       A.   December 19th.

13       Q.   I thought you said December 5th.

14       A.   December 5th is when she told me that she

15   knew about the Commission Against Discrimination.

16       Q.   Okay.

17       A.   So, no, it was December 19th was the day

18   that I learned that my hours were cut more so.

19       Q.   From 30 to 27 or 28?

20       A.   Uh-huh, yes.

21       Q.   All right.  Now, at the time that they were

22   reduced from 33 to 30, now, I have on this sheet

23   which we looked at which is Exhibit 10, we are not

24   sure why, but there is an effective date of

FARMER ARSENAULT BROCK LLC

148

1   December 2, 2002 and then there is a note on the

2   bottom of November 18, 2002, and your memory is that

3   it was on November 18th of 2002 that your hours were

4   reduced from 33 to 30?

5       A.   November 15th.

6       Q.   November 15th, okay.

7       A.   And I think he just established it on the

8   18th, which is on a Monday.  November 15th is on a

9   Friday, and then --

10      Q.   Okay.  Do you remember that, actually?

11      A.   Yes.

12      Q.   How do you remember that?

13      A.   I don't know.

14      Q.   November 18th is when you went to the

15  Commission against Discrimination, you said?

16      A.   November 18th.

17      Q.   And that was a month --

18      A.   Why I had to remember November 18th is I

19  had to remember my sister's birthday was coming up

20  because her birthday is October 16, and for some

21  reason I just remember anything that revolves about

22  around her birthday.

23      Q.   And going back, again, one more question.

24  The reduction in your hours that we don't have a

149

1  paper about, the one from 30 to 27 or 28, okay, you

2  hear about that on December 19th?

3      A.   Yes.

4      Q.   At that point, what is your understanding

5  as to why your hours are being reduced?

6      A.   Full load retaliation.

7      Q.   Explain that to me, "full load".  What does

8  that mean?

9      A.   They were getting even with me, and they

10  got even with me for going to the Commission against

11  Discrimination.

12      Q.   And so your, your feeling is that the hours

13  being reduced, and we have got to make sure I

14  understand that, okay, it's important.

15          The reduction from 33 to 30 is one

16  reduction, and then the reduction from 30 to 27 or

17  28 is the second reduction?

18      A.   Right, because the first --

19      Q.   So which one are you claiming is the

20  retaliation, the second one?

21      A.   Actually, both of them, because A, with

22  mentioning about Art Eisner, and also Miss

23  Fraunfelter was showing me, putting me in my

24  position, putting me in my place, and the second one

150

1  was definitely telling me.

2      Q.  Okay.  So the first reduction from 33 to

3  30.

4      A.  Yes.

5      Q.  Your position was that that was retaliation

6  for reporting Art Eisner?

7      A.  Yes.

8      Q.  And for reporting Miss Fraunfelter?

9      A.  Yes.

10     Q.  Now, let's take each one of those.

11 Reporting Mr. Eisner to whom at that point?  What

12 was it in retaliation of?  Who did you tell about

13 Mr. Eisner?

14     A.  I first told Dan O'Leary, and then Dan

15 O'Leary took it upon himself to tell John Mazzoni.

16     Q.  That is the black bitch comment we just

17 discussed?

18     A.  Yes.

19     Q.  So your position or sense is that the first

20 reduction in hours from 33 to 30 was because you

21 reported Mr. Eisner?

22     A.  Yes.

23     Q.  Now, would anyone retaliate against you for

24 something like that?  What do you think was going

151

1    on?

2        A.   It seemed too close of a time frame and it

3    didn't seem right.  You could feel the tension; it

4    was awful.

5        Q.   When did you report Mr. Eisner to --

6        A.   I didn't report him.

7        Q.   The conversation with Dan O'Leary after

8    which Mr. Mazzoni learned that you had a complaint

9    against Mr. Eisner.

10       A.   Yes.

11       Q.   That's the incident that you thought gave

12   rise to the retaliation?

13       A.   Gave rise to that retaliation.

14       Q.   The first reduction in hours?

15       A.   Yes.

16       Q.   Now, stick with me here.  When did that

17   conversation with Mr. O'Leary take place making the

18   black bitch comment, when did that conversation

19   occur?

20       A.   November 5th.  It was on a Thursday.

21       Q.   So your answer is that you believe, after

22   that conversation with Mr. O'Leary about

23   Mr. Eisner --

24       A.   Give me one second.

152

1    Q.   Well, early November.  I'm not going to pin

2  you down to a date.

3    A.   But it was on a Thursday.  It was on a

4  Thursday because he only works on Thursday.

5    Q.   Who only works on Thursday?

6    A.   Art Eisner.

7    Q.   Okay.  So early November on a Thursday, he

8  makes the comment; you talked to Dan O'Leary.  Dan

9  O'Leary tells you, you think he told Mr. Mazzoni?

10   A.   Which he did.

11   Q.   Then meets with you and Miss Fraunfelter?

12   A.   Yes.

13   Q.   They ask you who made this comment?

14   A.   Yes.

15   Q.   And I think this is what -- I understood

16 your testimony earlier to be that you then

17 acknowledged that Mr. Eisner had made the comment

18 and said that you weren't going to come forward and

19 report it yourself?

20   A.   No.

21   Q.   So when your hours were reduced on -- now

22 you said, I think, November 15th, from 33 to 30, you

23 said it's because you ended up having this

24 conversation where you said Mr. Eisner had called

153

1    you a black bitch?

2        A.   Yes, and also because I confronted about

3    Miss Fraunfelter.

4        Q.   And when was the conversation about Miss

5    Fraunfelter?

6        A.   It was right then because I said, she made

7    him act like that.  She just -- okay.

8        Q.   Now, why did you think, why did you believe

9    Mr. Mazzoni would retaliate against you for

10   complaining about Mr. Eisner and Miss Fraunfelter?

11       A.   How many times does a woman have to say

12   this individual or these individuals are

13   complaining; how many times?

14            Not one of them have ever been

15   reprimanded or anything of that type.

16       Q.   Well, but how many times have you told Mr.

17   Mazzoni, how many times have you complained to him

18   about Mr. Eisner?

19       A.   About two or three times.  But that, what

20   he said was a burdensome.

21       Q.   When did you first tell Mr. Mazzoni about

22   Mr. Eisner?

23       A.   When was the first time?

24       Q.   Yes.

FARMER ARSENAULT BROCK LLC

154

1    A.    When he mentioned about I should be

2    swinging around the pole with my big breasts.

3              Another time when I told him I wanted to

4    get out, not working with him anymore, that he

5    called me a black bitch.  But it was over.  And that

6    day, that day was on November 5th, when he mentioned

7    about me being the black bitch.

8    Q.    That is the first time you had talked to

9    Mr. Mazzoni about the fact Mr. Eisner called you a

10   black bitch, right?

11   A.    Yes.

12   Q.    November of 2002?

13   A.    Yes.

14   Q.    Was there any other time when you

15   complained to Mr. Mazzoni about Mr. Eisner?

16   A.    Yes, when he told me I would be great

17   working at Zachary's.  And then on top of it, on the

18   day when I asked him to not let me work with him

19   ever again on Sundays being alone.

20   Q.    And when was that, do you remember?

21   A.    Not offhand, no.

22   Q.    Was it before November 2002?

23   A.    Yes.

24   Q.    Now, what complaints had you made to Mr.

155

1    Mazzoni about Miss Fraunfelter, in November of 2002,

2    or was it just what you just told me?

3        A.   Yes.

4        Q.   It was?

5        A.   Yes.

6        Q.   So you had talked to Mr. Mazzoni about

7    however you felt about Miss Fraunfelter?

8        A.   Miss Fraunfelter.  Oh, I'm so sorry.  I'm

9    still stuck with Eisner.  I had been complaining

10   about Miss Fraunfelter for a long time, about how

11   she's --

12            Mrs. Fraunfelter, when I applied for

13   certain positions, I was never granted.  And that

14   was even before Mrs. Fraunfelter came around.  But I

15   knew when I told her I want to apply for medical

16   assistant, and she goes, she goes, "It's only for

17   people who have education," and we all know you

18   don't need education for medical assistant.  And --

19   you need maybe some training in it, but that's it.

20            I said, "I have education."  She said,

21   "You do, you have education?"  And it was like,

22   "Yes, I do have education."  And there was no -- I

23   was never granted for that position.  I was -- and

24   before she came along, and I know it's all dealing

156

1  with my suicide attempt, nobody wanted to give me

2  another position, such as when I applied for

3  business administration, administration, or -- oh,

4  come on, Sheila -- secretary.  And that was with

5  Courtney and Mr. Mazzoni, and they bypassed that.

6      Q.  Let me ask you, for those positions, the

7  business administration secretary, did you ever fill

8  out any paperwork?

9      A.  I never even filled it out when I applied

10  for 33 and a half hours, because that was a CPA

11  section.  That was totally -- I always asked

12  verbally.  Because I asked that I knew I could do it

13  again, ask verbally, and see if I can get those

14  positions.  But it was always granted to somebody

15  who never had any form of education, which was

16  Barbara and Jessica Clark.  Barbara was a CNA; she

17  said she never had secretary experience.

18          Jessica said she never had secretary

19  experience.  She was working at Zachary's as a

20  security individual, you know, just to check out

21  cards to see their ages.

22      Q.  Sure.

23      A.  And what I've learned about Fraunfelter is

24  she didn't have any college education to back hers

157

1    up.  But there were never any black people who ever

2    worked in those positions, either.

3              And the last two black people who did

4    work there, they worked in the same position as I

5    did, as UA's.  They never had other than high

6    school, and I am the one who had college.

7        Q.   All right, let me ask you this.  You said

8    before you thought a lot was related to the fact

9    that you attempted to commit suicide?

10       A.   Yes.

11       Q.   And that, I think --

12       A.   It was a joke.

13       Q.   Let me ask you this specific question.

14             Do you believe you were denied the

15   opportunity that, to apply for certain positions, or

16   to be considered for certain positions, because you

17   attempted suicide?

18       A.   Because I attempted -- oh, oh, oh, excuse

19   me, yes.

20             Courtney did say I could have the

21   position for secretary, but my amount of money would

22   be decreased, and I would go down from 9.10 to 7.25.

23       Q.   And when was that, that conversation with

24   Courtney?

158

1    A.    That was August, I would say the end of

2    August, but I believe it was August 28th, or the

3    beginning of September.  Because I remember my

4    mother hit on a number, and she gave me a hundred

5    dollars off that.  And it was something, 1946, that

6    number for some odd reason.

7    Q.    Was this in 2001 or 2002?

8    A.    2001.

9    Q.    Okay, let me stick with this question,

10   though, about what is it that makes you think or

11   believe that your suicide attempt was something that

12   made people not want to consider you for certain

13   positions.  Why do you hold that belief?

14   A.    Suicide attempts make people automatically,

15   if they know about it, which, which what's her name?

16   Janet Police and Courtney knew full force, because I

17   asked a secretary, a male secretary, a male nurse,

18   to call up my job and tell them that I attempted

19   suicide, yes.

20          And then I gave them, I came back, I was

21   forced to come back, because I did not want to -- I

22   needed some time off.  My liver was awful.  I

23   couldn't walk up the stairs.  And if you had

24   anything that hurt so bad that you could damage

159

1    inside, you can't walk the stairs.

2            So I told, when Courtney called me up

3    and she said, "You have to come in," and I'm like,

4    "Courtney, I've been in the hospital." And she

5    goes, "Just sit in the" -- "All you do is just sit

6    down and just watch the people."

7            And the next day from when I came in I

8    was written up. I gave them a slip that is by Dr.

9    Kaplan, telling them, yes, I did attempt suicide.

10   But I didn't want them to spread it around. And

11   when I found out that Dan O'Leary knew about it and

12   also, also Janet Police knew about it -- not Janet

13   Police, but Fraunfelter knew about it, because

14   besides having a name, Sheik and Arab, suicidal --

15   we're in war. People who is an Arab has

16   instructed -- it's not only them, they, I mean, they

17   really made me know this took place.

18           Black, Arab, statistically, how many

19   people who's black, who became a secretary, how many

20   people at Yarmouth who was secretary, business

21   administrative, a medical assistant? There was not

22   one from that place opened in 1988, uh-uh, not one.

23   Q.   Okay, let's again try to keep it to

24   specifics, just because it helps me to understand

160

1  what the basis of your complaint in this case is.

2          A couple final questions about the

3  reduction in hours.  I mean, you said that the first

4  you thought was in retaliation for you talking about

5  Mr. Eisner and Miss Fraunfelter to Mr. Mazzoni,

6  right?

7      A.  Yes.

8      Q.  And the second one was, the second

9  reduction in hours, which would be the 30 to 27?

10     A.  Because I went to the Commission Against

11 Discrimination.

12     Q.  What makes you think that that reduction

13 had anything to do with you went to the Commission

14 Against Discrimination?

15     A.  Because when I went to Mr. Mazzoni and

16 because of my suicide attempt, Miss Fraunfelter

17 mentioned that.  Mr. Mazzoni never said, "Come in my

18 office."  Never said anything.  He just totally

19 said, "You look angry.  You are angry with the wrong

20 person."  That shut everything off.  I had no

21 protection, no protection after that.  There was no

22 way -- I knew.

23     Q.  Now, what did Miss Fraunfelter say that

24 made you feel you knew that?

161

1      A.   How dare I?  Who the hell do I think I am,

2  to go to the Commission Against Discrimination?  "I

3  am no racist.  Do you hear me?  I am no racist."

4      Q.   That is what she said to you?

5      A.   She told me -- this is when a new customer

6  came in, a new client, and I was supposed to give

7  him a UA.  And, yes, maybe they changed that, but

8  when a new client comes in, you give him a UA.  And

9  she goes, "Well, why don't you take that to the

10 Commission Against Discrimination?"

11     Q.   So she was telling you that she felt she

12 hadn't been racist toward you, right?

13     A.   Uh-huh.

14     Q.   Did you say anything back to her about how

15 you thought she had been?

16     A.   No.

17     Q.   Okay, that's all right, I'm just going to

18 ask the questions and you could tell me.

19          Now, have you told me -- I think you

20 have told me everything about why it is that you

21 believe that the two reductions in your hours were

22 retaliatory.

23     A.   Uh-huh.

24     Q.   Are you saying you also believe that the

FARMER ARSENAULT BROCK LLC

162

1    fact that you previously attempted suicide was why

2    your hours were reduced?

3        A.    No, no, no, no.    It contributes, it adds up

4    to it, but -- they used it almost -- they, she said,

5    "We don't want somebody who attempted suicide to

6    work as a CPA."

7        Q.    You don't believe your hours were reduced

8    because you attempted suicide?

9        A.    Yes.

10       Q.    Do you think they were?

11       A.    Yes, to say something like that.

12       Q.    They were retaliatory and because you

13   attempted suicide?

14       A.    "We don't want anybody who attempted

15   suicide to be working on the CPA."  What more should

16   I think?  I don't know what else to think.

17       Q.    All right.  So everybody could have their

18   own interpretations.

19       A.    That is my interpretation.  I can't believe

20   anything else.

21       Q.    Okay, that is what I need to know.  You

22   believe there were two reductions in hours.  Both of

23   them were because you had attempted suicide?

24       A.    One was because I talked about Art Eisner,

163

1  and the other one because, and that same one is

2  because I talked to, about Miss Fraunfelter.

3      Q.   Right.   That was the first reduction in

4  hours?

5      A.   Yes, because the second one was because I

6  went to the Commission Against Discrimination.

7      Q.   Okay.   And --

8      A.   And so she didn't bring that up on that

9  occasion, but she brought it up on December 5th

10 because I --

11     Q.   She didn't bring what up?

12     A.   She didn't bring up on December 19th the

13 Commission Against Discrimination, but she brought

14 it up on December 5th.

15     Q.   And what I'm still trying to understand,

16 and I am not trying to make you go over and over it,

17 but what I'm am trying to understand is why do you

18 think your hours were really reduced and you said

19 part of it was retaliation.

20     A.   Definitely.

21     Q.   For different things?

22     A.   Definitely.

23     Q.   Do you also think they were reduced because

24 of your suicide attempt?

FARMER ARSENAULT BROCK LLC

164

1     A.    That may be, but I full force believe that

2   Miss Fraunfelter brought up the Commission Against

3   Discrimination.

4     Q.    So it wasn't really because of the suicide

5   attempt?

6     A.    She brought it; she brought it up.

7     Q.    What does that mean, "She brought it up"?

8     A.    It was enough to say I know about your

9   suicide and I am not going to let you work on it

10  anymore, she brought the Commission Against

11  Discrimination up on the fifth.  She knew about it.

12  I was gone for a week.

13    Q.    Right, and I understand, I understand what

14  you are saying.

15    A.    It's dealing full force with

16  Discrimination, Commission Against Discrimination.

17    Q.    Because, because the fact of the matter is

18  that your hours had actually been increased, even

19  though people knew about your suicide attempt on at

20  least a couple of occasions, right?

21    A.    Right, and then it decreased.

22    Q.    But, again, what I'm trying to understand

23  is these last two reductions in hours, do you think

24  they are in any way related to the suicide attempt,

165

1   or do you think they were both retaliation?

2       A.   Retaliation full force.

3       Q.   Oh, all right.  Do you think either one of

4   those reductions in hours was because of your race,

5   or was it just retaliatory for your having filed a

6   claim of discrimination?

7       A.   Retaliation because of what I did.

8       Q.   All right.  And what about, do you think

9   either one of them had to do with being motivated by

10  your national origin, or was it again in

11  retaliation?

12      A.   In retaliation.

13      Q.   Okay, I just need to understand what your

14  belief is on this.  All right, that's clear.

15              Now, between February and October of

16  2000, or I should say November of 2002, did you also

17  have a change in your job title from aide to office

18  assistant; do you remember that change?

19      A.   Yes, they did change it.

20      Q.   Okay.  Was that simply a name change or

21  were there responsibilities?

22      A.   Just a name change, that's it.  There was

23  no change in the responsibility.

24      Q.   Now, did you take issue with --

FARMER ARSENAULT BROCK LLC

166

1      A.   The name change.

2      Q.   -- the name change?

3      A.   No.

4      Q.   Did that bother you in any respect?

5      A.   No.  It's better than being called an aide.

6      Q.   An office assistant is better than being

7   called an aide?

8      A.   It doesn't matter; either way is fine.

9      Q.   Did you have an understanding as to why the

10  names were changed?  Did anyone talk to you about

11  why the names were being changed?

12     A.   They brought something up about it, and I

13  think it was so everybody -- oh, oh, oh, I am so

14  sorry.  Now I recall.

15     Q.   No, that's okay.

16     A.   Yes.  I was called assistant and the others

17  were called associates.  I forgot about that.

18     Q.   Which others?

19     A.   Which is Penny, Barbara.  No, excuse me, I

20  don't know what Barbara was.  I know it was Penny,

21  Linda.

22     Q.   Linda Fraunfelter?

23     A.   No.

24     Q.   I'm sorry?

167

A.   Alice, sorry.  Penny, Alice.  I do
apologize.  Dan.

Q.   Penny, Alice and Dan were all, their titles
were changed to associate?

A.   Associate, yes.

Q.   Do you know what grade level your job was;
did you know if there was a job level associated
with your job?

A.   I was a CPA.

Q.   But do you know whether it was a number, a
grade level?

A.   I knew if you had an amount of hours,
because when I approached Mrs. Fraunfelter, she
said, "Well, it's the amount, the years that you
have been working here, that's why you would be
associate."

         And I said, "Well, I have been working
here more than Alice."

         And then she goes, what did she say?
"Really?"

         "Yes."  She didn't say very much with
that, "Really?"  Well, "Well, you're an assistant."

Q.   Was anybody else's job site title changed
to "assistant," besides yours?

168

1    A.    Yes, it was Art Eisner and Andrea.    They

2    had much less hours.

3    Q.    Did anyone talk to you about why some

4    people's titles were changed to assistant, and some

5    people's were changed to associate?

6    A.    Yes.    I went to Fraunfelter and she said it

7    was because it deals with years and workload.

8    Q.    All right.    And did you, did anyone talk to

9    you about whether it had to do with what grade level

10   your job was, a grade level number?    Does that sound

11   familiar to you at all?

12   A.    No, no, to tell you the honest truth.    What

13   Miss Fraunfelter told me, it was dealing with years.

14   Q.    Okay.    Were you bothered by the fact that

15   Penny, Alice and Dan were, their jobs were renamed

16   associate?

17   A.    Yes, because if they were associates, I was

18   assistant.    If they were associates, and Alice got

19   it because of the amount of years, I should have

20   been the same, and amount of hours, I should have

21   been the same thing.

22   Q.    Okay, let me ask you this.    When your job

23   title was changed from aide to assistant, was there

24   any change in your pay or your benefits?

FARMER ARSENAULT BROCK LLC

169

1     A.   No.

2     Q.   And what about for people who became

3   associates; do you know whether there was any change

4   in their pay?

5     A.   No.

6     Q.   There was any?

7     A.   No, just title.

8     Q.   Okay.  What was Penny's full name?

9     A.   Shield.

10    Q.   Penny shield?

11    A.   Yes.

12    Q.   What race is she?

13    A.   Caucasian.

14    Q.   And Alice.  Aldridge?  Aldridge?

15    A.   Yes.

16    Q.   And what race is she?

17    A.   Caucasian.

18    Q.   And Dan O'Leary, I think you already told

19  me was Caucasian.

20    A.   Caucasian.

21    Q.   Were there any other employees who were

22  black, whose job titles were changed to either

23  assistant or associate, other than yourself?

24    A.   Yeah, Andrea, assistant.

FARMER ARSENAULT BROCK LLC

170

1    Q.    Okay.  And what is her last name, Andrea?

2    A.    It starts with an F.  Fernaldes

3    (phonetics), Fernaldes.  It's Fernaldes, something

4    like that.  I know, I just can't remember right now.

5    Q.    Now, was she an aide before her job title

6    name was changed to assistant, just like you?

7    A.    Yes.  We were considered -- actually, first

8    it was assistant and then they gave me this.  I know

9    I must have -- where are you?

10            Oh, yeah, that was our title.

11    Q.    What is this?

12            MS. TUCKER:  Okay, I'll just state for

13    the record that I'm looking at an identification

14    badge for you, correct?

15    A.    Uh-huh.

16    Q.    Dated July 22nd, 2002.  And it says, "Unit

17    manager, Yarmouth"?

18    A.    Yes.

19    Q.    And?

20    A.    Miss Fraunfelter took that picture.  She

21    printed the tag and everything.

22    Q.    So even though you were an aide according

23    to the paperwork, at least some of the paperwork

24    that we have seen, you were also known as a unit

171

1    manager as of July, 2002?

2        A.    Uh-huh.

3            MS. TUCKER:  Maybe we can -- I don't

4    think we actually need a picture of that.

5            Why don't we mark that an exhibit,

6    Exhibit 12.

7            (Marked, Exhibit 12, Identification

8    Badge.)

9        Q.    And I will make a copy of this so you can

10   take it back.

11           When the job titles were changed from

12   aide to assistant, and then when some other people's

13   titles were changed to associate, at that point in

14   time in November of 2002, did you talk to anyone

15   other than Miss Fraunfelter about why some people's

16   titles were being changed to assistant, and others

17   were being changed to associate?

18       A.    I asked Penny and then I asked Alice.  I

19   just thought, came to the conclusion that they had

20   been there longer.  Well, Alice wasn't there longer.

21       Q.    And do you know how long she had been

22   working there?

23       A.    I started before her, so I -- maybe a year

24   and something, at the time when I was there.

FARMER ARSENAULT BROCK LLC

172

1    Q.    And what was her job?

2    A.    Secretary.

3    Q.    And what was Dan O'Leary's job?

4    A.    Same thing like mine, but he would also do

5    filing in the back.

6    Q.    And had he been there longer than you?

7    A.    Oh, God, yeah.

8    Q.    And what about Penny?

9    A.    Yes.

10   Q.    She had been there longer?

11   A.    Longer there.

12   Q.    And what was her position?

13   A.    Secretary.

14   Q.    All right.

15          Now, is it your position now, in the

16   lawsuit that you have brought, that the change, that

17   the change in job title was in some way

18   discriminatory toward you?

19   A.    I found it was -- that they only made sure

20   the people of color, but they had Art Eisner, so he

21   didn't have color.  But no other -- with me and

22   Andrea, we were the only black girls there.

23   Q.    Well, let me ask you that question really

24   directly.

1        Do you think that the title of your job

2    was changed from aide to assistant rather than aide

3    to associate, because of your race?  Do you think if

4    you had been white it would have been changed to

5    associate?

6        A.   Oh, God, yeah.

7        Q.   You do?

8        A.   Yes.

9        Q.   And what makes you think that?

10       A.   Because I had more hours, more years than

11   Alice.  And then plus I was doing the CPA, which Dan

12   did this filing, I did the CPA, and --

13       Q.   But Alice was a secretary, right?

14       A.   Yes.

15       Q.   So isn't it possible that secretaries were

16   being renamed associates, whereas aides were being

17   renamed assistants, unless they had been there for a

18   long period of time?

19       A.   Why wouldn't all of us have been renamed

20   assistants, other than one just because he was

21   longer years?

22       Q.   I don't know.

23       A.   Years.

24       Q.   I don't know, but I have to ask the

174

1    questions, and if you have an answer, tell me, and

2    if you don't, tell me that.

3             But what I was trying to get at is what

4    is it that made you think it was your race, as

5    opposed to something else, that led to you being

6    called assistant as opposed to associate?

7        A.   How difficult is it to file?  And even

8    doing what I do, there is nothing different.  And,

9    yes, Dan O'Leary worked longer.  If they really

10   wanted to make sure that everybody was uniquely

11   equal to each other, then keep all us being

12   assistants, me, Dan, me and Art and Andrea.

13       Q.   Okay.

14            But isn't it possible that certain jobs

15   were being renamed as associates, and other jobs

16   were being renamed assistants?

17       A.   Maybe so.

18       Q.   In which case race wouldn't have anything

19   to do with it, would it?

20       A.   I just find that how one individual, just

21   because -- it should have been equal; it should have

22   been equal.

23       Q.   Okay.

24            Did anyone ever say anything to you that

175

1  made you think that you would have been renamed

2  associate as opposed to assistant, if you had been

3  white?

4      A.  No, no.

5      Q.  All right.

6          MS. TUCKER:  Let's mark the charge that

7  you filed at the MCAD.  I am going to ask you a

8  couple of questions about that.

9          (Marked, Exhibit 13, Charge filed at the

10 MCAD.)

11     Q.  Okay, Miss Sheik, take a look at

12 Exhibit 13, which should look familiar to you.  Can

13 you tell me what that is?

14     A.  This is what I filed at the Commission

15 Against Discrimination, against Miss Linda

16 Fraunfelter, Art Eisner.

17     Q.  And Habit Management?

18     A.  Art Eisner, where is Dan O'Leary and

19 Warren?  Well, they wouldn't put Warren in, because

20 they said he worked in a different company, and that

21 was when I -- and I did go back mentioning to them

22 about Warren the security guard.  But I did mention

23 about my attempted suicide.

24     Q.  When you went to the Commission Against

176

1   Discrimination, first of all, is it correct that you

2   filed this on or about November 18, 2002?

3        A.    November 18th, I did file this.

4        Q.    And one of the respondents, as they are

5   called, in this action, is Habit Management.  It's

6   called Institute here, right?

7        A.    Yes.

8        Q.    And the other ones that are named are Linda

9   Fraunfelter, it says, and Art Eisner?

10       A.    Yes.

11       Q.    And, okay.  And what, you're saying that

12  you talked to the Commission about filing a

13  complaint against Warren, the security guard?

14       A.    Yes.

15       Q.    But I'm looking at this complaint, and at

16  least at this point, he wasn't named as a defendant

17  in the action, right?

18       A.    Because they told me he was working for a

19  different company they didn't bring him in.

20       Q.    All right.

21            Now, you said you remember, I believe, I

22  think you said that November 18th of this year was a

23  Monday?

24       A.    No, that Monday, November -- yes, 11/18/02,

177

1    was a Monday.

2        Q.    Okay.

3              Do you remember when you went to the

4    Commission; was it after work that day?

5        A.    I didn't work that day.

6        Q.    You didn't work on the 18th?

7        A.    No, I don't work Mondays there.

8        Q.    Okay.

9              So you went into the Commission, and

10   your allegation, at that point, looking down further

11   on the front page, is that you had been

12   discriminated against on the basis of your race and

13   color, correct?

14       A.    Yes, race and color, that is what they say.

15       Q.    Now, at this point, you, you did not

16   characterize your complaint as being one of

17   discrimination on the basis of national origin,

18   right, it was race and color?

19       A.    I said it to her, "national origin," and

20   also my suicide attempt.  Why does that say that?

21   Because she corrected me when I said -- how she

22   said -- I said, "I committed, I committed suicide."

23   And she said, "No, you attempted suicide."

24       Q.    And, all right.  Now who is "she," the

FARMER ARSENAULT BROCK LLC

178

1    person at the MCAD?

2         A.   Yes.

3         Q.   Was that an intake person there?

4         A.   Yes.

5         Q.   All right.  So you explained to her what

6    your complaint was?

7         A.   Uh-huh.

8         Q.   Now, and I'm just noticing here, that here

9    it doesn't say that you are claiming discrimination

10   on the basis of national origin, it says on the

11   basis of race and color.

12        A.   And there is supposed to be national

13   origin.

14        Q.   And did you tell her to include that?

15        A.   Yes, and I did mention about my suicide

16   attempt.

17        Q.   Okay.  Well, take a look at what is stated

18   in the charge, all right?  I'm going to ask you a

19   couple of questions about it.  Why don't you read

20   the section entitled the "particulars."  Could you

21   just take a look at that and read it to yourself?

22        A.   (Witness complies.)

23             Yes.

24        Q.   Okay, have you read it?

179

1    A.   Yes.

2    Q.   So at that point, as of November 18th, was

3  that an accurate account of what you described to

4  the Commission as being the discriminatory conduct

5  you believed you had been subjected to?

6    A.   To a degree, because he did not put my,

7  that I attempted suicide.

8    Q.   Okay.  So that was omitted for some reason.

9  Anything else omitted?

10    A.   And also my origin.

11    Q.   All right.  Now, looking at what you said

12  in the charge, do you see the sentence where you

13  say, "Respondent," I'm sorry, "Simultaneously

14  Respondent, Linda Fraunfelter, who was my immediate

15  supervisor, has decreased my work hours."

16    A.   Yes.

17    Q.   Okay, this is my question.

18          At that point, did you believe that the

19  reduction in work hours was discriminatory against

20  you?

21    A.   It was retaliation against me.

22    Q.   Okay, it was retaliation.  At this point,

23  what was it retaliation for?

24    A.   Because I complained to Nick about Miss

FARMER ARSENAULT BROCK LLC

180

1    Fraunfelter, and about Art Eisner.

2        Q.   Okay.  And that was the complaint that you

3    were describing around November 5th, I believe?

4        A.   November 5th.  But my hours were cut

5    November 15th.

6        Q.   Okay.

7        A.   And because they did that I went to the

8    Commission Against Discrimination on November 18th.

9        Q.   Okay.

10            So you're claiming here on November

11   18th, that, because the second reduction in hours

12   hadn't occurred yet, right?

13       A.   No, because that took place --

14       Q.   On December 19th?

15       A.   On December 19th.

16       Q.   So when you go to the Commission, you are

17   complaining about that initial reduction from 33 to

18   30 hours, right?

19       A.   Yes.

20       Q.   So that is the reduction in hours that you

21   believe was retaliatory, as you described?

22       A.   Yes.

23       Q.   Did you also believe it was discriminatory

24   because of your race and color or was it because it

1    was retaliatory?

2        A.    Because he said black bitch.    That is what

3    I meant.

4        Q.    Who said that?

5        A.    Art Eisner.

6        Q.    But Art Eisner had nothing to do with

7    cutting your hours, right?

8        A.    No, but Art Eisner, because I mentioned

9    about Art Eisner and Miss Fraunfelter.

10       Q.    That it is retaliation for your

11   complaining?

12       A.    Yes.

13       Q.    All right.

14             Did you believe, at that point, that the

15   change in your job title was also retaliatory, or

16   was it, or was it discriminatory because of your

17   race or color?

18       A.    Because he mentioned that I was a black

19   bitch, there is the discrimination.    And then

20   because of my hours being cut, there is the

21   retaliation.

22       Q.    Okay.    Now, what about the change in job

23   title; was that something that you felt was

24   retaliatory, or was that something you felt was

182

1    because of your race or your color?

2        A.   I just found it funny that none of the

3    black people had associates, only whites.

4        Q.   And was that the, was that sort of the

5    primary reason you were suspicious about it because

6    when you looked at it sort of statistically, you

7    could see?

8        A.   Yes, statistically, yes.

9        Q.   Okay.

10           Now, what was the specific situation

11   that caused you to go to the Commission Against

12   Discrimination and file a charge; was it what you

13   already described that took place on December 19th?

14       A.   Yes.

15       Q.   I'm sorry, no, it couldn't have been.

16       A.   No, it was December 5th and it dealt with

17   December 18th.  No, excuse me, November 5th and

18   November 18th, what took place, and with the change

19   of title.

20       Q.   Okay.

21           So it was the initial reduction in hours

22   from 33 to 30, and it was the change in your title

23   to assistant rather than associate.  Were those the

24   two things that kind of made you think, "I have to

183

1    do something about this"?

2        A.    The reduction in my hours made me

3    definitely think, I better do something about this.

4        Q.    Okay.  And again, I'm just trying to make

5    sure that I am not missing any of what is going on.

6    There are a lot of dates.  So these two things

7    happened to you, your hours get reduced from 33 to

8    30; your titles change.  You thought there was

9    something about those two things, as I'm

10   understanding it, that wasn't right?

11       A.    Kosher, no.

12       Q.    So you go to the Commission Against

13   Discrimination.

14             Now, prior to doing that, did you speak

15   to anybody internally at Habit Management, about

16   feeling that you were being treated --

17       A.    No.

18       Q.    -- in a discriminatory way?

19       A.    No.

20       Q.    And can you tell me why you decided not to

21   do that?

22       A.    Internally?

23       Q.    Yes.

24       A.    I talked to Mr. Mazzoni, and there is

184

1  Linda.

2      Q.   I mean, about the reduction in hours and

3  the change in title.

4      A.   Those are my bosses, those are --

5      Q.   Did you tell them you thought that either

6  one of those things was discriminatory against you,

7  because of your race and your color, or --

8      A.   I should have, but I didn't.  I don't know

9  why, but I didn't do that.  I should have.

10     Q.   And I'm just trying to understand whether

11 you did at that point and then went to the

12 Commission.

13     A.   No, I went to the Commission.

14     Q.   All right.  So you went directly to the

15 Commission.  Now, did you ever have a conversation

16 with Mr. Mazzoni, again, prior, first, prior to

17 going to the Commission, did you ever have a

18 conversation with him where you said, "I think I am

19 treated differently by Habit Management, because of

20 my race and my color," as opposed to -- I know you

21 told me all about Mr. Eisner's comments and Warren.

22 Did you ever say, "I think this place is treating me

23 differently"?

24     A.   No.

FARMER ARSENAULT BROCK LLC

185

1       Q.    Now, when you went to the Commission and

2   you decided to file a claim against Habit

3   Management, as well as Miss Fraunfelter and Mr.

4   Eisner, did you feel, at that point, that, that the

5   company, Habit Management, had done something

6   discriminatory against you?

7       A.    I felt Habit Management never had any black

8   programmers.  It's obvious, statistically, they

9   don't have any black program directors; no black

10  business administrative assistant; no black

11  secretaries.  Yes, statistically, I do see that they

12  were discriminatory, Habit Management.

13      Q.    Because there are so few black people

14  actually working there?

15      A.    How can anybody state -- okay, yes.

16  Statistically, there are few people working there,

17  as a black, but why isn't there anybody like myself

18  who wanted to become a business administrative

19  assistant or secretary, or anything, was never

20  granted?  And it was always granted to people who

21  had no education other than a high school diploma.

22      Q.    Well, let me ask you this.  Do you know of

23  anyone, other than yourself, who's black, who was

24  refused an opportunity at Habit Management, and who

186

1  was qualified for it?

2          I know Andrea applied for a position,

3  but I don't know, she didn't receive it.

4      Q.  But you were never in a position to

5  consider all the applications for a position, were

6  you?

7      A.  Excuse me?

8      Q.  I mean, it was never part of your job to

9  consider applications for a particular position, was

10  it?

11      A.  It's not me for hiring, no.

12      Q.  So you might not know how everybody

13  compared in terms of their qualifications, right?

14      A.  Only what they told me such as what Barbara

15  told me and what Jessica told me, and it just came

16  to my knowledge, they have no experience, but they

17  were fortunate enough to be Caucasian; to be lucky

18  enough to move up in the rank.  And somebody of my

19  color, no.

20      Q.  Did Jessica Clark ever tell you that she

21  thought she got the position she got because of her

22  race?

23      A.  No.

24      Q.  Okay.  What about Barbara, did she ever say

187

1    that to you?

2        A.  No.  How many Caucasians really do?

3        Q.  You know, I can't give testimony here, so

4    I'm not going to answer that.

5        A.  No, that is fine.

6        Q.  Let's -- going back to your charge.  You

7    talk about the fact that Art Eisner had subjected

8    you to discriminatory remarks on more than one

9    occasion.

10               Now, you told me a lot already about

11   what he said that you believed was offensive and

12   discriminatory.  Were there any other comments that

13   he made that you think you haven't mentioned today,

14   that were discriminatory in nature?

15       A.  Only.  About with bombing Iraqis and get

16   rid of Arabs.  When he was talking to Warren the

17   security guard, and calling me an anus.

18       Q.  As I said, I know you told me a lot

19   already.  What I'm asking you is, is there any other

20   comment?

21       A.  No.  Oh, besides being, working at

22   Zachary's and being called black bitch.  And also --

23   that's it.

24       Q.  When we have talked about each of the times

FARMER ARSENAULT BROCK LLC

188

1  he made the comments that were offensive, I've tried

2  to ask you in connection with each time, I've tried

3  to ask you if you remember if anyone else overheard

4  the comments.  But let me ask you again, kind of in

5  a more general way.  As you sit here right now and

6  you think about it, when you think about the

7  comments he made that you found offensive, are there

8  any other individuals who you think might have

9  overheard those comments that you haven't already

10  told me about?

11      A.   Oh, Dan O'Leary heard, and being called a

12  black bitch, Fred, not Fred, Jeff, the nurse heard

13  with Art Eisner calling black bitches to me and

14  Andrea.  And he told him to get lost; get away from

15  me.

16      Q.   Okay.  Who told him to get away from him?

17  Sorry, you lost me.

18      A.   Oh, Jeff.  Jeff the nurse, he said, "Yes."

19  He came up to me and he said, "You know, I'm so

20  sorry.  I told him to get away from me."

21      Q.   And why is that?  What did he say had

22  happened?

23      A.   Art went up to Jeff and said, "How can you

24  work with these two black bitches?"

FARMER ARSENAULT BROCK LLC

189

1      Q.   Okay.

2      A.   And I just lost my train of thought.

3      Q.   Did you ever hear Mr. Eisner make remarks

4  about anyone besides you -- actually, strike that.

5          I mean, you told me he made these

6  comments about people in general.

7      A.   Can I actually say yes, there was another

8  comment and it was in front of Mr. Mazzoni, in front

9  of everybody?

10         This was a comment when -- we get what

11  do you call, you know, like First Aid, you know,

12  when you get those certificates, the First Aid.

13      Q.   Right.

14      A.   Well, a gentleman came to, came into, who

15  works in the First Aid, and he was talking about how

16  he was delivering babies and it was funny how he was

17  delivering a black woman who had a baby.  And the

18  baby came out of her, and he couldn't get over -- he

19  was going to hide the baby saying, mentioning how

20  light-skinned the baby is.  And he's like, "Oh, my

21  God, this woman was cheating on her husband."  And

22  he didn't realize the skin color would change.  And

23  Art Eisner said, "Yeah, all these dark-skinned

24  people who thinks maybe they are lighter and they go

190

1    for a different shade, that they are much better,

2    whoever is lighter skin."

3          And this was in front of Nick Mazzoni,

4    and Nick Mazzoni just stood there and quietly not

5    saying anything, other than saying, you know, "This

6    is repulsive.  Don't talk about that."

7    Q.   When was this?

8    A.   I have the certificate.  I can't remember

9    the date, but I have the certificate of First Aid,

10   and I have it in my drawer.  I just don't know the

11   date.  I can, I can --

12   Q.   Can you make a copy of that?

13   A.   Yes.

14   Q.   That would help us pin it down.

15   A.   Oh, yes, definitely.

16   Q.   So it must have been what, shortly before

17   that?

18   A.   This was when Courtney was working and it

19   was probably in November, but I have the First Aid

20   certificate there.

21   Q.   Okay.  I am going to ask you to get a copy

22   of that.

23   A.   Definitely.

24   Q.   And that will help us pin down that date.

FARMER ARSENAULT BROCK LLC

191

1        Did you ever tell Mr. Eisner to stop

2   making offensive comments to you directly?

3        A.   Many -- oh, God, especially the very last

4   day when he said, -- not the last day.

5            We were going to have this, what is it

6   -- party, at -- they did have a party at, a

7   Christmas party for, for Habit Management, Habit

8   Management's people.  And Art Eisner said, "Oh, we

9   are going to have a whole bunch of dancing womans

10  (sic) with their breasts exposed and everything."  I

11  said, "Art, knock it off with this foolishness, this

12  is awful."  And he looked at me like.  I said, "Just

13  knock it off.  Stop using body parts."  And he just

14  quiet his mouth up right away, but that's....

15       Q.   Do you remember reporting a comment that he

16  made to Mr. Mazzoni, a comment that must have had

17  some sexual connotation, I'm gathering, in December

18  of 2001?  Was that the one?

19       A.   December of 2001?

20       Q.   Yes, December of 2001.

21       A.   That was in December of 2002.

22       Q.   Okay.

23       A.   But he made, he made a gesture of

24  Zachary's, that I should be exposing --

192

1    Q.    That is what you told me before?

2    A.    Yes.

3    Q.    And you reported that to Mr. Mazzoni?

4    A.    Yes.

5    Q.    Do you know whether Mr. Mazzoni spoke to

6    Mr. Eisner about that comment?

7    A.    I can't say.  I know that my husband called

8    up.

9    Q.    Well, did Mr. Mazzoni ever tell you that he

10   had spoken to Mr. Eisner?

11   A.    No, no, no, he would never tell me.

12   Q.    Okay.  I almost hesitate to ask you,

13   because I know I have asked you that so much.  We

14   have that comment about Zachary's; you told me about

15   the conversation between Mr. Eisner and Warren; you

16   told me about Warren's comments; you told me about

17   Mr. Eisner calling you a black bitch on two

18   occasions.

19            Are there any other comments that Mr.

20   Eisner made -- let's start with him again.  Any

21   other comments that he made, that you believe to be

22   racist toward you?

23   A.    Besides blowing up Iraqis and Arabs

24   and --

193

1     Q.   Okay.  You know what, you've mentioned that

2  a few times, let me be sure that I got that.

3     A.   "Get rid of all the blacks."

4     Q.   Other than that occasion, did you hear Mr.

5  Eisner say that on other occasions about wanting to

6  blow up Iraqi?

7     A.   No.

8     Q.   All right.

9     A.   No, I can't remember right now.

10    Q.   Again, we don't want you to guess.  You

11  will have further opportunity to tell me.

12    A.   I can't remember right at this moment.

13    Q.   So you told me, at this point, anyway, you

14  believe you told me what you could remember about

15  Mr. Eisner's comments?

16    A.   Yes.

17    Q.   All right.

18          The only other question I guess I have

19  about Mr. Eisner is I notice in the charge, and I

20  don't know whether this is your decision to put it

21  this way or the decision of the intake person, but

22  you say that "More recently Mr. Eisner's

23  discriminatory actions escalated."

24    A.   At that point, yes.

194

1      Q.   What was that a reference to; what was the

2  escalation?

3      A.   It's when -- okay.

4          I noticed when Linda Fraunfelter and him

5  interacted and how she came up to me and said, "Oh,

6  I give Sheila a lot of problems and she knows it,"

7  and he turned around, "Give her hell.  Give her a

8  lot of hell."  And that following week, that's when

9  he brought up that other comment.

10     Q.   Which other comment?

11     A.   Which was on the 5th of November, "You're a

12  black bitch," when we were talking about swabbing

13  and all of that.

14     Q.   And that was the comment that you shared

15  with Dan O'Leary?

16     A.   Yes.

17     Q.   Okay, all right.

18         So there is a reference to his

19  discriminatory actions escalating.  It's the calling

20  you a black bitch?

21     A.   Yes.

22     Q.   And the comment she should give you hell?

23     A.   Yes.

24     Q.   All right.

FARMER ARSENAULT BROCK LLC

195

1              Now, what is your understanding, by the

2  way, with respect to what happened with this charge

3  of the Commission?  Do you understand it was also

4  filed at the EEOC?

5      A.   Yes, rubber stamp, I guess, that is what

6  they call it.

7      Q.   Well, do you have any understanding as to

8  whether the Commission or the EEOC investigated your

9  claim?

10     A.   I believe they did.

11     Q.   And did they come to a decision regarding

12  your claim?

13     A.   Yes.  No finding.

14     Q.   And what was the decision?  They found

15  there was no discrimination, right?

16     A.   Yes.

17     Q.   Now, at that point I gather you disagreed

18  with their finding, right?

19     A.   Definitely.

20     Q.   And you decided to file a lawsuit?

21     A.   Yes.

22     Q.   And at that point you went to Federal

23  Court, right?

24     A.   Yes.

196

1     Q.    And that was on or about July 28th, 2005, I

2     believe?

3     A.    Yes, I believe.

4     Q.    Let me ask you, before I mark that

5     complaint I'm going to mark the finding of the

6     Commission and the finding of the EEOC, so we have a

7     complete record here.  Those are Exhibits 14 and 15.

8     I'll let you take a look at them and you could tell

9     me whether you have seen them before

10          (Marked, Exhibit 14, Dismissal and

11     Notification of Rights at the MCAD.)

12          (Marked, Exhibit 15, Dismissal and

13     Notification of Rights at the EEOC.)

14     Q.    So here's Exhibit 14 and here's Exhibit 15.

15          MS. TUCKER:  And for the record,

16     Exhibit 14 is a document entitled, "Dismissal and

17     Notification of Rights from the Massachusetts

18     Commission Against Discrimination."

19     Q.    And Exhibit 15 is a Dismissal and Notice of

20     Rights from the US Equal Employment Opportunity

21     Commission, right?

22     A.    Yes.

23     Q.    Now, have you seen each of these documents

24     before?

197

1      A.   Yes.

2      Q.   And have you -- let's start with

3  Exhibit 14.

4           Did you review the memorandum attached

5  to the dismissal and notification of rights, which

6  explains why the Commission finds no probable cause?

7      A.   Uh-huh, yes.

8      Q.   And did you also review the document we

9  have marked as Exhibit 15, from the EEOC?

10     A.   Yes.

11     Q.   After reviewing the agency's findings in

12  your case, did you reconsider any part of your

13  complaint?

14     A.   We consider --

15     Q.   Right, let me rephrase the question.

16          After understanding these agencies had

17  found that there was no basis for a claim of

18  discrimination, did you reconsider your original

19  complaint?  Did you think about whether there might

20  be some part of it that you should no longer pursue?

21  Do you understand what I'm asking you?  Did their

22  findings cause you to question the original

23  complaint that you had filed in the first place?

24     A.   No.

FARMER ARSENAULT BROCK LLC

198

1  Q. So you disagreed completely with their

2 findings?

3  A. Yes.

4  Q. So after you received these findings and

5 you reviewed them, at that point you decided you

6 were going to file a lawsuit.  At that point, again,

7 just speaking from your head, what were the actions

8 that you thought Habit Management had taken, that

9 were discriminatory toward you?

10  A. Not having anybody who are of a black

11 descent working at Habit Management as being a

12 secretary or business administrative assistant;

13 cutting my hours because I went to the Commission

14 Against Discrimination, retaliation; and plus, on

15 top of it, I went into a deep depression; and having

16 Art Eisner still work there and Linda Fraunfelter,

17 who mentioned about my suicide attempt, Art Eisner

18 calling me a frigid bitch, a black bitch.  A black,

19 excuse me, not a frigid bitch; changing my title;

20 and Miss Fraunfelter with her comments, no, I don't

21 believe that what, the finding (indication), they

22 didn't even investigate like they should have.

23  Q. So the things, now, taking those things one

24 by one, you know, we start with your comment that

199

1    they didn't have black people in positions like

2    secretary.  And I believe you mentioned another

3    position, let me just finish my question.  That

4    fact, in and of itself, did you believe that that

5    showed that there was race discrimination going on

6    in Habit Management?

7        A.   Yes, yes.

8        Q.   All right.

9             Did you also believe that that fact

10   showed any other kind of discrimination such as, you

11   know, you brought a claim of national origin

12   discrimination?

13       A.   Yes.

14       Q.   Did you believe that there weren't people

15   of certain national origins in those positions --

16       A.   Yes.

17       Q.   -- showed discrimination?

18            And what was the national origin you

19   believed was being discriminated against by Habit

20   Management?

21       A.   People of black skin who are from other --

22   who are dark-skinned color.

23       Q.   I guess one of the things I am asking you

24   is do you distinguish between national origin and

FARMER ARSENAULT BROCK LLC

200

1    race and color so much or is it kind of all,

2    something to consider together?  Do you see what I

3    mean?  In other words, when you claim, for example,

4    that, as you did before, people who are black don't

5    seem to be put into these certain positions --

6        A.   Yes.

7        Q.   -- is that word interchangeable to you with

8    people of certain national origins?  In other words,

9    is the word "black" and "national origin," are those

10   pretty much the same thing in your mind?

11       A.   Oh, no, no, no.  "Origin," how I refer to

12   "origin" is their location, if they are from Mexico

13   or from India or from Africa.

14       Q.   Well, I do, too.  And what I'm asking you

15   is, do you think that people from certain national

16   origins were discriminated against?

17       A.   I never saw, like I said, business

18   administrative assistants, secretary, or medical

19   assistant, but none of them having a Puerto Rican or

20   black, especially black.

21       Q.   Okay.  So again, going back to your

22   original list of things which you believe were

23   discriminatory, that, the failure to have team,

24   people of, who were black, and the people of the

201

1   various national origins that you mentioned, in

2   certain positions, to you showed discrimination by

3   Habit Management or that was one of the things?

4       A.   Yes, yes.

5       Q.   Okay.  And then the second thing you

6   mentioned, I believe, was the, you went to the

7   reduction in your hours after you had filed the

8   complaint, and you thought that showed retaliation

9   by Habit Management?

10      A.   Yes.

11      Q.   And then you also mentioned the comments, I

12  believe, the, that Miss Fraunfelter had made, and

13  you didn't say much more about that.  But were -- I

14  mean, just now when you were telling me what you

15  thought the discriminatory actions were, you

16  mentioned the fact that Miss Fraunfelter made a

17  number of comments.  And I guess that is what I

18  wanted to ask you about.  Did she make comments that

19  you considered discriminatory; was it the suicide

20  comments or were there other comments?

21          MS. TUCKER:  Let's go off the record for

22  a second.

23          (Off the record.)

24      A.   The other comments, okay, besides her

FARMER ARSENAULT BROCK LLC

202

1  blending me and Andrea together, about Thin Mints;

2  about "Oh, I saw Sheila walking up and down.  A

3  whole bunch of men offering her" --

4      Q.  Right.

5      A.  -- "money."  Plus, since I went to the

6  Discrim -- Commission Against Discrimination, who

7  the hell do I think I am.  And also she told me --

8  that was on December 5th -- on October 31st, how I

9  mentioned how "I give Sheila a lot of problems and

10  she knows it."  And when she mentioned about -- Oh,

11  the security guard named Bill told me ahead of time,

12  before I, before I went to my dosing room he said,

13  "Sheila, be careful because Miss Fraunfelter kicked

14  you out of your desk so you could sit in a certain

15  seat, because she wants to, she wants to embarrass

16  you in a degree."  And I said, "It's okay."  So she

17  goes, "Well, I'm going to sit here and I'm going to

18  read everybody, if they get a change in, change in

19  insurance."  There was like the standard insurance

20  to a higher insurance, to a PPO insurance, if they

21  didn't have that.

22          And so Dan O'Leary started laughing and

23  he goes, "What's wrong, Sheila?"  And I said,

24  "Nothing, nothing."  And Miss Fraunfelter goes, "You

203

1    okay, Sheila, everything fine?"  And I said,

2    "Everything is fine."

3            And what happened was, actually made the

4    clients feel uncomfortable, and what is his name,

5    Chadwick, Mr. Chadwick came, told her to come out of

6    the dosing room, because she asked each one of the

7    clients, "Well, your insurance will be changing and

8    if you don't have this type of insurance, you will

9    be paying out-of-pocket."

10           So she made a lot of clients feel very

11   uncomfortable.  When one of the clients informed Mr.

12   Chadwick about it, she went up to Mr. Chadwick and

13   said, started screaming out loud, "It's all Sheila's

14   fault.  It's all her damned fault.  She did this.

15   She made sure," and then she was ready to come after

16   me and telling me off and said, "Oh, it's all your

17   damned fault," but he stopped her.

18       Q.   When was that?  When was that?

19       A.   That was the week before.  It was on a

20   Wednesday, and it, the following week of December

21   16th, of -- oh, I'm so sorry, of October 16th.

22       Q.   Of 2002?

23       A.   2002, the week before.

24       Q.   Okay.

204

1      A.   So instead of the 16th, it probably was

2  on --

3      Q.   The week of the 9th or --

4      A.   Yes.

5      Q.   Was there anything about that incident that

6  you think had to do with your race?

7      A.   No, she just wanted to get out after me.

8      Q.   Okay.  So going back to the comment about

9  the men wanting to give you money after the road

10 race.  Do you think that had anything to do with

11 your race; was that a racist comment?

12     A.   No, that was to trash me.

13     Q.   It was an offensive comment?

14     A.   Yes.

15     Q.   But it wasn't based on your race?

16     A.   No.

17     Q.   What about the --

18     A.   When she mentioned about the -- because I

19 told her I was a cheerleader, rather than mentioning

20 that I was a color guard, because I didn't want her

21 to use a joke into that.

22          And she said, "Well, it's obvious that

23 you didn't get good grades.  Dark people don't.

24 Black people don't get great grades."  I said,

FARMER ARSENAULT BROCK LLC

205

1    "Black people do get good grades," and I did.

2        Q.    And that comment, when did she make that

3    comment about --

4        A.    That was in front of Patty Champ.  And that

5    is when we had a meeting, and it was sometime in

6    October.

7              October was such a bad month, because

8    she wouldn't stop harassing me.  She was just

9    constantly belittling me and demeaning me in front

10   of my co-workers, and I don't understand that, and

11   in front of my boss, in a sense.

12       Q.    So when you are referring to your boss,

13   there, who are you referring to?

14       A.    Patty Champ.

15       Q.    At what point did she become your boss?

16       A.    She wasn't really my boss, she was actually

17   all the psychologists' boss.  I just referred to her

18   as a boss.  She was always around.

19       Q.    So she observed Miss Fraunfelter say

20   demeaning things to you?

21       A.    Yes.  And because I went up to her a few

22   times and I go, "Miss Fraunfelter is being a

23   racist."  And I said,  "What do you define as a

24   racist?"  To me, anybody who suppresses somebody,

1    who knocks somebody down constantly is a racist.

2          And then see the following week she

3    said, "Mr. Mazzoni told me to go and confront Miss

4    Fraunfelter about her racist attitude."

5       Q.   Patty said that?

6       A.   Patty, yeah.

7       Q.   Okay.  I want you to go back here.  I want

8    to make sure I understand.  This is the first time

9    you said that you believe you complained to Patty

10   about Mrs. Fraunfelter being racist.

11      A.   Being racist.

12      Q.   How many times?

13      A.   Maybe about twice the most.

14      Q.   In October of 2002 or --

15      A.   2002.

16      Q.   And Patty --

17      A.   And I did say "racist," that was my number

18   one.  Because Dan O'Leary said, "You know, she

19   really, she harassed you a lot of times."

20          I went to talk to Mr. Mazzoni, and he

21   goes, yeah, we can see Linda Fraunfelter harassing

22   me constantly, picking on me for everything, the way

23   I dress, the way I talk.

24      Q.   Okay, let me stop you right there.

207

1          When you say she picked on you a lot, do

2    you have any, but do you have any basis for thinking

3    that the picking on you is because of your race, as

4    opposed to, for example, she didn't like you for

5    some other reason?

6          A.   I believe it was my race.

7          Q.   What makes you believe that; that is what I

8    want to know?

9          A.   Because the day she mentioned about Thin

10   Mints and my color, and then when she mentioned

11   about, again, "Black people don't move up and they

12   only, they get average grades, and that's why they

13   don't go further ahead."  And then when she said, "I

14   make sure I give Sheila a lot of problems, and she

15   knows it."

16          And then when she called me a tramp,

17   referring right in front of Dan O'Leary, saying, "I

18   saw Sheila with a whole bunch of guys, but I don't

19   know anything about that, and I gave her money."

20   And then when she mentioned "I'm not a racist" and

21   "Who the hell do you think you are?  I'm not a

22   racist," and that was on November 5th.

23          Q.   But why don't you think that comment is

24   evidence that she is racist?

208

1     A.   She is an oppressive person.  She oppresses

2   somebody of a race.  She doesn't have to say "You're

3   a nigger" or "bitch" or "black," whatever, it's the

4   way she does it.  She demeans, belittles,

5   humiliates, and she doesn't give a damn.  And she

6   wants to say -- if I could have gone back in time.

7      Q.   Did you observe her do the same things to

8   Andrea?

9      A.   I wasn't around with Andrea.  Andrea worked

10   different days; she worked on Sundays and Mondays.

11   And, thank God, she wasn't really around Andrea,

12   because she was complaining about Andrea, because

13   Andrea wasn't showing up and Andrea is too fat.

14   Because Andrea, by accident, rolled over her feet,

15   and she goes, "Andrea, look how big she is."

16      Q.   Did you ever see Miss Fraunfelter around

17   anybody else who was black, other than yourself?

18      A.   What did you mean?

19      Q.   Well, did you ever observe the way she

20   conducted herself toward other black people?

21      A.   Oh, God, yeah.  When she -- oh, God, what

22   is her name?  Ray, her name was Ray.  She was a big,

23   big, black woman, very nice, very sweet hearted.

24   She is not black, she was Indian, but she was

209

1    dark-skinned and everything.  And I saw how she,

2    Mrs. Fraunfelter was coming in the room and looked

3    at Ray and ran the other way really fast.  And she,

4    Ray was like, "What was that about?"  And she was

5    just, "She is just a frigid woman, I could see that.

6    She is just a frigid woman."  And I am not, I am not

7    commenting on that.  I'm not saying a word.

8        Q.   And you inferred from that that -- well,

9    what did you infer from that, or what did you think

10   was going on?

11       A.   I don't know.  To tell you the honest

12   truth, I don't know.  I just know Ray was wonderful.

13            MS. TUCKER:  Okay let's mark this

14   exhibit.

15            (Marked, Exhibit 16, Complaint.)

16       Q.   Take a look at Exhibit 16, please.

17       A.   Yes.

18       Q.   Now, do you recognize that document?

19       A.   Yes.

20       Q.   Can you tell me what that is?

21       A.   United States District Court, and I filed

22   against Habit Management.

23       Q.   Right.  And this was your first complaint,

24   right?

210

1    A.   Yes.

2    Q.   And this was filed, you could see on the

3    top here, this was filed on July 28th, 2005; does

4    that sound accurate?

5    A.   Where is it?

6    Q.   Right at the very top here; there is a

7    notation, "Filed."

8    A.   Oh, yeah, yes.

9    Q.   Did you file this on or about that date?

10   A.   Yes, I did.

11   Q.   Okay.  And is that your signature on the

12   third page?

13   A.   Yes.  The whole thing is in my writing.

14   Q.   The whole thing is in your writing?

15   A.   Uh-huh.

16   Q.   Now, at this point, were you represented by

17   an attorney?

18   A.   No, pro se.

19   Q.   I'm going to ask you a couple of questions

20   about specific things you say in this original

21   complaint you filed.

22        If you look at the first page with your

23   writing on it, you're there, okay.

24        Do you see the line that says, "Sheila

211

1    Travers applied to be a CPA for more hours, which my

2    former boss, Janet Police agrees"?  Do you see that?

3        A.   Uh-huh.

4        Q.   You already told me what a CPA is.

5        A.   Uh-huh.

6        Q.   When you say you applied for more hours

7    there, could you tell me what you are talking about

8    there?  I know we talked about a couple of times

9    when your hours were increased.  Was there a

10   specific time when you remember applying for more

11   hours and not getting an increase in hours?

12       A.   No, no, I got an increase by Janet Police.

13       Q.   Okay.

14       A.   Her name was, who was left, what was her

15   name?

16       Q.   Miss Clark, Jessica Clark?

17       A.   Jessica, yes, Miss Clark.

18            And I requested, and Janet Police gave

19   it to me.

20       Q.   All right.

21            Now, going on here you say, "But when

22   Janet Police was fired a new boss was hired to take

23   Janet Police's job; his name was Nick Mazzoni."

24       A.   Yes.

FARMER ARSENAULT BROCK LLC

212

1    Q.    Now, you told me before that you didn't

2  know really much of anything about why Miss Police

3  left.

4              Was it your understanding that she was

5  fired?

6    A.    Yes.

7    Q.    Do you have any understanding as to what

8  the basis for the termination was?

9    A.    They wouldn't tell me.  I found out

10  afterwards, but I don't know if I found out

11  correctly.

12    Q.    Okay.  Well, what did you find out?

13    A.    I found out that there was an issue between

14  Fred Riley and Janet Police, and Mr. Mazzoni was

15  there, and I believe Penny Shield was there.  And

16  Mr. Mazzoni took notice, an event that Janet Police

17  did harm to Fred, Mr. Riley.

18    Q.    And who is Mr. Riley?

19    A.    At the time, I believe he was a

20  psychologist, a counselor.

21    Q.    Okay.

22              So your understanding is she was

23  terminated involuntarily because of something she

24  did to Mr. Riley?

FARMER ARSENAULT BROCK LLC

1    A.    Yes.  But it wasn't the first time I heard

2    that, too.  I heard that she struck somebody else,

3    and this happened in 1998, July 28th, but I could be

4    mistaken.  And there were no findings because it was

5    taken to court on July 1998 and it was dismissed on

6    December 1st, 2000.

7    Q.    Okay.  And who gave you that information?

8    A.    Oh, Penny.

9    Q.    And what is Penny's last name?

10   A.    Shield.

11   Q.    Penny Shield, all right.

12         Now, you say that after you talk about

13   Nick Mazzoni here, you say "There were many

14   positions I applied for, but he denied me for them."

15         Were there specific positions that you

16   spoke to Mr. Mazzoni about which he rejected you

17   for?

18   A.    Okay, all right.  Secretary, which I really

19   wanted.

20   Q.    Did you apply for that position?

21   A.    I actually went to Courtney to apply.

22   Q.    Did you ever speak to Mr. Mazzoni about it?

23   A.    No, because secretary is supposed to go

24   talk to Courtney.

214

1      And then I applied for the business

2   administrative assistant.

3      Q.   Who did you speak to about that position?

4      A.   Courtney.

5      Q.   Okay.  Did you ever speak to Mr. Mazzoni

6   about that position?

7      A.   I, I think I did once.  No, I don't know.

8   I remember directly with Courtney.  I don't remember

9   directly with Mr. Mazzoni, because Mr. Mazzoni was

10  just new, and I wasn't sure if he was really the

11  boss at that time.

12     Q.   So he didn't tell you that you were being

13  denied for those positions, did he?

14     A.   Oh, like I said before, Courtney and Mr.

15  Mazzoni approached me and said I could have the

16  secretary position, but the amount of money that I

17  was earning would be reduced to 7.25.

18     Q.   Did they tell you why?

19     A.   They just told me that's how it's going to

20  be.  "If you want that position, we will reduce your

21  amount of money down to 7.25."  I was making 9.10 at

22  that time.

23     Q.   So you decided not to take that position,

24  right?

1     A.   No, because of 7.25.  And what turned out,

2   Jessica --

3     Q.   Clark?

4     A.    -- Clark received a standard amount, which

5   was maybe about $11, and then when Jessica decided

6   she didn't want that job, I asked again and they

7   told me, no, Barbara was coming in and Barbara got

8   the job.

9           And then I asked for being a medical

10   assistant, I asked Miss Fraunfelter, who Miss

11   Fraunfelter told me "No, because you have to have

12   college education."  It turns out that you didn't

13   need college education, all you needed was to take

14   some classes from -- or they would teach you.  And

15   the job was open.

16     Q.   Okay.  Did Mr. Mazzoni ever reject you for

17   a particular job?

18     A.   He went along with Courtney for the

19   secretary position, which I would have less money,

20   which would be 7.25.

21           And because my earnings was 9.10 and it

22   would drop.

23     Q.   Okay.  No, I understand that.

24           Was there any position, other than that

1    one, where you were going to be getting a lower

2    salary, was there any other opening for which he

3    rejected you?

4        A.    Business administrative assistant.

5        Q.    He said you couldn't have that job?

6        A.    He didn't come up to me and deny me with it

7    or without it; he didn't say anything.

8        Q.    How do you know he had any input into it?

9        A.    Because he is the boss.

10        Q.    So your understanding is that he has input

11    into every decision about who gets what position,

12    then?

13        A.    Yes.

14        Q.    So what makes you think, did you think

15    there was something racist about the fact that you

16    were denied for those positions?

17        A.    I think because I attempted suicide, again,

18    and because I am black and because I had the last

19    name of Sheik did not help matters at all.

20        Q.    But do you think you were denied positions

21    because of your race?

22        A.    Yes.

23        Q.    And what --

24        A.    And because of my suicide attempt

217

1    collaborates together.

2        Q.    What makes you think Mr. Mazzoni would deny

3    you a position because of your race?

4        A.    Because I attempted suicide nobody in that

5    company would want somebody like me to move up

6    further.  And because of my race, there was nobody

7    in that place -- excuse me, I, excuse me.  There has

8    never been at Yarmouth any black people who are

9    business administrative assistant, for one thing.

10            The last person before Courtney was

11   Courtney's mom.  She was fired because she stole

12   money from that company.  Janet Police gave Courtney

13   the position, and Courtney did not have any

14   education in any form.  She just graduated from high

15   school and she was granted for that position, for

16   business administration.  And then after Courtney

17   decides to leave they hired Linda Fraunfelter who

18   had no college education.  I presented that I had

19   college education and nothing was perceived.

20       Q.    Now, how do you know what the different

21   educational backgrounds of Courtney and Linda

22   Fraunfelter were?

23       A.    I heard through the grapevine that.  But I

24   don't know about Linda Fraunfelter.  I knew she

FARMER ARSENAULT BROCK LLC

218

1    was -- she said she worked at a company that was --

2    oh, goodness, what was the company?  She worked for

3    an insurance company, I think that is what she told

4    me, and I think there was another company right in

5    Sandwich.

6        Q.   Oh.  Did you ever review any paperwork

7    showing her education?

8        A.   No.

9        Q.   And what about Courtney?

10       A.   No.

11       Q.   All right.

12            Did you know anything about Courtney's

13   employment background before she came?

14       A.   No, no, she just worked as being a CPA like

15   me.

16       Q.   But do you know what she did before coming

17   to Habit Management?

18       A.   No.

19       Q.   Okay.  Do you know whether Linda

20   Fraunfelter worked anywhere before working at Habit

21   Management?

22       A.   No.

23       Q.   Where did she work; do you know?

24       A.   Not exactly, I don't know where she worked,

219

1    I'm sorry.

2        Q.   You don't have any details about their

3    particular employment history, do you?

4        A.   No.

5        Q.   Now if you look at the next paragraph on

6    the complaint, you said here you complained to Nick

7    Mazzoni that your boss, Linda Fraunfelter, or, I

8    think you said, I think you said Eisner here, and

9    Warren the security guard were calling you the black

10   bitch, Indian, Arab.  I'm sorry, black and Arab,

11   should be blown up.

12           Again, I know we talked about this a

13   lot.  That reference in the complaint there, is that

14   a reference to the facts you already told me about

15   today?

16       A.   Yes.

17       Q.   I'm just trying not to make us go over this

18   unnecessarily.

19       A.   No, no, that is fine.

20       Q.   Now, one thing I notice, Miss Sheik, when

21   I'm looking at this complaint and I compare it to

22   the charge that you originally filed with the

23   MCAD --

24       A.   Yes.

220

1     Q.   -- which you could pull out if you want to,

2  as well --

3     A.   Yes.

4     Q.   -- I notice when you filed this original

5  complaint in Federal Court, that here you did not

6  complain, specifically, about the change in your job

7  title or the reduction in hours.  Here you were

8  talking about being denied positions and you were

9  talking about the comments that people made.  Why

10  didn't you include the hour reduction and the job

11  title change in your Federal Court complaint

12  originally?

13     A.   I don't know.  I should have added that on.

14     Q.   So is this an oversight?

15     A.   Oversight, and it should have been placed

16  in there.

17     Q.   Okay, all right.

18     A.   And it's not like I didn't mention to Judge

19  O'Toole about my reduction in hours or retaliation.

20  I did state that when I represented myself.

21     Q.   At this scheduling conference?

22     A.   Yes.  You were at both of them.

23     Q.   Okay.  So I'm just asking why you didn't

24  include it in your original, written complaint.

221

1      A.    I should have, and it should have been in

2   there.

3      Q.    Oh.    And at this time, you did mention the

4   word "retaliation" on the last page of the

5   complaint?

6      A.    Yes.

7      Q.    So when you filed this complaint, in your

8   mind, what were you thinking of as the retaliation

9   that Habit Management had committed?

10     A.    The retaliation -- sorry, I didn't mean to

11  overtalk you.    The retaliation was because, because

12  of December 19th, 2002, and because they cut my

13  hours again.

14     Q.    That was the reduction?

15     A.    My workload was gone, yes.

16     Q.    And you thought that was in retaliation for

17  what?

18     A.    Attending the Commission Against

19  Discrimination.

20     Q.    Was there any other action, other than that

21  reduction in hours from 30 to 27 or 28, was there

22  any other action that Habit Management took that you

23  think was retaliation, based on your having gone to

24  the Commission?

222

1      A.   Besides my reduction of hours, my workload

2   being taken away, my wage being cut down.

3      Q.   Well, that's all in connection with this

4   change in hours on December 19th, right?

5      A.   Yes.

6      Q.   Was there anything other than that?

7      A.   Yes, and then my suicide being mentioned

8   and that day with Miss Fraunfelter, and the day

9   before, Dan O'Leary and Miss Fraunfelter mentioning

10  about how dare I go to the Commission Against

11  Discrimination, who the hell do I think I am.

12     Q.   Yes, I understand that.  We have all that,

13  I think, on the record.  I'm just trying to make

14  sure we're not missing something in terms of any

15  action that Habit Management took or failed to take,

16  that you think was because you had gone and filed a

17  complaint.

18     A.   Because I went to the Commission Against

19  Discrimination.

20     Q.   Do you think we have everything on that?

21     A.   Yes.

22     Q.   All right.

23          MS. TUCKER:  Let's mark this Exhibit 17.

24          (Marked, Exhibit 17, Handwritten

FARMER ARSENAULT BROCK LLC

223

1    Complaint.)

2         Q.   I am going to ask you about Exhibit 17.

3         A.   Okay, yes.

4         Q.   Take a look at this.  This is a, let's see,

5    one, two, five-page document.

6              You recognize this document, Miss Sheik?

7         A.   Yes.

8         Q.   I'm sorry, maybe six pages.

9              Is this the amended complaint that you

10   filed with the court?

11        A.   Amended?

12        Q.   The court, the court ordered you to file an

13   amended complaint.

14        A.   Yes.

15        Q.   Is this the amended complaint?

16        A.   5/12/2006.  Yes, yes.

17        Q.   And it was filed on or about May 12th,

18   2006?

19        A.   Yes.

20        Q.   And that's your signature at the end?

21        A.   Yes.

22        Q.   Now, I assume you received notice from the

23   court that the court ruled on the motion to dismiss

24   that Habit Management filed?

224

1    A.   Yes.

2    Q.   And it granted part of it and it denied

3  part of it; do you understand that?

4    A.   Yes.

5    Q.   And do you understand that the claims that

6  the court is allowing you to pursue are the claims

7  that you brought under Title 7 for race, color and

8  national origin discrimination and for retaliation?

9    A.   Yes.

10    Q.   Now, if you look at your amended complaint,

11  I'm going to ask you to go to the page that's

12  entitled "Fax."

13    A.   Okay, fax.

14    Q.   Now, if you look at the second paragraph,

15  you say, "I filed a complaint because they

16  discriminated against me on my race, origin, my last

17  name Sheik, and they harassed me and intimidated me

18  because I attempted suicide.  I was never granted

19  for any job positions that were open, which I did

20  apply for, even though I have college education for

21  those positions."  Are those positions the ones you

22  have already told me about?

23    A.   Yes.

24    Q.   And you've told me why it is that you think

225

1    your race or your color or your national origin was

2    the reason for the denial?

3        A.    Yes.

4        Q.    Now, let's look at the next --

5        A.    And also because I attempted suicide,

6    number one.

7        Q.    Okay.

8             Look at the next paragraph.  You stated,

9    "Habit Management retaliated against me because I

10   went to the Commission Against Discrimination, and

11   cut my hours and demoted me and humiliated me by

12   using my attempted suicide."

13       A.    On December 19th, yes.

14       Q.    All right.  Well, then, you say on

15   December 19th, 2002, "Linda Fraunfelter, my former

16   boss, stated that I never was allowed to work on

17   this CPA, (even though I was working on it over a

18   year and a half).  'We don't want someone who

19   attempted suicide to work on this CPA.'"  Before we

20   go further with that paragraph, I want to go back.

21       A.    Yes.

22       Q.    All right.  You say that "Habit Management

23   retaliated against me because I went to the

24   Commission Against Discrimination."

226

1    A.    Yes.

2    Q.    And then you say, "And they cut my hours

3    and demoted me"?

4    A.    Yes.

5    Q.    When you say you were demoted, okay, what

6    are you referring to there?

7    A.    Cutting hours and not doing my workload.

8    Q.    Okay.  And that was -- okay, that was the

9    reduction which Mrs. Fraunfelter told you about on

10   December 19th, the day you went to Mr. Mazzoni and

11   then left?

12   A.    Yes.

13   Q.    The reduction in hours before that, from 33

14   to 30, that occurred in November?

15   A.    Yes.

16   Q.    That wasn't in retaliation for you having

17   been to the Commission, because you hadn't gone yet,

18   correct?

19   A.    No.

20   Q.    And that reduction, that occurred in

21   November, from 33 to 30, you stated earlier you

22   believe that was retaliatory for having complained

23   about Mr. Eisner?

24   A.    And Mrs. Fraunfelter.

227

1      Q.    And Mrs. Fraunfelter?

2      A.    Yes.

3      Q.    Okay.  And that earlier reduction, the one

4   33 to 30, you state that you thought that also was

5   related in some way to the fact that you attempted

6   suicide; is that correct or not?

7      A.    Which one?

8      Q.    That reduction from 33 to 30 hours.  Did

9   you think that your attempted suicide --

10     A.    That didn't come in that time.

11     Q.    It didn't?

12     A.    No, that was on December 19th that came in.

13     Q.    That came in, okay.

14           So the first reduction from 33 to 30,

15   the reason you were disturbed by that was because

16   you thought that was in retaliation of your having

17   complained about Mr. Eisner and Miss Fraunfelter?

18     A.    Yes.

19     Q.    Was there anything else about that

20   reduction in hours that you felt was wrong or

21   unfair?

22     A.    That's it.

23     Q.    Okay.  I just want to -- again, I'm not

24   trying to trick you, I'm trying to make sure I

228

1   understand your position.

2       A.   I understand.

3       Q.   Okay.  Now, when you say that -- because

4   you've said this at various times, you said that you

5   think the fact that you attempted suicide affected

6   how people treated you?

7       A.   Made jokes.

8       Q.   They were making jokes and -- the fact that

9   you attempted suicide, that, that's separate from

10  your race and your color and your national origin,

11  right?

12      A.   You would think.  You would think it would

13  be fine, but with being black and having an Arabic

14  name and being a suicide individual, uh-uh.

15      Q.   When you say -- I need to understand that.

16  Is there some reason that you think that the fact

17  that you attempted suicide is connected in people's

18  minds to the fact that you are black and you have

19  the last name Sheik?

20      A.   Yes.  I believe that --

21      Q.   Why do you think that?

22      A.   Okay.  I believe that it's because of my

23  suicide; that is discriminatory right there.

24  Because they used my race, such as being black, a

FARMER ARSENAULT BROCK LLC

229

1    black bitch, frigid bitch, douche bag, that is

2    dealing with my race, my color.

3         Q.   I understand that.  I understand that.

4         A.   And then on top of it, because my last name

5    is Sheik, it's origin.  It's not all collaborative,

6    but it is all quite, it's all dealing with me.

7         Q.   I understand it's all dealing with you.

8         A.   That all deals with me.  So I can't

9    distinguish when it all comes to me.  Okay, yes, I

10   attempted suicide February 2nd.

11              Yes, I was called a black bitch, a

12   frigid bitch, a douche bag, "Indians should be shot.

13   Mexicans should be.  They should wipe away Arabic,

14   blacks, they are all the same."

15              I had a nervous breakdown because of

16   this.  Nobody -- all this brought me down into a

17   deep, deep depression.  I had to seek out medical

18   attention, yes.  All that was due to retaliation,

19   because I went to the Commission Against

20   Discrimination, and the Commission Against

21   Discrimination I thought would just be there for

22   support, but, no, there was nothing, there was no

23   support, there was nothing.

24              In fact, my boss did not want me there.

230

1    Everything-- Linda Fraunfelter was fighting with

2    me.  It was so intense that no common, average

3    individual could tolerate something.  And for me, I

4    couldn't take it.  I couldn't take another day

5    somebody mentioning suicide.  I slipped into a

6    depression.

7              There everything dealt with me.  Yes, I

8    attempted suicide.  Yes, I was called a black bitch.

9    Yes, they took hours away from me.  All this

10   reflects on me.  And yes, my name is Sheik, I'm

11   Sheila Sheik.  I'm sorry, I have all these things,

12   and everything dealt with my color, my race, my

13   origin, my suicide, that's it.

14       Q.  So in some ways, in some ways, if I'm

15   following you, in some ways it's almost impossible

16   to untangle what about you is motivating somebody to

17   do something, right?

18       A.  No it, -- it's not because -- I'm saying

19   it's all, it happened.  These things happened, and

20   it, I can't change it.  What took place did happen.

21   I did go through racial events there.  I was cut

22   back because I went to the Commission Against

23   Discrimination.  Yes, yes, I attempted suicide and

24   people did make jokes about it.  I can't change what

231

1    happened.

2        Q.   No, I understand, I understand.

3        A.   And if I could, I would.  I don't want to

4    be in this predicament; I don't want to do this.  I

5    have to face it.  This is what took place, and yes,

6    I did, I couldn't get out of bed when I did leave

7    that place.

8             It wasn't right.  It wasn't -- I felt

9    like I was in a sleeping mode.  I couldn't wake up.

10   I had to seek medical attention.  I wasn't like that

11   when I attempted suicide.  For some odd reason, yes,

12   I did go back to work.  I worked and I made sure, I

13   tried to forget about it.  I couldn't, not when

14   somebody was telling me constantly that I attempted

15   suicide.  I can't, oh, God, I can't fix something

16   that I can't control.

17             And, yes, I couldn't control somebody

18   making jokes out of it.  I can't control that.  I

19   can't.

20       Q.   No, and I understand.  Take a minute and,

21   Miss Sheik, I'm not trying to make this harder for

22   you.

23       A.   That's all right.  Okay.  I can't --

24       Q.   What I'm trying --

FARMER ARSENAULT BROCK LLC

232

1       A.   I can't control somebody who wants to be

2   mean, wants to belittle somebody; wants to hurt

3   somebody.

4       Q.   Right.

5       A.   It's -- Warren, I can't control that.  It,

6   I didn't lash out to them.  I wouldn't do that to

7   somebody just because they are white or black or

8   Chinese.  God.

9       Q.   Okay.  Do you want to take a minute?  Do

10  you want to take a minute to take a couple of

11  breaths?

12      A.   I'm okay.

13      Q.   Okay.  And I guess, my last question is

14  just trying to understand.  A couple of things that

15  you said made me think that in some ways, I think

16  what you've said is that at certain points you

17  couldn't, you couldn't know, because you couldn't

18  get in someone else's head, whether they were being

19  driven by the fact that you had attempted suicide,

20  or maybe by the fact that your last name was Sheik.

21      A.   I can't understand somebody who is racist.

22  I can't understand it.

23      Q.   Or somebody who -- I mean, in some

24  instances --

233

1      A.   I can't understand somebody telling me,

2  telling me I'm a black bitch or my suicide attempt.

3  I can't understand it.

4      Q.   Right.  And in some senses you can't know

5  if someone is being, as you said, mean to you, you

6  can't know whether they are being mean to you

7  because of what they are thinking, the fact that you

8  attempted suicide, or because what they think about

9  your last name, right?  You can't get inside their

10 head, right?

11     A.   I can't understand them, plain and simple.

12     Q.   So if someone is being mean to you, in some

13 respects it's hard to know, isn't it, whether they

14 are being mean to you because of your race or

15 because of your medical history, or because of your

16 last name, right?

17     A.   Anybody who states about the color, states

18 about my suicide, they are being directly cruel for

19 that.

20     Q.   Right.  If the comment is something --

21     A.   Correct.

22     Q.   -- like black bitch?

23     A.   Yes, that deals with color.

24     Q.   Then that is a racist comment?

234

1        A.    And if it deals with the suicide attempt,

2    that deals with the suicide attempt.  And if it

3    deals with somebody who is going to do harm to me,

4    it deals with harm.

5        Q.    Right, okay, okay.

6        A.    You know, Warren, he is gone, he has left.

7              I don't know what happened to him,

8    exactly.  I don't know what happened to Janet

9    Police, exactly.  I don't know what happened to Miss

10   Fraunfelter exactly.

11             Oh, God, I'm sorry.

12       Q.    Don't apologize, take a couple of minutes;

13   that is absolutely fine.

14             In fact, I was only going to ask you one

15   more thing about your amended complaint, I had a

16   question about, because actually, I think we have

17   talked through most of what you mentioned in your

18   amended complaint.

19             You do state at the end that you are

20   seeking compensation of $5 million.

21       A.    It is whatever the judge decides and

22   whatever anybody decides.

23       Q.    My question to you is whether you arrived

24   at that by any particular formula?

FARMER ARSENAULT BROCK LLC

235

1      A.   (Indication.)

2      Q.   No?  You have to answer and not shake your

3  head.

4      A.   No.  I'm so sorry.  No, I just put the

5  money down.

6      Q.   Okay, let's talk about December 19th a

7  little bit more, because I want you to take a look

8  at this document.

9      A.   Yes, I see it.

10     Q.   If you can.

11     A.   I see it.

12          (Marked, Exhibit 18, Handwritten letter

13  dated 12/19/02.)

14     Q.   Okay, why don't we look at Exhibit 18, and

15  then we'll take a five-minute break and then we'll

16  go to 5:00 and then we will be done.

17     A.   Okay.

18     Q.   Take a look at Exhibit 18, and tell me, if

19  you would, what that is.

20     A.   My resignation.

21     Q.   It's a letter that you drafted?

22     A.   Yes.

23     Q.   Did you write that on December 19th --

24     A.   Yes.

236

1    Q.   -- 2002?

2    A.   Yes.

3    Q.   And to whom did you give it?

4    A.   I gave it to Barb -- oh, God, who did I

5    give it to?  I know I handed it to Barbara because

6    Mr. Mazzoni wasn't there, and also Linda Fraunfelter

7    wasn't there.  And the only person who was there was

8    Barbara, and also Art was there, and Verlina was

9    there.  I remember Verlina.

10   Q.   Okay.  Well, let me ask you about this for

11   a minute.  This is dated December 19th, 2002?

12   A.   Yes.

13   Q.   This is -- I don't know what day of the

14   week this was.

15   A.   That was Thursday.

16   Q.   Okay.  Let's look at what you wrote first.

17        You say, "Due to the manner in which I

18   was approached by Linda Fraunfelter, I felt

19   threatened and do not wish to work in such an

20   environment."

21        Now, right there, what are you talking

22   about when you talk about being approached by Miss

23   Fraunfelter?  What --

24   A.   It is the way she approached me and said,

237

1    "I don't think you heard me.  I don't think you

2    heard what I said.  You are not supposed to work on

3    this CPA," which she grabbed the paper out of my

4    hands, which I left.  And then when I came back, she

5    said, she said, "You are never supposed to work on

6    the CPA."  And I said, "What am I supposed to do?"

7              "Listen, we are not going to have

8    somebody who attempted suicide.  I don't know," and

9    she threw the paper down, and that is when I ran to

10   Nick Mazzoni.

11       Q.   And when was this; when did this happen?

12       A.   It happened around 10:15, 10:20, on

13   December 19th.

14       Q.   You had said earlier Mr. Mazzoni was not

15   there that day.

16       A.   Oh, no, no, no, this was when I came back

17   in the afternoon.  I came back at 5.  This was my

18   shift to finish, and I am going to finish my shift.

19       Q.   So when you're describing her --

20       A.   "Thank you," I put "Thank you" down.

21       Q.   When you describe her pulling the paper out

22   of your hands, which you said Mr. O'Leary

23   witnessed --

24       A.   Mr. O'Leary and Art was there.

FARMER ARSENAULT BROCK LLC

238

1  Q. -- that happened on December 19th, in the

2 morning?

3  A. At 10:15, 10:20, something like that.

4 Because I was going to get, which I did, I got all

5 the papers together, which deal with the swabs, and

6 I notice swabs, and I noticed there were still

7 things missing but not a whole bunch.  And I was

8 like, "Wait a minute, this is my workload."  And she

9 comes up and she goes, "I don't think you heard me.

10 I don't think you heard me.  You are not supposed to

11 do this anymore."  And she whipped it out of my

12 hands and I took off and I went out the building.

13  Dan O'Leary came to find me and I came

14 back in and I did not want to go to her office.  And

15 she goes, "Come here.  Come here."  And she said,

16 "You are not supposed to do this anymore.  Your

17 workload is taken away.  And I'm the one who's doing

18 it."  I knew right there, because my workload being

19 taken away and then she mentioned my suicide

20 attempt, I ran to Mr. Mazzoni for help.

21  Q. Did she mention to you your suicide in

22 front of anyone else?

23  A. Out loud.  It was loud enough -- Wayne was

24 in her room.

FARMER ARSENAULT BROCK LLC

239

1    Q.   It was loud?

2    A.   It was too much.

3    Q.   Do you think anybody overheard it?

4    A.   Oh, God, yes.

5    Q.   Who do you think overheard it?

6    A.   Penny.  I know that Penny overheard it.

7         Oh, my God.  It was just so loud.  It

8    was too embarrassing.  I'm sorry, I'm just going

9    to -- just strike that, I don't know.

10        To me, when I ran to Nick, Nick was

11   supposed, I thought, help me, say something, other

12   than telling me to leave, "Get out," you know.

13   Q.   You went to him on the morning of

14   December 19th, and you said, "If I don't have any

15   work, can I go," right?

16   A.   I was waiting for him before it wasn't --

17   before I even said that he said, "Well, you look

18   angry.  Well, you are angry with the wrong person."

19   And I waited for him to say something other than

20   that like, you know, "Come in.  Come to my office.

21   Let's talk about this."  Nothing was said.  There

22   was a long pause.  And all I could get out of my

23   voice was, "If I have nothing to do, can I leave?"

24   And I just didn't run out of the door, I didn't run

240

1    out the door, I waited, I stood there.  And I waited

2    for him to say something, something, other than just

3    dismissing me and looking at me.

4           He sat down, he looked at his computer

5    and he just looked at me and did this (indication).

6    And I was like, say something other than, you know,

7    I'm screaming inside.

8           THE WITNESS:  Mom, why don't you go?

9           MS. W. TRAVERS:  No, I'm okay.

10          THE WITNESS:  Are you all right?

11   Q.   So you did leave, right?

12   A.   Uh-huh.

13   Q.   And then did you come back with this letter

14   later in the day?

15   A.   Yes, I did almost.  Yes, I did.

16   Q.   Okay.  You remember giving this letter to

17   Barbara?

18   A.   Yes.

19   Q.   At any point during the day on

20   December 19th, did you talk to anybody after you had

21   spoken to Mr. Mazzoni, about what was going on?

22   A.   During that point in time?

23   Q.   During that day.

24   A.   When I left?

241

1    Q.   Right.  After you left Mr. Mazzoni's

2  office, and before you came back with this letter,

3  did you talk to anybody else about what had

4  happened?

5    A.   No.  I went home.  I went home.

6    Q.   What did you do?

7    A.   I just sat there dazed.

8    Q.   And you decided you had to quit?

9    A.   It wasn't only that I decided, emotionally

10  I was wiped out.  I didn't want to quit.  To tell

11  you the honest truth, if all this, if I could

12  backtrack everything, if nobody had called me a

13  black bitch, nobody mentioned about my suicide

14  attempt, if all these things didn't take place, I

15  would have loved to have been there.

16          If Nick just said, "Come into my

17  office," just one bloody thing, just tell me, "Come

18  into my office.  We'll talk about this.  Your hours

19  are not gone.  Everything is there."

20          Why couldn't he say that?  Was I

21  supposed to say everything?  I stood there and I

22  asked him bluntly, "If I have nothing to do, can I

23  leave?"  And I did not walk away or run away and I

24  waited and I waited.  And he just stood in his

FARMER ARSENAULT BROCK LLC

1    computer and just looked straight in, not looking up

2    and not waiting for me to say anything more.

3              And I got my stuff.  All I wanted him to

4    say, "Come into the office.  Let's talk about this."

5    What's the big deal about that?

6         Q.   When you came back with this and you gave

7    it to Barbara, did you think about trying to have

8    any further conversation with him at that point, or

9    did you decide that there was no point?

10        A.   I got scared.  I couldn't do it.

11        Q.   All right.

12             Now, are you, are you currently working,

13   by the way, are you currently employed?

14        A.   No, I'm not employed.

15        Q.   Immediately after you left Habit

16   Management, did you seek employment elsewhere?

17        A.   I was working at Barnes & Noble, but

18   unfortunately, I couldn't keep the job.

19        Q.   For what period of time were you working

20   there?

21        A.   I was working --

22        Q.   At Barnes & Noble.

23        A.   I was working once a week, and then maybe I

24   increased it maybe a couple of days, but I couldn't

243

1   function.  I couldn't do, I -- it took me hours to

2   get myself together.

3          I went into a nervous breakdown, and I

4   know it.  Because for some odd reason, I was fast.

5   I used to just do everything, get up early in the

6   mornings.  I couldn't even get up at 12:00.  The

7   hours seemed like it went by so fast, it was so

8   long.

9          I was in this state of, of a dream, and

10  I couldn't get out.  And it was a heaviness and I

11  think, I kept sleeping.  All I wanted to do was

12  sleep.  I would call them up, tell them I'm sick.

13         I came in not doing my work; not doing

14  anything properly; doing everything abnormally

15  wrong.

16     Q.  Wait, wait, wait, just stop for a minute

17  there, if you would.

18         When were you coming in and doing things

19  wrong?

20     A.  I was just in a daze.

21     Q.  Okay.  But where, what are you talking

22  about?  What period of time would this be?

23     A.  Oh, this was right after, within a week or

24  two.  Everything was going wrong; nothing was right.

244

1        Q.    After you left Habit Management?

2        A.    After I left Habit Management.

3        Q.    Okay, let's go back for a minute, though.

4    Right before you left, were you able to perform your

5    duties?

6        A.    I was --

7        Q.    At Habit Management.

8        A.    I wasn't doing great at Habit Management

9    even then.  It was, ever since I -- I remember going

10   to the walk-in center.

11              I went to the hospital on the 9th, and I

12   knew something was wrong, because I was crying each

13   day, and I, one day I, my husband come up to me and

14   he goes, "Why are you crying?"  And I didn't realize

15   that I was crying.

16       Q.    When was this?

17       A.    This was the 6th of December.

18       Q.    So this was before you left Habit

19   Management?

20       A.    Yes.

21       Q.    You were crying every day, for a while?

22       A.    I was crying quite a bit every night.  I

23   just couldn't stop.  And I didn't understand why am

24   I doing this.  This shouldn't be happening.

FARMER ARSENAULT BROCK LLC

245

1        And then --

2        Q.    When did that start?  When did the crying

3    start?

4        A.    It seemed like right in December, the first

5    week of December it was getting intolerable, and my

6    liver was killing me.

7        Q.    Let me ask you this.  Going back to the, to

8    -- the attempted suicide was in February of 2001,

9    right?

10       A.    Yes.

11       Q.    Between that and December of 2002, did you

12   have any periods of time when you suffered from

13   bouts of crying or sleep problems or --

14       A.    You know, to tell you the honest truth, no.

15   And that's the funny thing, because when you attempt

16   suicide, you would think somebody would just fall

17   apart.

18            Yes, I did fall apart because of my

19   husband going to leave me.  But when I got out of

20   it, I made, I must have thought everything wiped

21   away.  I just wiped every, my thought.  And I went

22   back to work, and I worked two jobs until September

23   something and I gave the other job up.

24       Q.    And that was Cape Heritage?

246

1    A.    Cape Heritage.

2    Q.    Right?

3    A.    I kept working, but --

4    Q.    And you got performance evaluations that

5  show that you met their expectations.

6    A.    Yes, but something happened.

7    Q.    So was it around, though, the end of 2002

8  that it started getting to be a problem?

9    A.    It was the beginning of December.  It was

10  the beginning of December.  And I knew then, I

11  thought my liver wouldn't stop paining, and I kept

12  drinking Pepto-Bismol and I kept sleeping and I

13  couldn't stop this crying bit, it wouldn't stop.  It

14  wouldn't stop.

15    Q.    Do you have any idea -- well, well, let me

16  ask you this.

17    A.    I got scared.

18    Q.    Let me ask you a question.

19          After the suicide attempt when you had

20  the issue with your liver because of the pills you

21  took, were you under a doctor's care for your liver

22  condition?

23    A.    No, no, because --

24    Q.    Not even a medical doctor?

FARMER ARSENAULT BROCK LLC

247

1      A.   No.   I stood away from everything.

2      Q.   Did you, did you have any medical treatment

3  between your, after your recovery from the attempted

4  suicide, and December 2002, no medical treatment at

5  all?

6      A.   No.

7      Q.   Well, at the time of the attempted suicide

8  you must have been admitted to a hospital?

9      A.   In the hospital, yes.

10      Q.   In which hospital?

11      A.   First Falmouth Hospital.  No, no, no, I'm

12  sorry.  Hyannis Hospital and then Boston Hospital.

13      Q.   You were at two different hospitals?

14      A.   Yes, because Cape Cod Hospital told me that

15  I was going to die in six hours, and the only place

16  was in Boston.

17      Q.   Do you remember which hospital?

18      A.   I was so sedated.  My sister was the one

19  who was there.  Even my mom, but --

20            THE WITNESS:  Do you recall --

21            MS. W. TRAVERS:  Yes.

22            THE WITNESS:  Which hospital?

23            MS. W. TRAVERS:  The one in Boston?

24            THE WITNESS:  Mommy, I don't want you in

FARMER ARSENAULT BROCK LLC

248

1    here if you are going to be that way.

2        Q.    Okay.  Well, there are a number of

3    hospitals in Boston, and I am curious if you

4    remember.

5        A.    I'm sorry, I was on high morphine and I

6    can't recall.

7        Q.    What is your sister's name?

8        A.    Dina, D-i-n-a, Travers, T-r-a-v-e-r-s.

9        Q.    That is your maiden name, right?

10        A.    It is my married name, too.

11        Q.    Travers-Sheik?

12        A.    Sheik.

13        Q.    But Travers is the name you grew up with?

14        A.    My birth name, right.

15        Q.    Is your sister married?

16        A.    She was.  She's divorced.

17        Q.    Does she go, still, by the name Dina

18    Travers?

19        A.    Dina Travers.

20        Q.    She was with you when you were admitted to

21    the hospital?

22        A.    She was there not when I attempted, when

23    I -- I don't know when she arrived.

24        Q.    You were in the hospital because of the

FARMER ARSENAULT BROCK LLC

249

1    attempted suicide?

2        A.   Yes.

3        Q.   And she came to that hospital?

4        A.   Yes.

5        Q.   And that was the hospital in Boston?

6        A.   Yes.  No, no, it was the hospital in

7    Hyannis.

8        Q.   And then were you transported from Hyannis

9    to Boston?

10       A.   Yes.  They put me in the ambulance, and....

11       Q.   Was this all on the same day, the February

12   2nd day, 2001, that you went to one hospital and

13   were taken to another?

14       A.   I can't answer that; I don't know.

15       Q.   But you were admitted to Hyannis Hospital

16   on February 2nd, 2001?

17       A.   I walked into Hyannis Hospital.

18       Q.   You were able to walk in?

19       A.   Uh-huh.

20       Q.   And you told them you had taken a lot of

21   pills?

22       A.   Yes.

23       Q.   And did they pump your stomach?

24       A.   No, I don't know what happened.  Right then

250

1    and there -- I know I vomited so much, so I guess

2    whatever I vomited came out as much as possible.

3        Q.    Do you know what you took?

4        A.    Oh, Tylenol extra strength.

5        Q.    Okay.

6              You were transported to Boston.  For

7    what period of time were you hospitalized?

8        A.    I can't answer that.

9        Q.    You don't know even in terms of days or

10   weeks?

11       A.    I can't answer that, I'm sorry.  I was so

12   sedated because they were putting -- I know I had

13   five pints of blood inside of me that they had to

14   put in.  I know they put me on high, high morphine.

15   I know one doctor told me I only have six hours to

16   live.

17       Q.    And then at some point --

18       A.    It's gone.

19       Q.    Would your sister know about --

20       A.    She knows all of it.

21       Q.    -- what happened?  All right.

22              So does she live at 7 Jonathan Lane,

23   still?

24       A.    Yes.

FARMER ARSENAULT BROCK LLC

251

1    Q.   So, obviously, you received care when you

2    were at each of the hospitals?

3    A.   Yes.

4    Q.   Now, you were released?

5    A.   Yes.

6    Q.   When you were released from the hospital in

7    Boston, you don't remember what hospital that was?

8    A.   No.

9    Q.   Do you remember where it was?

10   A.   I know it's here.

11   Q.   No, no.  I mean when you walked out of the

12   hospital, do you remember what you saw?

13   A.   Honestly I was so high on morphine, I don't

14   even know.

15   Q.   Would you recognize the name?

16   A.   No.  I know it's maybe Boston New England,

17   or --

18   Q.   New England Medical Center?

19   A.   I don't know.  I can't answer.  Dina knows.

20   Q.   Do you know, do you have any paperwork from

21   your time in the hospital?

22   A.   I can get it.  I have to ask Dina where it

23   was.

24   Q.   Well, we could follow up with you about

252

1   that.

2       A.   Okay.

3       Q.   I guess what I am most interested in right

4   now is after you left the hospital, did you have any

5   plan as to ongoing care of any kind, either for your

6   liver or emotionally?

7       A.   I was so disturbed, nothing clicked.  No

8   matter, if anybody talked to me, I was going to

9   ignore them.

10      Q.   So you didn't have any follow-up

11  appointments with doctors or anybody like that?

12      A.   No, which I should have.  No.

13      Q.   Okay.  Now, during the rest of your

14  employment at Habit Management, in other words,

15  after you came back, after the time in the hospital

16  until you left in December of 2002, it sounds like

17  you did not receive any medical treatment during any

18  part of that time, right?

19      A.   From the hospital to 2002, December 19th,

20  no.

21      Q.   Okay.

22      A.   But I did go December 16th and December

23  9th, I went.

24      Q.   Of what year?

253

1    A.    2002.

2    Q.    So before, okay, when you went on December

3    9th of 2002, you remember that?

4    A.    Yes.

5    Q.    Where did you go?

6    A.    I went to Falmouth Hospital.

7    Q.    And what did they do for you?

8    A.    I fell on ice.

9    Q.    Okay, so unrelated, though, to your liver,

10   or your emotional state?

11   A.    No, emotional state was December 12th --

12   16th.

13   Q.    Now, did you go to Falmouth Hospital then?

14   A.    I went into the walk-in center, and they

15   prescribed me some antidepressant pills.

16   Q.    And that was at Falmouth?

17   A.    No, at Hyannis at Mid Cape Walk-in Center.

18   Q.    Okay, Hyannis Mid Cape Walk-In Center?

19   A.    Yes.  You have the letter.

20   Q.    Is that the one I already have?

21   A.    You have, yes.

22   Q.    That you brought today?

23   A.    No, that is Jastaniah; that is my

24   psychiatric doctor now.

FARMER ARSENAULT BROCK LLC

254

1     Q.   Here, I was going to give the original of

2  that back to you.

3     A.   Okay, thank you.

4          This is the Falmouth Hospital one.  I

5  know you have that, but if you need it.  Here is

6  Hyannis, and this is part of Cape Cod Hospital with

7  that, and this is part of --

8     Q.   I believe we already have this.

9     A.   That one?

10     Q.   Well, why don't I take these and we will

11  make copies.  Is it your understanding that these

12  are things that you have already given me?

13     A.   Yes.

14     Q.   I think they are at -- well, so I'm not

15  going to worry about those yet.

16          I will give those back to you before you

17  leave.

18     A.   Okay.

19     Q.   Let's go back to December 16th, when you

20  went to the walk-in center at Hyannis Mid Cape

21  Walk-in Center.  What caused you to go there on

22  December 16th, 2002?

23     A.   I just fell into a deep depression.  I

24  couldn't --

255

1      Q.   Excuse me.  Do you remember what day of the
2   week it was, by any chance?
3      A.   That was on a Monday.
4      Q.   And what happened?  Did it happen in a
5   morning; did it happen at night; what do you
6   remember?  You were not working, right?
7      A.   It was in the morning; it was in the
8   morning.  No, I wasn't working, I just couldn't.
9   The reason, I just felt really, really depressed and
10  I couldn't get out of it.
11     Q.   Had that ever happened to you before?
12     A.   I think that one moment, when I attempted
13  suicide.
14     Q.   Well, that was probably because of what
15  happened with your husband, right?
16     A.   Yes.
17     Q.   So when this happened on December 16th, did
18  you have any idea why you were feeling this extreme?
19     A.   Because of Habit Management.  I just
20  couldn't get out of a depression, and with, knowing
21  that the security guard wanted to do harm to me;
22  knowing that Janet Police approached me on the 5th
23  of, December 5th, knowing that.
24     Q.   Hold on, Janet Police was gone.

FARMER ARSENAULT BROCK LLC

256

1      A.    Not Janet Police, I mean, Linda

2    Fraunfelter, what she said to me, and it just, it

3    rattled me, I couldn't take it anymore.  And the

4    doctor has, I don't -- the doctor there told me to

5    leave Habit Management.  And I told him, "No way,"

6    that was my only means.

7      Q.    Which doctor was that?

8      A.    It says right there.  I think his name is

9    Dr. Barry.

10      Q.    Which one of these?

11      A.    Oh, no, no, no, not that one, the very

12    first one.  That one right there.

13      Q.    Okay.

14            MS. TUCKER:  Why don't we mark this if

15    we are going to talk about it.  Would you mark that,

16    please.

17            (Marked, Exhibit 19, Mid Cape Medical

18    Center record.)

19      Q.    All right.  Take a look at Exhibit 19.

20    Would you please identify that for the record for

21    me.  What is Exhibit 19?

22      A.    This is my medical record that I went to,

23    which is the Mid-Cape Medical Center, and that was

24    on the 12/16/02, for being under severe stress.

257

1       Q.   I'm trying to read the doctor's writing

2   here, and under "Chief complaint" it does say

3   "stress."  I am not seeing anything in his notes

4   that refers to your work.

5       A.   Oh, yes, right there.  "Events at work."

6       Q.   I see, oh, okay.  Yes, thank you.

7            All right.  So he has "Events at work,"

8   and then under that it says, "Stress, increase in

9   heartburn."

10      A.   My liver was affecting me.

11      Q.   "Nightmares, insomnia.  Possible urinary

12  tract infection" I guess he has.

13      A.   Yes.  My stomach was killing me.

14      Q.   Now, is your recollection that he told you

15  not to go back to work?

16      A.   Yes, he told me not to go back.  He said,

17  "Why should I put you on medication when the whole

18  problem is your work that's causing you the

19  problem?"  And I said, "No way."  I needed this job.

20  "This is my only means of money."  And this was my

21  full-time job, at that time.

22           And so he goes, "Well, I'll put you

23  under, but you really should get out of here."

24      Q.   And what is the medication he prescribed to

FARMER ARSENAULT BROCK LLC

258

1    you?

2        A.    Paxil.

3        Q.    Paxil.

4            And that was on December 16th, right?

5        A.    Yes.

6        Q.    Now, did you take, did you think about

7    taking any time off from work at that point?

8        A.    I took a week off.  I fell on my back and

9    there is that week off.  I never took vacation or

10    anything.

11        Q.    Okay.

12            So when, after this conversation with

13    the doctor on December 16th, were you concerned

14    about whether you would be able to go in and do your

15    work?

16        A.    I was forcing myself.  I didn't even think

17    about this idea of being under depression or

18    anything.  I wanted to go back to work.

19        Q.    The doctor that you saw here, you mentioned

20    his name, and I don't know why I am having trouble

21    finding it on here; is it on here somewhere?

22        A.    Yes, it should be there.

23        Q.    There is a Dr. Barry identified as your

24    primary care doctor.

259

1     A.   Uh-huh, that is Dr. Barry.  And he is the

2  Mid Cape Walk-in Center, that is where I go to.

3     Q.   Okay, so is that Dr. --

4     A.   Barry.

5     Q.   That is the same Dr. Barry that is

6  identified on this other emergency center report.

7  Do you mind if we mark this as well?

8     A.   Go right ahead.

9          MS. TUCKER:  Okay, let's mark the

10  emergency center report as well.

11     Q.   Do you know Dr. Barry first name?

12     A.   No, no.

13          (Marked, Exhibit 20, Mid Cape Emergency

14  Center Report.)

15     Q.   Miss Sheik, we have marked as Exhibit 20

16  another document that you have produced entitled

17  "Emergency Center Report."  It's two pages, dated

18  February 2nd, 2001, and there is a doctor identified

19  on this form as Dr. Curtis G. Barry, M.D.

20     A.   Yes.

21     Q.   And he is identified as your primary care

22  physician.  Was he your primary care doctor at the

23  time?

24     A.   Yes.

260

1    Q.   Did you see Dr. Barry at any point between

2  February 2001 and December 2002?

3    A.   Between 12/16 of '02, no, I stopped going.

4    Q.   Okay.  But when you walked into the walk-in

5  center, did he just happen to be there, or did you

6  know that your primary care physician was at the

7  walk-in center?

8    A.   It was a coincidence.  I didn't expect him.

9    Q.   Okay.  Well, going back to December of

10 2002, you said that you woke up feeling extremely

11 depressed on December 16th?

12   A.   Yes.

13   Q.   And you attribute the depression to your

14 work environment?

15   A.   Yes.

16   Q.   But you decided that you could --

17   A.   I was going to fight it.

18   Q.   -- keep working.

19   A.   Because if someone could attempt suicide,

20 they can still force themselves, and I didn't

21 realize what type of depression I was in.

22   Q.   Okay.  Well, after you did leave Habit

23 Management on December 19th, 2002, what happened

24 with respect to your health?

FARMER ARSENAULT BROCK LLC

261

1      A.    I wasn't emotionally there.  I could not

2   reason.  I could not -- I couldn't get up.  I

3   couldn't do the things that I was supposed to do.

4   And no matter how hard -- I was so sick inside.

5      Q.    Now, for how long did that go on, that

6   feeling?

7      A.    That lasted quite a while.  And I mean, it

8   was a deep depression.  I tried to get out of it.  I

9   tried to reason, you know, it's just, it's just a

10  feeling of a nightmare, and I couldn't get out of

11  that mode, so....

12     Q.    Did you seek any treatment for this

13  emotional distress?

14     A.    Yes, I did, I went to see Dr. Yoon, and

15  this is it.  So Dr. Jastaniah.

16           MS. TUCKER:  All right, why don't we

17  make a copy.  This will be the next exhibit.

18           (Marked, Exhibit 21, Letter dated

19  1/11/07.)

20     Q.    Okay.  Taking a look at what has been

21  marked as Exhibit 21, which is a letter from Dr.

22  Jastaniah to Judge O'Toole, dated January 11th,

23  2007, can you tell me for the record when you first

24  saw Dr. Jastaniah?

FARMER ARSENAULT BROCK LLC

262

1      A.   It was in November.

2      Q.   And I'm looking at his letter, and the

3  first sentence of the letter says that you had been

4  a client of Cape Cod Human Services since February

5  12th, 2003?

6      A.   Yes.

7      Q.   Who did you see when you first came to Cape

8  Cod Human Services in February of 2003?

9      A.   Dr. Yoo.  He is a forensic psychiatric

10  doctor.

11      Q.   Do you know his first name?

12      A.   I can't pronounce it, Keshon (phonetics)

13  Yoo.

14      Q.   Do you know how to spell it?

15      A.   No.

16      Q.   So you first went to see him in February of

17  2003?

18      A.   Yes.

19      Q.   Between December 16, 2002, when you saw Dr.

20  Barry in the walk-in center, and February 12th of

21  2003, did you see anybody, any doctor?

22      A.   I called Dr. Yoo the beginning of January

23  and it took me a month to have, to get an

24  appointment with him.  I heard that he was the best,

263

1    though.

2        Q.    Now, when you started seeing Dr. Yoo, how

3    many times were you seeing him; was that once a week

4    or --

5        A.    It turned out first being once a week, and

6    then it turned to twice a month, and then it turned

7    out to be once a month, and that went on for three

8    and a half years.

9        Q.    Starting in February of 2003 until November

10   of 2006?

11       A.    Yes.

12       Q.    And at that point, you started seeing Dr.

13   Jastaniah?

14       A.    Yes, when Dr. Yoo departed and went to his

15   new location.

16       Q.    And you've agreed to sign releases that

17   would enable us to see Dr. Yoo's and Dr. Jastaniah's

18   records, right?

19       A.    Yes.

20       Q.    We do have some releases I will ask you to

21   sign before you leave today.

22       A.    Okay.

23       Q.    Do you believe their records would

24   accurately reflect your emotional health for the

264

1    period of time that you saw him?

2        A.   Yes.

3        Q.   Let's go back.   I had started to ask

4    you --

5            Do you want to take a five-minute break,

6    or do you want to go to 5:00?

7            THE WITNESS:   Are you okay?

8            MS. W. TRAVERS:   Yes.

9        Q.   What I would like to know is what

10   employment you held since you left Habit Management.

11           Now, I know you told me a brief period

12   of time --

13       A.   Barnes & Noble.

14       Q.   A brief period of time you were working at

15   Barnes & Noble one day a week, but I want to make

16   sure I am not missing any information.

17           When did you first have some employment

18   after Habit Management; was that Barnes & Noble?

19       A.   Barnes & Noble.   I was working Barnes &

20   Noble previously with Habit Management, which was

21   once a week.

22       Q.   When did you start that job?

23       A.   2001.

24       Q.   Do you remember what month?

265

| | | |
|---|---|---|
| 1 | A. | I would say September. |
| 2 | Q. | After you stopped working at Cape Heritage? |
| 3 | A. | Yes. |
| 4 | Q. | And that was once a week? |
| 5 | A. | Once a week. |
| 6 | Q. | For how many hours? |
| 7 | A. | About six -- six to eight hours. |
| 8 | Q. | Do you remember what your hourly pay was |
| 9 | there? | |
| 10 | A. | $8. |
| 11 | Q. | That continued even after you left Habit |
| 12 | Management? | |
| 13 | A. | Yes. |
| 14 | Q. | Was there any break in your employment at |
| 15 | Barnes & Noble? | |
| 16 | A. | April 30th, and that was it. |
| 17 | Q. | What do you mean, "April 30th"? |
| 18 | A. | What do you mean, "break"? |
| 19 | Q. | Well, you said you stared working in |
| 20 | September of 2001, once a week? | |
| 21 | A. | Yes. |
| 22 | Q. | Did you stop working there once a week at |
| 23 | some point? | |
| 24 | A. | We increased it, and I wasn't coming in to |

FARMER ARSENAULT BROCK LLC

266

1    work.

2       Q.   Well, when you say "we increased it," what

3    do you mean?

4       A.   They increased the hours for, say, twice a

5    week, and then three times a week.

6       Q.   When was that?

7       A.   It was like the end of January, beginning

8    of January, something like that, end of January.

9       Q.   What year?

10      A.   2003.

11      Q.   Okay.  So you left Habit Management

12    December 19, 2002?

13      A.   Yes.

14      Q.   Barnes & Noble, you have a job there; how

15    many times a week at that point?

16      A.   About twice in January, and then it

17    increased to three, and then it stayed at three

18    days.

19      Q.   Okay.  And how long did you keep doing that

20    work at Barnes & Noble?

21      A.   For about, without calling in -- I was

22    calling in all the time during those times.

23      Q.   What do you mean you were calling in?  You

24    were calling in to what?

FARMER ARSENAULT BROCK LLC

267

1    A.   Sick, I couldn't come in.

2    Q.   But you were still employed there?

3    A.   Yes, I was employed until they got fed up

4 with me.

5    Q.   When did that happen?

6    A.   April 30th.

7    Q.   Of 2003?

8    A.   Yes.

9    Q.   Now, after the employment at Barnes & Noble

10 ended, did you have any other employment?

11    A.   Not until internship, which was at Filene's

12 Basement.

13    Q.   When was that?

14    A.   Oh, it was last month.

15    Q.   Meaning December '06?

16    A.   Yes, December 6th.

17    Q.   And now --

18    A.   That is over with.

19    Q.   Now, when you say an internship.

20    A.   Oh, because I had my -- I worked, I had my

21 Fisher College.

22    Q.   So have you been attending classes at

23 Fisher College?

24    A.   Once a week.

268

```
 1        Q.   For what period of time?  Since 2004, or
 2   could you tell me?
 3        A.   2003.  But most of the time they were
 4   on-line.
 5        Q.   The class was on-line and you didn't have
 6   to actually go?
 7        A.   No, so it made it convenient.
 8        Q.   Was this human resource?
 9        A.   Now, it is mostly on-line, yes, human
10   resource.
11        Q.   Other than the work at Barnes & Noble, the
12   month at Filene's Basement and the class at Fisher
13   College, did you spend any time, between
14   December 19th, 2002 and the present, employed
15   somewhere?
16        A.   No.
17        Q.   Did you try to obtain employment anywhere?
18        A.   I wanted to, but emotionally I wasn't fit
19   to do so.  I was always not feeling well.  Not
20   feeling --
21        Q.   Not feeling up to the process?
22        A.   Not feeling normal.
23        Q.   Even though you were in treatment for the
24   emotional disturbance?
```

FARMER ARSENAULT BROCK LLC

269

1    A.    Yeah.  But it -- there is a difference by

2  taking medication and not taking medication, and I

3  wanted not to take medication when I go back to

4  work, and it, it just didn't make me feel -- I

5  wasn't feeling normal, because I had a depression.

6  And the medication made it better, but I wasn't

7  feeling myself, just the same.

8    Q.    Have you been on antidepressants since

9  December of 2002?

10    A.    I have been on antidepressants since 2002.

11    Q.    When you went to the walk-in center for

12  stress, in December of 2002 and you were prescribed

13  Paxil, I believe?

14    A.    Paxil, yes.

15    Q.    Have you been on an antidepression

16  medication of one kind or another ever since then?

17    A.    I have been on a few different medications.

18    Q.    And I am assuming those medications would

19  be reflected in the records of the doctors you told

20  us about.

21    A.    Oh, God, yes, yes.

22    Q.    Has there been any change in your emotional

23  state since December of 2002?

24    A.    It's better, it's much better.

270

1    Q.    When did you start feeling it was better?

2    A.    Maybe about a year ago.

3    Q.    And in what way did you feel it was getting

4 better?

5    A.    It's just a nicer feeling; not a suppressed

6 feeling.  It's just better.  It's a better, clear

7 thinking and it's -- I still have the depression

8 that comes up, and I will still do my crying and

9 stuff, but it's not as bad and heavy loaded.

10    Q.    And when it started feeling lighter, did

11 that make you feel that it would be, that you would

12 be able to --

13    A.    Maintain.

14    Q.    --seek employment again?

15    A.    Very soon.  I would love to.  I would love

16 to.

17    Q.    How did the employment at Filene's Basement

18 go?

19    A.    It went nicely.

20    Q.    Did you have any problems during that

21 period of employment?

22    A.    There were some episodes, but not with

23 people or anything.  It was just, it was just, maybe

24 because of Christmas it was tough.

FARMER ARSENAULT BROCK LLC

271

1    Q.   What were you doing there?

2    A.   Just retailing, and they were just showing

3  me around and everything.  It wasn't nothing major,

4  and cashiering.  But it was so basic, but it was a

5  very, very stressful event.  And just making sure I

6  am always there.  But my problem is, and I can see

7  it, and it is bad, I have something that I never did

8  before.  I was always fast.  I was always on time.

9  I have a problem with timing.  I have to be an hour

10  ahead of time or I'll be 15 to 20 minutes late, all

11  the time.  And that's not me.

12          There is that.  There is something that

13  happened in my brain, and it's slow, and she's

14  (indication), always telling me how slow I am, and

15  I, I can't seem to get out of this slowness.

16          When I worked at Habit Management, I was

17  always there on time.  There was not -- there was

18  only, excuse me, one time I was written up, and I

19  did have car problems, but the other times, no.  I

20  would get out of bed instantly.  There was no issue

21  about me getting out of bed.  I'm slow, and there is

22  something, and it's not age, I am 41 years old, I

23  should be fine and get up, no issue, but there is

24  something not right.

272

1    Q.   When did that start, the feeling of being

2    slowed down?

3    A.   That started right after -- it was the next

4    day, December 20th, 2002.  I went to bed, couldn't

5    -- it was abnormal.  This is one thing I can't, I

6    would never want anybody to feel, because I can't

7    get out of me and it's the slowness.  And I hate it

8    with a passion, and I want it to change.

9    Q.   Do your doctors tell you that it will

10   change?

11   A.   Who knows.

12   Q.   Is that what they say?

13   A.   It could change and it might not never

14   change.  And that is one thing that I can't get out

15   of me and I want it out.  There is something like, I

16   want to get back to who I used to be, but there is,

17   and -- I can't see it, and I'm trying, because I was

18   always late to Filene's Basement.  That is the only

19   problem.  I was every single day late.  And I am

20   doing this dazing.  And like here, making it here, I

21   was an hour early.  I was at --

22   Q.   The Federal courthouse?

23   A.   Yes.  And I made sure I was there, we were

24   45 minutes early, and I didn't care.  I had to be

273

1    there, and anyplace if I have to make an

2    appointment, it has to be earlier.

3        Q.    Okay.  Now, other than that issue that you

4    described pretty thoroughly about timing, other than

5    that, do you feel that you could handle things

6    pretty well?

7        A.    I am slow, okay?  So there is the slowness.

8    I am slow, and that is the biggest issue.  And even

9    when I worked at Filene's Basement, and it's a

10   disturbance to me, there is something, and they

11   noticed it, and it disturbs me with a passion,

12   because that is not me.  That wasn't me in the past

13   and now I guess that is me now.

14       Q.    Okay.  Do you ever collect unemployment

15   benefits?

16       A.    No.

17       Q.    You applied for them and they were denied,

18   right?

19       A.    No, they weren't denied, I didn't want -- I

20   notice they weren't denied, and I could have gone

21   back, but for some odd reason I couldn't go back.  I

22   couldn't face Linda Fraunfelter; I couldn't face Mr.

23   Mazzoni.

24       Q.    Let me ask you a question.  Either it was

274

1    denied or granted; what happened?

2        A.   It was granted.

3        Q.   You received unemployment?

4        A.   No, no, no.

5        Q.   What happened?

6        A.   We were supposed to have another meeting, I

7    didn't do it.

8        Q.   "We" being who?

9        A.   Mr. Mazzoni, Mrs. Fraunfelter.  Because the

10   last time we were there, they were there, and I

11   couldn't do it.  I was just not -- I wasn't even in

12   the right state of mind there, then.

13       Q.   Okay.  So you never received any

14   unemployment benefits?

15       A.   No.

16       Q.   Did you receive any kind of financial

17   support from any source other than --

18       A.   Yes, here.

19       Q.   Other than unemployment and the jobs you

20   told me about?

21       A.   Yes.

22            Right here in a second.

23       Q.   Okay.  Why don't we mark this which you

24   have produced, it's two pages.  Are they separate or

275

1    the same document?

2        A.   Same document.

3             (Marked, Exhibit 22, Document from

4    Social Security Administration.)

5        Q.   Okay.  Can you tell me, Miss Sheik, what

6    Exhibit 22, which you brought with you today, could

7    you tell me what that is?

8        A.   My Social Security that I was granted.

9        Q.   In what amount?

10       A.   When I first -- on 12/05 was -- oh, at

11   6/2/05 was 856 and then it was granted 12/2/05, 891.

12       Q.   Are you currently getting Social Security

13   benefits?

14       A.   Yes, I am, to this day.

15       Q.   How often do you get those benefits?

16       A.   Once a month.

17       Q.   In what amount are you getting them now?

18       A.   921.

19       Q.   Now, are you -- let me make sure I

20   understand your testimony about employment.  Are you

21   in a position where you believe you can seek some

22   employment?

23       A.   Not at this moment, because I am slow.

24   That's the one issue that I'm having, getting,

1   trying to get out of.  And once I get out of that,

2   yes, I would love to seek employment.

3        Q.   Did you apply for any positions which you

4   were rejected for?

5        A.   No.

6        Q.   After Habit Management, Inc.?

7        A.   No, I haven't even applied for nothing.

8        Q.   I think I just asked you this.

9             Do you have any other source of income

10  other than the Social Security?

11       A.   Oh, I get food stamps.

12       Q.   You do get food stamps?

13       A.   Yes.

14       Q.   And is that once a month as well?

15       A.   Once a month.

16       Q.   In what amount?

17       A.   156.

18       Q.   Do your parents help you financially?

19       A.   No.

20            MS. W. TRAVERS:   No.

21       Q.   I have to ask you the questions, do either

22  your mother or father, I'm sorry, your father is

23  deceased.

24       A.   That is fine.

277

1    Q.    Does your mother work?

2    A.    No, she is retired; she is 72.

3          MS. TUCKER:  Off the record.

4          (Off the record.)

5          MS. TUCKER:  Back on the record.

6    Q.    Have you sought medical treatment from

7    anyplace other than the doctors you've already

8    identified for me?

9    A.    No.  I do go for Dr. McCarthy for my back.

10   Q.    But that's not related in any way to your

11   employment, is it?

12   A.    No, nothing at all.  Oh, God, no.

13   Q.    I think the releases that we have will

14   suffice to allow us to obtain the records from Dr.

15   Yoo, and Dr. --

16   A.    Jastaniah.

17   Q.    -- Jastaniah.  And I will give those to you

18   after we are done.  I just have a few more

19   questions, so let's finish with those, and then I

20   could show you the releases.

21         I want to mark four documents, but don't

22   worry, we are not going through every page.  The

23   first thing I want to mark is Defendant's First Set

24   of Interrogatories to Plaintiff.

278

1              MS. TUCKER:  After that we can mark

2    Defendant's First Request to Produce Documents.

3              (Marked, Exhibit 23, Defendant's First

4    Set of Interrogatories to Plaintiff.)

5              (Marked, Exhibit 24, Defendant's First

6    Request to Produce Documents.)

7        Q.   Okay, Miss Sheik, I'm going to show you

8    Exhibit 23 and Exhibit 24.

9        A.   Yes.

10       Q.   Those should look familiar to you.

11       A.   Yes, they do.

12       Q.   Did you receive those interrogatories and

13   that request for production of documents?

14       A.   Yes, I did.

15       Q.   From Habit Management, Inc., or from me as

16   counsel for Habit Management?

17       A.   Yes.

18       Q.   Did you do your best to respond to those

19   requests?

20       A.   I did, but unfortunately, Dr. Yoo did go

21   away and my source of getting information seemed to

22   disappear.  But when I went to Jastaniah, then

23   everything came back, but I saw him on the November,

24   different date.

279

1      Q.   So you had some difficulty obtaining all

2  the medical records?

3      A.   All the medical.

4      Q.   Other than the medical records, do you

5  believe you provided all the information you have

6  that is responsive to the questions that are

7  contained in Exhibits 23 and 24?

8      A.   Most of it, yes.

9      Q.   Let me ask you --

10         MS. TUCKER:  I would like to mark this

11  document.

12         (Marked, Exhibit 25, Handwritten

13  requests.)

14      Q.   Okay, Miss Sheik, if you take a look at

15  Exhibit 25, do you recognize that document?

16      A.   Yes.

17      Q.   And that is your writing, isn't it?

18      A.   Yes, it is.

19      Q.   It is a multi-paged document in your

20  handwriting, and it starts with the words "Request

21  Number 1."

22      A.   Yes.

23      Q.   This is my question.  Was this your

24  response to the Request for Production of Documents,

280

1    which has been marked as Exhibit 24, or to the

2    interrogatories marked as Exhibit 23?  And I'll tell

3    you, I just, in looking at your handwritten

4    responses, I wasn't sure, frankly, whether you were

5    responding to the Request for Production of

6    Documents, or to the interrogatories, so maybe you

7    could help me understand that now.

8         A.   It was on this one (indication).

9         Q.   Could you please say which exhibit number

10   that is.

11        A.   Where is it?

12        Q.   Bottom sticker.

13        A.   Defendant's Request for Production of

14   Documents, and Exhibit Number --

15        Q.   It's on the bottom.  What is the sticker

16   number we just put on?

17        A.   Oh, 24.

18        Q.   So Exhibit 25 contains your responses to

19   the Request for Production of Documents that we have

20   marked as Exhibit 24, right?

21        A.   24, yes.

22        Q.   So my next question is, look at Exhibit 23

23   for a minute, the interrogatories.

24        A.   Yes.


FARMER ARSENAULT BROCK LLC

281

1    Q.    I don't believe you sent something

2    additional in response to these, did you?

3    A.    I thought I did.  I don't know.

4    Q.    I don't believe we have anything from you

5    that answers these questions under oath.  We have

6    what you have written in Exhibit 25, and to some

7    extent what you provided in --

8    A.    Okay, yeah.  I don't know what took place.

9    I thought I had everything.

10    Q.    Well, let me just ask you.

11    Do you remember ever writing answers?

12    As you look -- take a moment --

13    A.    I must have.

14    Q.    Take a moment.  Okay, look at Exhibit 23,

15    and think with me for a minute.  Do you remember

16    answering these interrogatories, because I don't

17    think we received copies of answers to these

18    interrogatories, other than we received what we

19    marked as Exhibit 25, which contains a lot of

20    information, some of which is responses?

21    A.    I should have sent it, but -- I know I did,

22    but I just don't understand why there is nothing.

23    Q.    Well, could you take a look and see if you

24    have anything?  If you had sent it, would you have

282

1    something?

2        A.    Not on me.

3        Q.    Would you have something at your house?

4        A.    I would, yeah.  I just don't remember --

5    this has been a while ago, hasn't it?

6        Q.    It has.  And --

7        A.    1/17/07?  Oh, this is the sticker.

8        Q.    No.  But because you filed this, you gave

9    us this longhand written response that we have

10   marked as Exhibit 25, it was unclear, frankly,

11   whether you meant here to be responding, in part, to

12   the interrogatories.

13       A.    Oh, no.  I, I thought I did this one.

14       Q.    Do you think you did separate answers to

15   that one?

16       A.    I know I did.

17       Q.    Okay.  Well, I would like you to take a

18   look and see if you have any copy of answers.

19       A.    Oh, I don't have it with me.  No, there is

20   nothing.  I've got just general things such as Dr.

21   Jastaniah, employment hours.

22       Q.    Okay, that's okay, we don't need to know

23   that right now.

24       A.    And all the other things that I gave you.

283

1      Q.   Well, let me ask you this, because I have

2   one other document, and maybe this is what you think

3   the answers to interrogatories are.

4             MS. TUCKER:  Let's mark that.

5             (Marked, Exhibit 26, Answers to

6   Interrogatories.)

7      Q.   The last document I have to ask about is

8   what we have marked as Exhibit 26.

9             As you might remember --

10     A.   Okay.

11     Q.   You might remember from our last court

12  appearance, we thought that you filed this as an

13  opposition to the motion to dismiss, but was this

14  something else?  Is this your answers to the

15  interrogatories?

16     A.   I think so; this is it.

17     Q.   All right, just so I understand.  Do you

18  think this is the other document you are

19  remembering?

20     A.   Yes, this is it with my grades, yes.

21     Q.   All right.  So Exhibit 26 is your Answers

22  to Interrogatories?

23     A.   Yes.

24     Q.   Just give me one minute.

284

1          What I'd like to do is have you take a

2    look through Exhibit 25 first, which is your

3    responses to your Request for Production of

4    Documents.

5          I'd like you to take a look through it

6    and take a few minutes, we have the time.  I just

7    want you to look through it and tell me if you see

8    anything in here, now that you have spent the whole

9    day talking about it, that you think is inaccurate

10   or incomplete, or that you would like to tell me

11   more about.

12      A.   Well, what I said all day today has been

13   accurate.

14          It's accurate.  Yes, that's accurate.

15      Q.   Tell me when you are through the whole

16   thing.  I just want to know if you see anything that

17   looks inaccurate or incomplete.

18      A.   It's accurate.

19      Q.   So you looked through Exhibit 25 and you

20   believe it to be accurate?

21      A.   Yes.

22      Q.   And I'm sorry, these pages aren't numbered,

23   so I wanted to ask you, though, about a page that is

24   in the middle where you are talking about Warren the

285

1   security guard.  Can you see, find that page?  It

2   says at the top that "Warren would shout out loud

3   and say, 'The Indians don't belong here.'"  That is

4   the page I'm talking about.

5       A.   Now, you said --

6       Q.   The page, it's Exhibit 25.

7       A.   25, yes.

8       Q.   And there is a page that has a lot of

9   statements about Warren the security guard.  It's in

10  the middle, maybe more to, a little bit more towards

11  the end.

12      A.   Okay.  Warren started saying --

13      Q.   Okay.  Do you have that page?

14      A.   Yes.

15      Q.   Okay, this is what I want to ask you about.

16           If you look at the paragraph in the

17  middle, you're talking about Warren and Art Eisner,

18  and you are saying that they both mention -- I'm

19  going to just read it here, quote, "About black

20  people, how they are nothing but niggers, and they

21  would scream out loud and call me a black bitch,"

22  closing quotes.  Now, we talked about the black

23  bitch comments.  Were there other times when Warren

24  or Art Eisner called you a nigger?

FARMER ARSENAULT BROCK LLC

286

1    A.   No.  They called me black bitch big time.

2    Q.   Do you recall them calling you nigger as

3 well?

4    A.   They did call me nigger, but it's just --

5 they kept saying things.  If it's not a black bitch,

6 it was a black bitch or a nigger.

7    Q.   But do you remember hearing a comment

8 directed at you by Warren or Art Eisner, where they

9 told you that you were a nigger, or talked about

10 black people?

11    A.   That was with Kara Johnson.

12    Q.   So did Warren ever look at you and call you

13 a nigger?

14    A.   No.

15    Q.   Okay.  What about Art Eisner, did he do

16 that to you?

17    A.   He called me black bitch.

18    Q.   Right, and we talked about that, but did he

19 ever call you a nigger?

20    A.   Not directly to my face.

21    Q.   Okay.  Did you ever hear Warren or Art

22 Eisner call other people niggers?

23    A.   Yes, I heard that in the hallway.

24    Q.   When did you --

FARMER ARSENAULT BROCK LLC

287

1     A.   But I didn't see who they were directing it

2   to.

3     Q.   When did you hear that; do you remember

4   that?

5     A.   When I was walking into the room there was

6   Art Eisner and there was Warren together.

7     Q.   Was this the dosing room?

8     A.   No, it was in the middle section.  This is

9   when you are entering.  But I was coming from the

10   lobby and I was walking around and I heard them say

11   that, but it was like, who were they talking to?  I

12   didn't see the person, so, and it -- if it is me, so

13   be it.

14     Q.   And they might have been talking to each

15   other?

16     A.   Uh-huh.

17     Q.   Okay.

18     A.   Oh, they were definitely talking to each

19   other.

20     Q.   So you don't know whether anybody else was

21   around them other than you overhearing it?

22     A.   No.

23     Q.   Well, again, you have had a chance to look

24   through this.

288

1     A.    Uh-huh.

2     Q.    And my sense, looking through this, is that

3   we have talked about all the incidents that you

4   mention in here.

5         Do you see anything in here that is

6   incomplete?  You said there was nothing that is

7   inaccurate, right?  I'm just trying to avoid having

8   you come back here, Miss Sheik, and so I just want

9   to know whether you think there is anything else you

10  need to tell me other than what is in here and what

11  we talked about already today?

12    A.    No.  There are so much things.

13        Oh, yeah.  Bill, that was his name, the

14  security guard, in the dosing room, with Lynn

15  Fraunfelter.

16    Q.    And you state here that Bill, the security

17  guard, mentioned that he overheard Linda Fraunfelter

18  say she enjoyed watching you get nervous.

19    A.    Nervous, with --

20        That is with Dan O'Leary.  Those two

21  would always chat together, and....

22    Q.    And did you think that comment about

23  enjoying watching you get nervous had something to

24  do with your race or national origin?

FARMER ARSENAULT BROCK LLC

289

1    A.    She just hated me, that woman, that is how

2    I felt.  It was like -- because I constantly went to

3    -- because I went to Miss Patty Champ, right then

4    and there, everything went worse.  And that was like

5    in October, and the whole October month was bad.  It

6    was getting so incredibly hard, and November was

7    worse.

8              December, forget it.

9    Q.    What was it that was getting worse?

10   A.    The comments were getting much worse.

11   Q.    By whom?

12   A.    By Miss Fraunfelter; by Warren, and -- but

13   Miss Fraunfelter was really at me.  And Art Eisner.

14   And then Dan O'Leary.  He was like friend and foe.

15             And especially that last week when he

16   was telling the clients about the day that I almost

17   -- he didn't say that I attempted suicide, that on

18   February 2nd, 2002 -- we are repeating the same

19   thing, I'm sorry.

20   Q.    No, that's okay.  And like I said before, I

21   know you have told me a lot about each of those

22   incidents.  All I want to know at this point is

23   whether you can think of anything you haven't

24   already told me about.  I think you have explained

290

1    the others quite clearly.

2        A.   It might be, but to tell you the honest

3    truth it is going to continue with the same things

4    that hit me in the head so much.

5            Besides, okay, let's say when, okay,

6    with Art Eisner, giving the wrong card to Rosa, and

7    say, which was meant for Frazier.  And I felt that I

8    was being blamed for it.  Not felt, I was being

9    blamed for giving the card.  And Linda Fraunfelter

10   wanted to get, you know, say it was all my fault,

11   and it wasn't me who handed the cards.

12       Q.   When was this?

13       A.   It is over the summertime.

14       Q.   2002?

15       A.   Yes.  Is it was more like August that this

16   took place.  And she confronted -- well, she did it

17   wrong.  And I told, I went up to Nick and said,

18   "Let's do ourselves a favor to find out who really

19   did this event.  Let's go and talk to the client."

20           And when Nick knew I wasn't fooling

21   around and we're going to talk to the client, that's

22   when, that's when he said, "Never mind.  I know who

23   did it."  And it was Art Eisner who handed the wrong

24   card and was actually referring that I did it.

291

1                There was another event --

2        Q.   Well, let me ask you, that whole event, did

3   you think that had anything to do with your race or

4   your color?

5        A.   I think they really wanted me out, simply

6   because of all the events that was taking place.

7                Deep down, everything that was being

8   blamed onto me, if it wasn't, if it wasn't the card,

9   it was the UA, and because one of the nurses, she,

10  by -- to me, it was by accident, but she blamed it

11  on me, that I gave her the wrong UA.

12       Q.   Which nurse blamed that on you?

13       A.   She's an older nurse.  She has been working

14  there longer, and I can't remember her name offhand,

15  right at this moment.

16       Q.   So you thought a lot of things were being

17  blamed on you that shouldn't have been blamed on

18  you?

19       A.   Well, that shouldn't be blamed on me,

20  because I marked the cup.  And then Dan O'Leary

21  said, "You're the one who picked it up."  He stood

22  up for me and said, "No, Sheila marked the cup.  She

23  placed it in the room, which was proper.  She picked

24  up the wrong cup."

FARMER ARSENAULT BROCK LLC

292

1    Q.    Okay.

2    A.    And they were going to get rid of me and

3    the nurse said, "It's all my fault.  It's all my

4    fault.  Blame it on me."  I said, "It's a mistake, a

5    terrible mistake, but it's a mistake."

6    Q.    We are just about done, by the way.  One

7    question I do have.  When you decided to go to the

8    Commission Against Discrimination in November 2002,

9    why was it that you decided not to complain about

10   comments made by Miss Fraunfelter?

11   A.    I did.  I did.  I went to Patty Champ.  I

12   went to Nick, and it didn't seem that Nick was

13   listening to --

14   Q.    No, that's not what I meant.  When you

15   actually did go to the Commission, why didn't you

16   include anything in your complaint, the one that you

17   filed, about comments made by Miss Fraunfelter?

18   A.    I was saying so much, and I guess the woman

19   just wasn't writing enough.  And I wanted everything

20   to be down, and I think what I was saying, what I

21   kept saying, it was too much.

22             She wrote whatever she thought was

23   enough, enough.  And I was going on and on, and

24   unfortunately, the woman couldn't put it down, and

293

1   she just condensed it to her satisfaction.  And she

2   was telling me how, the way I said it, that I

3   committed suicide, and "No, honey, it was, you

4   attempted suicide."  And I said things wrong, but it

5   wasn't wrong, it was just that I didn't say it

6   properly.  And I said so much.

7      Q.  Did you have an investigative conference at

8   the MCAD; do you remember that hearing?

9      A.  Yes.

10      Q.  Do you remember who your investigator was,

11   by any chance?

12      A.  No.

13      Q.  All right.  We'll have that in the record,

14   that's okay.

15      A.  Yes.

16      Q.  Okay.  Let me just take one minute and I

17   think we are done.

18         Okay.  I'm going to take one more look

19   at my papers here and see if there is anything else

20   I need to ask you.

21         I guess one thing I want to confirm with

22   you, Exhibit 26, which you believe is your response

23   to your interrogatories?

24      A.  Yes.  Yes, okay.

294

1        Q.    If you just take one look at that.

2        A.    (Witness complies.)

3        Q.    Could you pull that out?

4        A.    Yes.

5        Q.    Now, could you also pull out Exhibit 23,

6     which are the interrogatories, the questions?

7        A.    (Witness complies.)

8              Yes, right here.

9        Q.    Oh, all right.

10             The way you've submitted this

11    information, I can't really follow interrogatory by

12    interrogatory, because you haven't identified your

13    information as being answers.  You see that, right?

14       A.    Yes, I see what you're saying.

15       Q.    What I would like to do, is rather than

16    keep you longer here today, what I would like to do

17    is take a look at this, now that I understand that

18    you submitted this in response to that.

19       A.    Uh-huh

20       Q.    I would like to take a look at these two

21    documents, and ask that, to the extent that I have

22    questions that I think still aren't answered, then

23    we could reschedule a shorter deposition just for

24    the specific purpose of going through those

295

1    questions.  Would that be acceptable?

2        A.   That would be great.  That would be

3    wonderful.

4        Q.   Okay.  And then I think if we do that, I

5    think that makes the most sense in terms of

6    efficiency.  I just wanted to understand whether you

7    intended this to be your responses.

8        A.   Yes.

9        Q.   And then if you do, I think it makes sense

10   for me now to sit down with those two things side by

11   side, and if I think there are still questions that

12   aren't answered, we could reconvene.  It would be a

13   shorter deposition, and it would be just based on

14   the information that I think we still don't have,

15   and that I think you might have.

16       A.   Okay.  That would be great.

17       Q.   All right.  And the other thing we want to

18   do is just ask the doctors, now, for the information

19   that they have, and so I am going to ask you to sign

20   releases before you go, that allows them to produce

21   the records.

22       A.   Okay.

23       Q.   At that point we may or may not decide to

24   take some testimony from the doctors, okay?

296

1       A.   Okay.

2       Q.   All right.

3            MS. TUCKER:   So the deposition is

4   suspended for the purpose of my review of what the

5   Plaintiff has identified as her answers to

6   Defendant's interrogatories, and the deposition will

7   be resumed for the purpose of asking questions about

8   Plaintiff's Answers to Defendant's First Set of

9   Interrogatories, and any other remaining factual

10  items at that time.

11            (Time ended 4:48 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

297

1           CERTIFICATE OF COURT REPORTER

2                I, Patricia A. Bucko, Registered

3     Professional Reporter, do certify that the

4     deposition of SHEILA MAE TRAVERS-SHEIK, in the

5     matter of Sheik v Habit, on January 17, 2007, was

6     stenographically recorded by me; that the witness

7     provided satisfactory evidence of identification, as

8     prescribed by Executive Order 455 (03-13) issued by

9     the Governor of the Commonwealth of Massachusetts,

10    before being sworn by me, a Notary Public in and for

11    the Commonwealth of Massachusetts; that the

12    transcript produced by me is a true and accurate

13    record of the proceedings to the best of my ability;

14    that I am neither counsel for, related to, nor

15    employed by any of the parties to the above action;

16    and further that I am not a relative or employee of

17    any attorney or counsel employed by the parties

18    thereto, nor financially or otherwise interested in

19    the outcome of the action.

20

21    _Patricia A. Bucko_____    January 26, 2007

22    Patricia A. Bucko, RMR

23

24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SHEILA MAE TRAVERS-SHEIK, )<br><br>Plaintiff, )<br><br>v. )<br><br>HABIT MANAGEMENT INSTITUTE (sic), )<br><br>Defendant. ) | C.A. No. 05-11631 GAO |

## AFFIDAVIT OF MALCOLM J. GORMLEY

I, Malcolm J. Gormley, provide this affidavit based on personal information and knowledge and hereby depose and state:

1.    I am over the age of twenty-one (21) and give this affidavit of my own free will.

2.    I have personal knowledge of all facts stated herein and am competent to testify as to all facts stated herein.

3.    I am currently the Director of Human Resources at Habit OPCO, Inc., which bought Habit Management, Inc. in 2006. I have held my position as Director of Human Resources since 1991. In or about 1997, I drafted HMI's Employee Handbook. Since 1997, I have updated several different policies within the Handbook, but some policies have remained essentially unchanged since 1997.

4.    HMI does not keep hard copies of Handbook versions that have been revised. Attached hereto at Exhibit A are relevant excerpts of the Habit OPCO Employee Handbook dated October 27, 2006, which is the most recent version. The Employee Handbook contains, among other things, a comprehensive Anti-Harassment Policy and a Problem Resolution Procedure for employees who believe they have been mistreated. (Ex. A., §§ 703, 718). These policies provide employees with a specific mechanism to complain about harassment or any

other grievances that they may have.  Although the attached Employee Handbook is dated in 2006, sections 703 and 718 have remained substantially the same since 2001.

5.      While Travers-Shiek was employed at HMI, I met her on several occasions when I visited the Yarmouth facility to discuss general benefits with employees.  Additionally, Travers-Shiek called me on the telephone once or twice to ask questions about her benefits. Travers-Shiek never made any complaints to me regarding any type of harassment she had experienced, or to anyone else at Human Resources.  If she had, we would have a specific record of it, and we do not.

6.      In addition, HMI has specific policies about how to apply for transfers or other jobs within HMI.  Travers-Shiek never formally applied to the Human Resources Department for an internal transfer or promotion for which she was denied.

Signed under the pains and penalties of perjury this 12th day of July, 2007.

Malcolm J. Gormley

Firmwide:82731830.1 050742.1002

# Habit OPCO

# Employee Handbook

**10/27/2006**

HMI 085

# Habit OPCO
# Employee Handbook

## Table of Contents

**No. Policy**                                                         **Page**

INTRODUCTION
020   Employee Welcome Message
040   Introductory Statement
051   Employee Acknowledgement Form

EMPLOYMENT
101   Nature of Employment                                             1
102   Employee Relations                                               2
103   Equal Employment Opportunity                                     3
104   Business Ethics and Conduct                                      4
105   Hiring of Relatives                                              5
107   Immigration Law Compliance                                       6
108   Conflicts of Interest                                            7
110   Outside Employment                                               8
114   Disability Accommodation                                         9
116   Job Posting and Employee Referrals                               10

EMPLOYMENT STATUS & RECORDS
201   Employment Categories                                            13
202   Access to Personnel Files                                        15
203   Employment Reference Checks                                      16
204   Personnel Data Changes                                           17
205   Introductory Period                                              18
208   Employment Applications                                          19
209   Performance Evaluation                                           20

EMPLOYEE BENEFIT PROGRAMS
301   Employee Benefits                                                21
305   Holidays                                                         22
306   Workers' Compensation Insurance                                  23
308   Time Off to Vote                                                 24
309   Bereavement Leave                                                25
311   Jury Duty                                                        26
312   Witness Duty                                                     27
313   Benefits Continuation (COBRA)                                    28
314   Educational Assistance                                           29
315   Paid Time Off (PTO)                                              32
316   Health Insurance                                                 34

HMI 086

# Habit OPCO
# Employee Handbook

| | | |
|---|---|---|
| 317 | Life Insurance | 35 |
| 318 | Short-Term Disability | 36 |
| 320 | 401(k) Savings Plan | 37 |
| 324 | Employee Assistance Program | 38 |
| 326 | Flexible Spending Account (FSA) | 39 |
| 380 | Liability Insurance Coverage | 40 |

**TIMEKEEPING/PAYROLL**
| | | |
|---|---|---|
| 401 | Timekeeping | 41 |
| 403 | Paydays | 42 |
| 405 | Employment Termination | 43 |
| 408 | Pay Advances | 44 |
| 409 | Administrative Pay Corrections | 45 |
| 410 | Pay Deductions and Setoffs | 46 |

**WORK CONDITIONS & HOURS**
| | | |
|---|---|---|
| 501 | Safety | 47 |
| 502 | Work Schedules | 48 |
| 504 | Use of Phone and Mail Systems | 49 |
| 505 | Smoking | 50 |
| 506 | Meal Periods | 51 |
| 507 | Overtime | 52 |
| 508 | Use of Equipment and Vehicles | 53 |
| 510 | Emergency Closings | 54 |
| 512 | Business Travel Expenses | 55 |
| 514 | Visitors in the Workplace | 57 |
| 516 | Computer and E-mail Usage | 58 |
| 517 | Internet Usage | 59 |
| 518 | Workplace Monitoring | 61 |
| 522 | Workplace Violence Prevention | 62 |
| 526 | Cell Phone Usage | 64 |

**LEAVES OF ABSENCE**
| | | |
|---|---|---|
| 601 | Medical Leave | 65 |
| 602 | Family Leave | 67 |
| 603 | Personal Leave | 69 |
| 604 | Educational Leave | 71 |
| 605 | Military Leave | 72 |
| 607 | Pregnancy-Related Absences | 73 |

**EMPLOYEE CONDUCT & DISCIPLINARY ACTION**
| | | |
|---|---|---|
| 701 | Employee Conduct and Work Rules | 74 |

HMI 087

# Habit OPCO
# Employee Handbook

| | | |
|---|---|---|
| 702 | Drug and Alcohol Use | 75 |
| 703 | Sexual and Other Unlawful Harassment | 76 |
| 704 | Attendance and Punctuality | 77 |
| 705 | Personal Appearance | 78 |
| 706 | Return of Property | 79 |
| 708 | Resignation | 80 |
| 710 | Security Inspections | 81 |
| 712 | Solicitation | 82 |
| 714 | Drug Testing | 83 |
| 716 | Progressive Discipline | 84 |
| 718 | Problem Resolution | 85 |

MISCELLANEOUS

| | | |
|---|---|---|
| 800 | Life-Threatening Illnesses in the Workplace | 87 |
| 806 | Suggestion Program | 88 |
| 890 | False Claim Act and Healthcare Fraud and Abus | 89 |

HMI 088

# Habit OPCO
# Employee Handbook

## 703 Sexual and Other Unlawful Harassment

Habit OPCO is committed to providing a work environment that is free of discrimination and unlawful harassment. Actions, words, jokes, or comments based on an individual's sex, race, ethnicity, age, religion, or any other legally protected characteristic will not be tolerated. As an example, sexual harassment (both overt and subtle) is a form of employee misconduct that is demeaning to another person, undermines the integrity of the employment relationship, and is strictly prohibited.

Any employee who wants to report an incident of sexual or other unlawful harassment should promptly report the matter to his or her supervisor. If the supervisor is unavailable or the employee believes it would be inappropriate to contact that person, the employee should immediately contact the Human Resources Director or any other member of management. Employees can raise concerns and make reports without fear of reprisal.

Any supervisor or manager who becomes aware of possible sexual or other unlawful harassment should promptly advise the Human Resources Director or any member of management who will handle the matter in a timely and confidential manner.

Anyone engaging in sexual or other unlawful harassment will be subject to disciplinary action, up to and including termination of employment.

**HMI 165**

# Habit OPCO
# Employee Handbook

## 718 Problem Resolution

Habit OPCO is committed to providing the best possible working conditions for its employees. Part of this commitment is encouraging an open and frank atmosphere in which any problem, complaint, suggestion, or question receives a timely response from Habit OPCO supervisors and management.

Habit OPCO strives to ensure fair and honest treatment of all employees. Supervisors, managers, and employees are expected to treat each other with mutual respect. Employees are encouraged to offer positive and constructive criticism.

If employees disagree with established rules of conduct, policies, or practices, they can express their concern through the problem resolution procedure. No employee will be penalized, formally or informally, for voicing a complaint with Habit OPCO in a reasonable, business-like manner, or for using the problem resolution procedure.

If a situation occurs when employees believe that a condition of employment or a decision affecting them is unjust or inequitable, they are encouraged to make use of the following steps. The employee may discontinue the procedure at any step.

1. Employee presents problem to immediate supervisor after incident occurs. If supervisor is unavailable or employee believes it would be inappropriate to contact that person, employee may present problem to Human Resources Director or any other member of management.

2. Supervisor responds to problem during discussion or after consulting with appropriate management, when necessary. Supervisor documents discussion.

3. Employee presents problem to Human Resources Department if problem is unresolved.

4. Human Resources Department counsels and advises employee, assists in putting problem in writing, visits with employee's manager(s), if necessary, and directs employee to Appeals Committee for review of problem.

5. Employee presents problem to Appeals Committee in writing.

6. Appeals Committee reviews and considers problem. Appeals Committee informs employee of decision and forwards copy of written response to Human Resources Department for employee's file. The Appeals Committee has full authority to make any adjustment deemed appropriate to resolve the problem.

**HMI 174**

# Habit OPCO
# Employee Handbook

Not every problem can be resolved to everyone's total satisfaction, but only through understanding and discussion of mutual problems can employees and management develop confidence in each other. This confidence is important to the operation of an efficient and harmonious work environment, and helps to ensure everyone's job security.

**HMI 175**